IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:17-CV-37

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* TARYN HARTNETT, and DANA SHOCHED,<br><br>        Plaintiff,<br><br>    v.<br><br>PHYSICIANS CHOICE LABORATORY SERVICES, DOUGLAS SMITH, PHILIP MCHUGH AND MANOJ KUMAR,<br><br>        Defendants. | **APPENDIX IN SUPPORT OF THE UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DEFENDANT MCHUGH** |

**VOLUME III - TABLE OF CONTENTS**
**(EXHIBITS 65-82)**

| Ex. No. | Description | PDF Page No. |
|---|---|---:|
| 65 | Deposition Excerpts of Alan Campbell | 2 |
| 66 | Deposition Excerpts of Orlando Florete | 15 |
| 67 | Deposition Excerpts of John Grove | 25 |
| 68 | Deposition Excerpts of Sankar Jayachandran | 29 |
| 69 | Deposition Excerpts of John Johnson | 38 |
| 70 | Deposition Excerpts of Chris Kemp | 93 |
| 71 | Deposition Excerpts of Manoj Kumar | 105 |
| 72 | Deposition Excerpts of Gregory Masimore | 126 |
| 73 | Deposition Excerpts of Phillip McHugh | 139 |
| 74 | Deposition Excerpts of Joe Munden | 173 |
| 75 | Deposition Excerpts of John Nickels | 177 |
| 76 | Deposition Excerpts of Mark Roth | 195 |
| 77 | Deposition Excerpts of Yunus Shah | 205 |
| 78 | Deposition Excerpts of Marcus Sowinski | 220 |
| 79 | Deposition Excerpts of Jeff Thomas | 232 |
| 80 | Deposition Excerpts of Joe Wiegal | 255 |
| 81 | Deposition Excerpts of Anna Winger | 265 |
| 82 | Deposition of Joe Strickland | 275 |

```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                   CHARLOTTE DIVISION
              CIVIL FILE NO. 3:17-CV-37
       (CONSOLIDATED WITH CIVIL FILE NO. 3:17-CV-46)
```

```
_____ )
UNITED STATES OF AMERICA ex rel.     )
TARYN HARTNETT, and DANA SHOCHED,    )
                                     )
            Plaintiff,               )
                                     )          DEPOSITION OF
    vs.                              )
                                     )          ALAN CAMPBELL
PHYSICIANS CHOICE LABORATORY         )
SERVICES, DOUGLAS SMITH, PHILIP      )
MCHUGH and MANOJ KUMAR,              )
                                     )
            Defendant.               )
_____ )
```

On Tuesday, October 6, 2020, commencing at 9:05 a.m., the deposition of Alan Campbell was taken on behalf of Plaintiff at the U.S. Attorney's Office, 227 West Trade Street, Suite 1650, Charlotte, North Carolina, and was attended by Counsel as follows:

APPEARANCES:

```
          KATHERINE T. ARMSTRONG, ESQ.
          Assistant United States Attorney
          227 West Trade Street, Suite 1650
          Charlotte, North Carolina  28202
          on behalf of the Plaintiff


          BO CAUDILL, ESQ.
          MATTHEW M. VILLMER, ESQ.
          Weaver, Bennett & Bland, PA
          196 North Trade Street
          Matthews, North Carolina  28105
          on behalf of the Defendants


ATTENDING:      Cathleen Hollowell, Investigator

REPORTED BY:    Dee Anna Michaels, CVR-M, CCR
                ASHEVILLE REPORTING SERVICE
```

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
                    ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 2 of 283

1  to every Board I've been on.  The one I have
2  right now, we're talking about adding some
3  advisors in the way of, you know, bringing a
4  different speciality to the Board that we
5  don't currently have or knowledge base.
6  Q  Do you recall a speciality or knowledge base,
7  if any, Avery Chapman brought as an advisory?
8  A  I don't.
9  Q  How about Bob Smith?
10 A  Bob Smith I do.  The man was a legend.  He had
11 a long history with Jack Welch.  He helped
12 American Express International open.  He was a
13 true advisor to the Board that brought a lot
14 of just knowledge about running companies.
15 Q  Was he any relation to Doug Smith?
16 A  I have no idea.  And Marcus had his father-in-
17 law as an advisor, yeah.
18 Q  Did his father-in-law have any particular
19 skill or expertise?
20 A  He was -- he was CEO, I believe of two Fortune
21 500 companies and brought a lot of experience
22 to the Board.
23 Q  You mentioned earlier that there were some
24 tensions between Board members, can you
25 elaborate on that for us?

1  A  You know, other -- they didn't get along.  I
2  mean, they -- they just didn't get along with
3  each other.
4  Q  Are you aware of why they didn't get along?
5  A  Not -- not truly.  I mean, other than what I
6  saw and they just got offended by each other's
7  comments, and that's what I know.  They had a
8  deeper history but I don't really know it.
9  Q  Do you just recall from your tenure any
10 specific issues that caused tension between
11 the Board members?
12 A  Tensions around bringing in advisors for
13 selling the company is something I do remember
14 that we had different opinions on who it is we
15 wanted to use to represent us as an investment
16 bank when we went out to try to sell the
17 company.
18 Q  In your capacity as VP did you attend Board
19 meetings?
20 A  Yes, I did.
21 Q  All of the Board meetings?
22 A  The majority of the Board meetings.
23 Q  Aspirationally all of them?
24 A  Yes.
25 Q  And how frequently did the Board meet?

1  A  Quarterly, I believe.
2  Q  Going back to the start of PCLS.
3  A  Sorry.  I can't hear you.
4  Q  Sorry.  Yes, the scraping is getting so much
5  louder.  Going back to your beginnings with
6  PCLS in 2012.  I think you had mentioned that
7  the company was owned by Doug Smith, Marcus
8  Sowinski and Phil McHugh; is that correct?
9  A  And Joe Wiegel.
10 Q  And Joe Wiegel.
11 Yeah.  When I got there he had ownership in
12 the company.
13 Q  What was Doug Smith's day-to-day role in the
14 company when you joined in 2012?
15 A  He did not have a day-to-day role in the
16 company.
17 Q  What was his role?
18 A  He did some business development basically
19 that I'm knowledgeable of, but that's -- I
20 just remember him bringing a few different
21 interested parties in some of their products
22 and things like that to the company for us to
23 look at.  I probably interacted with him maybe
24 once or twice a month.  So I didn't really see
25 him very often, except at Board meetings.

1  Q  Do you recall any specifics about the products
2  or the other interested products he brought?
3  A  It's been a few years.
4  Q  Sure.
5  A  He had some sort of testing that he was trying
6  to develop for early identification of cancer
7  -- female cancers.  That's -- I can't remember
8  anything else at moment.
9  Q  Did PCLS ever get into the business of cancer
10 detection or diagnostic testing?
11 A  Not along those lines.  We ended up doing a
12 clinical trial, or -- or getting into a
13 clinical trial for a -- I can't remember.
14 Prostrate or bladder cancer type of -- genetic
15 type of trial that we were looking at and
16 developing a test for it.
17 Q  Did the company ever develop a test that it
18 marked and sold?
19 A  No.  When we were closing down I believe some
20 of that went to Vanderbilt and I don't know
21 what happened with it.  The gentleman that was
22 working on that I believe went to Vanderbilt.
23 Q  Did Doug Smith's role change at any time while
24 you were at PCLS?
25 A  Like I said, he just -- he wasn't very

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com

1  of that type of experience they did not have
2  when I came to the company. They -- they did
3  have, and Joe Wiegel especially, the clinical
4  side of the lab. He was a laboratory expert.
5  Q  And did you have higher work experience in
6  healthcare regulatory and compliance areas?
7  A  As chief financial officer of two different
8  home care companies and a outpatient therapy
9  center and other physician practices, I'd had
10 a lot of exposure to compliance and -- in my
11 role as chief financial officer.
12 Q  In your role as CFO with companies prior to
13 PCLS were you familiar with rules and
14 regulations pertaining to billing the Medicare
15 program?
16 A  Yes.
17 Q  I'm sure that's something that comes up in
18 home health ---
19 A  Yes.
20 Q  --- is that correct?
21 A  Frequently.
22 Q  Were you familiar with the anti-kickback
23 statute ---
24 A  Yes.
25 Q  --- before you joined PCLS?

1  A  Yes.
2  Q  And in your compliance rule did you put on any
3  trainings for PCLS employees or personnel?
4  A  Yes. And when I started the majority of our
5  sales force was outsourced and we put a
6  program in place for not just our in-house but
7  for our outsource sales force to be trained in
8  compliance as well because I felt like that
9  was an exposure for the company. That's why I
10 brought Jane Pinewood in, to be honest. So we
11 put a lot of time, energy and effort putting
12 training programs together for the outsource
13 sales force, as well as our inside. We
14 eventually went from majority outsource to 85
15 percent in-house, hired sales team and built a
16 sales team inside because it was an exposure
17 we did not feel comfortable with.
18 Q  And just tell us what you mean when you say
19 outsourced sales team.
20 A  They were contracted to provide the sales
21 service rather than employed by us as part of
22 our team.
23 Q  Were they, I guess, paid 1099?
24 A  There were some -- yes. Yeah, they were all
25 1099 contract. Yes.

1  Q  Got you.
2  A  Some were groups, some were individuals.
3  Q  Tell me what you mean when you say some were
4  groups.
5  A  We would contract with a sales -- or had
6  contracts with a sales group that had maybe 10
7  or 15 independent contractors working for it.
8  So they were already covering the market for
9  things like cardiovascular and had -- had
10 relationships in the market. And so, we would
11 contract with them to present our products to
12 those folks that they were already out there
13 talking to.
14 Q  Do you recall any of the specific concerns you
15 had when you joined the company about using
16 this type of outsourced sales team?
17 A  Just like anybody else would, they're not your
18 employees. So, you know, we stiffened up the
19 training because we felt like they really
20 needed to hear from us and they needed to
21 agree to abide by our rules and protocols. We
22 did understand what kickbacks were and we did
23 not want referrals coming into us because they
24 were not doing things ethically or legally.
25 so we really worked hard to make sure that

1  that did not occur, or if so, that it was on
2  -- on their own that they did those things,
3  and if we ever found out we would remove them.
4  Q  Did you ever have to remove an outside sales
5  force member for what you considered to be a
6  violation of the kickback statute?
7  A  Not for a violation of the kickback statute,
8  but maybe violation of some of our own
9  internal policies. I don't remember
10 specifics, but I do remember we asked a few
11 and separated from a few.
12 Q  Do you recall what policies they had violated?
13 A  I don't. It might simply have just been on
14 the relationships with the people that they
15 were bringing to the table we didn't really
16 feel like were adhering to our protocols or
17 something like that.
18 Q  And when you say relationships, do you mean
19 relationships between the sales rep and a
20 referring practice?
21 A  Yeah. We represented -- physician samples
22 were brought in from 40 plus states. And so,
23 if there was something that we saw that we
24 didn't like, we would investigate, and if we
25 didn't like it we would ask them, and if they

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 4 of 283

```
 1      didn't like it we asked them to leave.  So if
 2      they didn't want to exit that relationship, we
 3      just exited with them.
 4   Q  Did PCLS have written policies or procedures
 5      pertaining to anti-kickback statute?
 6   A  Yes.
 7   Q  Can you tell us about those?
 8   A  And online training.
 9   Q  Great.  Tell ---
10   A  CodeMap was an outsourced company that we
11      used.  I can't remember their attorneys that
12      worked with them.  But through CodeMap we did
13      online training that was required every year
14      for all the employees to be a part of, and
15      contractors.
16   Q  Did owners also participate in that training?
17   A  Yes.  Yeah, I actually brought in compliance
18      experts to work with the Board and do training
19      sessions with the Board as well.
20   Q  Do you recall about on how many occasions you
21      had compliance experts come in and do that?
22   A  It was at least annually.  It wasn't that many
23      years, so a couple of times.
24   Q  Right.  We're talking about 2013 through 2016
25      probably?
```

```
 1   A  Yes.
 2   Q  Do you recall any of the specific topics that
 3      the Board received training on?
 4   A  The generalities around anti-kickback training
 5      on -- I don't remember all the specifics, but
 6      it was your traditional canned sort of
 7      training package that you would use for your
 8      employees every year.  We just did it
 9      specifically to the Board.
10   Q  Going back to an earlier line of questions.
11      When you joined the company in 2012 what was
12      Joe Wiegel's role specifically?  His day-to-
13      day responsibilities?
14   A  They had -- they were each presidents of
15      something and I don't remember what.  Marcus'
16      I did remember because I worked a lot with
17      Marcus.  Eventually Joe's president role
18      because CEO.  Phil's was over sales and
19      marketing.  And I guess -- I don't even
20      remember what Doug's was because I never saw
21      him that often.
22   Q  Do you recall when Joe Wiegel became CEO for
23      the company?
24   A  I don't.  It was probably in '15, but I don't
25      remember.
```

```
 1   Q  Do you recall the circumstances that led to
 2      him becoming the CEO of PCLS?
 3   A  Yeah, we were actually preparing the company
 4      for sale and had brought in a group, Black
 5      Arch Partners is an investment bank here
 6      locally, and it was -- I can't remember, but I
 7      believe it was their suggestion that we have
 8      it a little bit more formalized.  And we knew
 9      that as a company that we needed a little bit
10      more formal structure than what they had
11      loosely had before.  And so, they decided Joe
12      was the operator and they would make him the
13      CEO.  And they stepped down in their roles and
14      that's when Marcus transitioned his compliance
15      role to me and quality to me.
16   Q  I want to make sure I've got the timeline
17      correct.  You -- when did PCLS begin preparing
18      itself for sale?
19   A  '14 to '15, but I don't remember exactly when
20      now.  Sorry.
21   Q  That's okay.  And what was the reason for that
22      decision to sell the company?
23   A  It had grown significantly and the advice of
24      some of the advisors was, you know, it's time
25      to possibly look at taking some chips off the
```

```
 1      table and getting something for their invested
 2      time and effort.  And they first brought in a
 3      couple of different investment banking groups
 4      to talk to us about that very concept, and
 5      then choice Black Arch Partners.  And it was
 6      about a year's time that we went through our
 7      own quality of earnings review outsourced with
 8      Ernst and Young.  We had a clinical and
 9      compliance review that was done by an
10      outsourced company as well.  I can't remember
11      their names right now, but we did have that
12      done, and had very successful audits to
13      prepare us for sale.  And ultimately after a
14      year's time there were offers brought to the
15      table and a vote was taken to not take those
16      offers at the time and to wait a year because
17      we had just carved out a chunk of business
18      that we didn't want basically as part of our
19      company and had dissassociated from, and the
20      advisors had recommended waiting a year or two
21      because we thought we could regrow that back.
22   Q  What was the chunk of business that you all
23      carved out at that time?
24   A  It was in Texas and it was a company that
25      they'd had relationships with when they formed
```

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 5 of 283

1  Q  Did you interact with Mr. McHugh in your
2     initial role in 2012?
3  A  Very limited.  But he would -- he was very
4     interested in financials of the company.  So
5     to that extent I did have a lot, but not in
6     his role of what he was doing.  It was more
7     along the lines of just the financial
8     reporting for the company.
9  Q  Did you eventually kind of interact more with
10    Mr. McHugh as your role in the company
11    developed into a VP?
12 A  I'm not sure of the question.  Can you
13    rephrase it?
14 Q  Sure.  I think you mentioned that you had
15    limited -- limited interactions with Mr.
16    McHugh with the exception of financial
17    discussions in 2012; is that correct?
18 A  Did that expand out?  Absolutely.  As my role
19    grew into legal and compliance I did have more
20    interaction with him.  Customer complaints
21    that came in on the quality side, obviously we
22    had frequent customer complaints that we had
23    to deal with, or patient complaints about
24    their tests and things like that.  He was
25    always very interested in those conversations

1     that we were making sure we were on top of so
2     that it didn't hurt the image and sales of the
3     company.  So that was really his domain.
4  Q  Do you recall any other topics that you
5     interacted with Mr. McHugh about after you
6     became VP?
7  A  It was -- there were a lot of topics and,
8     again, it would be around patient complaints
9     or quality measures and things like that, or
10    -- or the legal process taking too long to
11    onboard a new group of sales people that he
12    was trying to push through, and we were trying
13    to slow down and make sure we vetted out
14    things like that.
15 Q  Were these more independent contractor sales
16    groups?
17 A  Yes.
18 Q  So the compliance department would vet an
19    independent contractor before that person or
20    entity was brought in?
21 A  To the extent that we would do background
22    checks and all of that, yeah.
23 Q  Limited in some sense ---
24 A  Right.
25 Q  --- is that correct?

1  A  Yes.
2  Q  How did Mr. McHugh's role at PCLS change
3     throughout your tenure?
4  A  We brought in someone to head up all of our
5     sales.  Paul Schmidt, the CFO, actually
6     stepped over and took over running sales.  I
7     don't recall exactly what timeframe that
8     happened, but about the same time that -- that
9     Marcus and each of them stepped down from
10    their other roles and Joe became the CEO and
11    became the person running the company everyday
12    Phil began to step down as well and became
13    more of an active Board member than anything
14    else, but interacted heavily still with the
15    with the sales leader.  Her name was Robin
16    Marchin, that I had a prior experience with,
17    and she worked for me in another company and
18    we brought her into head up sales in
19    marketing.  And she grew a sales force that
20    was employee based.
21 Q  So Mr. McHugh stepped down from his role as
22    CEO; correct?
23 A  I remember each of them having president
24    roles, but I don't remember him having a CEO,
25    but he acted like the CEO for some period of

1     time.
2  Q  And then at some point Mr. Wiegel became the
3     formal CEO?
4  A  Yeah.
5  Q  Did Mr. McHugh, after the point where Mr.
6     Wiegel became CEO still exercise control over
7     PCLS operations?
8  BY MR. CAUDILL:
9     Objection to the form.  You can answer.
10 BY THE DEPONENT:
11    He did not.  Joe is a very independent
12    operator.
13 DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
14 Q  Mr. McHugh remained heavily involved, I think
15    from your prior testimony, in the sales and
16    marketing aspect of the company after Mr.
17    Wiegel became CEO?
18 A  He -- it weaned overtime.  He had a long
19    tenure with that part of the company and
20    helped start the company and grew all of that.
21    So he did stay somewhat involved working to
22    help Robin in her new role.
23 Q  Did Robin stay on to lead the sales team until
24    the sale of PCLS?
25 A  No.  No, she did not.  Paul, and I don't

10 (Pages 34 to 37)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
                         ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 6 of 283

1  remember why, decided to take it on himself
2  and exit Robin at some point.
3  Q  And Robin left the company at that point?
4  A  Yes.
5  Q  And you don't recall the circumstances?
6  A  I don't, no.
7  Q  But did Paul ---
8  A  I tried not to be involved because she and I
9  had worked together prior, so yeah.
10  Q  Did Paul stay on in that role until the
11  company was sold?
12  A  Yes -- well, no.  He left probably February of
13  '16.  In that -- somewhere in that timeframe.
14  Q  Who took over at that point in the sales side?
15  A  Joe.  And -- I'm sorry.  They did bring up
16  someone internally, but I don't remember who.
17  Q  As VP were you involved in I guess what I
18  would consider kind of the HR issues,
19  personnel issues of the company?
20  A  Somewhat, but not a lot.  But, of course, I
21  was involved if there were any complaints that
22  went to any types of hearings.  That's prior
23  depositions.  That's where I was involved.
24  Q  Yeah, I meant to ask you what types of
25  depositions.

1  A  Yeah, yeah.  When we had employee issues I
2  would go in and help in the arbitrations and
3  things like that.
4  Q  Were you involved in hiring or firing
5  positions?
6  A  The only ones were the ones that were relative
7  to me.  So billing and collections and the
8  quality department and those areas.
9  Q  Was there someone at PCLS who you considered
10  to have authority over hiring and firing?
11  A  We did have an HR director and Joe was often
12  very involved in those.
13  Q  Do you recall who your HR director was?
14  A  I don't.  If I think of it I'll tell you, but
15  I can't remember offhand.
16  Q  Sounds good.  Do you know if Mr. McHugh was
17  also acting as a sales representative for PCLS
18  at any point?
19  A  Not as a sales representative, but they would
20  ask him to go meet certain potential referral
21  sources.
22  Q  Who is the "they" that would ask him?
23  A  The sales team.  If they had a meeting with a
24  big opportunity or something like that he
25  would be involved.

1  Q  Do you know anything about what his
2  involvement was from when the sales team asked
3  him to go out and meet with potential referral
4  sources?
5  A  Just to represent our lab, and I'm not sure of
6  any of the specifics other than a typical
7  sales approach.
8  Q  Are you aware of any of the specifics as to
9  how PCLS marketed itself to physician
10  practices ---
11  A  Oh, yeah.
12  Q  --- or potential referral sources?
13  A  Absolutely.  We developed some pretty unique
14  products that we thought that -- and testing
15  capabilities that other labs did not have.  We
16  had a very high level of quality in our lab.
17  So physicians who were looking for accurate
18  testing and reporting that was delivered to
19  them within a 24 to 48 hour timeframe, those
20  types of things were what differentiated us
21  from a Lab Corp who may take five to seven
22  days to generate a test result and get a
23  report back, and our turnaround times were
24  much better than theirs.  And the quality of
25  our test, again, and the numbers of things

1  that we could pick up in our samples and
2  analyze for that we had validated that other
3  labs did not.  Like Ketamine was a newer one
4  that we had developed a test for.  Things like
5  that were what differentiated us to the
6  physicians.
7  Q  Do you know how the owners of the company were
8  compensated?
9  A  Joe had a salary.  An annual salary of CEO.
10  Marcus did for some period of time as well
11  because he was active day-to-day, and so did
12  Phil.  But once they stepped out of their
13  roles they did not receive, I don't believe --
14  I can't remember, to be honest with you.  If
15  they did, it wasn't very much at all.  It
16  might have been just enough to pay insurance
17  or something like that.  But their activity
18  really stopped on a day-to-day basis and,
19  therefore, they did not earn a salary.  Joe --
20  Joe was the only one with an annual salary.
21  Q  Are you aware of the company making any
22  distributions or profits to the owners?
23  A  They did.  There were profit and tax
24  distributions for the '11 and '12, possibly
25  '13 time period.

11 (Pages 38 to 41)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 7 of 283

1  Q   But do you recall any of the specifics and
2      those distributions?
3  A   I just provided a lot of reporting on those
4      and it was close to 100 million dollars in
5      profit and tax distributions over that period
6      of time.
7  Q   Would that 100 million dollars be between the
8      owners of the company?
9  A   Yes.
10 Q   And at that point we're talking about Smith,
11     Sowinski and Phil McHugh; is that correct?
12 A   And Joe Wiegel.
13 Q   And Joe Wiegel?
14 A   Yeah.
15 Q   Are you aware of any distributions from the
16     company to any of the individual owners after
17     2013?
18 A   I don't recall any.
19 Q   Is that something you would be aware of in
20     your role?
21 A   It would, I just -- if it was, it wasn't a
22     lot.  And my timeframe might be slightly off,
23     but it's -- to my remembrance it was close to
24     100 million dollars of profit and tax
25     distributions that we had given out.  I don't

1      recall anything more than that.
2  Q   Did the owners get paid as a result of the
3      sale of PCLS in 2016?
4  A   I don't think so, but I don't know.  There was
5      a large number of vendors and other folks that
6      needed to be paid before any distributions
7      were made.  I did hear that there was a little
8      bit of money left over after that that was
9      used to pay maybe Joe back a little bit of the
10     money -- he put money back into the company
11     when the other three did not when we were
12     going into hard times.
13 Q   Do you know approximately when Joe put money
14     into the company?
15 A   It was in '16, but I can't remember exactly
16     when.
17 Q   Were the other owners asked to put in money to
18     the company?
19 A   Yes.
20 Q   And they declined to do so?
21 A   Yes.
22 Q   Were there any discussions about that
23     particular topic that you were involved in?
24 A   No, it was basically Executive Board level
25     discussions.

1  Q   Where did PCLS maintain bank accounts?
2  A   I can't remember.  It originally was First
3      Union, but I can't remember.
4  Q   Did PCLS maintain more than one company bank
5      account?
6  A   We had -- well, we may have had a few
7      different accounts for lock boxes and things
8      like that for receipts that were coming in.  I
9      don't remember exactly what the structure was,
10     but it was all with one bank that I recall.
11 Q   Who would have authority to, I guess, access
12     PCLS accounts?  Who would have the authority
13     to access PCLS accounts?
14 A   Paul Schmidt as the CFO and Joe.  I don't
15     recall if I did or not.  I might have.
16 Q   Did the owners have access to PCLS accounts?
17 A   I don't think believe so, but I don't remember
18     how ---
19 Q   You don't recall either way?
20 A   Yeah.  I don't believe so.
21 Q   What do you know about Doug Smith's
22     professional background before joining PCLS?
23 A   Doug was a physician.  I believe family
24     practicing physician.
25 Q   Do you recall what state he was practicing in?

1  A   Florida.  And that he lost his license because
2      of an issue related to over prescribing, and
3      thus the genesis of the idea for the
4      toxicology company.
5  Q   And are you familiar with a company called
6      MedX?
7  A   It rings a bell but I can't remember.
8  Q   Do you know anything about Doug Smith's
9      relationship with MedX?
10 BY MR. CAUDILL:
11     Objection, lacks foundation.  You can answer.
12 BY THE DEPONENT:
13     I don't recall.
14 DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
15 Q   Are you familiar with a practice called
16     Southeast Spine and Pain Associates?
17 A   Again, it rings a bell, but I can't remember
18     exactly.
19 Q   How about Dr. Alan Foster?
20 A   That I do remember.  I believe it was in
21     existence prior to my coming onboard, and it
22     may have been with the Southeast Spine.  And
23     now that you say that, MedX may have had some
24     sort of services they were providing, but I
25     can't recall exactly what that was.

12 (Pages 42 to 45)

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 8 of 283

1 Q MedX providing services to Dr. Foster's
2 practice?
3 A I remember -- I just remember that there was
4 some sort of computer technology that was
5 being provided to one or two practices and Dr.
6 Foster was just a name I remember about that,
7 and I believe MedX was the company that was
8 doing it, but that's all I -- I really
9 remember about that.
10 Q Sure.
11 A Yeah.
12 Q Was Dr. Foster a provider who referred to
13 PCLS?
14 A I don't -- I don't remember. I don't remember
15 him being around our point of discussion, so
16 (pause) ---
17 Q Were you aware as to whether or not Doug Smith
18 handled any accounts for PCLS? Customer
19 accounts?
20 A No.
21 Q Are you familiar with the name Jim Lord?
22 A Again, slightly. It's been a while. I
23 believe he had something to do with the
24 computer side of that, but that's all I ---
25 Q In your role as vice president over finance,

1 legal and compliance were you ever asked to
2 evaluate whether or not PCLS could provide
3 computer software such as MedX to referring
4 provider practices?
5 A No.
6 Q Are you aware if anyone in the compliance
7 department ever evaluated that type of
8 machine?
9 A Marcus.
10 Q Tell us about that.
11 A I just remember Marcus having been involved in
12 that discussion, and that's where I've heard
13 these names.
14 Q Do you remember about what timeframe Marcus
15 would have been in on those discussions?
16 A '13 -- I'm sorry. It would have been '11,
17 '12, somewhere in there. 2011, 2012.
18 Q So before you transitioned into your role?
19 A Yeah. Yeah.
20 Q Do you recall anything else about those
21 conversations that we haven't touched on yet?
22 A No. I think Marcus was making sure that we
23 were being compliant, and if it -- if it was
24 not, that we regs it in. But that's all I
25 truly remember.

1 Q Are you aware of any instances in which Mr.
2 McHugh made loans or any of his companies made
3 loans to physicians?
4 A Yes.
5 Q What do you know about that?
6 A I just recall that he made a significant loan
7 to Dr. Florete, I believe was his name, and we
8 did a lot of work around localizing that issue
9 and dealing with it as a company.
10 Q Now, I don't want to get into what in-house
11 counsel or the companies outside legal counsel
12 said or advised you on. Does that make sense?
13 A Uh-huh. (Affirmative)
14 Q I'm interested more to know factually the
15 chronology of events. Does that make sense?
16 And then I can ask you some questions about
17 that.
18 A Okay.
19 Q But just as a warning, I'm not trying to
20 intrude on the company's privilege on that
21 issue, to the extent it has one. When did you
22 first become aware of the Florete loan?
23 A I can't remember the timeframes, but it was
24 probably late 2015, early 2016.
25 Q When you became aware of the Florete loan had

1 it already been made?
2 A Oh, yes. Yes.
3 Q Were you the first person at PCLS, outside of
4 Mr. McHugh, to become aware of that loan?
5 A I don't believe so, no.
6 Q How did it come to your attention?
7 A I believe Joe Wiegel.
8 Q Do you know how it came to Joe Wiegel's
9 attention?
10 A I don't know.
11 Q What steps did you take after you learned
12 about the Florete loan?
13 A We went and got our outside counsel involved
14 immediately, both through McDonald Hopkins and
15 through Jane Pine Wood at McDonald -- I'm
16 sorry, McDonald Hopkin, and then Jeff Hayes
17 group at Womble Carlyle.
18 Q To your knowledge, had PCLS engaged Jane Pine
19 Wood or Jeff Hayes on this issue prior to the
20 loan being made?
21 A Not to my knowledge.
22 Q To your knowledge, was anyone at PCLS aware of
23 this loan before it was made?
24 A Not to my knowledge.
25 Q And other than Jane Pine Wood and Jeff Hayes,

13 (Pages 46 to 49)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 9 of 283

1  did any other counsel review the Florete loan,
2  to your knowledge?
3  A  Eventually we brought in from McDonald
4  Hopkins, Bruce Reinhart.
5  Q  And Mr. Reinhart actually represented PCLS in
6  this investigation; is that correct?
7  A  I believe so.
8  Q  For a time?
9  A  For a time.
10  Q  But he no longer represents them, to your
11  knowledge?
12  A  Not to my knowledge.
13  Q  You wouldn't know; right?
14  A  I wouldn't know.
15  Q  So I understand PCLS brought in counsel to
16  review the Florete loan issue.  What was the
17  result?
18  BY MR. CAUDILL:
19  Objection.
20  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
21  Q  What action was taken as a result of the
22  company's investigation?
23  A  We were advised and, I believe, we stopped
24  accepting samples from the physician's
25  practice, and I believe we refunded any

1  governmental monies, but I don't 100 percent
2  recall that, if we actually refunded them.  I
3  do remember there was another matter that we
4  refunded the monies for, but not this one
5  because I think it was a very small dollar
6  amount, if I can remember correctly.  And then
7  we did receive further advice later on that --
8  that the actions that were involved in
9  creating that loan were actually done
10  appropriately.  So I don't know if we ever
11  restarted accepting samples from them again or
12  not.  I can't remember.
13  Q  Let me back up and make sure I understand.
14  You stopped accepting samples from Dr.
15  Florete's practice; is that correct?
16  A  While we were investigating it, for sure.
17  Q  And after the investigation you stopped
18  accepting samples from Dr. Florete?
19  A  I believe so, but at some point we may have
20  started receiving them again.  I just don't
21  recall.
22  Q  And then I think you said you believe but you
23  don't know if the company paid any money back
24  to Medicare related to ---
25  A  Yeah, for some reason I remember us getting

1  the dollar amounts and everything together and
2  the patient samples and I believe we were
3  prepared to do that.  I just don't remember
4  whether or not we actually did it.  I believe
5  we did, but I don't remember 100 percent.
6  Q  You didn't personally push the bottom to make
7  the repayment to the government?
8  A  I may or may have.  I just don't remember
9  right now.  There were the two going on at the
10  same time, and I know for certain we did the
11  one in Indiana.  I just -- I can't remember on
12  this one.  There was a lot of discussion about
13  whether or not it was something that should
14  have been or not.
15  Q  Who would have been involved in the decisions
16  to make a repayment to Medicare related to the
17  Florete referrals?
18  A  That would have been Joe Wiegel and the Board.
19  And obviously that was on advisory from out
20  outside counsel.
21  Q  And tell me how the actual repayment, if it
22  was made, would have been made?
23  A  We would have just processed a check for
24  specific patient samples that we had received
25  and done the services for.

1  Q  And who would have actually submitted that
2  check?
3  A  Paul Schmidt.
4  Q  Would the funds have come out of a PCLS bank
5  account?
6  A  Yes.
7  Q  But sitting here today you think it was done
8  but you can't recall?
9  A  Not 100 percent.
10  Q  You can't say 100 percent.  Got you.
11  Understood.  You did mention that there was a
12  repayment related to another issue.  Tell me
13  about that.
14  A  There was a practice in Indiana that we found
15  out that Manoj Kumar, if I remember his last
16  name, who was involved with our sales
17  organization, actually led it for a period of
18  time, was servicing in some capacity of
19  management of the practice.  And when we found
20  that out we obviously ceased accepting
21  samples, and then ultimately we did refund the
22  money to the government for that, which would
23  have been any Medicare, Medicaid or
24  governmental entities.
25  Q  And how do you know that money was reflected?

14 (Pages 50 to 53)

828-254-9230       ASHEVILLE REPORTING SERVICE       800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 10 of 283

```
1   A   I pulled the information together and -- I
2       don't 100 percent know that Paul wrote the
3       check, but I saw it clear the books.
4   Q   When did you see it clear the books?
5   A   It was in my -- my accounting reports.  I
6       don't remember.
7   Q   Do you recall the amount of the check?
8   A   I believe -- no, I don't.  I believe it was
9       some $30,000. It may have been more.  I just
10      don't remember right now.
11  Q   But Paul would have physically wrote the
12      check?
13  A   Or his department.  The finance.
14  Q   But you can't confirm whether or not that was
15      done?
16  A   I'm sure it can be confirmed.  I just don't
17      recall.
18  Q   How did the lab come up with the $30,000
19      figure?
20  A   Again, that's an estimate.  I don't recall the
21      amount.  What we did do was pull, again, every
22      sample that was processed for that facility
23      and refunded the dollars that we had received
24      on behalf of those samples.  And there was a
25      list of patients.
```

```
1   Q   Did you look during the specific timeframe?
2   A   Yeah, it was -- it was since inception of the
3       practice samples that we had received.  It was
4       over a long period of time.
5   Q   Did PCLS stop accepting referrals from that
6       provider in Indiana?
7   A   Yes.
8   Q   Do you recall the provider's name?
9   A   I don't.
10  Q   Does Dr. Masimore sound familiar?
11  A   Yes.
12  Q   Do you believe that's the provider?
13  A   I do.
14  Q   When did it come, if you know, to PCLS'
15      attention that Manoj Kumar was the practice
16      manager for Dr. Masimore?
17  A   For some reason I believe it was in December
18      of '15, but I may be wrong.  It's been a
19      while.  I just -- I thought it was during the
20      holidays that we saw a copy of a check that
21      was written to Manoj someone was circulating
22      that they had taken on their phone.
23  Q   Who was the check written by?
24  A   I think it was the practice.
25  Q   But you're not sure?
```

```
1   A   I can't remember.
2   Q   Did that lead to an investigation?
3   A   Yes, immediately.
4   Q   Was the company's counsel involved in that
5       investigation?
6   A   Yes.
7   Q   Prior to the circulation of this check in or
8       around December of 2015 had the compliance
9       team at PCLS ever vetted Mr. Kumar's
10      employment with the company?
11  A   I'm sorry.  Can you repeat the question?
12  Q   Sure.  Before you found out about the check
13      and there was an investigation, had compliance
14      at PCLS ever vetted Mr. Kumar's employment or
15      vetted Mr. Kumar?
16  A   Are you asking that he was employed by the
17      company?  That we vetted that he was actually
18      employed by the company?
19  Q   I think you mentioned earlier that compliance
20      would, the independent contractors, or
21      entities, or other potential employees.
22  A   Manoj had a special arrangement through his
23      early association with the company.  He was
24      running our sales division and I believe for
25      some period of time he was a 1099 contractor,
```

```
1       and then rolled into an employee role.  Yes.
2   Q   Thank you for clarifying that.
3   A   Yes.
4   Q   Did Mr. Kumar joint the company as a
5       contractor prior to you joining the company?
6   A   Yes.
7   Q   When you joined and took on the compliance
8       role were you ever asked to look at Mr.
9       Kumar's either independent contracting
10      relationship with the company or his
11      employment with the company?
12  A   No, but we did have outside counsel look at
13      that.
14  Q   When did outside counsel look at that?
15  A   I don't remember.
16  Q   Was it ---
17  A   It was, I believe, during his transition of
18      roles from an outside to an employee, because
19      there was a negotiation that was had with him
20      on that by Phil McHugh, and I'm not sure if
21      Joe was involved with that.
22  Q   During Mr. Kumar's transition from contractor
23      to employee did Mr. Kumar disclose that he was
24      managing at least one physician practice in
25      Indiana?
```

15 (Pages 54 to 57)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 11 of 283

1  A  I think he disclosed just the opposite. That

2     he was not involved in any practices.

3  Q  So you recall Mr. Kumar making an affirmative

4     statement to the effect that he was not

5     involved in any practices?

6  A  I remember him saying that in a meeting.

7  Q  Do you remember when that meeting was?

8  A  I don't. I just -- I do remember that we had

9     a discussion and he was adamant that he did

10    not have any dealings with any other

11    practices. I was in a meeting with -- I

12    believe Marcus was in that meeting with him.

13    it may have been Meg, but one of the two, I

14    think.

15 Q  Was Mr. McHugh in that meeting?

16 A  No.

17 Q  And would that meeting have taken place during

18    this transition from contractor to employee?

19 A  Yes.

20 Q  Are you aware of how Mr. Kumar became involved

21    with PCLS? I understand it predated your

22    employment, but ---

23 A  Yeah. He had a relationship with one of the

24    partners and I don't remember who.

25 Q  Was it a relationship with Mr. McHugh?

1  BY MR. CAUDILL:

2     Objection. You can answer.

3  BY THE DEPONENT:

4     I don't remember.

5  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:

6  Q  Was Mr. Kumar eventually terminated from PCLS?

7  A  Yes.

8  Q  Were you involved in that?

9  A  Yes.

10 Q  Could you tell us about the circumstances?

11 A  It was relating to this incident around the

12    fact that he had received funds from the

13    practice in Indiana for managing the company.

14    After we'd concluded the investigation and

15    confirmed that he was asked to leave.

16 Q  Are you aware as to whether or not Mr. Kumar,

17    after he individually became an employee of

18    PCLS, continued to own a company that was a

19    channel partner with PCLS?

20 A  No.

21 Q  Is CSS familiar to you?

22 A  I don't recall it.

23 Q  Who was involved in the discussions regarding

24    Mr. Kumar's termination?

25 A  Joe, outside counsel, inside attorneys as

1     well. I believe that was Mike Munro at the

2     time, and Meg. I'm sure Paul Smith was

3     involved because he worked a lot with Joe on a

4     lot of issues. I don't remember anybody else.

5  Q  Did Mr. Kumar receive any compensation in

6     connection with this termination?

7  A  I don't believe so.

8  Q  Was that ever discussed, to your knowledge?

9  A  I don't recall.

10 Q  Were you ever -- I guess if you don't recall

11    it ---

12 A  I don't -- I don't believe so because of the

13    circumstances.

14 BY MS. ARMSTRONG:

15    We've been going for almost an hour and a

16    half. Do you mind if we take a five minute

17    break?

18 BY THE DEPONENT:

19    I was just about to ask.

20 (OFF THE RECORD)

21 DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:

22 Q  Are you aware of any loans made to Dr.

23    Jayachandran?

24 A  No.

25 Q  I'm sorry.

1  A  No. I'm sorry.

2  Q  Other than the loan to Dr. Florete which we've

3     already discussed, are you aware of Mr. McHugh

4     making or being involved in loans to any other

5     practice?

6  A  Not that I recall.

7  Q  Are you familiar with desktop analyzers?

8  A  Yes, somewhat.

9  Q  Can you tell us what you know about them?

10 A  Sure. So as I mentioned earlier, PCLS

11    performed confirmation level testing with very

12    high grade equipment that could discern not

13    just the individual drugs that you've taken,

14    but also the metabolites that were within your

15    body for having taken them. A desktop

16    analyzer just analyzes the presence of an

17    opioid, for instance, and not specific to the

18    drug itself. In a doctor's office they often

19    use that as a first in line of testing. And

20    then if there's something present they send it

21    off for more of definitive tests that we would

22    perform. We actually did that as part of our

23    process because it helped us to get the

24    quality of our tests to make sure that we were

25    analyzing against the same compounds and

16 (Pages 58 to 61)

1  coming up with an answer that made sense when
2  we put the two together.
3  Q  And I think I've heard it referred to as
4  qualitative versus quantitative testing.
5  A  Yeah, qualitative meaning that there is
6  something present. Quantitative, how much and
7  specifically as to what it is.
8  Q  Are you aware of whether PCLS ever provided
9  physician practices with an analyzer program?
10  A  I don't believe so. When you say ever, there
11  may have been some prior to my existence that
12  they actually set offices up that way, but I
13  don't remember 100 percent. We did talk about
14  instituting a program to actually do that and
15  we looked into it, but I don't believe we
16  actually enacted it.
17  Q  Do you remember what the perimeters of that
18  program that you were discussing were?
19  A  I don't. I don't.
20  Q  The bottom line, the company did not do it?
21  A  I don't believe so.
22  Q  Are you aware of Mr. McHugh being involved in
23  the provision of analyzers to doctors offices?
24  BY MR. CAUDILL:
25  Objection to the form. You can answer.

1  BY THE DEPONENT:
2  I don't recall his being involved with that,
3  but I don't know.
4  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
5  Q  Are you aware of Mr. Kumar being involved in
6  the commission of analyzers to doctors
7  offices?
8  BY MR. CAUDILL:
9  Same objection. You can answer.
10  BY THE DEPONENT:
11  I did hear that he, after leaving, was doing
12  that.
13  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
14  Q  So after he left you heard that Kumar had had
15  some involvement providing analyzers to ---
16  A  Right.
17  Q  --- referring practices?
18  A  Yes.
19  Q  Tell us what you learned about that?
20  A  Just that I heard that he was out and that's
21  what he had been doing was helping to set
22  doctors up. And I don't know if that was his
23  full-time job or part-time job, but I do
24  remember hearing that he was involved in doing
25  some of that.

1  Q  During his tenure at PCLS were you aware that
2  he was involved in that type of work?
3  A  I don't believe so, because we would have
4  addressed it.
5  Q  So if someone at PCLS was providing analyzers
6  or reimbursing providers for their purchase of
7  analyzers is that something that the
8  compliance department would want to know
9  about?
10  A  Yes.
11  BY MR. CAUDILL:
12  Objection to the form of that question. It
13  also calls for speculation.
14  BY THE DEPONENT:
15  We would have definitely been interested if
16  someone had been paying a doctor for anything
17  and would have vetted whatever they were doing
18  through our counsel, because that was not
19  something that we as a company wanted to do at
20  all was to pay physicians for anything.
21  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
22  Q  Are you familiar with a Dr. Johnson?
23  A  I don't remember.
24  Q  What about a doctor John Nichols?
25  A  I don't remember.

1  Q  Do you recall whether or not the compliance
2  department at PCLS ever vetted any type of
3  arrangement between the lab and Dr. Nichols?
4  A  I don't remember his name, so I don't
5  remember.
6  Q  And you may have the same answer, but let me
7  just ask. Do you recall whether compliance at
8  PCLS ever vetted any arrangement between a Dr.
9  Johnson, John Johnson, I believe, and PCLS?
10  A  I don't know.
11  BY MS. ARMSTRONG:
12  I'm just going to go through my notes for 30
13  seconds and see. Mr. Campbell, I think that's
14  everything I wanted to go through with you, so
15  I appreciate your time. Counsel for Mr.
16  McHugh may have some questions, and it's
17  possible I may have some followup after he's
18  done.
19  BY THE DEPONENT:
20  Sure.
21  BY MS. ARMSTRONG:
22  I'll try to go through my notes and make sure
23  we can wrap it up. Thank you.
24  CROSS-EXAMINATION BY MR. CAUDILL:
25  Q  So, Mr. Campbell, we met off the record. My

17 (Pages 62 to 65)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK  Document 129-4  Filed 12/08/20  Page 13 of 283

1     you'd expect to see with that type of

2     transmission?

3 A   It would be a list of the amounts that had

4     been billed and collected by us for each of

5     those patients that we were -- either that or

6     we would have recorrected each claim, and

7     that's why I don't recall the specifics of how

8     it happened.  If we actually ended up writing

9     a check or if we just reprocessed each claim

10    back to them.  I mean, there's a couple of

11    ways that could happen, and I just don't

12    recall how we did it.

13 Q   Sure.

14 A   Yeah.

15 BY MS. ARMSTRONG:

16     That's it.  Thank you.

17 BY MR. CAUDILL:

18     Nothing for me.

19 (PROCEEDINGS IN THE ABOVE-ENTITLED MATTER WERE

20 CONCLUDED AT APPROXIMATELY 11:20 A.M.)

21

22

23

24

25

103

            CERTIFICATE

    I, Dee Anna Michaels, CVR-M, CCR, Court

Reporter and Notary Public, do hereby certify that

the foregoing 102 pages are an accurate transcript

of the deposition of Alan Campbell, taken by me and

transcribed under my supervision.

    I further certify that I am not financially

interested in the outcome of this action, a

relative, employee, attorney or counsel of any of

the parties, nor am I a relative or employee of

such attorney or counsel.

    This is the 13th day of October, 2020.

    _____

    DEE ANNA MICHAELS, CVR-M, CCR

    Notary Public No.: 19963300157

(The foregoing certification of this transcript
does not apply to any reproduction of the same by
any means, unless under the direct control and/or
supervision of the certifying reporter.)

    Asheville Reporting Service
  111 McDowell Street, Asheville, NC 28801
       828-254-9230

828-254-9230     ASHEVILLE REPORTING SERVICE     800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK  Document 129-4  Filed 12/08/20  Page 14 of 283

## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. Civil File No. 3:17-CV-37
(Consolidated with Civil File
No. 3:17-CV-46)
United States of America, ex rel.
Taryn Hartnett and Dana Shoched,

Plaintiff,

vs.

Physicians Choice Laboratory
Services, Douglas Smith, Philip
McHugh and Manoj Kumar,
Defendants.
-------------------------------/

VIDEO DEPOSITION
OF
DR. ORLANDO FLORETE, JR.

BY VIDEOCONFERENCE
October 8, 2020
Scheduled for 10:00 a.m.
Commencing at 10:12 a.m. to 12:33 p.m.

Taken before Sonnia Martinez, Notary
Public in and for the State of Florida at
Large, pursuant to Notice of Taking Deposition
filed in the above cause.
- - - - - - -

## Page 2

1    APPEARANCES:
2    ON BEHALF OF THE PLAINTIFF:
3        R. Andrew Murray
         United States Attorney
4        Suite 1650, Carillon Building
         227 West Trade Street
5        Charlotte, North Carolina 28202
         By: Katherine Armstrong,
6        Assistant U.S. Attorney
         katherine.armstrong@usdoj.gov
7
     Also present:
8
         Cathleen Hollowell
9        Investigator (contractor)
         U.S. Attorney's Office - WDNC
10       227 West Trade Street, Suite 1650
         Charlotte, NC 28202
11
     ON BEHALF OF PHILIP McHUGH:
12
         Weaver, Bennett & Bland
13       196 North Trade Street
         Matthews, North Carolina 28105
14       By: Bo Caudill, Esquire and
         Matthew Villmer, Esquire
15
     Also present:
16
         Brandon Mendiola, Videographer
17       - - - - - - -
18
19
20
21
22
23
24
25

## Page 3

1                    I N D E X
2    Witness:  Dr. Orlando Florete
3                 Direct    Cross
4    By Ms. Armstrong     5, 88, 97
5    By Mr. Caudill              73, 92
6              E X H I B I T S
7    United States'
8        No.  1 Page 46      No. 2 Page 48
9        No.  3 Page 50      No. 4 Page 66
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1        (The following was had.)
2        THE VIDEOGRAPHER:  In the case styled
3    United States of America, ex al, versus
4    Physicians Choice Laboratory Services, et
5    al.
6        This is the video deposition of
7    Dr. Orlando Florete, Jr. on October 8th,
8    2020.
9        The time is now 10:12 a.m.
10       Would counsel please state their
11   appearances for the record.
12       MS. ARMSTRONG:  Katherine Armstrong,
13   Assistant U.S. Attorney on behalf of the
14   United States.
15       MR. CAUDILL:  Bo Caudill on behalf
16   the Defendant, Philip McHugh.
17       MR. VILLMER:  Matt Villmer on behalf
18   of Defendant, Philip McHugh.
19       THE COURT REPORTER:  Doctor, please
20   raise your right hand, please.
21       Do you swear the testimony you will
22   give will be the truth, the whole truth
23   and nothing but the truth, so help you
24   God?
25       THE WITNESS:  I do.

1 (Pages 1 to 4)

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 15 of 283

1    THE COURT REPORTER:  Thank you.
2         DIRECT EXAMINATION
3    BY MS. ARMSTRONG:
4         Q.  Good morning, Dr. Florete.  Thank you
5    -- thank you for being here and thank you for
6    your patience as we work through some of these
7    technological glitches.
8         A.  My pleasure.
9         Q.  I'm sure you understand in this
10   current environment we're -- we're getting
11   used to doing things a different way.
12        Thanks for being here.
13        And we are taking your deposition
14   today in reference to the United States
15   litigation against Defendant Philip McHugh and
16   others.
17        Have you ever had a deposition taken
18   before?
19        A.  Yes.
20        Q.  Okay.  Can you tell us just generally
21   about how many times you've been deposed?
22        A.  Oh, I've been deposed related to my
23   practice over a hundred times, maybe.  Much
24   more than that.
25        Q.  So you don't really need me to go

1    in-depth on the ground rules and instructions;
2    is that right?
3         A.  Yeah.
4         Q.  Okay.  I'll just say, probably most
5    importantly for today, if I ask you a question
6    that you don't understand please stop and let
7    me know.  If you answer one of my questions I
8    will assume that you have understood it.
9         Is that fair?
10        A.  That's fair.
11        Q.  Great.  And if you have any problems
12   with the technology, hearing me or visual,
13   just please also let us know, okay?
14        A.  Okay.
15        Q.  Great.  Can you go ahead and tell us
16   your full name, please.
17        A.  My name is Orlando G. Florete,
18   Junior.
19        Q.  And Dr. Florete, what is your current
20   occupation?
21        A.  I am a pain management physician in
22   the state of Florida.
23        Q.  And what type of medical degree do
24   you have?
25        A.  I have a -- an M.D.

1         Q.  Do you have any other licensures or
2    Board certifications?
3         A.  I am Board certified in
4    anesthesiology.  I am Board certified in pain
5    medicine.
6         Q.  And are you practicing right now?
7         A.  Yes.
8         Q.  Okay.  What is the name of your
9    practice?
10        A.  Orles, O-R-L-E-S, Pain Management and
11   Regenerative Medicine Group.
12        Q.  And are you employed by Orles or are
13   you an owner of the practice?
14        A.  I am the owner of the practice.
15        Q.  And how long have you owned this
16   particular practice?
17        A.  I opened the practice in October of
18   2019.
19        Q.  Prior to opening this practice in
20   2019 where were you working --
21        A.  I was --
22        Q.  -- or practicing?
23        A.  I was the chief medical officer of
24   the International Stem Cell Medical Center in
25   Antigua.

1         Q.  And just generally what were you
2    doing as the chief medical officer for that
3    entity?
4         A.  I created the standard operating
5    procedures, the manual for the operation of
6    the clinic, and I do the procedures in the
7    clinic.
8         Q.  How long were you doing that for?
9         A.  A year.
10        Q.  What were you doing for work prior to
11   that?
12        A.  Prior to that I was a pain management
13   specialist practicing in Jacksonville,
14   Florida.
15        Q.  And what was the name of the practice
16   you were at in Jacksonville?
17        A.  The Institute of Pain Management.
18        Q.  And were you an owner of that
19   practice?
20        A.  Yes.
21        Q.  And I think the name gives us a
22   general idea of the type of practice, but
23   would you mind describing for us what services
24   the Institute of Pain Management provided?
25        A.  The Institute of Pain Management was

2  (Pages 5 to 8)

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 16 of 283

1   going to buy my practice.
2       So, you know, I looked at you're
3   supposed to own 49 percent.  I believe I owned
4   51 percent, I still had full control of the
5   practice and he -- he'll going to buy the
6   practice for a total of 15 million.  Five
7   million of which was given on the day of
8   signing.  I was supposed to receive a monthly
9   salary.  And then at the end of the fifth year
10   the -- whatever is the left over of the deal,
11   that's when I get paid in full.
12       Within three to four months that we
13   did that, he start to demand -- he started to
14   demand that I fire my key people and he wanted
15   to put his own people in there.  And then he
16   owned a drug testing company and he demanded
17   that I do drug testing every month for
18   confirmation.  So I said, no.  You know, there
19   was a clause in our contract that if I am not
20   happy within six months I can return the money
21   and I can take over the practice.  But of
22   course, since we used the money already for
23   paying our debts and for expansion of the
24   practice, and by the time I realized that
25   there is this danger that we are actually

1   basically overbilling -- I mean overusing drug
2   testing beyond what I considered as useful and
3   customary and he wanted to fire my people, I
4   said no, no and no.  So I turned down the
5   medical directorship that he offered, I then
6   said, I'm going to return your money, but at
7   that point in time I used the money, so I had
8   to give up actually one of my buildings to pay
9   him.  And then I have to look for other
10   sources of funding to get him off my back
11   because I was in total disagreement what he
12   was doing.  Because he tried to reach what I
13   strongly believe was illegal.
14       So, you know, it so happened that I
15   know Mr. McHugh and Mr. McHugh and I talk
16   about it and he offered that he can provide
17   the funding to pay off Mr. William Hughes.
18      Q.  Dr. Florete, thank you for that.  It
19   was a very comprehensive answer but I'm going
20   to go back and ask you a couple more detailed
21   follow-up questions before we move on to
22   Mr. McHugh.
23      Tell us just generally as to
24   Mr. William Hughes, he operated what
25   laboratory?

1      A.  It's called the Universal Oral Fluid
2   Solution, which is based in Pittsburgh.
3      Q.  May I call it UOFL going forward?
4      A.  Yes.
5      Q.  Okay.  Is UOFL currently in business?
6      A.  I have no idea.
7      Q.  Okay.  Have you spoken to Mr. Hughes
8   within the last five years or so?
9      A.  Yes, because I still owe him some
10   money.
11      Q.  Okay.
12      A.  He's still demanded -- he still
13   demands that I pay him, you know, after I gave
14   him the -- my building, after I paid him a
15   significant amount of money, you know, he
16   still said that I still owe him some money.
17      Q.  How much money does he say you owe
18   him?
19      A.  He say -- he claim that I still owe
20   him a million dollars.
21      Q.  Let's walk through some details here.
22   If I understood you correctly, as part of the
23   transaction with Mr. Hughes you were going to
24   retain a majority ownership in IPM?
25      A.  No, a hundred percent ownership.

1      Q.  Oh, you would maintain a hundred
2   percent ownership?
3      A.  Yes.
4      Q.  Okay.  He would not obtain any
5   ownership interest in your company?
6      A.  No.
7      Q.  Okay.
8      A.  I would never allow that.
9      Q.  Okay.  So the -- I'm trying to
10   understand -- the 15 million was going towards
11   what, what was its original purpose?
12      A.  Well, the 15 million was used to pay
13   our existing debts at the time but we are in
14   the process also of expanding the practice or
15   trying to hire more people and to buy newer
16   equipment.
17      Q.  What was Mr. Hughes getting in
18   exchange for the $15 million, I guess, you
19   didn't -- you don't call it a loan but the $15
20   million he had --
21      A.  Oh, he gets 49 percent ownership of
22   the practice.
23      Q.  I'm sorry, what was that percentage
24   again?
25      A.  I think -- I believe it was 49

6 (Pages 21 to 24)

Fernandez & Associates Court Reporters
305-374-8868   service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 17 of 283

1    percent.
2    Q.  49 percent, okay.  So he -- had this
3    gone to fruition as planned he would have
4    eventually obtained an ownership percentage?
5    A.  Yes.
6    Q.  Okay.  And I think what you're saying
7    is it never got there.  You got out of the
8    deal before he obtained an ownership interest?
9    A.  Technically when I signed the deal he
10   became owner 49 percent.
11   Q.  Okay.
12   A.  But I still was running the practice.
13   Only it's after three months or four months
14   later that his minions tried -- were trying to
15   take over the practice and trying to dictate
16   the policy of the practice and trying to
17   demand that we do monthly qualitative and
18   quantitative testing so.
19   Q.  And just orient us to the time frame,
20   when did you sign the loan agreement with
21   Mr. Hughes?
22   A.  Oh, God, that was eight years ago, so
23   sometime in 2012, I believe.
24   Q.  And just to clarify, was the loan
25   agreement between you personally and Mr.

1    Hughes or were there business entities that
2    were parties to this agreement?
3    A.  You're referring to it as a loan
4    agreement but it is actually a sale agreement.
5    Q.  Okay.  Thank you.  I'll call it --
6    yes, thank you, a sales agreement.  Who are
7    the parties to sales agreement?
8    A.  Yes, myself and Mr. McHugh -- I'm
9    sorry, just myself and Mr. Hughes.
10   Q.  Was it -- was Mr. Hughes entering
11   into the agreement under the name Universal
12   Pain Management; does that should familiar?
13   A.  Yes.
14   Q.  What is Universal Pain Management?
15   A.  That was supposed to be the entity
16   that he claims to own like 21 clinics, you
17   know, and it's an entity that was acquiring
18   pain practices all over the country,
19   primarily, I believe, in the northeast and the
20   western state, I believe.
21   Q.  Okay.  So the sales agreement was
22   between UPM and was it between IPM and Ares as
23   well, as the sellers?
24   A.  I believe it's between IPM and the
25   Universal Pain.

1    Q.  Okay.  And did you have to sign a
2    personal guaranty for that agreement?
3    A.  I'm not -- you know, it's -- I'm not
4    really sure if I did.
5    Q.  Did you have to put up any property
6    as collateral or security for that deal?
7    A.  No, because it's a sale, it's a sale
8    of the practice.
9    Q.  Sure.  Did you sign a promissory note
10   in connection with that deal?
11   A.  I don't think so.  I did not -- I do
12   not recall.
13   Q.  Okay.  Was there any security -- I
14   guess if you don't recall if there was a
15   promissory note you don't recall whether there
16   was any security pledged as part of the
17   promissory note.
18   A.  Yeah, I don't think so.
19   Q.  You mentioned earlier that you had
20   used a portion of the $5 million initial
21   payment to pay the debts of IPM, what debts do
22   you recall at that time?
23   A.  We have debts from medical supplies,
24   we have debts from -- I think we still have
25   taxes to pay and we had back payments to our

1    employees.  So almost all of the money were
2    used, really, actually, to do that, as well as
3    for practice expansion.
4    Q.  What amount, if any, was put towards
5    practice expansion?
6    A.  Travis Guthrie handled the finances
7    so I really don't have specific numbers.
8    Q.  And do you recall whether out of that
9    initial five million you were able to satisfy
10   IPM's debts to medical suppliers?
11   A.  Yes.
12   Q.  How about the taxes, were you able to
13   pay those taxes?
14   A.  Yes.
15   Q.  Do you recall about when you paid off
16   the taxes that IPM owed at that time?
17   A.  I don't.  As I mentioned, Guthrie
18   handled anything related to finances.  All I
19   wanted to do is see patients, but -- and I
20   leave to my, unfortunately, to my COO to
21   handle everything else.
22   Q.  Is it fair to say you were not
23   involved in, I guess, the nitty-gritty of the
24   financial expenditures of the practice?
25   A.  No, I don't even have access to our

7 (Pages 25 to 28)

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 18 of 283

1 inquired what kind of testing they do, and
2 they said they're state of the art drug
3 testing. And I said, okay, we'll give you a
4 try, we don't have -- we don't do exclusivity,
5 we send drug testing to quite a few companies,
6 at least three or four companies. And then
7 that's how I come to introduce to PCLS. And
8 then subsequently I got to be introduced to
9 Mr. McHugh.
10    Q. Do you remember when that meeting
11 with the sales rep took place?
12    A. I'm bad with dates. It must be
13 sometime in 2013 or something like that.
14    Q. And just to confirm, this was a PCLS
15 sales rep; correct?
16    A. That is correct.
17    Q. And do you recall his or her name?
18    A. His name is Chris Kemp, K-E-M-P.
19    Q. And do you recall the first time you
20 met Mr. McHugh?
21    A. Not really. It's seven years ago,
22 eight years ago.
23    Q. Are you trying to say he didn't make
24 a big impression here?
25    A. Well, no, he did, but I'm just not

1 very good with dates.
2    Q. Understood. Date notwithstanding,
3 when you met Mr. McHugh what was your
4 understanding of his role with PCLS?
5    A. I know that he is one of the key
6 people at PCLS. What specifically was his
7 role, I'm not really know. Well, I know he's
8 one of the owners.
9    Q. Okay. And when you say "key people
10 in PCSL," tell us a little bit more about what
11 you mean by that.
12    A. Well, he is -- he is basically one of
13 the people behind PCLS and that's as far as I
14 know, you know, that's what it is.
15    Q. Do you know the names of any of the
16 other key people at PCLS?
17    A. No.
18    Q. Do you recall if Mr. McHugh came to
19 meet you at your practice in Jacksonville?
20    A. Vaguely.
21    Q. You think he did come to your
22 practice or did not come to your practice?
23    A. I am not sure but I was invited to
24 visit the PCLS facility in Rockfort.
25    Q. Rock Hill?

1    A. Rock Hill, South Carlina -- or North
2 Carolina.
3    Q. South -- South Carolina.
4    A. Oh, South Carolina.
5    Q. Right south of the border.
6    A. And I did -- yeah, and then I did
7 went and visited them. Then that's where I
8 clearly specifically sat down and talked to
9 Mr. McHugh.
10    Q. But you may or may not have met with
11 him or spoken with him prior to your visit to
12 Rock Hill?
13    A. Spoken to him, I may have spoken to
14 him, I just don't know if it's in person or in
15 the telephone.
16    Q. Sure. Who invited you to visit the
17 lab facility in Rock Hill?
18    A. The invitation was conveyed to me
19 through Chris Kemp. I believe he arranged the
20 visit.
21    Q. And did Mr. Kemp arrange the
22 logistics related to the visit, such as
23 airfare, hotel if you stayed overnight, that
24 type of thing?
25    A. Yes.

1    Q. And did -- do you know if PCLS paid
2 for that visit?
3    A. I presume that they did.
4    Q. You don't recall you or IPM paying
5 for expenses related to that trip?
6    A. No.
7    Q. How long were you visiting with the
8 lab on that first time?
9    A. Just as a day. It was the first and
10 only time I visited the lab.
11    Q. What did you do during your visit?
12    A. They give me a tour of the facility
13 and then I sat down with their scientists and
14 explained to me the science behind the
15 testing, why they are the state of the art of
16 drug testing and their accuracy, sensitively,
17 etcetera, it's all a legitimate scientific
18 visit.
19    Q. And if you recall during that visit
20 what -- what was the nature of the products or
21 services that PCLS was offering in terms of
22 toxicology testing?
23    A. Pure drug testing, quantitative drug
24 testing.
25    Q. Quantitative or confirmation testing?

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com

1    A.  I don't -- I could not recall the
2   specific dates, but I meet with Mr. Kumar
3   several times.
4    Q.  What were your meetings with
5   Mr. Kumar about?
6    A.  The -- at that time we were
7   discussing about -- about how to better
8   monitor patients and he explained to me the
9   way -- he basically help us, help guide us on
10  how to better control, you know, the flow of
11  information from -- for the patient, as well
12  as help us potentially help improve our
13  business.
14   Q.  Did Mr. Kumar ever meet with you at
15  your practice in Jacksonville?
16   A.  Yes.
17   Q.  About how many times do you think?
18   A.  I cannot recall that.
19   Q.  At some point did you enter into a
20  loan agreement with one of Mr. McHugh's
21  companies called Silent Storm Holdings?
22   A.  Yes.
23   Q.  How did that transaction come about?
24   A.  Well, I explained to Mr. McHugh my
25  predicament with Mr. Hughes and that

1   Mr. Hughes was threatening, really, legal
2   actions that could harm IPM and I'm looking
3   for a way to repay Mr. Hughes, and that's
4   when, you know, Phil -- I mean Mr. McHugh and
5   I developed some sort of a professional
6   relationship and he offered or maybe I asked
7   if he could help me with this bit of problem
8   with Mr. Hughes.
9    Q.  And do you recall when you first
10  discussed your problem with Mr. Hughes with
11  Mr. McHugh?
12   A.  Maybe sometime in 2013.  I'm not
13  really sure.  Again, I'm not very good with
14  dates.
15   Q.  Do you recall if that was an
16  in-person conversation or something you may
17  have had with him over the phone?
18   A.  I'm not sure.  Maybe it's an
19  in-person conversation.
20   Q.  Okay.  And I think you mentioned that
21  you may have asked him for help, do you recall
22  specifically what you may have asked him for?
23   A.  That I'm looking for funding so that
24  I can get off -- Mr. Hughes off my back.
25   Q.  And what happened next?

1    A.  And Mr. McHugh told me that he may be
2   able to, you know, he will consider doing a
3   business loan with the practice, and that's
4   how the loan with Mr. McHugh come about
5   through Silent Storm.
6    Q.  Was Mr. Guthrie involved in this
7   transaction?
8    A.  He is in the thick of it.  He was the
9   one, actually, dealing primarily with
10  Mr. McHugh.
11   Q.  Can you give us some more detail
12  about that?
13   A.  Well, the -- the negotiation and the
14  particulars, what was put in the contract was
15  all negotiated by Travis Guthrie.  I was only
16  given the final document to sign.
17   Q.  You mentioned earlier that I think
18  you were having some trouble recalling dates,
19  including the time frame of these discussions
20  with Mr. McHugh, correct?
21   A.  Yes.
22   Q.  I'm going to show you a document and
23  I'll ask you to review it and then we can talk
24  a little bit about that.
25   Hold on one second.  I've done this

1   before but it'll take me just...
2    This document, for identification
3   purposes, is Bates Numbered USA-182326.
4    And Dr. Florete, assuming all goes
5   well, I'm going to be able to share this with
6   you and I believe give you the ability to
7   control this screen so you can take a look at
8   this document.
9    Please let me know if that works,
10  Dr. Florete.
11   You should be able to scroll up and
12  read that.
13   A.  I'm not able to scroll this.
14   Q.  Okay.  You know what --
15   A.  I think it's affixed with Travis
16  Guthrie, chief operating officer's name on it.
17   Q.  Gotcha.  I'm going to do it one more
18  time.  I will maintain control of the document
19  and I think I should it been able to scroll
20  for you.
21   Okay.  There we go.  Can you see
22  that?
23   A.  Yes.
24   Q.  Okay.
25   A.  It says 2013, okay.

11 (Pages 41 to 44)

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 20 of 283

1  note.  The practice was earning enough money
2  to be able to pay the loan, but I -- at that
3  time I have no idea why we were not be able to
4  pay the promissory note and only the recent
5  events did I realize that the reason being
6  that a lot of the money being earned by the
7  practice is diverted somewhere else.
8      Q.  When did you first learn that IPM was
9  not meeting its obligation under the
10 October 2013 loan, repayment obligations?
11     A.  I believe we got a notice from
12 Mr. McHugh's lawyer that we are not paying the
13 monthly amount as stated and I instructed
14 Guthrie to make sure that we do so.  Maybe
15 sometime in 2014 or 2013, I'm not really sure.
16     Q.  Had you received a notice to that
17 affect after you had already done a loan
18 modification with Mr. McHugh?
19     A.  Yes.
20     Q.  So prior -- let's -- I'll back up and
21 I'll try to ask a better question.
22        Before any loan modifications,
23 operating under this original loan agreement,
24 do you know whether all payments were made
25 under this original loan obligation?

1      A.  No, because Guthrie is handling all
2  the financial transactions of the practice.
3      Q.  Do you know now that the payments
4  were not all made?
5      MR. CAUDILL:  Objection to form.
6  You can answer, Dr. Florete.
7      THE WITNESS:  Specific to this
8  promissory note, I'm not really sure.
9  BY MS. ARMSTRONG:
10     Q.  Do you know anything about payments
11 that were made specific to this promissory
12 note?
13     MR. CAUDILL:  Objection to form.
14     THE WITNESS:  No.
15     MR. CAUDILL:  Dr. Florete, you can
16 answer.
17     THE WITNESS:  No.
18 BY MS. ARMSTRONG:
19     Q.  Okay.  So sitting here today you
20 can't tell us what was paid under the original
21 promissory note?
22     MR. CAUDILL:  Objection, he's
23 answered this question three times.
24     Dr. Florete, you can answer.
25     THE WITNESS:  Yes.

1  BY MS. ARMSTRONG:
2      Q.  You eventually entered into a loan
3  modification with Mr. McHugh; is that correct?
4      A.  Yes.
5      Q.  What were the circumstances giving
6  rise to that modification?
7      A.  I'm not really sure.  I really don't
8  know why we increased the loan.
9      Q.  Do you know how much you increased
10 the loan?
11     A.  I think we went up to $2 million.
12     Q.  Do you recall anything about the
13 terms of the modified loan?
14     A.  No, because, as I mentioned, this was
15 all handled through Guthrie.
16     Q.  Would you and Guthrie meet to discuss
17 financial issues of IPM on any sort of regular
18 basis?
19     A.  Well, I'm getting -- I was getting a
20 profit and loss report and they always looked
21 good and, you know, he will show it to me and
22 it showed how much we owed and how much we
23 earn and how much we paid, in general.  You
24 know, I do not really recall the specifics of
25 it, but I do get quarterly reports from him.

1      Q.  You said earlier that you were
2  looking for funding sources to get out from
3  under Mr. Hughes and that deal with UPM; is
4  that correct?
5      A.  Yes.
6      Q.  And that's how this loan with
7  Mr. McHugh came about, correct?
8      A.  Yes.
9      Q.  Prior to negotiating this deal with
10 Mr. McHugh had you evaluated any other funding
11 sources?
12     A.  I don't think so.
13     Q.  And what I mean by that is had you
14 gone to a bank to attempt to obtain a loan?
15     A.  No.
16     Q.  Had you gone to any other individuals
17 or companies in an attempt to obtain funding?
18     A.  No.
19     Q.  Were you a personal guarantor of the
20 original loan in 2013?
21     A.  I'm not sure.
22     Q.  Do you know if you ever signed a
23 guaranty after you all did the loan
24 modification?
25     A.  I believe I did.

14 (Pages 53 to 56)

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 21 of 283

1     Q.  Do you recall when that loan
2  modification -- first loan modification
3  occurred?
4     A.  Specific date, no.  I believe it was
5  in sometime in 2014.
6     Q.  After the loan was modified did IPM
7  start making regular payment towards its
8  obligations under the loan?
9     A.  Travis told me that he was making
10  payments.  I do not think it's regular.
11     Q.  You eventually, as well as IPM and
12  Ares, were named in a lawsuit brought by
13  Silent Storm's holdings in Florida state
14  court; is that correct?
15     A.  That is correct.
16     Q.  What was that lawsuit about?
17     A.  Well, this is after the fact that I
18  found out that Travis was not actually paying
19  the loan in a timely manner to Mr. McHugh in
20  that we've accumulated a significant amount of
21  debt because of the interest, and since Ares
22  Medical Corporation and IPM already was closed
23  because of an IRS issue, Silent Storm then
24  brought a lawsuit against me since I
25  personally guaranteed the loan.

1     Q.  And how did that lawsuit eventually
2  resolve, what happened?
3     A.  Well, I have a judgment against me.
4     Q.  Okay.  When was a judgment entered
5  against you, if you recall?
6     A.  Sometime last year, I believe.
7     Q.  And against you personally?
8     A.  Yes.
9     Q.  Were there any judgments entered
10  against IPM or Ares?
11     A.  Those entities are already shut down.
12     Q.  And do you recall the amount of the
13  judgment entered against you?
14     A.  It's $2.5 million plus, and $59,000
15  in lawyer's fee for his lawyer.
16     Q.  Have you made any payments towards
17  satisfying that judgment?
18     A.  Well, Silent Storm garnished my cars,
19  my boats, some of my bank accounts, my
20  buildings, some of the real estate properties
21  that I owe -- that I own I mean.
22     Q.  Sure.  Has that judgment been
23  satisfied, to your knowledge?
24     A.  No.
25     Q.  Do you have an estimate as to how

1  much is outstanding on that judgment?
2     A.  Because of the interest accruing,
3  still 2.5 million, I believe.
4     Q.  Did you ever discuss your
5  circumstances with Mr. Hughes with Manoj
6  Kumar?
7     A.  Yes.
8     Q.  Okay.  When did you discuss that with
9  Mr. Kumar?
10     A.  Probably the similar time that I
11  discussed it with Mr. McHugh, around the
12  timeline.
13     Q.  Was Mr. Kumar involved in any of the
14  negotiations for the original loan from Silent
15  Storms in 2013?
16     A.  I don't believe so.
17     Q.  Did you discuss that 2013 loan with
18  anyone else from PCLS besides Mr. McHugh?
19     A.  No.
20     Q.  At some point did you stop referring
21  patient samples to PCLS for urine drug
22  testing?
23     A.  I'm not really sure, because we
24  continued sending samples.  I don't handle
25  those things, so I am not really sure if we

1  stopped sending PCLS samples or we stopped --
2  I don't know if PCLS stopped operating, I'm
3  not really sure.  But we -- I know that we
4  continued to send -- it's one of the labs we
5  sent samples to, so.
6     Q.  Was your role in selecting the labs
7  where the samples were sent for IPM patients?
8     A.  Hardly any.  They brought to my
9  attention there's a lab that wants us to try
10  their testing, I said go ahead.  Sometimes I'm
11  not being asked, you know, my primary --
12  again, primarily Guthrie will tell us what to
13  -- what companies we were going to use or my
14  policy is, as long a third-party payor will
15  pay for it, if it's within their license or
16  approved companies to deal business with, go
17  ahead and send the samples.
18     Q.  And specific to PCLS, did you make
19  the decision to start sending samples there or
20  did somebody else make that decision?
21     A.  Actually I did that as a goodwill to
22  help my -- my -- or the friend of my office
23  administrator's daughter or son, you know,
24  send the samples as long -- I told him, as
25  long as you are in the network I have no issue

15 (Pages 57 to 60)

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 22 of 283

```
1          And then I'm not -- for sure people
2    are sending me email through that address but
3    I cannot read it, I cannot access it, because
4    Guthrie was the administrator.
5          So, yeah, and more recently we -- a
6    private investigator is helping us gather
7    significant evidence and I'm actually meeting
8    him this Sunday, so yeah.
9          Q.  Okay.  When is the last time you've
10   spoken with Mr. McHugh?
11         A.  Off the top of my head, several
12   months ago.
13         Q.  Do you recall what the conversation
14   was about?
15         A.  Oh, this is with regards to what I
16   owe Silent Storm and, you know, and in what
17   ways does we'll be able to mitigate what I
18   owe, maybe if I go after -- they go after
19   Travis Guthrie and then maybe I don't have to
20   pay the whole caboodle.  And plus I forget to
21   mention, when IPM shut down I created an
22   entity called Integrated Pain Services, which
23   I handed over to a woman which actually was
24   introduced to me by Travis, to run IPM during
25   the last two years.  And so -- and I was gone
```

```
1    for a year, I cannot own the practice because
2    of the IRS garnishing everything that I have,
3    that's why I had to go Antigua for a while.
4    Then when I paid the IRS, I came back and
5    said, I'm going to take over Integrated Pain
6    Services, you know what they told me?  You
7    don't own Integrated Pain Services, it is
8    ours.  I said, but all of the things in there
9    are mine, all the patients are mine.  They
10   said, show us proof of ownership.  I can't.  I
11   don't have any document to show ownership.
12   And IPS was created with their name in it.
13   And so I said, well, at least I want to get my
14   stuff back, so they told me, okay, pick them
15   at the office, I went the office, you know
16   what, there were boxes outside the office.  I
17   wasn't even allowed to get into the office.
18   That's why I created this entirely new
19   practice, Orles Pain Management.  I started
20   like I'm starting the same like I started
21   25 years ago, so there you go.
22         Q.  Thank you for that.
23             Were you and Mr. McHugh ever able to
24   work out a resolution to mitigate what amounts
25   are owed to Silent Storm?
```

```
1          A.  Well, not yet.
2          Q.  It's something you're still working
3    on?
4          A.  I'm hoping that we will.
5          Q.  Sure.  Do you recall when that last
6    conversation was, you said several months ago?
7          A.  Yeah, several months ago.  I can't
8    recall the specific date.
9          Q.  Have you discussed this litigation,
10   the litigation between the United States and
11   Mr. McHugh, with Mr. McHugh?
12         A.  No, no.
13         Q.  Have you discussed this deposition
14   with Mr. McHugh?
15         A.  No.
16         Q.  Have you spoken with Mr. McHugh's
17   counsel before this deposition?
18         A.  I don't remember those two gentlemen,
19   so no.
20         Q.  And you and I have never spoken
21   before today; is that correct?
22         A.  Oh, no.
23         Q.  One more quick question, you
24   mentioned earlier that you did not go to any
25   banks seeking a loan in an effort to resolve
```

```
1    your financial issues with Mr. Hughes, can you
2    tell us why not?
3          A.  As I said, I don't handle the
4    finances.  Travis handles everything, you
5    know, all he want me to do is see patients and
6    he said I'll take care of the business side of
7    it, so I trusted the guy, he worked with me
8    for a long time.  And the thought even didn't
9    enter my mind, to go into the bank.
10             MS. ARMSTRONG:  All right.  I think
11   that's everything I have.  Thank you so
12   much, Dr. Florete.
13             MR. CAUDILL:  Dr. Florete, I do have
14   a couple of follow-ups.  I apologize, I'll
15   try --
16             THE WITNESS:  Oh, no problem.
17             MR. CAUDILL:  I'll try to be brief.
18             THE WITNESS:  We set this for four
19   hours, so you can go on asking me
20   questions.
21             MR. CAUDILL:  Great.  Well, I won't
22   keep you here for --
23             MS. ARMSTRONG:  You'll be sorry you
24   said that, Dr. Florete.
25             RECROSS-EXAMINATION
```

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 23 of 283

```
 1              CERTIFICATE
 2    THE STATE OF FLORIDA,
      COUNTY OF MIAMI-DADE
 3
 4         I hereby certify that I have read the
      foregoing deposition by me given, and that the
 5    statements contained herein are true and
      correct to the best of my knowledge and
 6    belief, with the exception of any corrections
      or notations made on the errata sheet, if one
 7    was executed.
 8         Dated this _____ day of ___, 2020
 9
10
11    _____
           (Deponent's name)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Fernandez & Associates Court Reporters
305-374-8868     service@fernandezcr.com

Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 24 of 283

```
                IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                         CHARLOTTE DIVISION
                    CIVIL FILE NO. 3:17-CV-37
```

```
_____
                                )
UNITED STATES OF AMERICA, ex rel. )
TARYN HARTNETT and DANA SCHOCHED, )
                                )
            Plaintiffs,          )
                                )
            v.                   )      DEPOSITION OF JOHN GROVE
                                )
PHYSICIANS CHOICE LABORATORY     )
SERVICES, LLC, DOUGLAS SMITH,    )
PHILIP MCHUGH AND MANOJ KUMAR,   )
                                )
            Defendants.          )
_____)
```

On Thursday, July 30, 2020, commencing at 9:00 a.m., the deposition of John Grove was taken on behalf of the Plaintiffs at the offices of United States Department of Justice, 227 West Trade Street, Suite 1650, Charlotte, North Carolina, and was attended by Counsel as follows:

APPEARANCES:

KATHERINE T. ARMSTRONG, ESQ.
SETH JOHNSON, ESQ.
Assistant United States Attorneys
United States Department of Justice
227 West Trade Street, Suite 1650
Charlotte, North Carolina  28202
on behalf of the Plaintiffs

BO B. CAUDILL, ESQ.
Weaver Bennett & Bland, PA
196 North Trade Street
Matthews, North Carolina  28105
on behalf of the Defendant Philip McHugh

ATTENDING:  Philip McHugh, Cathleen Hollowell

REPORTED BY:  MAI-BETH KETCH, CCR, CVR-M

ASHEVILLE REPORTING SERVICE

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
                        ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 25 of 283

1    in the previous question. But I don't

2    remember the name of that program.

3   Q  Got you. So now looking at this, if it

4    refreshes your memory, how was this desktop

5    analyzer pitched to the customer accounts or

6    potential customer accounts?

7   A  Yeah. So in a previous question I had told

8    you that the previous cup method, those

9    reimbursements were cut significantly from a

10    physician-office level. And they were now, it

11    looks like, that $20 figure, whereas before,

12    depending on the state, they were probably

13    much higher. And that's when these analyzer

14    discussions were more frequent because, with

15    that type of program, they could -- with the

16    proper equipment and all that kind of stuff,

17    could get back to similar type reimbursements

18    as before.

19   Q  Did that change to reimbursement from point-

20    of-care testing occur in the context of

21    Medicare, or was it universal to private pay

22    insurance carriers, etcetera?

23   A  I remember it -- I remember it as Medicare,

24    and then some of the private payers following

25    suit with that.

1   Q  Do you remember if PCLS ever put a hard stop

2    to the desktop analyzer in-house lab program?

3   BY MR. CAUDILL:

4    Objection. You can answer.

5   BY THE DEPONENT:

6    I don't remember. I remember the hard stop,

7    in my mind, is when we -- we started to --

8    things started to change in 2012. I don't

9    remember if that was directed or whatnot, but

10    there was a point that we just -- you know,

11    from side of things it wasn't discussed

12    anymore. I wasn't involved in those types of

13    discussions.

14   DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:

15   Q  So you weren't involved in discussions at a

16    decision level, as to the analyzer program; is

17    that correct?

18   A  I don't recall. I mean, what I was saying to

19    you is I remember that this was a period of

20    time that, in my mind, ended in around -- when

21    we started to kind of change as a sales

22    organization, new people coming in and such.

23   Q  I was looking through my notes for a second.

24   A  You bet. Go ahead.

25    Were you ever a party to any conversations

1    with anyone at PCLS about the use of the

2    analyzer in-house lab program to generate more

3    physician referrals to the company?

4   A  I don't -- I don't remember those

5    conversations. You know, looking back, you

6    know, probably helping some of these

7    physicians with that program or an

8    introduction maybe, you know, would help us

9    get confirmatory-type business. I just don't

10    -- I don't remember those discussions back

11    then. I don't.

12   Q  Do you remember any discussions internally

13    about the purpose of promoting these desktop

14    analyzers or in-house lab services to

15    customers or potential customers?

16   A  Can you say it again? I'm sorry.

17   Q  Sure. And it's a very similar question. I'll

18    try and ask it another way. Do you remember

19    any conversations internally about the purpose

20    of offering desktop analyzers or in-house lab

21    services to existing or perspective accounts?

22   BY MR. CAUDILL:

23    Objection. You can answer.

24   BY THE DEPONENT:

25    I don't remember specific conversations. But

1    my understanding, you know, is that it, you

2    know, could help us get the business that we

3    wanted.

4   DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:

5   Q  Who at PCLS, during the time you were offering

6    the analyzer services, would have been

7    responsible for making that decision?

8   BY MR. CAUDILL:

9    Objection. You can answer.

10   DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:

11   Q  Do you understand the question?

12   BY MR. CAUDILL:

13    Objection. You can answer.

14   BY THE DEPONENT:

15    Yeah, it would have been ownership.

16   DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:

17   Q  And who on the ownership team would have been

18    involved in decisions relating to the analyzer

19    program?

20   BY MR. CAUDILL:

21    Objection. You can answer.

22   DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:

23   Q  You understand the question?

24   A  I do.

25   BY MR. CAUDILL:

828-254-9230    ASHEVILLE REPORTING SERVICE    800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK  Document 129-4  Filed 12/08/20  Page 26 of 283

1     Objection to that question also.  You can
2     answer.
3 BY THE DEPONENT:
4     It would have been -- it would have been, you
5     know, Phil and Marcus at that time.
6 DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
7 Q  Do you recall anything specific about Phil
8     McHugh's involvement in the analyzer program?
9 BY MR. CAUDILL:
10     Objection.  You can answer.  And just to be
11     clear, my objection is to the use of the
12     phrase "analyzer program."  I'm not sure what
13     that refers to.
14 DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
15 Q  Do you understand what I mean when I'm saying
16     "analyzer program"?
17 A  I do.
18 Q  We can go back and define it.  Analyzer
19     program means PCLS offering to customer
20     accounts or prospective accounts to assist
21     with the setup of ---
22 A  Sure.
23 Q  --- in-office analyzers; correct?
24 A  Yeah.
25 Q  That's what you understood it to mean the

1     entire time we've been talking about this?
2 A  I understand.
3 Q  Okay.
4 A  Can you repeat your question?
5 Q  Now I've forgotten it.  Yes.  What was Phil
6     McHugh's involvement with the desktop analyzer
7     program?
8 A  Phil was a big part of sales at that time.
9     When I think of analyzers and -- you know, I
10     think of a relationship with that -- as I
11     mentioned before, the one that comes to mind
12     the most is the Select Labs out of Greensboro.
13     And Phil would have been involved in that.
14     Joe Wiegel would have been involved about --
15     with that at that -- you know, to some degree,
16     and probably Marcus.
17 Q  Was Manoj Kumar involved in desktop analyzers?
18 A  I believe so, based on some things that you've
19     mentioned today.  But when I think of during
20     the specific time frame that you're
21     referencing, I don't envision him in all those
22     conversations.  You later said that with Dr.
23     Nichols and he did this and that.  So
24     obviously, in my mind, I know that he was --
25     obviously you're saying he was involved.  But

1     when I look specific to this time frame, I
2     don't remember specific conversations with him
3     about analyzers.
4 Q  And I appreciate your clarification of that,
5     and I'll ask it again a different way.  Based
6     on your independent recollection, do you
7     recall Manoj Kumar having any involvement in
8     the analyzer program?
9 A  Vaguely.  And I don't know if it's because of
10     what has been discussed or whatnot.  But I
11     don't -- I don't remember him too much during
12     that time frame.
13 Q  When did Manoj Kumar join PCLS?
14 A  I don't know the specific -- specific time.  I
15     could speculate, if you'd like.
16 Q  No need to speculate.  That's fine.  I
17     appreciate that.
18 A  Okay.
19 Q  At some point Manoj Kumar came to work for
20     PCLS?
21 A  Correct.
22 Q  Do you know how he was brought onboard?
23 A  I don't.  I remember I think he was working
24     with some facilities in Indiana, and then I
25     believe he was brought on in a billing -- a

1     billing capacity for PCLS, as I -- that's how
2     I remember it during that time.
3 Q  What did you know about Manoj Kumar's
4     involvement with the medical practice or
5     practices in Indiana?
6 A  Not too much.  I -- the first I heard of Manoj
7     was that he was helping to manage -- I
8     believe, if I recall correctly, to manage some
9     similar type physician offices in the State of
10     Indiana.
11 Q  When you say similar type, are you referring
12     to pain management practices?
13 A  I believe so.
14 Q  Were you involved in the hiring of Manoj
15     Kumar?
16 A  No.
17 Q  Did you have any knowledge or information as
18     to his role in those pain management practices
19     in Indiana?
20 A  No.
21 Q  Do you recall when you first met him?
22 A  I don't.  I obviously remember meeting him and
23     having a number of conversations with him over
24     the year -- year or two and -- but I don't
25     remember specifically when I met him.

828-254-9230    ASHEVILLE REPORTING SERVICE    800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK  Document 129-4  Filed 12/08/20  Page 27 of 283

1  significant leaps as well from, maybe 24 to 48
2  to, you know, perhaps 70, 80, to 115. And I
3  think my base when I left was 120 maybe.
4  BY MR. CAUDILL:
5  Okay. If you will give me just five minutes,
6  I'm going to just talk to Phil and we'll come
7  back, and I'll probably be almost done.
8  BY THE DEPONENT:
9  Okay.
10 (OFF THE RECORD)
11 CROSS-EXAMINATION RESUMED BY MR. CAUDILL:
12 Q  Mr. Grove, we're back from a break. I just
13    have very fast questions for you, I think.
14 A  Okay.
15 Q  Other than the one time you came here in
16    December or November of 2017, have you spoken
17    to any representative of the Government about
18    this case?
19 A  No, I have not.
20 Q  Has any representative of the Government
21    attempted to contact you to speak to you about
22    this case, other than the time you came here
23    in December, November of 2017?
24 A  No, just a -- just a phone call a few weeks
25    ago to schedule me for this one.

1  Q  Have you ever been interviewed -- and this is
2     a little complicated, so stay with me. Have
3     you ever been interviewed, questioned, or
4     given a statement to a lawyer about this case,
5     other than a lawyer that represented you? And
6     tell me if you need me to ask it again.
7  A  Yeah, just ---
8  Q  One more time?
9  A  --- yeah, one more time.
10 Q  Other than a lawyer that represented you, so
11    not a lawyer that you hired, have you ever
12    spoken with, been questioned by or interviewed
13    by a lawyer related to this case?
14 A  No. Just my previous session here with Mr.
15    Ferry.
16 BY MR. CAUDILL:
17    Thank you. Those are all my questions.
18 (GOVERNMENT EXHIBIT NO. 5 MARKED)
19 REDIRECT EXAMINATION BY MS. ARMSTRONG:
20 Q  Very briefly, John, I think we'll get you out
21    of here in the next two minutes, I'm going to
22    show you what's been marked as Exhibit 5. I
23    just want to make this part of the record.
24    Does that document look familiar? (Tenders)
25 A  (Upon review) Yes.

1  Q  Is that the letter and subpoena that was
2     served on you by my office?
3  A  Yes.
4  Q  So you're here today pursuant to a subpoena?
5  A  Yes.
6  Q  And I believe you mentioned you had one phone
7     call with the Government prior to today to
8     schedule this. Is that correct?
9  A  Yes.
10 Q  No substantive conversation about the case or
11    investigation?
12 A  No, just to -- this was early in the month --
13    to see what would work for me later in the
14    month.
15 Q  I think the first time you and I have ever
16    spoken was this morning in the lobby where I
17    found you with Mr. McHugh and Mr. Caudill; is
18    that right?
19 A  That's correct.
20 BY MS. ARMSTRONG:
21    That's all I've got.
22 (PROCEEDINGS CONCLUDED AT APPROXIMATELY 1:29 P.M.
23 NEITHER COUNSEL NOR THE WITNESS REQUESTED TO READ
24 AND SIGN THE DEPOSITION.)
25

161

CERTIFICATE

I, Mai-Beth Ketch, CCR, CVR-M, Court Reporter
and Notary Public, do hereby certify that the
foregoing 160 pages are an accurate transcript of
the deposition of John Grove, taken by me and
transcribed under my supervision.

I further certify that I am not financially
interested in the outcome of this action, a
relative, employee, attorney or counsel of any of
the parties, nor am I a relative or employee of
such attorney or counsel.

This is the 20th day of August 2020.

_____

MAI-BETH KETCH, CCR, CVR-M

Notary Public No.: 19981410006

(The foregoing certification of this transcript
does not apply to any reproduction of the same by
any means, unless under the direct control and/or
supervision of the certifying reporter.)

Asheville Reporting Service
111 McDowell Street, Asheville, NC 28801
828-254-9230

41 (Pages 158 to 161)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
                         ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 28 of 283

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA    )
ex rel. TARYN HARTNETT,    )
and DANA SHOCHED,    )
    )
        Plaintiff,    )   CIVIL FILE NO.
    )    3:17-CV-37
    vs.    )
    ) (CONSOLIDATED WITH
PHYSICIANS CHOICE    )  CIVIL FILE NO.
LABORATORY SERVICES,    )  3:17-CV-46)
DOUGLAS SMITH, PHILIP    )
McHUGH, and MANOJ KUMAR,    )
    )
        Defendants.    )


        The deposition of SANKER
JAYACHANDRAN, M.D., called by
the Defendant for examination, taken pursuant to
the Federal Rules of Civil Procedure of the
United States District Courts pertaining to the
taking of depositions, taken before DIANE M.
NULICK, a Notary Public within and for the
County of Cook, State of Illinois, and a
Certified Shorthand Reporter of said State, at
Suite 200, 70 West Hubbard Street, Chicago,
Illinois, on the 18th day of November, A.D.
2020, at 10:28 a.m.

10

1  Q.  Great.
2      Go ahead and tell us your full
3  name, please.
4  A.  Sanker Jayachandran.
5  Q.  Dr. Jayachandran, what is your current
6  occupation?
7  A.  I'm a physician.
8  Q.  What type of physician are you?
9  A.  I'm a psychiatrist specializing in
10 addictions.
11 Q.  And are you currently working as a
12 psychiatrist?
13 A.  Yes, ma'am.
14 Q.  Where do you work?
15 A.  I work in Munster, Indiana.
16 Q.  And do you work at a medical practice?
17 A.  No.  This is my one practice, ma'am.
18 Q.  What is the name of your practice?
19 A.  Confidential Care.
20 Q.  And what type of practice is
21 Confidential Care?
22 A.  It's an outpatient treatment for
23 psychiatric and addictions for adult patients.
24 Q.  How long have you owned Confidential
25 Care?

11

1  A.  Since 1991.
2  Q.  And do you have any other medical
3  providers working at Confidential Care with you?
4  A.  Dr. Vijay Jayachandran, my wife,
5  another psychiatrist working with me.
6  Q.  And how long has your wife been working
7  at Confidential Care with you?
8  A.  Since 1991.
9  Q.  You mentioned, I believe, you were
10 located in Munster, Indiana.
11     Does your practice have any
12 other locations?
13 A.  No other location except currently we
14 are providing exclusively the telepsychiatry,
15 telemedicine.
16 Q.  Is that due to the current COVID
17 pandemic?
18 A.  Because of the pandemic, yes.
19 Q.  Thank you.
20     As part of your practice, do
21 you use urine drug testing?
22 A.  Yes, ma'am.
23 Q.  Can you tell us generally why you use
24 urine drug testing in your practice?
25 A.  There are many reasons.  One is the

12

1  initial eval and diagnosis.  I have to get some
2  kind of an understanding about the patient.  And
3  then on an ongoing basis, if I do any acute
4  care, like a detox, I need a repeated urine test
5  for the management purposes, acute care.  And
6  then the frequency of testing will go down later
7  on, after a month, once the patient becomes more
8  stable.
9  Q.  Are you using any labs right now for
10 your urine drug testing needs?
11 A.  Currently, I'm using two labs.
12 Q.  Can you tell us who those are?
13 A.  One is Quest Diagnostic.  The other one
14 is Diagnostic Center of Northwest Indiana
15 Region.  It's in Northwest Indiana.  NWI.
16 Diagnostic of NWI.
17 Q.  And are you using both of those labs
18 for confirmation drug testing?
19 A.  Both initial screening and
20 confirmation.
21 Q.  Can you tell us generally what you mean
22 by initial screening?
23 A.  When a new patient comes, which I stop
24 doing after the beginning of the pandemic, I do
25 the initial urine test.  That's part of the

13

1  diagnosis.  So what they report and what report
2  I get, if it's different, then I get more
3  information from that.  So I have to come up
4  with a diagnosis and what cause of action I have
5  to take, whether I should keep them in the
6  outpatient detox and maintenance or whether I
7  should refer them to an inpatient setting.
8  Q.  And for your initial screening, do you
9  use a qualitative or quantitative drug test?
10 A.  Within -- initially, it is
11 qualitative -- I need that right away, if
12 possible -- and then followed by the
13 quantitative testing.
14 Q.  Can you explain to us briefly what
15 qualitative testing means to you?
16 A.  A qualitative test is either positive
17 or negative, yes and no.  And then it also --
18 sometimes it doesn't pick up some other tests,
19 so it may have some false negative results.
20 That's one thing.
21     Secondly, if it's a positive
22 and negative, then I need to know the level of
23 drugs in the urine.  That's what the
24 confirmation is.
25 Q.  And is confirmation testing another way

4 (Pages 10 to 13)

**14**

1  of describing quantitative testing?
2      A.   It is to confirm because the
3  qualitative testing is not very accurate.  It
4  may miss some positive test.  And, also, it
5  doesn't tell me the quantity of substances in
6  the urine itself.  Then the confirmation tells
7  me the -- more of the quantity part of it, which
8  would be useful for me for the later serial
9  testing because the level is going down or going
10  up, so we can measure that as part of the
11  treatment.
12      Q.   And do you have the ability to run
13  qualitative tests in your own practice and how?
14      A.   Well, I -- initially, I didn't have
15  that.  In 2016, I started, and then I stopped
16  again with COVID and everything.
17      Q.   And I apologize, Doctor.  I caught the
18  in 2016 you started, but then I was not able to
19  get the rest of your answer.
20      A.   2016, I started doing some screening
21  because -- not all.  The majority, I refer them
22  out.  But later on, we stopped around 2019.
23      Q.   And did you say you stopped because of
24  COVID in 2019?
25      A.   Because I stopped taking more acutely

**15**

1  ill patients in 2019.
2      Q.   Okay.  Thank you.
3      A.   Because I moved from acute care --
4  acute care to more maintenance treatment.
5      Q.   When you were doing qualitative testing
6  in your office, were you using point of care
7  testing cups or another method to run your
8  tests?
9      A.   Mainly, the point of care is the
10  maintain thing.  Until 2016, I did not have
11  anything else other than a cup or sometimes a
12  strip, like that, one of the two.
13      Q.   Okay.
14          At any point in your practice,
15  did you use desktop analyzer equipment in your
16  office to run qualitative drug testing?
17      A.   Later on, after 2016, I started that.
18      Q.   Have you heard of a lab called,
19  Physicians Choice Laboratory Services?
20      A.   Yes, ma'am.
21      Q.   And as we talk today, I may refer to it
22  as Physicians Choice or PCLS, and will you know
23  I'm referring to Physicians Choice Laboratory
24  Services?
25      A.   Yes, ma'am.

**16**

1      Q.   How did you first become familiar with
2  Physicians Choice?
3      A.   When I started working with addiction
4  in 2010 and 2011, we needed a lab to work with.
5  And then we were contacted by many laboratory
6  services during that time.  One of them -- we
7  started working with Physicians Choice during
8  that time, in 2011.
9      Q.   Do you recall who from Physicians
10  Choice contacted you in 2011?
11      A.   I don't recall, ma'am.
12      Q.   And did you set up an account and
13  become a customer of Physicians Choice in 2011?
14      A.   Later on, I believe, in 2012, we
15  established an account.
16      Q.   All right.
17          In 2012, when you established
18  an account, do you recall who your PCLS sales
19  representative was?
20      A.   No, ma'am.
21      Q.   Do you know who Manoj Kumar is?
22      A.   Yes, ma'am.
23      Q.   How do you know Mr. Kumar?
24      A.   As a rep for Physicians Choice Lab, he
25  came to our office.  That's how I came to know

**17**

1  him.
2      Q.   And when did Mr. Kumar first come to
3  your office?
4      A.   I believe he came in 2014.
5      Q.   Is it possible that Mr. Kumar was your
6  PCLS sales rep back in 2012 when you signed up
7  with the company?
8          MR. CAUDILL:  Object to form.  You
9  can answer.
10          That was -- that was me
11  objecting to the form.
12  BY MS. ARMSTRONG:
13      Q.   You can answer, Doctor.
14      A.   No, ma'am.
15      Q.   When -- let me start again.
16          How did the meeting with Mr.
17  Kumar at your office in 2014 come about?
18      A.   Can you clarify the question?
19      Q.   Sure.
20          You mentioned earlier that in
21  2014 Mr. Kumar came to your office.  And the
22  question is:  How did that meeting come about?
23      A.   Like any representative from other lab
24  services, he came to our office, and then he
25  talked to me in-between patients.  And that's

18

1  the way we started.
2      Q.   Do you recall anything that you
3  discussed with Mr. Kumar during that first
4  meeting in 2014?
5      A.   I don't, ma'am.
6      Q.   At the time that Mr. Kumar met with you
7  in 2014, were you using Physicians Choice for
8  urine drug testing?
9      A.   I was using Physicians Choice to some
10 extent in previous years also, 2012 and 2013 and
11 also 2014.
12     Q.   In 2012, other than PCLS, were you
13 using any other labs for urine drug testing?
14     A.   I have other labs also.  I wanted to
15 restrict the number of labs to two or three
16 because of difficulty in managing many labs, so
17 I was using other labs.
18     Q.   Okay.
19          What other labs do you recall
20 using in 2012?
21     A.   I remember Millennium Lab.  I remember
22 Medstar.  And then I remember other ones I
23 tried, Aegis, A-e-g-i-s.
24     Q.   And in 2013, what other labs do you
25 recall using for urine drug testing?

19

1      A.   I might have used other labs, but I
2  don't have the full memory at this point, ma'am.
3      Q.   You stated that you recalled using PCLS
4  in 2013.  What is that recollection based on?
5          MR. CAUDILL:  Object to form.
6          You can answer.
7          THE WITNESS:  It's based on my memory
8  I'm going that point.
9  BY MS. ARMSTRONG:
10     Q.   Did you review any documents such as
11 patient files or order forms to determine when
12 you made referrals to PCLS?
13     A.   Not at this point.  I used to have
14 those records in the past.
15     Q.   For purposes of this deposition today,
16 though, I think the question is:  Did you review
17 any files or documents to refresh your memory as
18 to when you were referring to PCLS?
19         MR. CAUDILL:  Object to form.
20         You can answer.
21 BY MS. ARMSTRONG:
22     Q.   You can answer, sir.
23     A.   I reviewed some of the records, yes,
24 ma'am.
25     Q.   What records did you review today for

20

1  purposes of today?
2      A.   The exhibit I received yesterday, I
3  reviewed that, and -- and those are the main --
4      Q.   I'm sorry.  Go ahead.
5      A.   Those are the main thing I reviewed at
6  this point.
7      Q.   When you say the main thing you
8  reviewed, did you review anything in addition to
9  those exhibits in order to prepare for today?
10     A.   I was trying to recollect what labs I
11 was using, and then these are the names I came
12 up with from my memory.  Millennium.  Medstar.
13 One more lab I remember is Soft Landing.  Aegis.
14 These are the labs I remember.
15     Q.   Other than Mr. Kumar, have you ever met
16 with anyone else affiliated with PCLS?
17     A.   No, ma'am.  That I don't recall.
18
19          (WHEREUPON, the document marked
20          Jayachandran Deposition Exhibit
21          4 for identification was
22          tendered to the deponent.)
23
24 BY MS. ARMSTRONG:
25     Q.   I am going to ask you to look at a

21

1  document, and I apologize.  I don't know what's
2  the -- what number I labeled it as when I sent
3  it out yesterday because I'm not on my computer,
4  but it is a Physicians Choice Laboratory
5  Services provider acknowledgment and consent.
6          Do you have that in front of
7  you?
8      A.   I'm going through that, ma'am.  One
9  moment.  I'll get to it.
10     Q.   Thank you.  I appreciate that.
11     A.   Yes.
12         MR. CAUDILL:  Are you asking about
13 the PAF?
14         MS. ARMSTRONG:  Correct, Bo.  Thanks.
15         MR. CAUDILL:  Exhibit 4.
16         MS. ARMSTRONG:  Okay.
17         THE WITNESS:  Exhibit 4?
18         MS. ARMSTRONG:  Thank you.
19 BY MS. ARMSTRONG:
20     Q.   Do you have it in front of you, Doctor?
21     A.   Yes, ma'am.  I have Exhibit 4.
22     Q.   Great.  Thank you.
23          And are you familiar with this
24 document?
25     A.   I saw that yesterday, ma'am.

6 (Pages 18 to 21)

22

1    Q.   Have you seen it at any time before
2  yesterday morning?
3    A.   It's from my recollection.  I might
4  have seen this before.
5    Q.   Is that your signature at the bottom of
6  the document?
7    A.   That is my signature, yes, ma'am.
8    Q.   Do you recall when you filled out this
9  form?
10    A.   I don't know when I filled this form
11  because -- I'm trying to recollect.  I don't
12  remember when I did this.
13    Q.   Okay.
14        I see what looks like a fax
15  machine timestamp at the time top of the
16  document that reads May 29 of 2012.
17        Do you see that notation?
18    A.   Yes, ma'am.
19    Q.   Does that give you any indication as to
20  when you signed this document?
21    A.   From the date at the bottom, May 29,
22  and the date stamp at the top, it looks like
23  it's May 29, 2012.
24    Q.   If you will flip to page two of this
25  document, please, on the top right corner,

23

1  there's a notation 7/16/14.
2        Do you see that?
3    A.   Yes, ma'am.
4    Q.   Do you know who put that notation on
5  this document?
6    A.   I have no clue, ma'am.  I don't know.
7    Q.   Do you recall reviewing this document
8  again in 2014?
9    A.   I don't remember, ma'am.
10    Q.   Do you see the notation CB next to the
11  7/16/14?
12    A.   Yes, ma'am.
13    Q.   Is there someone at your office whose
14  initials are CB?
15    A.   I don't recall anybody that had the
16  initials CB, ma'am.
17    Q.   All right.
18        We're done with that document.
19  Thank you.
20        Did you at some point obtain a
21  loan from a company called M Holdings, LLC?
22    A.   I don't remember getting a loan from a
23  company except the documentation that I saw
24  yesterday.  I don't remember that name, ma'am.
25

24

1        (WHEREUPON, the document marked
2        Jayachandran Deposition Exhibit
3        1 for identification was
4        tendered to the deponent.)
5
6  BY MS. ARMSTRONG:
7    Q.   Okay.
8        And let's -- let's take a look
9  at a document I believe you reviewed.  It's the
10  promissory note.
11        Bo, would you mind sharing with
12  us what exhibit number that is?
13        MR. CAUDILL:  It is Exhibit 1.
14        MS. ARMSTRONG:  Thank you.
15  BY MS. ARMSTRONG:
16    Q.   Doctor, if you'll take a look at
17  Exhibit 1, please.
18    A.   Yes, ma'am.
19    Q.   Is this the document you reviewed in
20  preparation for your deposition?
21    A.   Yes, ma'am.
22    Q.   Do you recall seeing this document at
23  any point prior to yesterday?
24    A.   No, ma'am.
25    Q.   And if you'll flip to the second page

25

1  for me.
2    A.   Yes, ma'am.  I did.
3    Q.   Okay.
4        Is that your signature there on
5  the second page?
6    A.   Yes, ma'am.
7    Q.   Do you believe that at some point you
8  did review and sign this document?
9    A.   That's what I believe, ma'am.
10    Q.   Okay.
11        Flipping back to the front
12  page, it looks like there's a fax notation
13  8/24/14, at the top.
14        Do you see that?
15    A.   Yes, ma'am.
16    Q.   Do you know whose fax number that is?
17    A.   I don't know, ma'am.  That 812 number?
18  I don't know what number it is.
19    Q.   What were the circumstances leading up
20  to your signing this promissory note?
21    A.   The circumstance was I was in the midst
22  of helping the opiate crisis and the amount of
23  referrals for me from our community and
24  physicians -- a lot of patients came to our
25  practice in an acute condition in 2014.  So

7 (Pages 22 to 25)

26

```
 1  during that time, I needed -- I was looking for
 2  a loan.  Many lenders offered many loans as a
 3  working capital, as the bridge loan, to help our
 4  practice.  And then my belief is I obtained one
 5  of these loans during that time.  That's my
 6  belief.
 7       Q.   Which lenders offered you or the
 8  practice a bridge loan?
 9       A.   A lot of lenders, ma'am.  I obtained a
10  loan from a company called, the Bankers
11  Healthcare Group, New Logic, and Capital cards
12  and many -- yeah.  Capital credit cards.  Yeah.
13       Q.   Let's -- let's go through that.  I
14  missed some of your answer -- and I apologize --
15  due to, I think, the difficulty of technology.
16            So if I understood you
17  correctly, you obtained multiple bridge loans;
18  is that correct?
19       A.   That is correct, ma'am.
20       Q.   Okay.
21            One of the lenders was Bank
22  Healthcare Group?
23       A.   Bankers Healthcare Group.  It's -- the
24  abbreviation for that is BHG.
25       Q.   How much money was the loan you
```

27

```
 1  obtained from that group?
 2       A.   Two hundred fifty thousand.
 3       Q.   And when did you obtain that loan?
 4       A.   I don't remember exactly, ma'am.  It
 5  might be 2012.  I might have renewed it again in
 6  '13 and '14.
 7       Q.   I'm sorry.  I caught 2012, and I missed
 8  the last part of your answer.
 9       A.   Every year I might have renewed the
10  loan.  That's my feeling, yeah.  I don't
11  remember exactly.
12       Q.   Okay.
13            And you mentioned New Logic.
14  Was that another lender?
15       A.   That's another co-lender from the
16  Bankers Health Group, and they recommended
17  additional loan.  New Logic is another one.
18       Q.   Okay.
19            And how much was the loan you
20  obtained from New Logic?
21       A.   I don't remember the amount, ma'am.
22       Q.   Do you remember when you obtained that
23  loan from New Logic?
24       A.   Around the same -- around the same
25  period, I believe.  I don't recollect
```

28

```
 1  completely.  Maybe '13 or -- '12, '13, or '14.
 2  Around that time.
 3       Q.   Okay.
 4            And I believe you mentioned
 5  another lender, Capital something?
 6       A.   Yeah.  Capital card.  That's a credit
 7  card company.  I also received a lot of calls
 8  and then mail solicitation, and also many people
 9  came to my office also soliciting for the loan.
10       Q.   How much was the loan that you obtained
11  from Capital, the card company?
12       A.   I don't remember that.  Maybe --
13  $15,000, maybe.  I don't know the exact amount.
14       Q.   And do you recall when you obtained
15  that loan?
16       A.   Around the same time.  I don't
17  recollect.
18       Q.   Do you recall receiving any other loans
19  that we haven't discussed yet?
20       A.   I don't recall any other loan.
21       Q.   Okay.
22            Did you eventually repay the
23  loan from the -- the Aegis Healthcare Group?
24       A.   I paid off Bankers Healthcare Group.  I
25  paid off the Capital card.  And also I paid off
```

29

```
 1  the New Logic loan.
 2       Q.   Do you recall when you paid off the
 3  $250,000 Bankers Healthcare Group loan?
 4       A.   Last year.  2019.
 5       Q.   Do you recall when you paid off the New
 6  Logic loan?
 7       A.   That was sometime back.  I don't
 8  remember when.
 9       Q.   Do you recall when you paid off the
10  Capital card loan?
11       A.   That was three or four years ago.
12       Q.   Turning our attention back to Exhibit
13  1, the promissory note for a $50,000 loan, do
14  you have that in front of you?
15       A.   Yes, ma'am.
16       Q.   Have you had an opportunity to review
17  it?
18       A.   Let me review that, ma'am.
19       Q.   Sure.
20       A.   I did review it before the meeting
21  today.  Let me review it a little bit more.
22       Q.   Of course.
23       A.   Yes, ma'am.
24       Q.   What, if anything, do you know about
25  the lender, M Holdings, LLC?
```

30

```
 1        A.   What is your question?  Repeat the
 2   question, ma'am.
 3        Q.   Sure.
 4             What, if anything, do you know
 5   about the lender, M Holdings, LLC?
 6        A.   I don't remember anything about M
 7   Holdings, LLC.
 8        Q.   Did you ever meet with a representative
 9   of M Holdings, LLC?
10        A.   I don't recall, ma'am.  I don't
11   remember.
12        Q.   Who did you negotiate the $50,000 loan
13   with?
14             MR. RAAB:  I'm going to object to
15   form as vague.
16   BY MS. ARMSTRONG:
17        Q.   Dr. Jayachandran, you obtained a
18   $50,000 loan from M Holdings, LLC, correct?
19        A.   That's what this record shows, ma'am.
20   But the name itself, I don't remember.  M
21   Holdings, LLC, I don't remember that.
22        Q.   But do you recall a $50,000 loan?
23        A.   I remember the loan.  Yes, ma'am.
24        Q.   Okay.
25             Who did you discuss the loan
```

31

```
 1   with?
 2        A.   I don't remember that, ma'am.
 3        Q.   Was it Manoj Kumar?
 4             MR. CAUDILL:  Object to form.
 5             You can answer.
 6
 7             (There was a discussion off
 8              the record.)
 9
10   BY MS. ARMSTRONG:
11        Q.   All right.
12             I believe that my question
13   was -- why don't I just do this.  I'll ask it
14   again.
15             Did you discuss a $50,000 loan
16   with Manoj Kumar?
17        A.   I don't remember that, ma'am.
18        Q.   Did you discuss any loans with Manoj
19   Kumar?
20        A.   I was looking for some loan during that
21   time.  I might have discussed something with
22   him.  But I don't recall if I specifically
23   discussed anything with him.
24        Q.   Did you ever get a loan from a person
25   named Dr. Gupta?
```

32

```
 1        A.   Yes, ma'am.
 2        Q.   Who is Dr. Gupta?
 3        A.   Dr. Gupta is a physician.  He's in
 4   practice two and a half hours away from my
 5   practice in Munster.  He's near Indianapolis.
 6   And that's Dr. Gupta.
 7        Q.   And did you known Dr. Gupta before you
 8   obtained a loan from him?
 9        A.   No, ma'am.
10        Q.   How did you get introduced to Dr.
11   Gupta?
12        A.   Kumar might have -- Kumar recommended
13   me to Dr. Gupta.  That's how I came to know him.
14        Q.   And what was the amount of the loan
15   that you obtained from Dr. Gupta?
16        A.   Fifty thousand, ma'am.
17        Q.   Do you know when you obtained that loan
18   from Dr. Gupta?
19        A.   From my records, I see that I received
20   it on December 19, 2014.
21        Q.   Okay.
22             And was it a loan from Dr.
23   Gupta individually or for -- from an entity or a
24   company?
25        A.   Individually.
```

33

```
 1        Q.   I apologize.  I missed that?
 2        A.   Individually, ma'am.  Not from an
 3   entity.
 4        Q.   Gotcha.  Thank you.
 5             And did you repay that loan to
 6   Dr. Gupta?
 7        A.   Yes, ma'am.
 8        Q.   And what did you use the money you
 9   obtain from Dr. Gupta for?
10        A.   I used the money to repay the loan I
11   obtained during this time and paid off that
12   loan.  The following day, I paid it off.
13   Whoever were the lenders for me for the $50,000,
14   the original $50,000, I paid off the loan on the
15   next day after I received the loan.  It's more
16   like a refinancing the loan.
17        Q.   Okay.
18             Let me make sure I understand
19   that.  You used the money from Dr. Gupta to
20   repay the $50,000 from M Holdings, LLC?
21        A.   I don't remember the name, but the
22   record says M Holdings.  It's confusing me
23   because I paid that -- not to M Holdings.  I
24   paid it to a different company, so it's not
25   clear to me.
```

**34**

```
 1        Q.   Let's talk about that.
 2             Bo, may I ask your assistance,
 3   again?  Could you please tell us what number the
 4   exhibit is for the Chase Bank statement of
 5   August 14 through September 14?
 6        MR. CAUDILL:  It's two.
 7        MS. ARMSTRONG:  Two?
 8        MR. CAUDILL:  Yeah.
 9        MS. ARMSTRONG:  Great.  Thank you.
10
11        (WHEREUPON, the document marked
12         Jayachandran Deposition Exhibit
13         2 for identification was
14         tendered to the deponent.)
15
16   BY MS. ARMSTRONG:
17        Q.   Dr. Jayachandran, can you please look
18   at Exhibit No. 2?
19        A.   Yes, ma'am.
20        Q.   And do you see the name of the account
21   holder on this bank statement midway down the
22   first page?
23        A.   Yes, ma'am.
24        Q.   And is that your wife?
25        A.   Yes, ma'am.
```

**35**

```
 1        Q.   And do you see on this bank statement a
 2   wire transfer?
 3        A.   Yes, ma'am.
 4        Q.   Can you tell us who you received that
 5   transfer if from?
 6        MR. RAAB:  Object to form.
 7   BY MS. ARMSTRONG:
 8        Q.   You can answer, Doctor.
 9        A.   I see the $50,000 now that I'm reading
10   the details now.  At the point when I received,
11   I was looking into the details.
12        Q.   Having reviewed this, are you able to
13   say who wired the $50,000 into your wife's Chase
14   account?
15        MR. RAAB:  Object to form.
16   BY MS. ARMSTRONG:
17        Q.   You can answer.
18        A.   It was transferred from Wells Fargo
19   Bank.
20        Q.   Ah-huh.
21             Do you see the name Philip T.
22   McHugh, Jr.?
23        A.   Yes, ma'am.
24        Q.   Who is Philip T. McHugh, Jr.?
25        A.   I have no clue, ma'am, from the -- at
```

**36**

```
 1   that point, I didn't read this one.  And I have
 2   no clue who Philip McHugh was.
 3        Q.   And sitting here today, you do not know
 4   who Philip T. McHugh, Jr., is?
 5        A.   From the information given to me now, I
 6   know he is one of the owners of PCLS.
 7        Q.   And just to make sure I understand,
 8   that's information that you obtained in
 9   preparing for this deposition; is that correct?
10        A.   Only yesterday I came to know this.
11   Yes, ma'am.
12        Q.   Okay.  Thank you.
13
14        (WHEREUPON, the document marked
15         Jayachandran Deposition Exhibit
16         3 for identification was
17         tendered to the deponent.)
18
19   BY MS. ARMSTRONG:
20        Q.   Okay.  Let's go ahead and look at what
21   I believe is marked as Exhibit 3.  It should be
22   an image of a check.
23             Do you have that in front of
24   you, sir?
25        A.   Yes, ma'am.
```

**37**

```
 1        Q.   All right.
 2             Does this appear to be a check
 3   written from your bank account?
 4        A.   Yes, ma'am.
 5        Q.   And is this the $50,000 repayment you
 6   mentioned earlier that you had funded through a
 7   loan from Dr. Gupta?
 8        A.   Yes, ma'am.
 9        Q.   What is Silent Storm Holdings?
10        A.   I have no idea, ma'am.  I believe --
11   looking at this now, I believe it was the -- one
12   of the lenders who loaned me the money
13   originally, the $50,000.  And I paid back that
14   loan after I got the refinancing.
15        Q.   Why did you take out a $50,000 loan
16   from Silent Storm and/or M Holdings?
17        MR. RAAB:  Objection.  Asked and
18   answered.
19        MR. CAUDILL:  I'm also going to --
20   I'm also going to object to form.
21   BY MS. ARMSTRONG:
22        Q.   Dr. Jayachandran, why did you take out
23   this specific loan?
24        A.   This is one of the bridge loan I
25   needed.
```

50

1  STATE OF ILLINOIS   )
2             ) SS:
3  COUNTY OF C O O K   )
4
5     I, DIANE M. NULICK, a Notary Public
6  within and for the County of Cook, State of
7  Illinois, and a Certified Shorthand Reporter of
8  said state, do hereby certify:
9     That previous to the commencement of the
10  examination of the witness, the witness was duly
11  sworn to testify the whole truth concerning the
12  matters herein;
13     That the foregoing deposition transcript
14  was reported stenographically by me, was
15  thereafter reduced to typewriting under my
16  personal direction and constitutes a true record
17  of the testimony given and the proceedings had;
18     That the said deposition was taken before
19  me at the time and place specified;
20     That the said deposition was adjourned as
21  stated herein;
22     That I am not a relative or employee or
23  attorney or counsel, nor a relative or employee
24  of such attorney or counsel for any of the
25  parties hereto, nor interested directly or

51

1  indirectly in the outcome of this action.
2     IN WITNESS WHEREOF, I do hereunto set
3  my hand and affix my seal of office at Chicago,
4  Illinois, this 25th day of November, 2020.
5
6
7
8
9
       _____
10     Notary Public, Cook County, Illinois.
11
12  C.S.R. Certificate No. 084-002029.
13
14
15
16
17
18
19
20
21
22
23
24
25

14 (Pages 50 to 51)

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 3               CHARLOTTE DIVISION
 4
 5  UNITED STATES OF AMERICA        : CIVIL
 6  ex rel., TARYN HARTNETT, and    : FILE NO.:
 7  DANA SHOCHED,                   : 3:17-CV-37
 8        Plaintiffs,               : (CONSOLIDATED
 9     v.                           : WITH CIVIL
10  PHYSICIANS CHOICE LABORATORY    : FILE NO.:
11  SERVICES, DOUGLAS SMITH,        : 3:17-CV-46)
12  PHILIP MCHUGH, and MANOJ KUMAR,:
13        Defendants.               :
14
15     VIDEOTAPED DEPOSITION OF JOHN H. JOHNSON
16  taken on behalf of the Plaintiffs herein,
17  pursuant to the Rules of Civil Procedure, taken
18  before me, the undersigned, Dale Curtis Rose,
19  Jr., a Court Reporter and Notary Public in and
20  for the Commonwealth of Pennsylvania, at the
21  United States Attorney's Office for the Western
22  District of Pennsylvania, 319 Washington Street,
23  Suite 200, Johnstown, Pennsylvania, 15901, on
24  Wednesday, September 9th, 2020, beginning at
25  10:05 a.m.
```

1    Q.         You mentioned your corporation.  What
2    corporation is that?
3    A.         Central Anesthesia and Lighthouse Medical.
4    Q.         Is that one corporation or two corporations?
5    A.         Two corporations, but there was much cross-
6    pollination, cross-staffing.
7    Q.         You mentioned those were your corporations.
8    Did anyone else have an ownership in those two
9    corporations?
10   A.         No, not those.  We had a few d/b/a's,
11   Central PA Pain Management, but they were all
12   operating under Central Anesthesia and Lighthouse.
13   Q.         And you were the sole owner of Central
14   Anesthesia and Lighthouse; correct?
15   A.         Yes.
16   Q.         For the eight pain management practices that
17   you had, roughly, how many people did you employ?
18   A.         200-plus.  We had numerous independent
19   contractors too.  Maybe 20, maybe 40 independent
20   contractors on top of the employees.
21   Q.         How many doctors?
22   A.         It would vary over time.  Ten (10) is a good
23   estimate at any particular time.  We also employed
24   mid-levels, PA's, and nurse practitioners, and that
25   would vary.  Most likely another 10 or so of those.

1  Q.        Would there be one doctor per location I

2  would assume?

3  A.        We would have several different locations

4  that each physician would cover and with overlap

5  between them mostly limited by geography.  Not all

6  clinics operated five days a week.  Some would.  Some

7  were only one, two, three, four days a week.

8  Different doctors and different mid-levels would go to

9  different clinics on different days.

10  Q.        You mentioned these began in the early

11  2000's; right?

12  A.        Yes.

13  Q.        And then you said at the max there was eight

14  pain management clinics open; right?

15  A.        One second.  It gets confusing.

16  Q.        Fair enough.

17  A.        Seven or eight.

18  Q.        So roughly seven or eight ---

19  A.        Yes.

20  Q.        --- at the max?  And then you seemed to

21  indicate that that number dropped at a certain point;

22  is that correct?

23  A.        That was the maximum, and it really didn't

24  drop.  It stayed that level until mid-2017.

25  Q.        In 2012 to 2013, how many pain management

1  ran it?

2  A.        Yes, my brother.

3  Q.        Were those profitable?

4  A.        Considering I inherited most of them, yes.

5  Q.        So you had no upfront cost for the farms?

6  A.        That's right, yeah.  Well, a couple I

7  purchased but ---.

8  Q.        For your pain management practice, did you

9  have a relationship with Williams Hughes and his

10 laboratory Universal Oral Fluids Laboratory?

11 A.        Yeah, yes.

12 Q.        And if I refer to that lab as UOFL, you'll

13 know what I mean?

14 A.        Yes.

15 Q.        How long did you have a relationship with

16 Mr. Hughes and UOFL?

17 A.        Best of my recollection from in around 2011,

18 maybe a bit earlier.

19 Q.        Can you describe your relationship with

20 Hughes and UOFL?

21 A.        I was the lab director and also I sent

22 saliva toxicology or saliva toxicology drug testing

23 samples to --- to him.

24 Q.        Did you ever receive any payments for

25 sending drug testing samples to Hughes and UOFL?

1    A.          Yes.

2    Q.          What types of payments?

3    A.          The amount or how it was paid?

4    Q.          What kind?    Was it cash, check?

5    A.          Check, check.

6    Q.          So you would receive checks for sending drug

7    testing samples to UOFL; correct?

8    A.          Yes.

9    Q.          How long did you receive checks for sending

10   those samples to UOFL?

11   A.          Best of my recollection from the time we

12   started the relationship was somewhere around 2011

13   until 2014.    Maybe it was '12 to '14, somewhere in

14   there.    '11 or '12 to spring of '14.

15   Q.          And that was in addition to the payments you

16   received as lab director; correct?

17   A.          No, it was just one big check.

18   Q.          Just one big check?

19   A.          Yeah.

20   Q.          Do you have an estimate of how much money

21   UOFL paid you to refer lab tests to them?

22   A.          I know how much they paid me in total was

23   somewhere around $2.2 to $2.4 million.

24   Q.          Do you know what qualitative versus

25   quantitative testing is?

1  set the cutoff, the more reliable it is, but it's less

2  sensitive.

3  Q.        So that's something you can adjust versus

4  using the urine or saliva cups?

5  A.        The cups, there's no adjustment to it.  It's

6  either blue or not blue.

7  Q.        Did PCLS ever do the quantitative testing

8  for UOFL?

9  A.        Yes, they did.  That was not advertised to

10  me by Hughes that were doing that.  He presented to me

11  that he was doing all the testing himself, qualitative

12  and quantitative.  Then I realized Physicians Choice

13  was doing the quantitative testing because there was a

14  report that came to me with that on it, and I was a

15  little surprised that he was --- it didn't make any

16  difference.  The results are the results.  It just

17  seemed a little odd that he was working with another

18  lab to do the quantitative testing.

19  Q.        So you were sending samples for testing to

20  UOFL, and those were being sent to PCLS for

21  quantitative testing; right?

22  A.        Yes.  I didn't know that to begin with, but

23  again, it didn't make --- it made no difference in the

24  results, but I did not know that until later on.

25  Q.        Did that change at any point?

1  A.        Yes.  Hughes set up his own analyzers.

2  Q.        Do you remember when that was?

3  A.        2012/2013.  I'm just not exactly sure of the

4  date.

5  Q.        It's been a while?

6  A.        Yes.

7  Q.        Can I steal an exhibit sticker from you?

8                              *   *   *

9            (Whereupon, the document was marked as

10 Deposition Exhibit No. 1 for purposes of

11 identification.)

12                             *   *   *

13 BY ATTORNEY JOHNSON:

14 Q.        I'm going to show you what's being marked as

15 Exhibit 1.  Did you ever receive a letter like this

16 from PCLS?

17 A.        Yes.  Would you mind if I read it all again?

18 This is the first time I've seen this in seven/eight

19 years.

20 Q.        Certainly.  Take your time.

21 A.        (Witness peruses document).  Yes.

22 Q.        So you've seen the letter in Exhibit 1;

23 right?

24 A.        Yes.

25 Q.        And that was a letter from PCLS to you?

1  A.        Yes.

2  Q.        And that informed you that effective

3  November 30th, 2011 UOFL and PCLS were no longer ---

4  PCLS was no longer doing the testing for UOFL; right?

5  A.        Yes.

6  Q.        Did you stay with UOFL after you received

7  this letter?

8  A.        Yes.

9  Q.        Did you stay with UOFL for the entirety of

10 your pain management practice?

11 A.        Until the spring of 2014.

12 Q.        Why did your relationship with UOFL end in

13 the spring of 2014?

14 A.        There was an FBI and related agency raid

15 both at UF --- Universal and my clinics in March of

16 2014.

17 Q.        Would it be easier if we just called them

18 Universal?

19 A.        Yes.

20 Q.        Probably, yeah.

21 A.        The letters and the acronyms are getting a

22 little confusing.

23 Q.        I agree.  We'll refer to them as Universal

24 from now on.  You mentioned there was an FBI raid in

25 2014, Mr. Johnson.  You're currently incarcerated;

1  correct?

2  A.        Yes, I'm home confinement now.

3  Q.        You've been released on home confinement?

4  A.        I'm under --- I'm in custody, but yes, on

5  home confinement.

6  Q.        And that's the result of convictions in the

7  Southern District of Florida and the Western District

8  of Pennsylvania; correct?

9  A.        Yes, we cut a plea deal in both

10  jurisdictions.

11  Q.        And you were sentenced to 84 months?

12  A.        Yes.

13  Q.        And you were ordered to pay restitution?

14  A.        Yes.

15  Q.        And was that $2.3 million to Health and

16  Human Services?

17  A.        That sounds about right.

18  Q.        And roughly $720,000 to the IRS?

19  A.        Yes.  That's for the Pennsylvania case with

20  Universal.  The tax was me personally that was failure

21  to remit withholding tax and that had nothing to do

22  with Universal.  The tax was on my end for my company.

23  The $2.3 or $2.4 million was in relationship to

24  payments from Universal.

25  Q.        And that was for accepting monetary payments

1  to refer samples to Universal; correct?

2  A.        Yes.   Kickbacks, yes.

3  Q.        So you accepted kickbacks to refer samples

4  to Universal and then as part of your criminal

5  conviction you were ordered to pay roughly $2.3

6  million in restitution to HHS?

7  A.        Yes.

8  Q.        And to be clear, you were accepting those

9  kickbacks through the spring of 2014 when there was

10  that FBI raid?

11  A.        Yes.

12  Q.        And you were accepting those kickbacks when

13  Universal was referring the samples for quantitative

14  testing to PCLS; correct?

15  A.        Yes.

16  Q.        Did anyone ever try to gain your business

17  from Universal?

18  A.        Yes.

19  Q.        Who?

20  A.        Many different companies.

21  Q.        Did PCLS ever try to gain your business from

22  Universal?

23  A.        Yes.

24  Q.        Who at PCLS tried to gain your business from

25  Universal?

1  A.        Manoj Kumar.  I knew him by Manoj.  He was

2  my primary contact.  Phil McHugh was also involved but

3  not --- most of the conversations were with Manoj, the

4  emails and --- and phone calls.

5  Q.        How did PCLS, Manoj Kumar, and Phil McHugh

6  try and gain your business from Universal?

7  A.        What --- please realize it's been several

8  years between that and now.  So I'll recall to the

9  best of my ability with this.  I'm not certain who

10 reached out to who.  It's my recollection that someone

11 from PCLS reached out to me about a relationship.  And

12 that it was --- I'm not certain if they wanted all the

13 business or just wanted a piece of the business.  I

14 was very reluctant to sever my relationship with

15 Hughes.  It was a known entity, the system was

16 working, but I had a large volume of samples.

17          So my thought process was maybe I can work

18 with more than one entity at a time.  And then that

19 way it's a backup in case something happens to one,

20 there's another entity.  Now, PCLS was not the only

21 lab that approached me.  There were many other labs.

22 I don't have the records on that and memory fails me.

23 But I know there were several out of Louisiana,

24 Mississippi. There were some out of Texas and other

25 states.

1  Q.        Did anyone from PCLS ever indicate to you
2  that they were aware of the arrangement you had with
3  Hughes and Universal?
4  A.        They were aware of a relationship.  I'm not
5  certain they were --- they knew the particulars or the
6  specifics of the relationship.  They may have and
7  didn't say it.  I don't know.  I didn't say anything.
8  But from the conversations, they were aware that there
9  was a relationship there, a financial relationship in
10 return for sending samples.
11 Q.        So from your conversations with PCLS, you
12 believe that they were aware that you had a kickback
13 arrangement with Universal?
14 A.        Yes.  That sounds rather blunt right now,
15 but you know, at the time, it was in my mind it was
16 denial and I sort of smoothed it over.  But they were
17 aware there was an improper relationship.
18 Q.        What made you think that PCLS was aware
19 there was an improper relationship?
20 A.        In the conversations, again, I cannot tell
21 you exact words.  I can't tell you exact days.  I
22 don't recall.  But the general recollection was that
23 one of the advantages of working with PCLS was that
24 the relationship would be more compliant was the term
25 they used.  That it would --- the financial

1  relationship would be --- it would be more compliant

2  or less likely to be discoverable or people know about

3  it.  And one thing was too in conversation was the

4  relationship with Hughes was not just with me but with

5  everyone was very public.  He told everyone of the

6  relationships.  I even think he had it on the website

7  for a while.  And he was very open about it.

8  Q.        And Hughes was paying you straight cash by

9  check; correct?

10 A.        Check, yes.

11 Q.        So your understanding was that the financial

12 arrangement with PCLS would be done more covertly than

13 a check?

14          ATTORNEY CAUDILL:  Objection, it's

15 leading.

16 BY ATTORNEY JOHNSON:

17 Q.        You can answer.

18 A.        Answer the question?

19 Q.        Yes, you can answer.

20 A.        Yes, it would be not so obvious.

21 Q.        But there would still be a financial

22 arrangement with PCLS?

23          ATTORNEY CAUDILL:  Objection, also

24 leading.

25          THE WITNESS:  The arrangement was that

1  there wouldn't be money changing hands; okay?  But

2  what it was was PCLS had set me up with an analyzer

3  where I could do the qualitative testing and submit

4  the billing for that, and the reimbursement was

5  significantly more than the point-of-care cups.  And

6  so that they would set me up with the analyzer, I

7  would bill for that, but in return I would send to

8  them for quantitative testing all the samples that I

9  ran on the analyzer.  That was the arrangement.

10  BY ATTORNEY JOHNSON:

11  Q.        So having an analyzer in your office would

12  be more profitable to you than using the cups?

13  A.        Yes.

14  Q.        Are analyzers expensive?

15  A.        Expensive is a relative term.

16  Q.        Do you know how much the average analyzer

17  costs?

18  A.        Yes, I do.  And that depends on a lot of

19  factors, whether you get used, used refurbished, the

20  age of the machine, the size of the machine, the model

21  of the machine, the manufacturer, and it depends on

22  whether you're talking about the qualitative testing

23  or the quantitative testing.  The qualitative testing

24  like the machine they were going to set me up with,

25  typically an Olympus, and there's different models

1 based upon throughput. A used one that's refurbished

2 at that time could be bought for $40,000/$50,000; a

3 new one maybe twice that or more.

4       Now, on the quantitative end, the mass spec,

5 liquid chromatography mass spectrometry, that gets

6 very expensive. At the time, a used refurbished one

7 of those was $350,000/$400,000. I know. I bought two

8 of them. New ones were almost double that for the

9 amount of volume that we were doing. But we weren't

10 talking about quantitative. We were talking about the

11 less expensive qualitative machine.

12 Q.     You mentioned that it was an Olympus?

13 A.     Yes, and that's also the machine that I

14 eventually put in on my own.

15 Q.     When did you eventually put in an Olympus on

16 your own?

17 A.     I think 2013.

18 Q.     Why did you put in the Olympus on your own

19 versus the Olympus that PCLS was going to arrange for

20 you?

21 A.     It was multi-factorial. Number one, I was

22 reluctant to break my relationship with Hughes because

23 I was sending samples to PCLS and --- but the majority

24 of my samples were going to Universal. I had other

25 labs I was working with too; there was no financial

1  arrangement with some of the others.  But the staff
2  when you have a big staff, there's always chitter-
3  chatter.  And Hughes had somehow found out about
4  samples going to PCLS.  And it was my understanding
5  there was a lot of bad blood there.  And so Hughes
6  through Jeff Thomas and Hughes himself were very vocal
7  about not working with PCLS --- PCLS.
8          And the other thing is I realized that the
9  analyzer was not that expensive and I found another
10  source of it where I could --- there's no upfront
11  cost. I just paid for the analyzer through the use of
12  the reagents.  The reagents are the chemicals that are
13  used to do the test, and there was another company
14  that would mark up the cost of the reagents, but that
15  included --- you know, the lease of the machine was
16  built into the cost of the reagents.  And I could
17  actually make more money that way and not have the
18  conflict with Hughes.  So I decided to do it on my
19  own.
20 Q.      So there's two ways a doctor could buy an
21 analyzer for their practice.  You could purchase the
22 analyzer out-front, and then --- or you could lease it
23 and pay a higher reagent fee?
24 A.      Yes.  There are multiple ways of --- there's
25 all sorts of creative financing for that, but those

1  are two ways commonly, two broad categories.

2  Q.       And so you stopped referring samples to PCLS

3  because you were, A, worried that Hughes would find

4  out you were referring samples to PCLS and that would

5  harm your relationship with Hughes and Universal, and

6  B, you realized you could obtain the analyzer on your

7  own?

8  A.       Yes.  I'm not certain if I completely

9  stopped sending to PCLS.  I think I did.  I think I

10  did.  But I know the volume cut back, and I think I

11  eventually stopped sending them there.  But I'm not

12  certain if I stopped every one, all the submissions.

13  Q.       Let's go back to the beginning of the

14  relationship with PCLS.  Who did you talk to at PCLS

15  in the beginning?

16  A.       It was mostly Manoj.  There were a few

17  conversations with McHugh on the phone.  There were

18  emails, and McHugh directed me to work primarily with

19  Manoj, which was not uncommon for the CEO to delegate

20  a subordinate to deal with routine operational-type

21  issues and set-up issues.

22  Q.       You mentioned you emailed with Philip McHugh

23  and talked to him on the phone.  Did you ever meet

24  with Philip McHugh in person?

25  A.       Yes.

1    Q.          When was that?

2    A.          Somewhere around 2012, maybe early 2013.

3    Q.          Was it before you were referring samples to

4    PCLS?

5    A.          I think I was sending them samples before

6    that.  Now whether that was a relation --- yeah,

7    here's --- forgive me for the recollection issue, but

8    it's been a while.  I started sending them samples

9    when we had a discussion because they wanted a good-

10   faith gesture that I was going to send them samples

11   that they weren't going to invest all this time and

12   money in me and then me not send them samples later

13   on.  They set me up in a lab and then I just basically

14   not send them any samples, so they wanted some good-

15   faith show that I would send them samples for some

16   period of time to show that I would be willing to work

17   with them if they were going to invest in me.

18   Q.          Who at PCLS told you they wanted that good-

19   faith gesture?

20   A.          Manoj.

21   Q.          Was anyone else present for that

22   conversation?

23   A.          The in-person conversation?

24   Q.          The conversation where you were told PCLS

25   wanted a good-faith gesture of samples?

1  A.        That was on the phone.

2  Q.        That was on the phone with Manoj?

3  A.        Yes.

4  Q.        And was anyone else on that phone call?

5  A.        Not that I recall.

6  Q.        Was that conversation before or after the

7  in-person meeting?

8  A.        That was before.

9  Q.        And so after that, you met with Manoj Kumar

10  and Phil McHugh?

11  A.        Yes.

12  Q.        Where was that meeting?

13  A.        That was in Altoona at one of my offices.

14  Q.        What was discussed at that meeting?

15  A.        The particulars of how the arrangement would

16  work, what they were going to do and what I would do

17  and how it would benefit me.  It was my impression the

18  face-to-face meeting was to move the process along

19  because I had been dragging my feet, and I was

20  dragging my feet because I was really unsure of what

21  to do with Hughes, whether I wanted to upset that,

22  especially with someone that it appeared that he

23  really didn't like.  You know, there was two problems.

24  One was taking business away from him.  Number two,

25  was giving business to somebody he really despised.

1    That was my impression of things.  And so that was

2    weighing heavy on me.

3    Q.         So from the outset you were worried about

4    harming your relationship with Universal and Hughes?

5    A.         Yes.

6    Q.         You mentioned the particulars of how the

7    arrangement would work were discussed at that in-

8    person meeting with Manoj Kumar and Philip McHugh.

9    Can you tell me a little more detail about what those

10   particulars were?

11   A.         Yes.  There were a certain number of samples

12   that they wanted per month that it was told to me that

13   they had to cover their costs.  And if it fell below

14   that, then the arrangement wouldn't work.  And to the

15   best of my recollection, it was 200 samples, around --

16   - maybe 250, so 200/250 samples a month that would

17   need to run through them through the arrangement.  And

18   that may have been a negotiated number because I think

19   they started higher than that, and we came down.  But

20   it was a number of samples that had to run through the

21   system.

22             And also, they didn't want me using their

23   analyzer to send samples to Hughes.  And that what it

24   would do is they would get the entire lab setup, they

25   would provide the machine, and the lab director, and

the overall --- make sure the system ran smoothly.
What I had to provide was the samples. I had to
provide a space with all the build-out for the
machine. I had to give them $10,000. And then they
were going to help with recruiting staffing and help
with staff management, although the staff would be
employed by me. And the samples would be sent to them
for quantitative testing.

Q.      Was the $10,000 payment the only payment
that you were expected to give to PCLS, Manoj Kumar,
and Phil McHugh?

A.      Yes.

Q.      So you weren't expected to pay for the full
cost of the analyzer?

A.      I didn't know what the cost of the analyzer
was at that time.  Later on, I found out.

Q.      And having a desktop analyzer would be more
profitable to you; correct?

A.      Yes.

Q.      Why is that?

A.      It's more profitable than the point-of-care
cups.  I was on the fence whether this would be more
profitable than dealing with Hughes.  That was a
little on the fence.  When you did all the math, they
were pretty close.

1  Q.        Do you know if Manoj Kumar ever made a down

2  payment on an analyzer for use in your lab?

3  A.        I don't recall.  See, I'm working at a

4  little disadvantage.  I don't have access to my

5  records, emails, and that sort of information.  So

6  it's from memory at this point.

7  Q.        Who was Elan Colen?

8  A.        It was my understanding he was either a

9  physician or a chiropractor.  He was some person with

10 some medical training that was a representative or an

11 employee of PCLS.  And once we reached an

12 understanding of how the arrangement would work, Elan

13 came involved and he was sort of the point person from

14 that point on. And I have to say his customer service

15 was great.  He was a welcome addition to the

16 situation.

17 Q.        So at some point, you began to have more

18 interaction with Colen as opposed to Kumar or McHugh

19 at PCLS?

20 A.        Yes, it was at that point Colen was the main

21 contact and then Manoj Kumar after that and then

22 McHugh not that often.

23 Q.        Were you ever pressured by anyone at PCLS to

24 send more samples?

25 A.        Yes.

1  Q.       Who was that?

2  A.       Elan and I think it was Manoj also.

3  Q.       Was that by email, phone call?

4  A.       Both.  As I would dip down below whatever

5  agreed upon level and they would complain about that

6  that the numbers had dropped down.  And also, I think

7  there was a conversation or two where they complained

8  of the number of medical assistance patients being

9  sent and that they were not profitable and all that

10 we're asking for is a fair representation across

11 insurance lines.

12 Q.       Could you explain that to me, the medical

13 assistance patients being sent and not being

14 profitable?

15 A.       Yes, medical assistance are welfare

16 patients, Medicaid.  Medicaid universally pays less

17 than the cost of providing any service.  I don't know

18 --- there may be, but I don't know of a single service

19 that Medicaid pays that covers the cost of providing

20 that service.  And no one likes to deal with those

21 patients and do the work and lose money.  And most

22 companies consider it a cost of doing business.  We'll

23 take the Medicaid to get the better paying insurances.

24 Q.       So PCLS was unhappy that you were sending

25 too many Medicaid patients basically?

1  A.        Yes.

2                        *  *  *

3          (Whereupon, the document was marked as

4  Deposition Exhibit No. 2 for purposes of

5  identification.)

6                        *  *  *

7  BY ATTORNEY JOHNSON:

8  Q.        I'm going to show you what is being marked

9  as Exhibit 2.  And is this an email from Mr. Colen to

10 yourself?

11 A.        Yes.

12 Q.        And that's your email address,

13 jjohnson@lhmed.com?

14 A.        Yes.

15 Q.        And it's dated January 8th, 2013?

16 A.        Yes.

17 Q.        And then in the body of your email to Mr.

18 Colen you state you will be getting more samples later

19 in the month.  I just need a little breathing room for

20 a few days; do you see that?

21 A.        If you wouldn't mind, I'd like to read the

22 entire one.

23 Q.        Certainly.  Take your time.

24 A.        (Witness peruses document).  The question?

25 Q.        So you wrote to Mr. Colen you will be

1  getting more samples later in the month.  I just need

2  a little breathing room for a few days; is that

3  correct?

4  A.        Yes.

5  Q.        Was that referencing the pressure you were

6  getting from PCLS to send more samples?

7  A.        Yes.

8  Q.        So the breathing room you were referring to

9  was for them to ease off on you sending the requisite

10  number of samples?

11  A.        Yes.

12                          *   *   *

13            (Whereupon, the document was marked as

14  Deposition Exhibit No. 3 for purposes of

15  identification.)

16                          *   *   *

17  BY ATTORNEY JOHNSON:

18  Q.        I'm going to show you what's being marked as

19  Exhibit 3.  This is an email chain between Mr. Colen,

20  yourself, and ---.

21                  ATTORNEY CAUDILL:  Can I get a copy of

22  the exhibit?

23                  ATTORNEY JOHNSON:  Oh, sorry.

24                  ATTORNEY CAUDILL:  Thanks.

25  BY ATTORNEY JOHNSON:

1 Q.        This is an email chain between Mr. Colen,
2 yourself, and Steve Glenn?
3 A.        Yes.
4 Q.        Do you want time to read the full chain, or
5 do you want me to just kind of pick and choose for
6 you?
7 A.        Yes, I would like to read the entire email
8 if possible.  It's these three, four pages; is that
9 right?
10 Q.        That's correct, yeah.  Take your time.
11 A.        (Witness peruses document).  What's the
12 question?
13 Q.        Ready to talk about it?
14 A.        Yes.
15 Q.        All right.  If you could turn your attention
16 to the second to last page, there is an email from Mr.
17 Colen to yourself dated March 9th, 2013; do you see
18 that?
19 A.        What time?
20 Q.        12:21.
21 A.        Yes.
22 Q.        And in the second to last paragraph, Mr.
23 Colen writes they also inform me that they are still
24 not receiving specimen volume from you again as you
25 promised me last week.  Please let me know the status

1  of this so I can report back to the lab.

2  A.        Yes.

3  Q.        Is this referencing the promised volume of

4  patient samples to PCLS?

5  A.        Yes.

6  Q.        And then if you could turn to the next page

7  forward?

8  A.        Yes.

9  Q.        You'll see another email from Mr. Colen,

10  which actually starts on the first page.  It's dated

11  March 9th, 2013 to yourself copying Steve Glenn.

12  A.        Yes.

13  Q.        And in the last full paragraph you'll see

14  Mr. Colen writes, the lab received a total of only

15  eight samples last week from all clinics, parenthesis,

16  which the lab has been receiving small amounts of

17  specimens sporadically since December, closed

18  parenthesis, down from the previous usual volume of

19  200-plus per week?

20  A.        Yes.

21  Q.        Was that, again, referencing the volume you

22  were expected to send to PCLS?

23  A.        Yes.

24  Q.        And then Mr. Colen later writes this was all

25  that was received, and I informed the lab that you

1  would begin sending normal volume again as we

2  discussed?

3  A.        Yes.

4  Q.        Is the normal volume the 200-plus a week?

5  A.        Yes.

6  Q.        And then going to the first page of Exhibit

7  3, you write to Mr. Colen on March 9th, 2013 at 4:13

8  p.m., getting to 200 a week in samples will be a

9  reach, but we can do way more than eight per week;

10 correct?

11 A.        Yes.

12 Q.        And that's, again, referencing the expected

13 volume to PCLS?

14 A.        Yes.

15 Q.        And then Mr. Colen writes back in his email,

16 appreciate you looking into the volume?

17 A.        Yes.

18                        *   *   *

19              (Whereupon, the document was marked as

20 Deposition Exhibit No. 4 for purposes of

21 identification.)

22                        *   *   *

23 BY ATTORNEY JOHNSON:

24 Q.        I'm going to show you what's being

25 introduced as Exhibit 4.

1 don't have it in front of me; it's been that period of

2 time. But my recollection is the agreement was that we

3 would --- we paid the down payment for the machine.

4 We paid the $10,000, and then the obligations of each

5 party to do their part of the arrangement.  And ---

6 but I don't think there was any mention of any number

7 of samples going to PCLS or that samples had to go to

8 PCLS.  But I don't have the document here to read, and

9 it's been that long; I can't tell you exactly what was

10 in that document.

11 Q.        So the arrangement you discussed with Mr.

12 McHugh and Mr. Kumar in that meeting, that wasn't ever

13 put --- the full arrangement wasn't ever put down in

14 writing?

15 A.        No.

16 Q.        And it's your understanding that that

17 arrangement would be illegal; correct?

18 A.        That arrangement would be what?

19 Q.        Illegal, unlawful?

20 A.        The quid pro quo, the samples for this?

21 Q.        Correct.

22 A.        Yes.

23 Q.        So there would be a reason not to put it

24 down in writing?

25 A.        Yes.

1   A.          Yes.

2   Q.          And then Mr. Kumar responds and then he cc's

3   Mr. Glenn and Phil McHugh as well; correct?

4   A.          Yes.

5   Q.          And then he lists steps in terms of

6   obtaining a CLIA licensure?

7   A.          Yes.

8   Q.          What is that?

9   A.          CLIA is --- that's a certificate that to be

10  able to run samples and bill insurance companies and

11  any third-party payer, you have to have CLIA

12  certification, which is a process where inspectors

13  come by and evaluate not only the equipment but the

14  policies, the procedures, and every aspect of the lab.

15  It's a fairly involved --- for a high-complexity lab,

16  it can take a full day for the inspection.  And once

17  the --- you have to pay a fee for it.  It's several

18  hundred dollars, if not more.  But without the CLIA

19  certificate, you're not able to bill insurance

20  companies or even to use the test results for clinical

21  medicines to ensure that the results are accurate.

22  Q.          Do you remember who paid the money to CLIA?

23  A.          I don't recall.

24  Q.          But PCLS was helping you get the CLIA

25  licensure; correct?

1  A.        Oh, they were walking us through every
2  aspect of it.  I didn't know how to do it.
3  Q.        So that was something of value to your
4  practice?
5            ATTORNEY CAUDILL:  Objection, leading.
6            THE WITNESS:  It was a value because I
7  had tried for two years to find consultants to walk
8  me, tell me how to do it, to walk through or do it for
9  me. And they didn't exist or they worked for other
10 labs.  And the --- it was so common with all the other
11 labs is we're not going to tell you how to do this
12 unless you send us samples.  I just can't tell you how
13 many labs were like that; it was enumerable.  And it
14 was no one would tell you how to do it yourself.  The
15 insurance companies were no help.  The state and
16 federal agencies wouldn't give you any guidance
17 whatsoever on how to do it.  The consultants all
18 worked for other labs, and it was you have to send us
19 samples and we'll tell you how to do it.  So I had no
20 idea how to do it.
21 BY ATTORNEY JOHNSON:
22 Q.        So helping with the CLIA licensure is one of
23 the things that PCLS did to you in terms of helping
24 you set up your lab?
25 A.        Yes.

1                        *   *   *

2           (Whereupon, the document was marked as

3    Deposition Exhibit No. 8 for purposes of

4    identification.)

5                        *   *   *

6    BY ATTORNEY JOHNSON:

7    Q.        I'm going to show you what's being marked as

8    Exhibit 8.

9    A.        We're sort of going back in time; aren't we?

10   Q.        Yeah, we've skipped around in time a little

11   bit.   I apologize for that.

12   A.        (Witness peruses document).

13                ATTORNEY CAUDILL:   Seth, do you mind if

14   we take five minutes?

15                ATTORNEY JOHNSON:   Yes.   No, we can

16   take five.

17   (BRIEF BREAK)

18   BY ATTORNEY JOHNSON:

19   Q.        Dr. Johnson, when we broke, I believe we

20   were looking at Exhibit 8.   Could you turn your

21   attention back to that?

22   A.        Yes.

23   Q.        And this is a series of emails with yourself

24   and Manoj Kumar?

25   A.        Yes.

1  Q.       If you could go to the third to last page,

2  which is the first email that starts the chain?

3  A.       All right.

4  Q.       This is an April 13th, 2012 email between

5  Manoj Kumar to johnnyspot@atlanticbb.com?

6  A.       Yes.

7  Q.       Is that your email address?

8  A.       Yes.

9  Q.       If you could turn your attention to the

10  second to last full paragraph?

11  A.       Yes.

12  Q.       Mr. Kumar writes, well, the good part is

13  that we can do all that for you for a very reasonable

14  cost. We would love the opportunity to meet with you

15  over coffee/lunch/dinner, whatever is convenient in

16  your busy schedule.  Phil McHugh from PCLS and I will

17  discuss all aspects of this lab, and we'll get the

18  show on the road most expeditiously.  We could be with

19  you any day on Wednesday, Thursday, or Friday of the

20  coming week; did I read that correctly?

21  A.       Yes.

22  Q.       Is that the --- is that referencing the in-

23  person meeting you had with Phil McHugh and Manoj

24  Kumar that we talked about earlier?

25  A.       Yes, we only met once in person.

1  Q.        And then later there's a few scheduling

2  emails; correct?

3  A.        Yes.

4  Q.        And then they ask if Thursday around 12:30

5  p.m. would be good?

6  A.        Yes.

7  Q.        And so you met with Phil McHugh and Manoj

8  Kumar in April 2012; correct?

9  A.        It appears from this email chain that's the

10  case.  I don't remember the exact day or month.  I

11  know we met with them.

12  Q.        If this email chain was referencing that

13  meeting, it would've been in the spring of 2012;

14  correct?

15  A.        Yes.

16  Q.        And is the spring of 2012 generally

17  consistent with your recollection of when that meeting

18  occurred?

19  A.        Yes.

20  Q.        If you'll turn to the first page, Mr. Kumar

21  emails you on Thursday, April 26th, 2012, and attaches

22  a document called Dr. Johnson's lab list; do you see

23  that?

24  A.        Yes.

25  Q.        If you will turn to the very last page of

1  this exhibit, you'll see that attachment entitled Dr.

2  Johnson's lab action plan; do you see that?

3  A.          Yes.

4  Q.          Okay.   And it lists a number of items to do

5  in terms of getting your lab set up; correct?

6  A.          Yes.

7  Q.          The first is lab setup contract already with

8  Steve?

9  A.          Yes.

10  Q.          That's action by you?

11  A.          Yes.

12  Q.          The next is lab director paperwork and

13  submittal, and that's something that Manoj Kumar and a

14  technical supervisor would do?

15  A.          Yes.

16  Q.          Was that something that was valuable to you?

17                ATTORNEY CAUDILL:   Objection.

18                THE WITNESS:   Yes.

19  BY ATTORNEY JOHNSON:

20  Q.          Not having to do the required paperwork to

21  set up the lab?

22  A.          Yes.

23  Q.          And that's something that PCLS provided;

24  correct?

25  A.          They either provided or were going to

1  provide.  I'm not sure we finalized any of that

2  outside of signing the documents.

3  Q.       They offered to provide to do the lab

4  director paperwork and submittal for you?

5  A.       Yes.

6  Q.       What is --- the next bullet point is

7  technical supervisor visit, start SOP and overview of

8  lab flow submission of papers to CLIA; what is that

9  referencing?

10  A.       There was to be a technical supervisor come

11  to the site and there's a lot of documentation that

12  has to be.  There are SOPs, policies, procedures, just

13  a huge amount of paperwork that has to be submitted to

14  obtain CLIA certification, and this is in reference to

15  that.

16  Q.       Was that something that PCLS offered to do

17  for you?

18  A.       Were going to do it or arrange to have it

19  done.

20  Q.       But they were ---.

21  A.       I didn't even know how to do it.  I had no

22  idea what was needed or how to even go about it.

23  Q.       So it was something you didn't know how to

24  do yourself?

25  A.       I had no way of --- I did not know that, and

1  I didn't know of anyone that could do it.

2  Q.        And PCLS was either going to do it for you

3  or arrange to have it done?

4  A.        Yes.

5  Q.        And was that something of value to you?

6                  ATTORNEY CAUDILL:  Objection.

7                  THE WITNESS:  Yes.

8  BY ATTORNEY JOHNSON:

9  Q.        The next bullet point is Olympus AU 400

10 contract signed with financing options and attractive

11 financing option is assured.  It says Phil is working

12 on this?

13 A.        Yes.

14 Q.        Did you have any interactions with the

15 desktop analyzer company?

16 A.        I really don't think so.

17 Q.        Was that something that PCLS was handling on

18 your behalf?

19 A.        Yes.

20 Q.        Was that something of value to you?

21                 ATTORNEY CAUDILL:  Objection.

22                 THE WITNESS:  Yes.

23 BY ATTORNEY JOHNSON:

24 Q.        The next bullet point reads, LIS software

25 with integration to EMR and Phil's team will assist in

1   the integration?

2   A.          Yes.

3   Q.          What does that mean?

4   A.          The software of the analyzer has --- you get

5   the machine; it's just not plug and play.  These

6   machines are very complicated as I learned after the

7   fact.  And there's software the machine has.  Then

8   there's software that communicates with the machine to

9   your EMR, your electronic medical records.  There's

10  two or three levels of software everywhere in there

11  that I had no idea this even existed.  I thought you

12  plugged the machine in, it would work, and all of the

13  sudden communicate.  Oh, no, there's way more to it

14  than that. And this is talking about the lab

15  information system software.  It's called LIS

16  software.

17  Q.          And is that something that PCLS offered to

18  help you out with?

19  A.          Yes.

20  Q.          And did you understand the, and Phil's team

21  will assist in the integration; did you understand

22  that to reference Phil McHugh?

23  A.          Yes.

24  Q.          Was that something of value to you?

25                  ATTORNEY CAUDILL:  Objection.  I'm just

1  going to have a standing --- so I don't have to keep

2  doing it, a standing objection.  I think it's a vague

3  question and it calls for a legal conclusion.

4              THE WITNESS:  Yes.

5  BY ATTORNEY JOHNSON:

6  Q.      You can answer.

7  A.      Yes.

8              ATTORNEY JOHNSON:  And I'm fine with

9  your standing objection.

10 BY ATTORNEY JOHNSON:

11 Q.      The next bullet point down battery backup

12 system purchased.  What does that reference?

13 A.      You need to have a battery backup in case

14 the electricity goes down that you don't lose all of

15 the lab results that the analyzer has produced from

16 between the last time it downloaded to the electronic

17 medical record software.  It stores that information

18 in the system.  And if it's not downloaded, you lose

19 all that and have to repeat it.  So it's a backup

20 energy source in case electricity goes down.

21 Q.      Was that something that PCLS offered to do

22 for you?

23 A.      Yes.

24 Q.      Was that something of value to you?

25 A.      Yes.

1   Q.        The next bullet down DI Water system

2   purchased and installed.  What does that mean?

3   A.        It's a deionized water system.  There's ---

4   for these machines to operate, they have to have pure

5   water.  And there's two ways to obtain essentially

6   pure water with no impurities.  One is reverse

7   osmosis, the RO system, where it goes through a

8   membrane to get pure H2O or you have the deionization

9   systems, which this is, and they're less expensive.

10  They accomplish the same goal of having pure water

11  because if the water goes into the testing and it has

12  contaminants, the results can be spurious or even ---

13  even just flat out wrong.

14  Q.        Was that something that PCLS offered to do

15  for you?

16  A.        Yes.  I didn't even know the battery backup

17  system or the DI water system, I didn't know any of

18  that was even needed.  It is needed, but I wasn't

19  aware of it.  It was my --- I was being I guess naïve

20  or uninformed.  I knew nothing about it.

21  Q.        And was that something of value to you?

22  A.        Yes.

23  Q.        The next bullet down, two computer purchase,

24  network, internet access completing, positioning as

25  advised by tech supervisor.  What is that referencing?

1   A.          Again, I wasn't aware this was needed.

2   There was quite a few surprises how complex this

3   supposed simple operation was going to be.  But there

4   was computers that were needed to enter information

5   identifying patient information and other information

6   into --- so the results that the machine produced

7   could be tagged to a particular patient collection

8   date and all that, and also to review the results

9   within the system because there's reports you want

10  that your EMR system can't provide you, only the

11  analyzer can if you want to look at broad datasets,

12  trends, and things like that.

13  Q.          And is that something that PCLS offered to

14  do for you?

15  A.          Yes.

16  Q.          Was that of value to you?

17  A.          Yes.

18  Q.          Lab build-outs, walls, floor, electric,

19  plumbing --- I'm going to assume that means plumbing,

20  it's misspelled.

21  A.          Yes.

22  Q.          And tables, visit by the tech supervisor,

23  estimated time two weeks.

24  A.          Yes.

25  Q.          That bullet point, what's that referencing?

1   A.        Those are tasks that we had to complete, and

2   we did complete.  It was the build-out of the physical

3   space.

4   Q.        So those were tasks that you would do on

5   your end?

6   A.        We had to do on our end, but we had to have

7   the schematics and the layout for it because we had no

8   idea where anything went or the electrical service or

9   water service or the HVAC requirements or anything

10  like that.  We had no clue of what that was.

11  Q.        Who provided the schematics and layout to

12  you?

13  A.        I don't recall if that was PCLS or someone

14  they had provide that information to us, but that was

15  provided to Steve and then Steve made sure the build-

16  out met those requirements.

17  Q.        So PCLS obtained the schematics and layouts

18  and then provided it to Steve?

19  A.        They made the arrangement that we were given

20  this information.  I don't recall if they provided it

21  or if they paid someone or if they had an arrangement.

22  I just don't remember how it was.  I'm not sure I even

23  knew at the time.  It was something I sort of

24  delegated to Steve to take care of and didn't really

25  pay that much attention to it.

1    Q.          They were behind getting the schematics and

2    layouts to you?

3                        ATTORNEY CAUDILL:   Objection.

4                        THE WITNESS:   Yes.

5    BY ATTORNEY JOHNSON:

6    Q.          Was that something of value to you?

7    A.          Yes.

8    Q.          The next bullet point down, post ad, hire

9    MLT, and data entry/sample assistant.   What does this

10   bullet point reference?

11   A.          That's the advertising for a position for

12   the lab tech and the assistant and then helping with

13   hiring those people and training them.   And that would

14   be our responsibility to pay for those people, but

15   they were going to help us write --- or write or help

16   us write the ads and help us in knowing how to hire

17   the right people.

18   Q.          And by they, you mean PCLS?

19   A.          Yes.

20   Q.          And was their offer to do that something of

21   value to you?

22   A.          Yes.

23   Q.          The next bullet down, billing codes checked;

24   what does that reference?

25   A.          The billing codes for the quantitative ---

1    or the qualitative testing results that this machine

2    would provide.  Basically assistance to be able to

3    make sure we had the correct codes and how to bill it

4    properly with the proper diagnosis codes, the proper

5    procedure codes, and how to bill it because different

6    insurances use different codes and it was fairly

7    complex to sort out how to bill it.  It wasn't like

8    one code for all insurance companies.  They had

9    different rules.

10   Q.        So PCLS offered to help you with the

11   billing?

12   A.        Yes.

13   Q.        Was that something of value to you?

14   A.        Yes.

15   Q.        Install Olympus and validate system?

16   A.        Yes.

17   Q.        Installation approximately five weeks after

18   CLIA papers are submitted?

19   A.        Yes.

20   Q.        The CLIA papers first, we talked about that

21   approval process a little bit earlier; correct?

22   A.        Yes.

23   Q.        Did you ever submit for the CLIA licensure?

24   A.        I think we did.  I think.

25   Q.        Did you get that approved?

1 A.        Well, we eventually had it approved.  I'm
2 not sure if it was approved through PCLS, or we did it
3 later on.  I just don't recall.  I think we --- I
4 think we did it and had it all set up through PCLS,
5 but we never had the machine installed.  One was a
6 financial concern raising the money, and the other was
7 the issue with Hughes.  So I'm not certain if we had
8 the CLIA for this lab or we used it for our own lab or
9 we got another one for our own lab; I don't recall.
10 Q.        But PCLS offered to help with the CLIA
11 licensure and that process; correct?
12 A.        Yes.
13 Q.        Was that something of value to you?
14 A.        Yes.
15 Q.        Going to the install Olympus and validate
16 system, could you just tell me what that means?
17 A.        The machine had to be delivered and then set
18 up, and it's much more complicated than just plugging
19 it in a wall.  You had to make sure that the results
20 were standardized.  You would get the state to give
21 you the CLIA certificate would give you unknowns.  You
22 would tell them what you were going to test for.  Then
23 they would send you mystery samples containing various
24 substances that you were going to test for.  Then you
25 had to give back the --- you were blinded.  You didn't

1  know what was in there.  Then you had to test it and

2  give the results back to the state.

3          And if you correctly identified each

4  substance and each sample and didn't identify any

5  substance that was not supposed to be there, then they

6  would use that as part of the criteria to issuing your

7  CLIA certificate.  They wanted to make sure your

8  machine worked and was reliable.  And it had to be set

9  up and installed and validated where you run samples

10  from the manufacturer from some other vendor with

11  known substances in and you did that before you did

12  the validation for CLIA.  You had to get your machine

13  set up to make sure it properly identified everything

14  and calibrate it so it would properly identify.  And

15  so that's what is involved to make sure the machine

16  gave reliable results.

17  Q.      Did PCLS offer to help with that?

18  A.      Yes.

19  Q.      In what way were they going to help?

20  A.      They --- it was my understanding they were

21  not going to do this themselves.  They would arrange

22  to have someone else do it or show us how to do it or

23  somehow walk us through or somehow get it done, but I

24  don't think they were going to do it themselves with

25  their own employees.

1  Q.      In the action by column it mentions Phil

2  will assist in getting this done?

3  A.      Yes.

4  Q.      What was your understanding of what Phil

5  McHugh was going to do in reference to that bullet

6  point?

7  A.      He was going to oversee this aspect of all

8  these items.  He was going to oversee that.  It was my

9  impression that was one of the more important items,

10  so it would rise to his level of involvement.

11  Q.      The last bullet point and before I move on,

12  was the items in the bullet point we were just talking

13  about, the install Olympus and validate system and the

14  CLIA licensure, were those things of value to you?

15  A.      Yes.

16  Q.      The last bullet point, accept and process

17  samples?

18  A.      Yes.

19  Q.      Is that just the end result of setting up

20  the lab?

21  A.      Basically that's the final thing.  Once all

22  this is done, then we can --- once we get the CLIA

23  approval, then we're set to start processing samples.

24  Q.      And these samples would be sent to PCLS;

25  correct?

1  Q.        Yeah.  And over time they paid you about

2  $2.3 million?

3  A.        Yes.

4  Q.        And that's specifically for sending

5  referrals to UOFL?

6  A.        Yes.

7  Q.        Now, UOFL, what kind of services did they

8  provide?

9  A.        They were a toxicology lab.

10  Q.        Did they --- do you know whether UOFL --- so

11  it's right there, it's in the name, oral fluid.  Did

12  they test anything other than saliva?

13  A.        Oral fluids is it.  No urine, no blood.

14  Q.        And I think you testified that sometimes

15  UOFL would send PCLS samples for confirmation testing?

16  A.        It was my understanding early on they sent

17  them all to Physicians Choice for confirmation

18  testing, and then there was a split and they sent none

19  after that.

20  Q.        Do you have any idea why Physicians Choice

21  split from UOFL?

22  A.        What I'm told, and this is speculation as

23  you guys like to say, is that Hughes decided he was

24  going to do the confirmation testing himself and

25  capture that revenue source.  It would be financially

1  more advantageous for him than sending it out to
2  Physicians Choice.
3  Q.        And I believe you said that sometime in ---
4  well, you testified that there was a meeting between
5  you and Phil McHugh and Manoj Kumar sometime in the
6  spring of 2012; right?
7  A.        It's in here.  It's '12 or '13.  Whatever
8  the documents say is what it was.
9  Q.        I'll represent to you that it was the spring
10 of 2012 according to those emails.
11 A.        Okay.
12 Q.        So prior to that time though, you had been
13 contacted by Physicians Choice?  I mean they were
14 trying to get your business; correct?
15 A.        Yes.
16 Q.        About how many other laboratories were
17 trying to get your business?
18 A.        I can't count them.
19 Q.        About how many pitches did you hear for your
20 business from other laboratories?
21 A.        Numerous.  It got to the point that I would
22 have my staff field those calls and tell them no so I
23 didn't have to be bothered with it.
24 Q.        Did you have meetings with other
25 laboratories?

1  A.        I ---.

2  Q.        Not sure?

3  A.        It's been too long, and I don't have my

4  records.  I can't ---.

5  Q.        Do you recall when it first occurred to you,

6  hey, you know, maybe I should go see about securing an

7  analyzer?

8  A.        That's what --- that's what happened.

9  Q.        Do you recall when that thought popped into

10 your head?

11 A.        After the --- after the potential --- after

12 the arrangement with Physicians Choice sort of fell

13 through or didn't move along because of my delaying it

14 for two --- I delayed it for two reasons.  One is

15 Hughes and the other was the amount of the cost of the

16 analyzer.  I didn't feel like I had the money to pay

17 for that.

18 Q.        To pay Physicians Choice for the analyzer?

19 A.        No, whatever company that was in the other

20 documents.

21 Q.        Oh, I see.  So you felt you didn't have the

22 money to pay that third-party company for the analyzer

23 that Physicians Choice was procuring for you?

24 A.        Yes.

25 Q.        Okay.  So you were going to pay for that?

1   A.          That was presented to me that I would have
2   to pay for that.  And the other option was the reagent
3   lease, and when I built my own lab I did the reagent
4   lease arrangement where the lease payments are built
5   into the reagent fees.
6   Q.          Right.
7   A.          And even though you pay more money, you
8   don't have to come up with the cash upfront.
9   Q.          So --- okay.  So ---.
10  A.          And then after the raid I'm thinking --- the
11  timelines get all muddied here.
12  Q.          I know.  I know.
13  A.          But after the raid, we put in our own
14  quantitative analyzer, the mass spec.  That was a big
15  step up and started doing that ourselves.
16  Q.          Yeah.  But that would've been in '14?
17  A.          That would've been --- I think that was in
18  '14, I think.
19  Q.          All right.  And again, I'm not --- I know
20  it's difficult to recall, but at some point you're
21  looking at the contract for the purchase of the
22  Olympus AU 400 and you're thinking I can't afford
23  that, I need to look into other options for procuring
24  an analyzer.  And you were also concerned I think you
25  testified about preserving your relationship with Bill

1  upon these records.

2  Q.        You don't have any independent recollection

3  of those dates?

4  A.        No.  I --- I know sort of a general idea how

5  things transpired in a general timeline.

6  Q.        Yeah.

7  A.        But I just don't recall the months and the

8  years or the seasons.

9  Q.        Okay.  You never got the analyzer from PCLS?

10 A.        Never.  No, did not.

11 Q.        Just let me look through my notes.  I think

12 I'm finished.  Hang on one second.

13 A.        Sure.

14 Q.        Not many more, I promise.  Do you recall

15 meeting with an Assistant United States Attorney by

16 the name of Jonathan Ferry?

17 A.        Out of North Carolina?

18 Q.        Yes.

19 A.        Yes.

20 Q.        And when did that meeting occur to the best

21 of your memory?

22 A.        '16 or '17.

23 Q.        And the purpose of that meeting was for them

24 to ask you questions about among other things

25 Physicians Choice; right?

1 didn't work anymore.  They took a backup file I had on
2 my current laptop, and they took --- they copied the
3 information on the server.  I don't know what they ---
4 I assume they took everything.  I have no idea and I
5 didn't ask and they didn't tell.
6                    ATTORNEY CAUDILL:  Dr. Johnson, thanks
7 for your time today.
8                    THE WITNESS:  Oh, you're quite welcome.
9 RE-EXAMINATION
10 BY ATTORNEY JOHNSON:
11 Q.       I will be very brief.  Looking at Exhibit 5,
12 which was the contract for the analyzer we've talked
13 about?
14 A.       Yes.
15 Q.       You testified earlier that receiving this
16 was a surprise to you; correct?
17 A.       Yes, as looking through the other emails,
18 there were numbers mentioned in another email, and I'm
19 not sure it was before or after this one.  But
20 overall, the amount of money was a surprise to me,
21 yes.
22 Q.       It was your understanding that under the
23 arrangement with PCLS you would just pay $10,000;
24 correct?
25                    ATTORNEY CAUDILL:  Objection, leading.

1  BY ATTORNEY JOHNSON:

2  Q.        You can answer.

3  A.        Yes.

4  Q.        And we've talked about alcohol and

5  cooperation agreements today, but your testimony here

6  today has been truthful; correct?

7  A.        Yes.

8              ATTORNEY JOHNSON:  Nothing further.

9              ATTORNEY CAUDILL:  Thank you, Dr.

10 Johnson.

11             THE WITNESS:  Thank you.

12

13             *  *  *  *  *  *  *  *

14         DEPOSITION CONCLUDED AT 1:55 P.M.

15             *  *  *  *  *  *  *  *

16

17

18

19

20

21

22

23

24

25

1 COMMONWEALTH OF PENNSYLVANIA :

2                               : SS:

3 COUNTY OF CAMBRIA          :

4     I, DALE CURTIS ROSE, JR., a Freelance Court

5 Reporter and Notary Public in and for the Commonwealth

6 of Pennsylvania, do hereby certify that the foregoing

7 deposition was taken before me at the time and place

8 specified in the caption; that I administered unto the

9 Deponent his oath to testify to the truth, the whole

10 truth, and nothing but the truth; that he was present

11 and then orally examined and testified as herein set

12 forth; that I reported said examination and testimony

13 stenographically, and that this transcript of

14 deposition constitutes a true and correct

15 transcription of the shorthand report of said

16 deposition.

17     I FURTHER CERTIFY that I am neither related to

18 nor employed by any counsel or party to the cause

19 pending, nor interested directly or indirectly in the

20 event thereof.

21     IN WITNESS WHEREOF, I have hereunto set my hand

22 and affixed my seal of office this 18th day of

23 September, 2020.

24 _____    _____

25 Date      Notary

## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. Civil File No. 3:17-CV-37
(Consolidated with Civil File
No. 3:17-CV-46)
United States of America, ex rel.
Taryn Hartnett and Dana Shoched,

Plaintiff,

vs.

Physicians Choice Laboratory
Services, Douglas Smith, Philip
McHugh and Manoj Kumar,
Defendants.
----------------------------------/

VIDEO DEPOSITION
OF
CHRIS KEMP

BY VIDEOCONFERENCE
November 12, 2020
Scheduled for 10:00 a.m.
Commencing at 10:06 a.m. to 11:47 a.m.

Taken before Sonnia Martinez, Notary
Public in and for the State of Florida at
Large, pursuant to Notice of Taking Deposition
filed in the above cause.
- - - - - - -

## Page 2

1  APPEARANCES:
2  ON BEHALF OF THE PLAINTIFF:
3      R. Andrew Murray
        United States Attorney
4      Suite 1650, Carillon Building
        227 West Trade Street
5      Charlotte, North Carolina 28202
        By: Katherine Armstrong,
6          Assistant U.S. Attorney
            katherine.armstrong@usdoj.gov
7
    Also present:
8
        Cathleen Hollowell
9      Investigator (contractor)
        U.S. Attorney's Office - WDNC
10     227 West Trade Street, Suite 1650
        Charlotte, NC 28202
11
    ON BEHALF OF PHILIP McHUGH:
12
        Weaver, Bennett & Bland
13     196 North Trade Street
        Matthews, North Carolina 28105
14     By: Bo Caudill, Esquire and
            Matthew Villmer, Esquire
15
    Also present:
16
        George Thomas, Videographer
17         - - - - - - -
18
19
20
21
22
23
24
25

## Page 3

1              I N D E X
2  Witness:  Chris Kemp
3                  Direct   Cross
4  By Ms. Armstrong        5
5  By Mr. Caudill          49
6          E X H I B I T S
7  United States'
8      No. 1 Page 05        No. 2 Page 37
9      No. 3 Page 37        No. 4 Page 38
10     No. 5 Page 39        No. 6 Page 40
11     No. 7 Page 40        No. 8 Page 41
12     No. 9 Page 42
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1          (The following was had.)
2          THE VIDEOGRAPHER:  In the case styled
3      U.S., ex rel, Taryn Hartnett, et al,
4      versus Physicians Choice Laboratory
5      Services, et al.  Civil Action
6      Number 3:17-CV-37.
7          This is the videotaped deposition via
8      Zoom of Chris Kemp.
9          Today's date is November the 12th,
10     2020.
11         The time on the video monitor is
12     10:06 a.m.
13         Would counsel please state their
14     appearances for the record.
15         MS. ARMSTRONG:  Sure.
16         This is Katherine Armstrong, an
17     Assistant U.S. Attorney on the Western
18     District of North Carolina.  I represent
19     the United States.
20         MR. CAUDILL:  Mr. Kemp, my name is Bo
21     Caudill.  I represent the defendant,
22     Philip McHugh.
23         MR. VILLMER:  This is Matt Villmer, I
24     represent Defendant Philip McHugh.
25         THE VIDEOGRAPHER:  Okay, Sonnia,

1 (Pages 1 to 4)

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 93 of 283

1    A.  They did.

2        Q.  Okay.  Tell us about that, how you
3    came to have Dr. Florete and his practice as
4    one of your accounts.

5        A.  Sure.  It -- you know, taking the
6    job, you know, you did our due diligence of
7    what was going to be needed and how it's
8    gonna, you know, potentially go after your
9    business.  And then when I came on board with
10   the company, as it is most pharmaceutical
11   companies out there, they -- they get reports
12   on who is -- who's writing prescriptions for
13   X, Y, Z medications and that -- you can kind
14   of strategically go after those because, at
15   the time, that's the business that -- that we
16   were going after for toxicology test and -- as
17   well as genetic testing for various markers
18   that the company tested for.  And so I had
19   approached him many times in several months in
20   before I actually got a, you know, an
21   appointment with his folks and it started from
22   there.  And then -- I knew he was one of the,
23   based on the criteria that our company had,
24   these reports -- and forgive me, I can't
25   recall what the name of the reports were.  But

1    they're nationally generic reports that you
2    can get, I suppose.  But I knew he was a big
3    account for this area and so I spent a lot of
4    time, you know, going after the bigger
5    accounts and he was one of them.

6        Q.  When you say "based on the criteria,"
7    can you kind of walk me through what you mean
8    by that?

9        A.  Yes.  So, as I mentioned, the company
10   paid some company, national company, to get
11   reports on, you know, who is either writing
12   prescriptions that we needed to test for or
13   companies that -- or, you know, new doctors
14   that transferred from one, you know, city to
15   another, we would pay attention to those as
16   well.  And that's -- that's -- those are the
17   reports that we -- it essentially told you who
18   was writing what and how many potential
19   prescriptions they were writing.

20       Q.  And did those reports also identify
21   providers as "big accounts," to use your
22   words?

23       A.  Well, it's just based on the number,
24   the volume that they wrote versus, that there
25   -- you know, a doctor that was competing in

1    that industry in Jacksonville.  So he was one
2    of the top ten percent, you know, in
3    Jacksonville, the big doctors, if you will,
4    that I was approaching.

5        Q.  Okay.  And so when you say the number
6    they wrote, are you like referring to the
7    number of pain prescriptions that --

8        A.  Yes, correct, correct.  So those were
9    the accounts that we would go after and, you
10   know, provide toxicology testing for them,
11   solutions thereof.

12       Q.  Okay.  And you mentioned it took you
13   several months to actually get in with him or
14   his staff, what was the reason for that?

15       A.  Just it's -- I -- I would label it
16   just the nature of the business of sales.
17   It's just knocking -- you know, initially it
18   was a cold call and you got to build your way
19   up to, you know, speaking with them and
20   meeting, and so I -- I went through that you
21   process, you know, trying to get in touch
22   would their office manager and then presenting
23   what we could provide for them.  And then I
24   got, you know, put up with the -- with
25   Orlando, Dr. Orlando Florete, and so forth.

1    And then that -- that just pushed on, meeting
2    after meeting after meeting to try earn their
3    business.

4        Q.  And do you recall who IPM sales
5    manager was at the time you were trying to get
6    that account?

7        A.  IPM sales manager, so my direct boss?

8        Q.  I apologize, Mr. Kemp.  Office
9    manager, sorry.

10       A.  Oh, gosh, no, I do not.  It was a
11   female.

12       Q.  Okay.  And did you have any personal
13   connections or contacts with IPM while you
14   were trying to get its business?

15       A.  Like personal contacts, from cold
16   calling and meeting the people in the front
17   desk and different nurses at different
18   locations, you know, just the process of
19   sales, you know --

20       Q.  Okay.

21       A.  -- trying to earn sales or earn their
22   business, get a meeting, so through that I met
23   folks and tried to nurture those
24   relationships.

25       Q.  Okay.  Prior to beginning cold

4 (Pages 13 to 16)

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 94 of 283

1  calling on the practice, did you know anyone
2  who worked there or have any friends or
3  personal connections with anyone who worked at
4  IPM?
5      A.  Yeah, I knew a nurse at one time at
6  one of his locations, but he closed down
7  relatively -- during my sales process, if you
8  will.
9      Q.  And during the time you had the IPM
10 account how many locations were operating?
11     A.  Initially it was three and then that
12 got drown down to two.  So -- as I began the
13 sales process he had three accounts, three
14 locations, and then -- I guess day one we got
15 the initial setup, maybe 30 days in or so he
16 closed the third office.  So for the bulk of
17 my business I think it was mainly coming from
18 two locations, if I recall.
19     Q.  Were both those locations in
20 Jacksonville?
21     A.  Yes.
22     Q.  Do you recall when you first met with
23 Dr. Florete in person?
24     A.  Yeah, roughly.  It was in his office
25 trying to, you know, pitch our -- what we

1  could provide his office and his practice.
2  And then to get an appointment, you know,
3  initial 30 minutes, if you will, that was my
4  first kind of introduction.
5      Q.  And what type of information did you
6  provide in that first introduction to
7  Dr. Florete?
8      A.  Well, it was really getting to know
9  his practice beyond, you know, what the
10 reports I mentioned earlier and the daily
11 routine and where -- and then from there I
12 strategically, I guess, provided our
13 offerings, where we could help.  And I guess
14 one of the bigger ones was time, you know,
15 getting -- sending test in, getting results
16 back quickly and efficiency.
17     Q.  Do you know what lab or labs
18 Dr. Florete was using for urine tests before
19 he signed on to PCLS?
20     A.  I do not.  I know -- I remember him
21 --he had used multiple labs, you know, I would
22 say the previous five years, but I couldn't --
23 I don't recall what those names of those labs
24 were.
25     Q.  And before you started calling on

1  Dr. Florete and his practice in an effort to
2  get that account, do you know if Dr. Florete
3  had used PCLS?
4      A.  No, we were a new company.  Nobody in
5  Jacksonville had used our services before I
6  came on board.  I was the first rep in this
7  region, this location.
8      Q.  Okay.  And when -- during your tenure
9  at PCLS, did other reps get added to the
10 Jacksonville area or region?
11     A.  No, not locally.  At the tail end
12 they were talking about potentially splitting
13 my area, but I left before that -- that
14 actually came to fruition.
15     Q.  In the course of working to get the
16 Florete and IPM account, did you meet with any
17 of the other providers at the practice?
18     A.  No, I did not.  It was, you know, he
19 was the decision-maker and everything started
20 and stopped with him, what I came to find out,
21 and so there forwarded most of me -- the
22 meetings I was involved with was with him.
23 And sometimes his office manager or he had a
24 runner that would, you know, I guess went
25 between the two offices, and, forgive me, I

1  can't remember his name or his actual title,
2  but he was in a few of those meetings.
3      Q.  Okay.  Do you recall when Dr. Florete
4  and IMP actually signed up with you as an
5  account with PCLS?
6      A.  Oh boy, it was, I would say, a good
7  six months, maybe even eight months, from my
8  first start date with PCLS.
9      Q.  Okay.  So I'm notoriously bad at math
10 but let me think about it.  So you started
11 with PCLS in the spring of 2013.
12     A.  April, yep.
13     Q.  Okay.
14     A.  So it's in the fall, late fall, I
15 believe, and then -- I believe.  I can't
16 remember exactly, but it seems about right.
17     Q.  All right.  I am going to do my best
18 to share a document with you, bear with me.
19     A.  Sure.
20     Q.  I have been successful at this in the
21 past but not always.  Hold on a second.
22         Mr. Kemp, I am -- or I can give you
23 control of the screen so that you can scroll
24 through this, does that work for you?
25     A.  Yeah, sure.

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 95 of 283

1    Q.  Actually, I thought I could.  Hold on
2  a second.
3    A.  Sure.
4    Q.  All right, Mr. Kemp, I think you now
5  have the ability to get on here and control
6  this screen so that you can scroll through
7  this document.  Let me know if that works.
8    A.  Sorry, I'm unable to scroll through.
9    Q.  Let me try something -- that's fine,
10 you know, what I can do is --
11   A.  Wait, I think I got it.
12   Q.  Did you get it?  Is that you that you
13 just moved that?
14   A.  Nope.
15   Q.  I can just scroll through.
16   A.  Okay.
17   Q.  If this is easier.
18   A.  Sure.
19   Q.  Why don't I just do that, then.
20   A.  Sure.
21       MS. ARMSTRONG:  I'm going to mark
22 this as Exhibit 1.
23       (Government's Exhibit Number 1 was
24   marked for identification and is attached
25   hereto.)

1  BY MS. ARMSTRONG:
2    Q.  All right.  Let me get to the top of
3  the first email.  Go just ahead and take your
4  time reviewing this, please.
5    A.  Okay.
6    Q.  And let me know if you're ready for
7  me to scroll down.
8    A.  Sure.
9    Q.  Thanks.
10   A.  Okay.  Okay.
11   Q.  All right.  Do you recall this email,
12 now having had a chance to review it?
13   A.  Yeah, yeah, now I do, yeah.
14   Q.  Who were the people you sent it to?
15   A.  Let's see, Masud, he was a -- one of
16 our genetics kind of reps.  He floated around
17 our -- our -- the southeast to help reps, kind
18 of talk more about the genetics testing,
19 which in the email is listed GX, and so he's
20 the -- that's who I initially cc'ed Todd
21 Seder, my direct boss.
22       Jack Davis, he was another resource
23 for us in, I guess, as a company from a -- if
24 we needed help getting into the weeds about
25 the toxicology and/or genetic testing.

1        And then our sales manager at the
2  time, Joe Munden.
3        Then Aida, I believe she was one of
4  the folks internally that helped coordinating,
5  you know, if we had travel, if we needed
6  different -- you know, be a rep for an event
7  the doctors put on or various
8  hospital-affiliated learning seminars,
9  anything like that.
10       And then it was -- obviously the
11 subject was Institute of Pain Management.
12   Q.  Thank you.  And at the time you sent
13 this email in July of 2013, is it your
14 recollection that Dr. Florete was not yet
15 signed up with the company?
16   A.  Yes.
17   Q.  It looks like you all are discussing
18 in this email a meeting with Dr. Florete where
19 he would come to the lab; is that correct?
20   A.  Yes, correct.
21   Q.  All right.  What is the purpose of
22 having Dr. Florete come meet at PCLS?
23   A.  So when I first signed on with PCLS
24 they were still in these remote offices in
25 Carolinas and they -- we were in the process

1  of building a brand new building, brand new
2  lab, it was state-of-the-art equipment, and so
3  that -- that was built and then the company
4  had moved in there, and so we really wanted to
5  kind of promote, you know, we were kind of a
6  state-of-the-art company and promote our kind
7  of our lab, and so one thing that I think a
8  few reps throughout the country did, I
9  believe, is probably more geographically
10 located, you know, closer to -- to our
11 corporate office, but if we had the capability
12 of flying in doctors so they could take a look
13 at the building and, you know, our -- our
14 process firsthand to, you know, gain their
15 business.  And, you know, obviously, as a
16 sales rep, we wanted a hundred percent of an
17 office's business.  At the time a lot of
18 doctors wanted to send it to multiple places
19 for, I guess, their own various reasons.
20   So obviously a bigger account, which
21 I would label IPM, or Dr. Florete's office, I
22 would label him as a bigger, you know, we
23 wanted to get a hundred percent of his
24 business, so whatever, you know, take flying
25 him up to corporate and taking a look and

6 (Pages 21 to 24)

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 96 of 283

1    getting firsthand, you know, knowledge of kind
2    of how we do things, that was a primary
3    objective.
4        Q.   And did this visit to PCLS ever
5    happen?
6        A.   Yes.
7        Q.   And do you recall when -- I don't
8    need an exact date, but month, year, that
9    Dr. Florete actually to visit the lab?
10       A.   Based on the email, this email, I
11   would say it happened within about 30 days,
12   because they had to set up flights 30, 45
13   days, at least.
14       Q.   Did PCLS pay for Dr. Florete to come
15   to Charlotte?
16       A.   Gosh, I can't -- I do not recall.
17   You know, I believe -- I just don't recall.  I
18   want to say -- I want to say I thought it was
19   a flight or a hotel but that was it.  There
20   was a limit and I don't recall now.  My
21   corporate office handled that; I wasn't
22   involved with that part of it.
23       Q.   Did you come to the meeting at PCLS
24   with Dr. Florete?
25       A.   Yeah, I actually -- at first I wasn't

1    owner of the company.  What was Phil's role at
2    PCLS while you were there?
3        A.   I didn't -- we didn't see him a lot.
4    He would poke his head in every once in a
5    while if we had to come back for some, you
6    know, corporate training as we rolled out our
7    genetic testing or -- when I first got there,
8    you know, everybody met, both he and Joe
9    Munden.
10       His primary role, I know he -- he got
11   involved with some of our bigger accounts.
12   And saying involved, you know, he would send
13   an email or, you know, on our behalf saying,
14   hey, look, you know -- for instance, for me it
15   was, hey, Chris, you know, he's our rep, he
16   told me a little bit about you, we look
17   forward to hopefully partnering with you,
18   things like that, just to kind of put a touch
19   on from, I guess, an ownership level with
20   larger accounts so they feel like they're, you
21   know, wanted/needed, so forth.
22       Q.   And during the time you worked for
23   PCLS were you physically located and living in
24   Jacksonville?
25       A.   That's correct, yes.

1    able -- couldn't get on the same flight.  Then
2    they got me in, so I ended up flying up with
3    him as his rep.
4        Q.   Do you recall who else -- do you
5    recall who else met with Dr. Florete when he
6    visited PCLS?
7        A.   Oh gosh, he met with everybody in our
8    office, you know, that was over a certain --
9    you know, over every department, so that he
10   could kind of get a taste of when -- you know,
11   if they sent urinalysis samples in, where it
12   started from, from receiving to going through
13   testing, seeing our lab, how it's done.  He
14   met with some of our C-suite folks, Joe Munden
15   was one.  I believe -- I believe Jack Davis
16   was there, I don't recall.
17       And some of our -- our owners, Phil
18   McHugh was there.  Oh gosh, there was another
19   gentleman.  I can't recall his name.  He --
20   gosh, it may come to me, sorry.
21       But he -- he met with everybody that
22   was, you know, that either ran a department or
23   had, you know, owned the company or was at a
24   C-suite level for us.
25       Q.   And you mentioned Phil McHugh as an

1        Q.   How many times would you say you
2    would at PCLS' corporate headquarters or the
3    lab during your tenure?
4        A.   Oh, goodness.  I would say -- at the
5    lab -- now, we would be -- I'd say at the lab
6    about four or five times, but we would also go
7    up around the lab at a hotel for like sales
8    training and it was maybe ten to thirty
9    minutes away from the -- from the office, and
10   that would be another -- I'd say that's a
11   total combined eight times, roughly.
12       Q.   Do you recall where the lab was
13   physically located when you worked for PCLS?
14       A.   Yeah, it was in Rockhill.
15       Q.   Were the sales trainings you
16   mentioned different than the annual trainings
17   that we've already talked about?
18       A.   Yes, yes, they were more geared to,
19   you know, how to bring in sales, how to make
20   better cold calls, close the sale cycle,
21   things of that nature.
22       Q.   And who presented those trainings?
23       A.   There is a gentleman up around there
24   that ran a -- it's called Sandler Sales
25   Training.  I don't recall his name, but the

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 97 of 283

1   company outsourced it to him in the beginning
2   of my tenure with -- there.  And then, as
3   closer to the end of my tenure, you know, we
4   had a lot of personnel changes and they -- I
5   guess they discontinued that relationship and
6   went a different route and brought somebody
7   else, you know, that taught sales training in
8   the country.  And forgive me, and I don't
9   recall either of their names, but yeah.
10      Q.  Okay.  I'm going to turn back to the
11  email for a moment --
12      A.  Sure.
13      Q.  -- and see if there's anything else I
14  want to ask you about.
15      Near the bottom of the email you
16  write "This will be a great thing for the PCLS
17  anchor in Jax," can you tell me what you meant
18  by that statement?
19      A.  Yes, so we -- because we were a new
20  company and, you know, as a sales rep, I
21  wanted to be at the top, you know, the top
22  sales rep for the company, and I was hoping
23  to, you know, have Jacksonville be the leading
24  or at least North Florida, specifically
25  Jacksonville, if you will, be the kind of

1   leading accounts or, you know, I would be the
2   larger rep in the State of Florida, so that's
3   what I meant by becoming an anchor.
4       And then because I knew IP -- or
5   Institute of Pain Management was a large
6   account, I knew that would be a nice footprint
7   to kind of -- you know, because as a sales
8   rep, once you get a big account you're able
9   to, sometimes, you know, people are familiar
10  with their name, hey, we do all the testing
11  for X, Y, Z, we'd love to have you, too, so
12  we'd use that to build from.
13      Q.  And, okay.  So when you say that you
14  thought IPM was going to be a big account for
15  PCLS, can you kind of explain to me all these
16  things that you consider going into what makes
17  an account a big account?
18      A.  Sure.  I mean, it's rather simple,
19  it's -- you know, how many -- how many
20  urinalysis testing do they generally do and if
21  they don't -- if an office doesn't do it but
22  is writing certain prescriptions, we would try
23  to explain of the importance of doing so.  And
24  for Institute of Pain Management specifically
25  it was, you know, as I mentioned earlier, we

1   -- you know, we'd get these national reports
2   and derived from there what -- how many
3   prescriptions they wrote and we'd say, okay,
4   this person is writing a lot so surely they're
5   testing.  And as I went through the sale cycle
6   with his account I kind of understood that it
7   was definitely a big -- could be a big
8   account.  It was going to be my biggest
9   account at that time, so I knew, as I
10  mentioned in that email, it would be a nice
11  anchor, so I can kind of work that.  But I
12  hope that answers.
13      Q.  Okay.  Did you track the volume of
14  samples your accounts were sending to PCLS?
15      A.  Yes, we -- we, yes, absolutely, every
16  rep did.
17      Q.  How did you do that?  How was that
18  accomplished?
19      A.  We would log into our internal system
20  that we had at the time.  And forgive me, I
21  don't know the name of -- recall the name, but
22  we would log into their internal system, we
23  would see how many submission -- toxicology
24  submissions, urinalysis submissions came in
25  the day before or the past week or the past,

1   you know, month, quarter, and kind of, you
2   know, scaling that up from there.
3       Q.  Did you monitor the amount of samples
4   Dr. Florete's practice was referring to PCLS?
5       A.  Yes.
6       Q.  And what do you recall about the
7   volume of his sample referral to PCLS?
8       A.  We -- it kind of started, you know,
9   from a standstill to a sprint, if you will.
10  He decide that he was going to send, you know,
11  use us as his primary lab and we got the bulk
12  of his samples rather, you know, initially,
13  and that kind of maintained for a few months.
14      Q.  And after a few months did something
15  change with the volume of samples?
16      A.  It didn't change, he was -- I guess
17  they were going through some practice changes
18  and as far as how the urinalysis test went
19  out, I guess, we -- I was -- they were coming
20  from two offices and then I think they kind of
21  drilled down to one and then we started
22  talking about genetic testing and only one
23  location was doing to do that and so it just
24  -- I wouldn't say it dropped off but it just
25  kind of built up, plateaued, and kind of

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 98 of 283

1  stayed right there, if you will.
2      Q. Sitting here today do you remember
3  the -- I guess the highest volume that IPM
4  referral ever reached?
5      A. Oh, wow, I do not, sorry.
6      Q. That's okay.
7      A. It was more than any other account I
8  had, I know that.
9      Q. We talked earlier about IPM signing
10  as a PCLS account. Can you walk us through
11  how a practice or provider signs up with the
12  lab?
13     A. Yeah, it's relatively easy. I guess
14  most of the work is done by the rep. It's
15  simply getting the loca -- if they say, yes,
16  we're going to use you, we basically have to
17  get their -- get them an account number.
18  There's a little form that we filled out,
19  submitted that internally, they would get them
20  loaded in our system and -- so we can track
21  things electronically, and those things being
22  the toxicology test.
23         So we would get -- once that's set up
24  we would get supplies sent out and it's less
25  than had a week, I think it was like two or

1  three days, actually, get them loaded up with
2  supplies. The supplies being the cups that
3  were utilized for the technology testing, the
4  mail -- the overnight envelopes with labels
5  and things of that nature. And then we -- I
6  would, for a good two weeks or so, maybe even
7  longer than that, I would -- I would
8  periodically stop there every day or every
9  other day to help them, you know, hey -- so
10  their office staff knew what to do and did
11  everything, got everything sent out correctly
12  so it would arrive to us in the best way so
13  then we could track things and go from there.
14     Q. And did providers sign paperwork
15  called Provider Acknowledgement Forms?
16     A. I believe so. And forgive me, my
17  memory on that. I know that there was -- it
18  was just one signature that we needed for them
19  to kind of say that, yes, they were going to
20  us as a lab, before we kind of send out
21  supplies that, you know, the company paid for.
22     Q. I am going to show you another
23  document. Fingers crossed it goes a little
24  more smoothly.
25         All right. Can you see that

1  Mr. Kemp?
2      A. Yes.
3      Q. I will slowly scroll through it so
4  you have a chance to reacquaint yourself with
5  this.
6      A. Yeah. And so -- I'm sorry, this is a
7  different form that I was thinking.
8      Q. Okay.
9      A. But this -- this was sent in for each
10  test, basically. As I mentioned on the
11  supplies, it was -- they had to go down, check
12  the items, you know, the different various
13  drugs they wanted to test for, and then they
14  would, you know, sign at the bottom and that
15  could go -- come in with -- with every sample.
16     Q. Would this go in with every sample or
17  would a separate order or requisition form go
18  in with every sample?
19     MR. CAUDILL: Objection --
20     THE WITNESS: Yeah, forgive me.
21     MR. CAUDILL: I'm sorry, let me just
22  press pause. Mr. Kemp, I'm sorry, I may
23  occasionally object and I just wanted to
24  make sure my objection gets on the record,
25  so I'm going to object to the form of that

1  question.
2      You can go ahead.
3      MS. ARMSTRONG: You can answer,
4  Mr. Kemp.
5      THE WITNESS: I apologize.
6      MR. CAUDILL: No, you're fine.
7      THE WITNESS: So, yeah, I apologize,
8  this is part of the setup, forgive me.
9      So they could say -- so they weren't
10  doing that every time. They would check
11  off certain things they wanted tested on
12  each patient and then that would go in as
13  part of their setup and then, you know,
14  it's -- to your request, to your point and
15  the question, the rec form is the portion
16  that gets sent with the sample.
17  BY MS. ARMSTRONG:
18     Q. And when you say setup, you mean part
19  of their on boarding to PCLS?
20     A. Yes.
21     Q. Great. I'm just going to scroll
22  down.
23         Who was the provider that signed this
24  Provider Acknowledge Form?
25     MR. CAUDILL: Objection.

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 99 of 283

1 Choice and the Institute of Pain Management
2 prior to you starting to work with Physicians
3 Choice, and I believe your testimony -- and I
4 am summarizing so please free to correct me --
5 was that there really was no relationship with
6 the Institute of Pain Management prior to you
7 starting work with Physicians Choice; is that
8 a fair summary of your testimony?
9     A.  Yeah.  I knew -- he thought he had
10 known our company before but it turned -- from
11 what I recall, it turned out, no, he didn't,
12 and, you know, we were a very new company,
13 like I -- I was one of the first eight reps
14 they hired.
15     Q.  And so just to make sure I understand
16 that, to what extent -- other than through
17 secondhand information that you would have
18 from communicating your supervisors and other
19 people with Physicians Choice, to what extend
20 would you have been aware of Physicians
21 Choice's efforts to work with the Institute of
22 Pain Management?
23     A.  Could you explain, I don't --
24     Q.  Yeah.  I guess I'm trying to
25 understand the source of your knowledge of

1 what efforts or what relationship, if any,
2 existed between the Institute of Pain
3 Management and Physicians Choice before you
4 started working for Physician Choice.
5     A.  Oh, there was -- I didn't know of any
6 before I started working there or before he
7 started, you know, the account started
8 submitting samples to us.
9     Q.  You would have asked, you know -- or
10 basically you would have had conversations
11 with other people at Physician Choice and they
12 would have told you, yeah, we've not worked
13 with that doctor --
14     A.  Yeah, that's correct.  We didn't have
15 an account number for them, so that was kind
16 of a first indicator for us -- at least for me
17 that I was told that we needed to get them
18 started up as -- as with any new -- new
19 office.
20     Q.  But in terms of the possibility that
21 someone may have pitched Institute of Pain
22 Management on Physicians Choice services prior
23 your start date, is it fair to say you
24 wouldn't really have any knowledge of that?
25     A.  Yes.

1     Q.  All right.  You testified a little
2 bit about a meeting that took place with
3 Dr. Florete at the Rockhill laboratory in
4 2013.  Do you recall testifying about that?
5     A.  Yes, I do.
6     Q.  And it sounds like you flew up from
7 Jacksonville with Dr. Florete to bring him to
8 the laboratory so that he could meet various
9 individuals and tour the lab; is that right?
10     A.  That's correct.
11     Q.  All right.  And how did that meeting
12 go?
13     A.  It seemed to go very well.  I mean,
14 he was somewhat blown away seeing firsthand of
15 how we take samples in and how efficient we
16 were as a company and especially as a new lab.
17 We were gearing up from the size of our lab
18 and the machines we had to -- to really go
19 very, very big and be kind of a national --
20 huge national player in that industry and he
21 was very pleases to see because he -- I guess
22 he had mentioned that he was hoping to maybe
23 grow some more offices, you know, down the
24 road and that we could support them and not
25 dip in efficiency.  So overall it went

1 fantastic, from my understanding.
2     Q.  Yeah.  And so let me back up just a
3 little bit, too, because I don't want to walk
4 over this.  I mean, you had been trying to
5 break that account for a while by the time
6 he's at Rockhill; is that fair to say?
7     A.  Oh, yeah, absolutely.
8     Q.  And can you talk to me a little bit
9 -- I think you -- you testified a little bit
10 about this, because can you tell me about
11 those efforts, how did you try to break that
12 account?
13     A.  So, you know, initially we -- you
14 know, it's an industry I wasn't familiar with,
15 so I leaned on some of the resources the
16 company had, and that was they would order, my
17 understanding was, most pharmaceutical
18 companies get these -- this information of
19 like who, what providers write what, how many
20 they -- how many prescriptions they write on a
21 monthly basis to help us really, you know, go
22 after, you know, what you would label a big
23 account, a medium account and a small account.
24 So we would pepper days accordingly to kind of
25 go after those accounts and that's how I -- I

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 100 of 283

1 knock, you know, cold call initially, started
2 trying to set up a meeting with whoever I
3 needed to try to get to, as I went through the
4 process, find out Dr. Florete was basically
5 the one that made all the decisions, so I knew
6 I had to eventually get in front of him
7 somehow or another, so it was a process.
8 Q. Yeah. And so you -- the process
9 started with cold calls and emails and
10 progressed to trying to set up meetings. Do
11 you recall when your first meeting with
12 Dr. Florete would have been?
13 A. Oh, I do not. Once I found out after
14 getting trained up, you know, on some of the
15 details of our products we provided or
16 services we provided from a testing
17 perspective, I just -- you know, I knew I had
18 to pick at least four to six whale accounts,
19 big accounts, if you will, to -- I needed to
20 touch those on a daily basis to kind of get
21 ramped up as a new rep in a new -- brand new
22 territory.
23 Q. Would you describe it as a lot of
24 work, breaking that account?
25 A. Sure. Absolutely.

1 Q. All right. So you mentioned you
2 didn't recall when you first met with
3 Dr. Florete. Do you recall where you would
4 have first met with Dr. Florete?
5 A. It would have -- it would have been
6 in his office.
7 Q. All right.
8 A. One of them.
9 Q. I want to look back at the email that
10 Ms. Armstrong showed you that's marked as
11 Exhibit 1 to your deposition. Let me pull
12 that up. Bear with me one second.
13 A. Okay.
14 Q. I'm sorry, Mr. Kemp, are you able to
15 see that email?
16 A. Yes, I can.
17 Q. Great. Okay. Let me know if at any
18 point you need me to zoom in on it, okay?
19 A. Yes.
20 Q. All right. So I want to start with
21 the email that you sent down here, this email
22 is dated July 23, 2013 at 3:40 p.m., do you
23 see?
24 A. Yes.
25 Q. And it says that you just had a

1 meeting with Dr. Florete and his practice
2 manager; is that right?
3 A. Yes.
4 Q. All right. So fair to say that by
5 July 23, 2013 you have sat down at least on
6 one occasion with Dr. Florete?
7 A. Yes.
8 Q. Okay. And in this email you talk
9 about rescheduling his corporate trip. Is
10 that the trip that you were talking about
11 where he came up to Rockhill to take a look at
12 the laboratory?
13 A. Correct.
14 Q. And so, because this email is
15 referencing rescheduling that trip, my
16 assumption is, and you tell me if this
17 assumption is right or wrong, that it had been
18 previously schedule.
19 A. Yeah. There was, you know, he had --
20 he owned a very big practice, so his time was
21 limited and I believe -- I know that had a big
22 play as to why it was rescheduled. And then
23 also making sure all of our, you know, heads
24 of our departments were in office at the time
25 to accommodate, you know, a visit like that.

1 Q. It was very difficult logistically to
2 put this trip together, fair to say?
3 A. Yes.
4 Q. All right. So it had been scheduled
5 at least once and this email is saying, We
6 need to reschedule to August 15th and 16th, do
7 you see that in the second line of the email?
8 A. Yes, I do.
9 Q. Do you think that the trip was
10 actually -- actually went forward around
11 August 15 or 16?
12 A. That sounds about right.
13 Q. All right. And in the body of this
14 email you talk about a few other things that I
15 want to ask you about. In the second
16 paragraph here you refer to GX samples. I
17 believe you testified earlier that those are
18 genetic testing samples; is that right?
19 A. Yes, that's correct.
20 Q. That's a service that Physicians
21 Choice was beginning to offer around the time
22 that you were working there?
23 A. Yes.
24 Q. And you were pitching Dr. Florete on
25 Physicians Choice's genetic testing; is that

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 101 of 283

1 everybody kind of drops their -- what they're
2 doing to make sure that the customer feels,
3 you know, appreciated and we're there for him
4 or her, whoever visits us. So I thought it
5 was -- I thought it went spectacular from the
6 -- you know, from my portion that I was
7 involved with so, and we ended up getting the
8 business so I would say that was a win.
9 Q. When did you learn that Dr. Florete
10 was ready to move forward with Physicians
11 Choice?
12 A. It was probably about a week or --
13 maybe a week or two after the visit, I would
14 suspect, somewhere around there.
15 Q. All right. So that would put you
16 somewhere in late August/early September?
17 A. Yes. And there's sales reports out
18 there that we had internally that would give
19 you a more definitive answer.
20 Q. What's the ramp-up time once someone
21 says, hey, I'm ready to go, I want to start
22 referring samples, what's the ramp-up time
23 associated with getting that process --
24 A. You know, it's actually different for
25 every location. At the time it was very

1 commonplace from an office or practitioner to
2 not send all their samples to one location,
3 you know, kind of test you out. And then some
4 of them would spread it over multiple labs and
5 keep it that way and everybody gets a portion,
6 because there's -- you know, obviously my
7 competition was knocking on their doors as
8 well.
9 So for his account specifically it
10 was kind of like he flipped the switch and
11 said, okay, you know, I feel comfortable using
12 PCLS, so I need you to go around and train all
13 my offices on how to submit, and so that's
14 where those Provider Acknowledgement Forms
15 probably came in as a process to get that
16 going.
17 Q. Yeah, and I think I understand that,
18 my question is a little different. So what
19 I'm wondering is from the time -- from the
20 time you found out that Dr. Florete wants to
21 use Physicians Choice, how much lead time does
22 Physicians Choice need before it starts
23 receiving samples from Dr. Florete?
24 A. As long as they have an account
25 number they can, you know, turn the switch on

1 and send everything. And so once we had all
2 the proper paperwork, account setup, we -- he
3 kind of flipped the switch and turned it on
4 and we started receiving, I would say, the
5 bulk of his business.
6 Q. And were you happy about that?
7 MS. HOLLOWELL: Excuse me, this is
8 Cathleen, Kat was kicked off, she needs to
9 reconnect.
10 MR. CAUDILL: Oh, no. Okay. All
11 right, yeah. Thanks, Cathleen.
12 MS. HOLLOWELL: Sure.
13 MR. CAUDILL: Okay. Mr. Kemp, we're
14 going to pause and go off the record for
15 just a second until Kat can rejoin.
16 THE WITNESS: Certainly.
17 THE VIDEOGRAPHER: Okay. We're going
18 off the video record at 11:34 a.m.
19 (Recess was taken and Ms. Armstrong
20 joined the deposition.)
21 THE VIDEOGRAPHER: We're back on the
22 video record at 11:41 a.m.
23 BY MR. CAUDILL:
24 Q. Mr. Kemp, let me repeat what I just
25 asked you, I'm going to phrase it slightly

1 differently: Were you happy to learn that
2 Dr. Florete had decided to use Physicians
3 Choice?
4 A. Yes.
5 Q. And is that because part of your
6 compensation as an employee of Physicians
7 Choice included bonuses based on sales
8 performance?
9 A. That is correct.
10 Q. And can you explain to us just a
11 little bit about how about that works, how you
12 were compensated while you worked at
13 Physicians Choice?
14 A. Certainly. So we would -- as a W-2 I
15 got a salary plus commission. And the
16 commission plans varied, multiple, multiple
17 times while I was there, but in essence it was
18 a percentage of what was paid out by the, you
19 know, the insurance, the individual patient
20 insurance. So it was all really tied up --
21 tied up or, I'm sorry, began based on the
22 volume of test that were sent from a specific
23 account.
24 Q. And so your -- part of your
25 compensation while you were at Physicians

18 (Pages 69 to 72)

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 102 of 283

1   Choice was these commissions that you were
2   getting based on referrals from the Institute
3   of Pain Management?
4      A.  Yes, the toxicology test, correct.
5      Q.  Great.  Do you recall how you found
6   out that Dr. Florete was ready to move forward
7   with Physicians Choice?
8      A.  I know I -- I was in -- stopped by at
9   some point in his office just to do my --
10  after the trip, just touching every day trying
11  to, you know, keep it on the burner, if you
12  will, so he'd want to join, and he said, I
13  think we're -- I think we're going to be good
14  to go, what do we need to do to get set up or
15  how do we need, you know, go through that
16  process, so that's where we kind of began the
17  paperwork or account setup process.
18      Q.  And that was to -- I think you
19  testified earlier, to your recollection, a
20  couple weeks after the trip?
21      A.  Yes, I believe so, yes.
22      Q.  I think you mentioned that you didn't
23  work with Phil McHugh very closely but you did
24  have some interactions with Philip McHugh.
25      A.  Yes, absolutely, especially, I guess,

1   as one of the first reps to be hired, you
2   know, from where we -- where my tenure with
3   them began and they had multiple offices in
4   this office park to the big lab space that we
5   got in Rockhill, you know, he -- we'd go for
6   training and he would -- if he was in town he
7   would attend a dinner with all -- all the
8   attendees, so -- from the employees that were
9   reps, things -- or he'd poke a head in and
10  say, hey, you know, and then I'd -- that's the
11  kind of dialogue we had, because everything
12  was pretty much handled, you know, from my
13  direct boss and up the chain through him.
14      Q.  All right.  Let me just take two
15  minutes off the record to review my notes and
16  I think I'm almost done, if not completely
17  done, Mr. Kemp, so bear with me one second.
18      THE VIDEOGRAPHER:  Okay.  We're going
19  off the video record at 11:44 a.m.
20      (Recess taken.)
21      THE VIDEOGRAPHER:  We're back on the
22  video record at 11:46 a.m.
23  BY MR. CAUDILL:
24      Q.  Mr. Kemp after Dr. -- after the
25  Institute of Pain Management started using

1   Physicians Choice, did you continue to make
2   calls to the Institute of Pain Management?
3      A.  Oh, absolutely.
4      Q.  What kind of efforts, after they
5   started using Physicians Choice, did you
6   engage in to keep that business?
7      A.  I probably touched their account
8   three times a week just to make sure that if
9   anybody had any questions, if they hired any
10  new personnel make sure they were trained up,
11  and, you know, I -- I knew they were going to
12  be probably my biggest account so I wanted to
13  make sure I nurtured that until everybody felt
14  comfortable with submitting, you know, samples
15  to us as a company.
16      Q.  And so you said about three times a
17  week, was that the case really from the time
18  they started using Physicians Choice until you
19  left the company?
20      A.  That's correct.
21      MR. CAUDILL:  Mr. Kemp, I don't have
22  any further questions for you, sir.
23      Thank you for your time today.
24      THE WITNESS:  Thank you.
25      MS. ARMSTRONG:  Mr. Kemp, this is Kat

1   again, and I do not have any questions
2   either.
3      Thank you, we -- we appreciate your
4   time.
5      THE WITNESS:  Absolutely.
6      THE VIDEOGRAPHER:  All right.  We're
7   going off the video record, then, at 11:47
8   a.m.
9      (Deposition concluded.)

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com

1        CERTIFICATE OF OATH
2
3    STATE OF FLORIDA
     COUNTY OF MIAMI-DADE
4
5        I, the undersigned authority, certify
6    that Chris Kemp appeared before me and was
7    remotely duly sworn.
8        WITNESS my hand and official seal this
9    12th day of November, 2020.
10
11
12
13
14    ------------------------ *Sonnia Martinez*
15    Sonnia Martinez
      Notary Public - State of Florida
16    My Commission No. GG 969119
      My Commission Expires 03/12/2024
17
18
19
20
21
22
23
24
25

1        REPORTER'S CERTIFICATE
2    STATE OF FLORIDA
     COUNTY OF MIAMI-DADE
3
4        I, Sonnia Martinez, Notary Public in and
     for the State of Florida at large, do hereby
5    certify that Chris Kemp was by me first duly
     remotely sworn to testify the whole truth;
6    that I was authorized to and did report said
     remote deposition in stenotype; and that the
7    foregoing pages, numbered from 1 to 78,
     inclusive, are a true and correct
8    transcription of my shorthand notes of said
     remote deposition.
9
        I further certify that said remote
10   deposition was taken at the time and place
     hereinabove set forth remotely and that the
11   taking of said remote deposition was commenced
     and completed as hereinabove set out.
12
        I further certify that I am not an
13   attorney or counsel of any of the parties, nor
     am I a relative or employee of any attorney or
14   counsel of party connected with the action,
     nor am I financially interested in the action.
15
        The foregoing certification of this
16   transcript does not apply to any reproduction
     of the same by any means unless under the
17   direct control and/or direction of the
     certifying reporter.
18
        IN WITNESS WHEREOF, I have hereunto set
19   my hand this 20th day of November, 2020.
20
21
     ------------- *Sonnia Martinez*
22   Sonnia Martinez
23
24
25

20 (Pages 77 to 78)

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 104 of 283

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL FILE NO. 3:17-CV-37
(CONSOLIDATED WITH CIVIL FILE NO. 3:17-CV-46)

```
_____
                                        )
UNITED STATE OF AMERICA ex rel.         )
TARYN HARTNETT, and DANA SHOCHED,       )
                                        )
            Plaintiff,                  )
                                        )
        v.                              )   DEPOSITION OF MANOJ KUMAR
                                        )
PHYSICIANS CHOICE LABORATORY            )
SERVICES, DOUGLAS SMITH, PHILIP         )
MCHUGH AND MANOJ KUMAR,                 )
                                        )
            Defendants.                 )
_____ )
```

On Friday, October 16, 2020, commencing at 8:42 a.m., the deposition of Manoj Kumar was taken on behalf of the Plaintiff at the US Attorney's Office, Carillon Building, 227 West Trade Street, Suite 1650, Charlotte, North Carolina, and was attended by Counsel as follows:

APPEARANCES:

KATHERINE T. ARMSTRONG, ESQ.
Assistant United States Attorney
US Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina  28202
on behalf of the Plaintiff

BO CAUDILL, ESQ.
MATTHEW M. VILLMER, ESQ.
Weaver, Bennett & Bland, PA
196 North Trade Street
Matthews, North Carolina  28105
on behalf of the Defendant Philip McHugh

(Appearances continue)

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 105 of 283

1  A  Yes, ma'am.
2  Q  What do you do?
3  A  A manage a group of clinics in Asheville.
4  Q  Asheville, North Carolina?
5  A  Yes, ma'am.
6  Q  What types of clinics do you manage?
7  A  They are pain clinics.
8  Q  When you say manage, just talk to us generally
9     about your roles and responsibilities.
10 A  Administrative role.
11 Q  What does that mean?
12 A  Hiring people, making sure the clinics are
13    running okay, all facilities are available for
14    the clinicians.  Typically that's the role.
15 Q  Do you have any other prior work experience
16    managing medical practices?
17 A  Yes, ma'am.
18 Q  Tell me about that.
19 A  In Indiana it was called Pain Management
20    Centers of Southern Indiana and then it was
21    Texas Pain Institute in Dallas.  In between
22    that I've given guidance to a couple of
23    physicians, not as a full-time employee but
24    just as a consultant.
25 Q  Great.  When were you working or providing

1  services for the Pain Management Centers of
2  Southern Indiana?
3  A  From 2005 to like 2009 -- 2010.  Sorry, 2010.
4  Q  Sure, thank you.  What type of practice was
5     the Pain Management Centers of Southern
6     Indiana?
7  A  It was a pain group, ma'am.
8  Q  Was that one office location or multiple?
9  A  It had multiple locations.
10 Q  Was there a physician who ran that practice?
11 A  The owner is the physician.
12 Q  Who was that?
13 A  His name was Dr. Kamal Tiwari.
14 Q  What was your title when you were working for
15    Pain Management Centers of Southern Indiana?
16 A  It started as HR manager and then after it
17    became manager in the last, I would say, one
18    year.
19 Q  Were you a W2 employee for that practice?
20 A  Yes, ma'am.
21 Q  In your role as manager for Pain Management
22    Centers of Southern Indiana, what types of
23    duties did you perform?
24 A  All administrative duties.
25 Q  In the context of Pain Management Centers of

1  Southern Indiana, give us some examples of
2  administrative duties.
3  A  Oversee billing, talk to contractors, hiring
4     people, making sure facilities are running,
5     making schedules.
6  Q  Were you involved in any way, while you were a
7     manager of Pain Management Centers of Indiana,
8     in the laboratories referral of urine drug
9     testing to outside labs?
10 A  No, ma'am.
11 Q  Why did you end up leaving the practice in
12    2010?
13 A  It got closed down.
14 Q  Why did it get closed down?
15 A  Because the owner-physician was indicted for
16    doing too many -- various reasons, one of
17    which was doing too many procedures.
18 Q  Do you recall what happened in his criminal
19    case?
20 A  He went to prison for a short period of time.
21    I did not know how much.
22 Q  Did the practice cease operating at that point
23    when Dr. Tiwari was indicted?
24 A  Yes, ma'am.
25 Q  When did you work for Texas Pain Institute in

1  Dallas?
2  A  From 2015, March-April onwards, till 2018
3     January, end.
4  Q  What type of services did you provide for that
5     pain clinic?
6  A  Similar administrative services.
7  Q  What you've already described to us, billing,
8     contractors, etcetera?
9  A  Yes, ma'am.
10 Q  Were you involved in any way with Texas Pain
11    Institute's referral of urine drug testing to
12    laboratories?
13 A  They had -- we had an internal lab.  So there
14    was nothing going out.
15 Q  But did Pain Management Centers of Southern
16    Indiana have an in-house lab?
17 A  It did not have an in-house lab.
18 Q  Did Pain Management Centers of Southern
19    Indiana send all of its patient samples out to
20    other laboratories for urine drug testing?
21 A  Yes, ma'am.
22 Q  Do you recall what laboratories that Pain
23    Management Centers of Southern Indiana
24    physicians were referring to?
25 A  It was a laboratory based out of Indianapolis.

4 (Pages 10 to 13)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 106 of 283

1    I do not recall the name.
2  Q  How many providers worked at Pain Management
3     Centers of Southern Indiana, if you recall?
4  A  More than 20.
5  Q  Do you know if any of the providers at Pain
6     Management Centers of Southern Indiana ever
7     referred samples for urine drug testing to
8     Physicians Choice Laboratory?
9  A  No, ma'am.
10 Q  You don't think they did or you don't know?
11 A  I do not know.
12 Q  If I say PCLS or Physicians Choice, can we
13    agree that means Physicians Choice Laboratory
14    Services?
15 A  If you say so.
16 Q  If I say PCLS, will you know I'm referring to
17    Physicians Choice Laboratory Services?
18 A  Yes, ma'am.
19 Q  Great, just to cut down on some of the words
20    that we have to use today to simplify.  Do you
21    know if PCLS ever marketed its services to
22    Pain Management Centers of Southern Indiana?
23 A  How do you say marketing?  What do we qualify
24    as marketing, ma'am?
25 Q  Sure.  Do a sales rep from PCLS ever speak

1     with any of the providers or staff at Pain
2     Management Centers of Southern Indiana?
3  A  I would say the staff is only me, that none of
4     the reps spoke to nobody else.  That's what I
5     recall.
6  Q  So let me make sure I understand that.  A
7     sales representative from a urine drug testing
8     laboratory would only speak with you in your
9     capacity as manager of the practice?
10 BY MR. CAUDILL:
11    Objection to the form.  You can answer.
12 BY MS. OWEN:
13    You can answer when he objects.
14 BY THE DEPONENT:
15    Okay.  No, not true.  They would speak to the
16    doctors.
17 DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
18 Q  So do you know if anyone from PCLS ever spoke
19    to any of the doctors at Pain Management
20    Centers of Southern Indiana?
21 A  I do not know, ma'am.
22 Q  You would not have been involved in that at
23    all?
24 A  No, ma'am.
25 Q  Did Texas Pain Institute ever refer patient

1     samples for urine drug testing to PCLS?
2  A  Yes, ma'am.
3  Q  When did they start referring to PCLS?
4  A  I do not recall the date or the month, but
5     around 2014.
6  Q  When you worked for Texas Pain Institute, were
7     you a W2 employee?
8  A  Yes, ma'am.
9  Q  You mentioned that you had also given guidance
10    to some providers as a consultant.  Can you
11    identify those providers for us?
12 A  Can you say it again?
13 Q  Sure.  Can you tell us who those providers
14    were that you provided consulting services to?
15 A  I provided consulting services to physicians
16    who left to make their own practices after
17    Pain Management of Southern Indiana stopped
18    working, and these were Dr. Masimore and Dr.
19    Shah.
20 Q  Are there any other physicians for whom you
21    provided consulting services other than Drs.
22    Masimore and Shah?
23 A  Not directly consulting services at that time.
24 Q  What do you mean by not directly consulting
25    services?

1  A  By me -- by saying that, in conversation with
2     a physician, I may suggest thing but not that
3     I managed them or gave consultancy to them.
4     So while discussing, I will suggest, "Hey,
5     these are things to do.  These are nice things
6     to do."  But it's not that I am consulting
7     with them.
8  Q  Were physicians paying for this type of
9     discussion?
10 A  It was -- no, this is not a paid thing.  This
11    was a friendly discussion happening when you
12    meet somebody.
13 Q  So your paid consulting work was limited to
14    Dr. Masimore and Dr. Shah?
15 A  Yes, ma'am, at that time.
16 Q  I think you mentioned this earlier, but just
17    to confirm, you were not a W2 employee of
18    either Dr. Masimore or Dr. Shah?
19 A  I was not, ma'am.
20 Q  We'll talk about Dr. Masimore and Dr. Shah a
21    little bit later, but first I would like to
22    kind of go back to background here.  Other
23    than the work you've already discussed, did
24    you perform services on behalf of any other
25    companies?

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 107 of 283

1 A Geographical area.
2 Q What was your geographical area?
3 A Indiana. That's where I was at that time.
4 Q Were you living in Indiana at that point?
5 A Yes, ma'am.
6 Q Did MK Land Holdings end up getting sales reps
7 working under it?
8 A It did, one or two. I do not recall how much
9 business they were able to drum up.
10 Q Do you recall their names?
11 A No, ma'am.
12 Q Did you approach PCLS about working as a sales
13 representative or manager or did someone from
14 PCLS approach you?
15 A I do not recall, ma'am.
16 Q Who at PCLS was involved in negotiating this
17 independent contractor agreement with MK Land
18 Holdings?
19 A I used to talk to only two people at PCLS and
20 I do not recall who talked about the contract
21 and how much, but the two people were Marcus
22 Sowinski and Phil McHugh.
23 Q When did you first meet Marcus Sowinski?
24 A In 2008 or 2009. I'm not sure right now.
25 Q Where did you meet him?

1 A Florida.
2 Q What were those circumstances of that meeting?
3 A While working for Pain Management Centers of
4 Southern Indiana, Marcus and Phil and the head
5 of the -- which I was given to understand at
6 that time a partner or doctor -- were setting
7 up a prescription dispensation in a
8 physician's office. And I was invited out
9 there to see how it works and that's how --
10 that's the first time I met Marcus Sowinski.
11 Q What do you mean by a prescription
12 dispensation system?
13 A When you go to a doctor's office, they write a
14 prescription to you and then you go to a
15 pharmacy and get it filled. So at that time
16 it was new that you have a pharmacy within the
17 clinic itself and you could dispense the
18 prescriptions right there and then.
19 Q Who invited you to come see this prescription
20 dispensing system?
21 A I'm hazy on how it happened and which one it
22 was, but I used to talk to only two people,
23 Marcus and Phil.
24 Q So you don't recall who invited you to go see
25 the system?

1 A No, ma'am, it's very long back.
2 Q Why did they invite you to come see this
3 system?
4 A They were doing regular sales. I guess that's
5 why they invited me, because they saw the -- I
6 presumed they realized that we had a large
7 practice and it can be successful.
8 Q Did the Pain Managements Centers for Southern
9 Indiana ever end up doing a prescription
10 dispensing system in-house?
11 A No, ma'am.
12 Q Do you remember the name of the clinic where
13 you went to see the demonstration?
14 A No, ma'am.
15 Q When was the first time you spoke to Phil
16 McHugh?
17 A I do not recall the date and -- maybe 2008 or
18 '09, somewhere around that time. I don't
19 recall when.
20 Q What were the circumstances of you meeting Mr.
21 McHugh?
22 A I do not recall, ma'am. The only thing I have
23 a hazy memory and what I can put together is
24 that at Pain Management Centers of Southern
25 Indiana at that time urine drug testing cups

1 were being utilized as a source for immediate
2 qualitative results and that is something --
3 those cups were something Phil was selling. I
4 do not know how we got -- how he came to know
5 about me or who introduced us. So that is the
6 first time I met him and he assisted us in
7 procuring the cups for our clinic and doing --
8 guided the staff. He came and visited once to
9 guide us in how it should be done.
10 Q Just to confirm, when you say we, you're
11 talking about the Pain Management Centers ---
12 A Yes, ma'am.
13 Q Thank you, of Southern Indiana?
14 A Yes, ma'am.
15 Q Do you remember the year when Mr. McHugh came
16 and, as you described, showed your staff how
17 to use the cups at Pain Management Center?
18 A No, ma'am.
19 Q Do you know if Mr. McHugh was an owner of PCLS
20 at the time he came to the clinic with the
21 cups?
22 A From what I know, PCLS did not exist at that
23 time.
24 Q What's your understanding of when PCLS came
25 into existence?

8 (Pages 26 to 29)

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
                    ars@ashevillereporting.com
        Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 108 of 283

1   A   I don't remember, ma'am.

2   Q   Do you recall what you told him about your

3       business relationship with Avicenna and Dr.

4       Shah?

5   A   I do not remember, ma'am.

6   Q   When was the first time you told Mr. Sowinski

7       about your business relationship with Dr.

8       Masimore and Pain Management Solutions?

9   A   I do not remember, ma'am.

10   Q   Do you remember what you told Mr. Sowinski

11      about your relationship with Pain Management

12      Solutions and Dr. Masimore?

13   A   I do not remember, ma'am.

14   Q   Did you ever tell Mr. McHugh about your

15      relationship with Pain Management Solutions or

16      Dr. Masimore?

17   A   Him and Marcus Sowinski both.

18   Q   What do you remember telling Mr. McHugh and

19      Mr. Sowinski about your business relationship

20      with Pain Management Solutions and Dr.

21      Masimore?

22   A   I do not remember, ma'am.

23   Q   What do you remember in telling them about

24      your business relationships with Dr. Shah and

25      Avicenna?

1   A   Can you go back to the previous question,

2      please?

3   Q   Sure.  I was asking:  What do you remember

4      telling Mr. Sowinski and Mr. McHugh about your

5      business relationships with Pain Management

6      Solutions and Dr. Masimore?

7   A   No, I do not remember.  I got confused with if

8      you were talking about Pain Management Centers

9      of Southern Indiana.

10   Q   I'm sorry.  Thank you for -- all the names

11      sound the same to me.

12   A   Same here.

13   Q   I want to make sure I'm getting this right.

14      Pain Management Solutions is Dr. Masimore's

15      practice, correct?

16   A   Yes, ma'am.

17   Q   Do you believe that you told either Ms. McHugh

18      or Mr. Sowinski about your relationship with

19      Dr. Masimore and his practice before you

20      became an independent contractor for PCLS?

21   A   I do not remember, ma'am.  It's very long

22      back.

23   Q   Same question as to Dr. Shah and Avicenna.  Do

24      you recall if you told Mr. McHugh or Mr.

25      Sowinski about your business relationship with

1      that practice before you entered into the

2      independent contractor agreement?

3   A   I do not remember, ma'am.

4   Q   Do you remember talking to anybody else at

5      PCLS about your business relationship with Dr.

6      Masimore and his practice Pain Management

7      Solutions?

8   A   That is before signing the contract?

9   Q   At any time.

10   A   Yes, I talked about it after I became a W2

11      definitely with Joe Wiegel, with Paul Schmidt,

12      with the senior vice president -- I don't

13      remember his name now.  I distinctly remember

14      these.

15   Q   What conversations do you remember having with

16      Joe Wiegel about your business relationship

17      with Masimore and Pain Management Solutions?

18   A   I do not remember exactly what I said, ma'am.

19      It's been a long way back.

20   Q   Do you remember generally what the

21      conversation was about?

22   A   It will be conjecture.

23   Q   Do you remember how you came to be talking to

24      Joe Wiegel about your business relationship

25      with Dr. Masimore and Pain Management

1      Solutions?

2   A   No, ma'am.

3   Q   Do you recall the circumstances of how you

4      came to talk to Paul Schmidt about your

5      relationship with Masimore and Pain Management

6      Solutions?

7   A   No, ma'am.

8   Q   Do you recall anything about your

9      conversations with Mr. Schmidt on that topic?

10   A   No, ma'am.

11   Q   Then you mentioned the senior vice president.

12      Do you recall how you came to be talking to

13      that person about your relationship with

14      Masimore and Pain Management Solutions?

15   A   No, ma'am.

16   Q   Did you also talk to Mr. Wiegel, Mr. Schmidt,

17      and the senior VP about your business

18      relationships with Avicenna and Dr. Shah?

19   A   That is what I've said, yes.

20   Q   I thought we were talking about Masimore and

21      Pain Management Solutions, but were you ---

22   A   The both of them, ma'am.

23   BY MR. CAUDILL:

24      Objection.

25   BY THE DEPONENT:

14 (Pages 50 to 53)

828-254-9230       ASHEVILLE REPORTING SERVICE       800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 109 of 283

1    Yes, ma'am.
2  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
3  Q    Do you recall anything specific about your
4       conversations with Mr. Wiegel, Schmidt, or the
5       senior VP about Avicenna and Dr. Shah?
6  A    No, ma'am.
7  Q    Do you recall conversations with anyone at
8       PCLS about either Dr. Shah and his practice or
9       Dr. Masimore and his practice before you
10      became a W2 employee?
11 A    Yes, because that was added to my employee
12      agreement that these practices were exempt
13      from the business.
14 Q    Tell me what you mean by exempt from the
15      business.
16 A    That I would continue to collect commission on
17      the practice, not only these, but there were
18      more who were already my clients.  So that --
19      I believe I talked to both Marcus and Phil
20      about -- both Marcus and Phil about it.
21 Q    Let's take a look at that employment agreement
22      since you brought it up.
23 BY MR. CAUDILL:
24      Kat, can we take a five-minute break?
25 BY MS. ARMSTRONG:

1    Yes, of course.
2  (OFF THE RECORD)
3  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
4  Q    Mr. Kumar, are you ready to get started again?
5  A    Yes, ma'am.
6  Q    We took a short break and right before we
7       broke we had started to talk about your hiring
8       as a W2 employee for PCLS.
9  A    Yes, ma'am.
10 Q    How did that come about?
11 A    I'm not sure of the question, ma'am.
12 Q    Sure.  How did you come to be hired as a W2
13      employee for PCLS?
14 A    Being offered the job.
15 Q    Who offered you the job?
16 A    I do not remember who between the two it was.
17 Q    I'm sorry, between ---
18 A    Between Marcus Sowinski and Phil or both.  I
19      do not recall who.
20 Q    Do you recall the initial conversation with
21      either Phil or Marcus regarding your
22      transition to a W2 position with the company?
23 A    I do not recall, ma'am.
24 Q    Do you recall when you started talking to
25      either Marcus or Phil about transitioning into

1    a W2 role?
2  A    I do not recall, ma'am.
3  Q    Was this something you asked for or something
4       the company proposed?
5  A    I do not recall, ma'am.
6  Q    Did your role at PCLS change when you became a
7       W2 employee?
8  A    Yes, ma'am.
9  Q    Tell us how it changed.
10 A    I became in charge for all the 1099
11      independent contractors and it was to develop
12      more independent contractors.
13 Q    Would that be all independent contractors
14      nationwide or limited to a specific territory?
15 A    That was nationwide, ma'am.
16 Q    What was your job title?
17 A    Vice President, marketing, channel partners.
18 Q    What does channel partners mean?
19 A    Independent contractors.
20 Q    Is that just another term for independent
21      contractors or does it have some specific
22      meaning?
23 A    That is how it was termed at PCLS.
24 Q    In addition to overseeing the independent
25      contractor sales force, did you take on any

1    additional roles or duties when you became a
2  W2 employee?
3  A    Not for PCLS directly.
4  Q    What do you mean by that?
5  A    In addition to the task given to me PCLS was
6  as a vice president, channel partners for PCLS
7  -- that was the task that was assigned to me.
8  Q    I asked you if you had taken on any other
9  roles and responsibilities and you said not
10 directly.  What do you mean by not directly?
11 A    I was still working with my own reps of MHS.
12 Q    Was MHS a channel partner of PCLS?
13 A    Yes, ma'am.
14 Q    When did MHS become a channel partner of PCLS?
15 A    It started as MK Land Holdings.  When MK Land
16 Holdings transitioned to MHS, I do not recall.
17 Q    So at some point in time, MK Land Holdings'
18 channel partnership transitioned into MHS'
19 channel partnership?
20 A    Yes, ma'am.
21 Q    What was the reason for that?
22 A    I do not recall, ma'am.
23 Q    Do you recall what year that occurred in?
24 A    I do not recall, ma'am.
25 Q    So in addition to your W2 responsibilities,

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 110 of 283

1    you still had responsibilities as channel
2    partner through MHS, is that correct?
3  A  Yes, ma'am.
4  Q  Were you performing any other work for PCLS in
5    any other capacity at the time you became a
6    W2?
7  A  I'm not clear on the question, ma'am.
8  Q  Sure.  Were you through any of your entities
9    still providing billing services to PCLS --
10    data entry?  I'm sorry, I think you mentioned
11    it was data entry.
12  A  I do not recall when data entry was taken in-
13    house.  I do not recall the time frame.
14  Q  Do you recall when you started doing data
15    entry for PCLS?
16  A  It was -- as far as I remember -- I just want
17    to make sure that if I'm not certain about
18    something, you want me to answer it or you --
19    or you would prefer me to say I do not know
20    and I do not remember.
21  Q  I don't want you to speculate, but I also want
22    you to try your best to give us ---
23  A  So I will let you know that I'm not certain
24    absolutely.  So I'm not absolutely certain
25    when it was.  It was around the end of -- it

1    was around 2010.
2  Q  How were you compensated as a W2 employee?
3    What did you get paid?
4  A  It was in the contract.  I do not remember
5    exactly what it was.
6  Q  Did you have a base salary?
7  A  Yes, ma'am.
8  Q  You continued to collect commissions on
9    collections on MHS accounts, is that correct?
10  A  Yes, ma'am.
11  Q  Do you remember if there were any other
12    benefits to you in becoming a W2 employee for
13    PCLS?
14  A  A regular benefit package that was for all
15    employees and it was exactly as per contract.
16    I do not remember what the contract says.
17  Q  When you transitioned into your W2 role, were
18    you still living in Indiana?
19  A  No, I was -- I had moved to Charlotte at that
20    time.
21  Q  As vice president of marketing, did you
22    maintain at a presence at PCLS' offices or lab
23    space?
24  A  Yes, ma'am.
25  Q  How often were you at the company location?

1  A  Every day other than the day I was traveling
2    for some clients or on vacation.
3  Q  Sure.  Was this like a Monday-through-Friday
4    job?
5  A  Yes, ma'am.
6  Q  What were your typical hours worked?
7  A  Typical hours of 8:00 to 5:00.
8  Q  Then I think you mentioned you also traveled
9    to see clients, is that correct?
10  A  Clients and reps because I was in charge for
11    channel partners across the country.  So I had
12    to go and meet channel partners, go and meet
13    their clients.
14  (GOVERNMENT'S EXHIBIT NO. 4 MARKED)
15  BY MS. ARMSTRONG:
16    Let's take a look at the employment agreement
17    we've marked Plaintiff's 4.  Cathleen, would
18    you mind?
19  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
20  Q  Take a moment and go over that, please.  You
21    mentioned before we broke that when you became
22    a W2 employee certain accounts that you had
23    worked as a sales rep or manager were exempted
24    from the agreement, is that accurate?
25  A  Yes, ma'am.

1  Q  Tell me what you mean by that.
2  A  That if there's any business from them, I
3    would continue to receive commission on those
4    accounts.
5  Q  Are those the accounts that are listed on
6    Schedule C of this employment agreement?
7  A  These are accounts that are listed, but this
8    Pain Management Center of Wilmington was never
9    an account.  The others were possibly those
10    that I was -- some of them were those that I
11    was already working on.  I'm not sure.  I do
12    not remember whether all of them were accounts
13    already or not.
14  Q  Pain Management Solutions is Dr. Masimore's
15    practice in Jasper, Indiana, is that correct?
16  A  Yes, ma'am.
17  Q  Is Dr. Shah's practice on this list?
18  A  It is not there on this list.
19  Q  But is it your understanding that Dr. Shah's
20    practice was one of the accounts that MedTech
21    Health Solutions would continue servicing as a
22    channel partner?
23  A  Yes, ma'am.
24  Q  Going back to Page 2 ---
25  A  Possibly by this time his practice had closed.

16 (Pages 58 to 61)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 111 of 283

1        Dr. Shah.

2  Q  So when you stated earlier that the reason Dr.

3      Shah and Avicenna were not listed on Schedule

4      C could be that the practice had stopped

5      operating, that was speculation, correct?

6  A  Yes, ma'am, I said it could be.

7  Q  Going back to Page 2 of the employment

8      agreement which is Exhibit 4, there's a

9      Subparagraph C -- little C.  Just take a

10     moment and read that for me to yourself.  I

11     didn't mean for you to read it out loud.  I'm

12     going to ask you some questions about it.

13  BY MS. OWEN:

14     Which exhibit?

15  BY MS. ARMSTRONG:

16     Four.

17  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:

18  Q  Are you through?

19  A  Yes, ma'am.

20  Q  So Subparagraph C states, "For the period of

21     March 1, 2013, through May 31, 2013, it is

22     expected that Employee bring to a conclusion

23     any and all activities with such clients while

24     working in the capacity as owner of MHS," and

25     it's referring to the clients on Schedule C.

1  Q  By May 31, 2013, did MHS stop working with Dr.

2     Masimore's practice?

3  A  Once I moved to Charlotte, the only work I was

4     effectively doing for them was payroll.

5  Q  I appreciate that.  I'm not talking about your

6     work for Dr. Masimore.  But Schedules C lists,

7     it appears, several accounts of MHS and this

8     contract states that by May 31st of 2013 MHS

9     cease its activities related to Dr. Masimore's

10     practice, correct?

11  A  Yes, ma'am.

12  Q  Did that happen?

13  A  No, ma'am.

14  Q  Why not?

15  A  It was my understanding that these -- these

16     clients will continue with MHS.  That's why

17     PCLS continued paying for them all the while.

18  Q  Did anyone at PCLS discuss this paragraph with

19     you?

20  A  No, ma'am.

21  Q  Did you read it prior to signing the

22     employment agreement?

23  A  No, ma'am.

24  Q  Did you read through the agreement generally

25     before signing it?

1  A  No, ma'am.

2  Q  Why not?

3  A  I did not go word-by-word.

4  Q  Do you know who drafted this agreement?

5  A  I do not know who at PCLS drafted it.

6  Q  If you flip to Page 10, who signed this

7     employment agreement on behalf of PCLS?

8  A  Phil McHugh.

9  Q  Keep flipping forward to -- it is Page 1 of

10     Schedule E kind of near the back.

11  A  Yes, ma'am.

12  Q  I'm paraphrasing here, but there's a paragraph

13     that indicates PCLS has adopted written

14     policies -- certain compliance policies for

15     its personnel.  Were you ever provided with

16     any copies of written policies from PCLS?

17  A  I don't recall.

18  Q  There's also a sales and marketing standard of

19     conduct referenced in Schedule E.  Can you

20     tell us what that is?

21  A  It is part of the code of ethics, Schedule E.

22  Q  Do you recall PCLS' sales and marketing

23     standard of conduct?

24  A  Yes, ma'am.

25  Q  Was a copy of the sales and marketing standard

1     of conduct ever provided to you?

2  BY MR. CAUDILL:

3     Objection to the form.

4  BY THE DEPONENT:

5     I do not recall, ma'am.

6  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:

7  Q  Did you read through this Schedule E before

8     you signed the contract?

9  A  I don't think so, ma'am.

10  Q  Again, why did you not read through Schedule

11     E?

12  BY MR. CAUDILL:

13     Objection to the form.  You can answer.

14  BY THE DEPONENT:

15     I have no answer to that, ma'am.

16  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:

17  Q  It does look like on the last page, Page 5,

18     that your signature appears here, is that

19     correct?

20  A  Yes, ma'am.

21  Q  Did your employment with PCLS ever come to an

22     end?

23  A  In 2015.

24  Q  Do you recall the date and the month in 2015?

25  A  No, ma'am.

18 (Pages 66 to 69)

828-254-9230      ASHEVILLE REPORTING SERVICE      800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 112 of 283

1    Dr. Johnson's meeting in Pennsylvania?
2  A  Dr. Johnson wanted to know about how to set up
3     a laboratory in his office to do presumptive
4     testing. And since I had knowledge about
5     that, I was asked to go and advise him.
6  Q  What is presumptive testing?
7  A  Analyzer. Presumptive testing could be a
8     urine cup or an analyzer, ma'am.
9  Q  Just to simplify it even more, what is
10    presumptive testing? What are you testing
11    when you refer to presumptive testing?
12 A  Presumptive testing for urine toxicology.
13 Q  Is presumptive testing qualitative or
14    quantitative?
15 A  Qualitative.
16 Q  Qualitative testing means you're looking for
17    what?
18 A  Positives and negatives.
19 Q  The presence of a substance?
20 A  Or an absence of a substance.
21 Q  Did ---
22 A  Sorry. The qualification there is that it has
23    a lot of false-positives and false-negatives.
24 Q  Presumptive testing does?
25 A  Yes, ma'am, and it does not talk about

1     metabolites.
2  Q  Dr. Johnson was interested in learning more
3     about a lab to do presumptive testing. Did he
4     reach out to the company, to PCLS, about this?
5  A  I was not working with PCLS that time. The --
6     the rep for Dr. Johnson was Elan Colen from
7     Florida and the lead came through him and
8     that's how I got roped in to talk to his
9     client about an analyzer.
10 Q  When you say you weren't working at PCLS, you
11    mean you weren't working as a W2 employee at
12    that time?
13 A  Yes, ma'am.
14 Q  But you were working as a channel partner?
15 A  I'm not certain about the time, but it appears
16    so.
17 Q  Do you recall anything specific about what Mr.
18    Colen told you about Dr. Johnson's needs?
19 A  No, I do not recall specifically what he told
20    me.
21    You mentioned analyzers. Tell us more about
22    analyzers. What is an analyzer?
23 A  An analyzer is a lab equipment to do amino
24    acid testing.
25 Q  Is it something that a doctor could set up and

1     use in his or her practice?
2  A  That is something a doctor could set up to use
3     in a -- in his or her practice to reduce the
4     cost or to reduce the number of confirmations
5     that they have to send for.
6  Q  What do you mean by confirmations?
7  A  Quantitative testing as you had specified.
8  Q  What is involved in setting up an analyzer lab
9     in a physician's clinic?
10 A  Three aspects are required. The first is a
11    license, the second is a director, and the
12    third is an analyzer.
13 Q  Prior to meeting with Dr. Johnson, have you
14    had experience setting up analyzer labs in
15    physician practices?
16 A  Yes, ma'am.
17 Q  Tell me about that.
18 A  For six months I was working with a company
19    called Clinical Lab Services whose job was to
20    set up laboratories in doctors offices -- set
21    up laboratories. They may or may not be in
22    doctors' offices.
23 Q  Other than a doctor's office, where would you
24    find an analyzer lab?
25 A  In the regular lab also there will be

1     analyzers.
2  Q  When were you working for Clinical Lab
3     Solutions -- Solutions did you say?
4  A  Clinical Lab -- I do not remember the exact
5     name of the company. It was based out of
6     California. This was four or five months in
7     2010 August to 2011, beginning, something like
8     that, ma'am.
9  Q  Did you have any ownership interest in that
10    company?
11 A  No, ma'am.
12 Q  What specifically was your role with Clinical
13    Laboratory Services?
14 A  To coordinate the setting up of a laboratory.
15 Q  Prior to joining that company, Clinical Lab
16    Services, did you have any experience in
17    setting up analyzer labs?
18 A  No, ma'am.
19 Q  How did you get trained to do that?
20 A  On-job training.
21 Q  During your time with Clinical Laboratory
22    Services, about how many analyzer labs did you
23    work on setting up? Not to completion, just
24    how many analyzer lab projects were you
25    working on?

828-254-9230    ASHEVILLE REPORTING SERVICE    800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 113 of 283

```
 1  A   I do not specifically remember the number, but
 2      more than ten.
 3  Q   So I think you said that you got, to use your
 4      phrase, roped in and went to go meet with Dr.
 5      Johnson, is that correct?
 6  A   Yes, ma'am.
 7  Q   Tell me about that meeting with Dr. Johnson.
 8  A   We met Dr. Johnson at his clinic.
 9  Q   Was anyone else present when you met with Dr.
10      Johnson?
11  A   I do not recall whether his manager was there
12      initially or he was there later.
13  Q   Who was his manager?
14  A   I do not recall the name, ma'am.
15  Q   What specifically did you talk about in terms
16      of setting up an analyzer for Dr. Johnson when
17      you all met?
18  A   I'm not clear on what you're looking for here.
19  Q   Sure.  How did you explain the analyzer lab
20      setup to Dr. Johnson?
21  A   I explained the analyzer lab setup in the
22      similar fashion where I explained to you that
23      there are three aspects of the setting up of a
24      lab.
25  Q   Did you have any conversations with Dr.
```

```
 1      Johnson before you went to meet with him?
 2  A   I do not recall talking to him ever before
 3      that, ma'am.
 4  Q   Did you have, I guess what I would call, a
 5      sales pitch in terms of why Dr. Johnson should
 6      set up an in-house analyzer lab?
 7  A   I do not recall.  I was not in the business of
 8      selling labs to people.
 9  Q   But was there any financial upside to Dr.
10      Johnson for putting an analyzer in his
11      practice?
12  A   I would assume yes.
13  BY MS. ARMSTRONG:
14      Let's take a little break if you all don't
15      mind.  We've been going for a while.  Let's do
16      ten minutes.
17  (OFF THE RECORD)
18  BY MS. ARMSTRONG:
19      Let's look at an email that I believe you
20      produced.  It's Kumar-Email 28167 and we are
21      on Exhibit No. 12.
22  (GOVERNMENT'S EXHIBIT NO. 12 MARKED)
23  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
24  Q   What does Exhibit 12 appear to be?  (Tenders)
25  A   (Upon Review)  It's an email from myself to
```

```
 1      Marcus and Phil.
 2  Q   This is in February of 2011, is that correct?
 3  A   Yes, ma'am.
 4  Q   You reference that this is a follow-up on an
 5      analysis of the current trend in CPT codes.
 6      What are you referring to by current trend in
 7      CPT codes?
 8  A   I not recall when changes happened, but this
 9      could be that initially the physicians -- when
10      they were testing with a cup in their clinics,
11      they were getting paid up to $200 and the
12      rules were changing, that if they need to get
13      paid more, they would have to put an analyzer.
14      Otherwise, if they would continue to do the
15      cup, it would be -- the paid amount to them
16      would be substantially lower.
17  Q   When you refer to the rules changing, are
18      these the rules for reimbursement for ---
19  A   Yes, ma'am, the CPT code and the related fee
20      schedule.
21  Q   Generally, the use of cups or analyzers, are
22      those referred to as point-of-care testing?
23  A   Yes, ma'am.
24  Q   In this email you reference an idea where PCLS
25      could offer providers services relating to
```

```
 1      setting up a moderate complexity lab, is that
 2      correct?
 3  A   Yes, ma'am.
 4  Q   Tell me what you mean by moderate complexity
 5      lab.
 6  A   There are there or four qualifications of a
 7      laboratory.  The lowest qualification is a
 8      CLIA waived laboratory that any clinic can
 9      have and any physician can be the director of
10      that laboratory.  Then there is a moderate
11      complexity or a -- and a high complexity
12      laboratory and these have got specific
13      requirements.  The major change -- the one
14      major change is that the director needs to be
15      a pathologist.
16  Q   Would an analyzer lab be a moderate complexity
17      lab?
18  A   These rules continue to change, ma'am, and it
19      could be a moderate or a high complexity lab
20      depending upon the analyzer.
21  Q   Back in 2011 when you're writing this email,
22      are you talking about setting up analyzer
23      labs?
24  A   Yes, and this came from my experience of
25      Clinical Laboratory Services.  There I was --
```

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
                        ars@ashevillereporting.com
      Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 114 of 283

1 A So we are -- like Millennium was funneling
2 their -- clinics wanted an analyzer to be set
3 up to Clinical Labs or to a company out of
4 Texas who was providing the analyzer. So that
5 -- Millennium became a feeder for them.
6 Likewise, if we are sending an increasing
7 number of clients to these people to -- they
8 will respond to us a little faster because we
9 are helping them getting a client.
10 Q Did PCLS ever become a feeder into one of
11 these companies like CLC or other vendors?
12 A Never.
13 Q Why not?
14 A We did not pursue the setting up of analyzers
15 aggressively.
16 Q Why was that?
17 A Basically because we needed to dedicate
18 resources and we did not want -- that is again
19 something that I have to -- again it's just a
20 conjecture, but it never -- it was never the
21 focus area of PCLS.
22 Q That's all I'm just clarifying, that that is
23 just conjecture at this point; you were not a
24 party to any conversations about why the
25 company was not pursuing setting up analyzers?

1 A I was not party to any conversation about
2 setting up analyzers, only if a rep wanted any
3 client -- if any client of a rep wanted to
4 know about analyzer, the rep was told, "Hey,
5 you can direct it to Manoj and he will send
6 them the information." So PCLS was never
7 directly involved.
8 BY MS. ARMSTRONG:
9 Let's turn to Exhibit 14. This is going to be
10 Kumar-Email 27228.
11 (GOVERNMENT'S EXHIBIT NO. 14 MARKED)
12 DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
13 Q Tell me when you're done looking at it.
14 A Do you want me to read this one?
15 Q Just skim it and ---
16 A Okay, I'm ready, ma'am.
17 Q You're ready, okay. Who is
18 johnnyspot@atlanticbb.com ?
19 A I have no idea, ma'am.
20 Q The email is addressed to Dr. Johnson. Could
21 that be an email you sent to Dr. Johnson?
22 A Yes, ma'am.
23 Q I think Dr. Johnson's first name is John, is
24 that correct?
25 A Yes, ma'am.

1 Q You say, "Dr. Johnson, great talking to you
2 today." Did you have a phone call or a
3 meeting with Dr. Johnson?
4 A A phone call. The first time I met Dr.
5 Johnson was with Phil.
6 Q That came later, after the phone call?
7 A Yes, ma'am.
8 Q I'm trying to get a sense of the time line
9 here. It appears that you're providing him
10 some information about desktop analyzers and
11 lab set-up, is that correct?
12 A Yes, ma'am.
13 Q You reference in the first paragraph "your
14 kind of volume." What did you know at the
15 time about Dr. Johnson's volume?
16 A I don't recall exactly, but the information
17 was from his rep, Elan Colen, that he does
18 about 1,000 samples a month. That's what I
19 recall right now, but I'm not certain.
20 Q How does that compare to other PCLS customers
21 back in this 2012 time frame?
22 A That is a subjective question because it will
23 depend only upon the number of clinics and
24 providers and group you are. A larger group
25 can have much more. A smaller group -- an

1 individual provider may have a 100, 150. So
2 it's depending -- depending upon the size of
3 the business.
4 Q Would a customer that referred approximately
5 1,000 samples a month to PCLS be considered a
6 big customer?
7 A Considered a big customer for any laboratory.
8 Q In the last paragraph, you indicate that "the
9 good part is that we can do all that for you
10 at a very reasonable cost." Who is the we you
11 were referring to?
12 A It's figurative and it is quite like the email
13 earlier where it is broken down -- the cost is
14 almost nothing to the provider initially. It
15 all gets phased out.
16 Q I guess in the preceding paragraph you
17 identified a number of tasks incidental to
18 setting up the lab such as employing
19 personnel, writing policy, serving as
20 technical supervisor, etcetera, and then you
21 indicate that "we can do all that for you,"
22 right?
23 A By we I meant once again figuratively the
24 companies that I would introduce because he
25 signed up agreements with Clinical Lab

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@asheville reporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 115 of 283

```
1   Services to set up the lab for him.  He wanted
2   to buy the -- they would provide the director.
3   They would set up the lab, that is policies
4   and procedures, it was certification.
5   Q   What do you recall your involvement being with
6       Dr. Johnson after he signed up with CLC?
7   A   After he signed up with CLC?
8   Q   I think you just said he would sign up with
9       CLC or the vendor.
10  A   At that stage, I did not know what -- what
11      involvement will I have.  So my only intention
12      was to go and meet with him and explain to him
13      all that was required and present him these
14      contracts from other companies.
15  Q   Were you providing him with options from
16      various companies or just CLC?
17  A   I knew of only CLC that time.
18  Q   At this time you were not longer working for
19      CLC?
20  A   I was not working for CLC that time.
21  Q   Why did Mr. McHugh come to this meeting with
22      you?
23  BY MR. CAUDILL:
24      Objection to form.  You can answer.
25  BY THE DEPONENT:
```

```
1       I do not know why he came.  Possibly because
2       the rep who had referred this account was a
3       part of the channel partners and Phil at that
4       time was in charge of marketing or everything.
5       I do not now.  And maybe that is how they had
6       come to him and that's why he wanted to
7       participate in that meeting.
8   DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
9   Q   Again, that was all just conjecture, is that
10      correct?
11  A   Yes, absolutely.
12  Q   Did you invite Mr. McHugh to this meeting with
13      Dr. Johnson?
14  A   I think it possibly is the other way around.
15      I do not know Dr. Johnson.  Dr. Johnson has
16      been sent to me from PCLS.
17  Q   Did you and Mr. McHugh have any conversations
18      about Dr. Johnson before you met with him in
19      2012?
20  A   I don't remember, ma'am.
21  Q   Does the name Steve Glenn sound familiar to
22      you?
23  A   Say it again, ma'am.
24  Q   Steve Glenn, is that familiar?
25  A   I've forgotten the name.
```

```
1   Q   Is it possible that he is one of Dr. Johnson's
2       administrative employees or staff?
3   A   Could be.
4   Q   Do you recall if you ever met or communicated
5       with Mr. Glenn about the analyzer?
6   A   I communicated a couple of times because he
7       was the one who was responsible to get the
8       paperwork and money, etcetera, everything.  So
9       he was my main person to contact.
10  Q   When you met with Dr. Johnson, what was his
11      response to the information you provided about
12      setting up an in-house analyzer lab?
13  A   He was very interested in setting it up.
14  Q   Did he have questions about it?
15  A   I don't recall, but he must have had questions
16      at that time, ma'am.
17  Q   What happened after your initial meeting with
18      Dr. Johnson in terms of the analyzer lab set-
19      up?
20  A   I don't distinctly recall, but I do know that
21      he signed up with the lab setting up company
22      who started his paperwork for the licensure.
23      He set up an agreement with me to pay me over
24      four installments for -- three or four
25      installments and I was supposed to get paid
```

```
1       three or four thousand dollars to help him get
2       this all together.  We signed an agreement and
3       he -- I think he sent a first payment.  After
4       that his payment did not come.  So it's --
5       well, it was put in a stall.
6   Q   During your first meeting with Dr. Johnson,
7       was there any discussion about him sending
8       samples to PCLS for confirmatory testing?
9   A   No, ma'am.
10  Q   That didn't come up at all during your initial
11      conversation?
12  A   No, ma'am.
13  Q   At the time you met with Dr. Johnson, was he a
14      customer of PCLS?
15  A   I do not know, ma'am.
16  Q   Was Elan Colen a sales rep for any other urine
17      diagnostic testing laboratories that you're
18      aware of?
19  A   Please say it again.
20  Q   Yes, I want to make sure I understand the
21      players.  Elan Colen was a rep for PCLS, is
22      that correct?
23  A   He was the rep of another channel partner.
24  Q   Was he also a sales rep for any other urine
25      drug testing labs?
```

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 116 of 283

1     the contract between Dr. Johnson and MedTech

2     Healthcare Solutions?

3  BY MR. CAUDILL:

4     Objection.

5  BY THE DEPONENT:

6     I don't know.

7  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:

8  Q    Was Mr. McHugh an owner of MedTech Healthcare

9     Solutions?

10  A    Sorry, say it again, ma'am.

11  Q    Was Mr. McHugh ever an owner of MedTech

12     Healthcare Solutions?

13  A    No, ma'am.

14  Q    Was he ever employed by the company?

15  A    No, ma'am.

16  Q    Was he ever an agent for the company?

17  A    No, ma'am.

18  Q    Did this contract ever get signed to your

19     knowledge?

20  A    Yes, ma'am.  A signed copy was provided

21     earlier.

22  Q    Who, if you recall, was the primary contact

23     with Diamond Diagnostics related to this

24     transaction?

25  A    I don't recall the name, ma'am.

1  Q    I should ask a better question, I'm sorry.

2     Did you communicate with Diamond Diagnostics

3     regarding the purchase of the analyzer for Dr.

4     Johnson?

5  A    I did.

6  Q    Did Mr. McHugh also communicate with Diamond

7     Diagnostics regarding the purchase of the

8     analyzer for Dr. Johnson?

9  A    I do not know if he talked to them and at what

10     length, but he introduced me because they had

11     equipment from Diamond Diagnostics.  He knew

12     about them.  I did not know about them.

13  Q    When you say they, you mean PCLS?

14  A    I mean Diamond -- I mean Diamond Diagnostics

15     and PCLS.

16  BY MS. ARMSTRONG:

17     Thank you.  I'm going to mark Kumar-Email

18     27289 as Exhibit 20.

19  (GOVERNMENT'S EXHIBIT NO. 20 MARKED)

20  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:

21  Q    Does this appear to be an email that Elan

22     Colen forwarded to you in January of 2013?

23     (Tenders)

24     (Upon Review)  Yes, ma'am.

25  Q    On the first page, going down to the email

1     from John Johnson to Elan Colen, the third

2     paragraph, "But you guys really need to come

3     to the table with ways we can enhance this.  I

4     would have expected that you would have known

5     what your competitors are doing."  Do you know

6     what he's referring to?

7  A    No, ma'am.

8  Q    When you received this email, did you call Mr.

9     Colen to discuss it?

10  A    I do not recall, ma'am.

11  Q    Do you recall if you sent him an email in

12     response?

13  A    I do not recall him sending this email.

14  Q    If you flip to -- well, first looking at the

15     bottom of the page and then flipping over, it

16     looks like Elan Colen has sent an email to

17     John Johnson and it's starts on the second

18     page.  "I understand you have been offered

19     financial compensation for these tests.  We

20     would love to do the same for you as well."

21     Do you know what he's referring to there?

22  A    No, ma'am.

23  Q    At this point in time in January of 2013, do

24     you know whether or not Mr. Colen is still a

25     sales rep for a channel partner of PCLS?

1  A    He was still a rep of a channel partner.

2  Q    Let's talk about Dr. Nickels.  Was Dr. Nickels

3     ever one of your accounts as a channel

4     partner?

5  A    No, ma'am.

6  Q    Do you know whose account he was?

7  A    No, ma'am, I don't remember.

8  Q    Did you ever have any conversations with Dr.

9     Nickels about setting up an in-house analyzer

10     lab?

11  A    I may have had some conversations with him,

12     but I do not recall anything about him.

13  Q    Nothing about him at all?  What kind of doctor

14     was he?  Do you remember?

15  A    He was a pain doctor.  In our conversations an

16     analyzer -- I really don't remember anything.

17  Q    Do you remember where his practice was

18     located?

19  A    Yes, ma'am.  It's in Ohio.  Maybe Columbus,

20     Ohio.

21  Q    How did you come to speak with Dr. Nickels if

22     you ever did?

23  A    I had met Dr. Nickels a few times.  I've

24     spoken to him a few times.  I do not recall if

25     he came to me as somebody who a clinical lab

828-254-9230       ASHEVILLE REPORTING SERVICE       800-357-5007

ars@ashevillereporting.com

1  was already talking to or through a rep of
2  PCLS.  I do not recall, ma'am.
3  BY MS. ARMSTRONG:
4     I'm going to show you a document that I'll
5  mark as Exhibit 21.  It's Sowinski 93910.
6  (GOVERNMENT'S EXHIBIT NO. 21 MARKED)
7  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
8  Q   If you flip to the second page, it looks like
9     this is an email from you to Marcus Sowinski
10    and Philip McHugh in April 2012 and you state,
11    "As you are aware Phil is attempting to get
12    back Dr. John Nickels from Cleveland."  What
13    did you mean by that statement?  (Tenders)
14  A  (Upon Review)  That John Nickels was an
15    earlier client and Phil is trying to get him
16    back.
17  Q   Do you know when he was a client?
18  A  No, ma'am.
19  Q   Do you know why Mr. McHugh is trying to get
20    him back?
21  A  No, ma'am.
22  Q   Do you recall why you sent this email to Mr.
23    Sowinski and Mr. McHugh?
24  A  I don't remember, but from the email it
25    appears that he needs -- he's asking for EMR

1  integration.  And for that, the clinics would
2  fill a form talking about the specifics of
3  their EMR so that HL7 interface can billed
4  between the LIS, which is Lab Information
5  System, and the EMR.  So maybe that form has
6  come and I forwarded that.
7  Q   Was that something that was in Marcus'
8     purview?
9  A  At that stage, Marcus was actively involved in
10    the -- at the laboratory.
11  Q   Marcus' response is, "Is Dr. Nickels still a,"
12    quote, "'priority'?"  Do you know what he
13    meant by that?
14  A  No, ma'am.
15  Q   Did PCLS refer to any customers or client
16    accounts as priorities?
17  A  I was not part of PCLS at this time.  I really
18    do not know what it means.
19  Q   Well, you were a sales rep for PCLS at this
20    time.  While you were a sales rep, were you
21    aware of anyone at PCLS, whether other sales
22    reps or employees, referred to customers as
23    priorities?
24  BY MR. CAUDILL:
25     Objection to form.  You can answer.

1  BY THE DEPONENT:
2     No, ma'am, I'm not aware.
3  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
4  Q   You write to Marcus, "His lab is likely
5     to be up and running by mid June."  Are you
6     referring to an in-house analyzer lab?
7  A  Yes, ma'am.
8  Q   You write, "It is expected that he would
9     switch to us at that stage or soon after."
10    What did you mean by that?
11  A  That he will probably switch wherever he is at
12    -- I think he was with United Oral Fluid and
13    that he would switch to doing -- to go to PCLS
14    for his confirmations.
15  Q   Mr. McHugh confirms, is that correct?
16  A  I don't know what he confirms.  He says, "Yes,
17    let's chat."
18  Q   Was it ever specifically discussed with Mr.
19    Nickels that he would start referring samples
20    to PCLS in exchange for the in-house analyzer
21    lab set-up?
22  BY MR. CAUDILL:
23     Objection.  You can answer.
24  BY THE DEPONENT:
25    I don't recall, ma'am.

1  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
2  Q   You don't recall, okay.  Did you assist in
3     setting Dr. Nickels up with an analyzer in his
4     clinic?
5  A  Very hazy.  I have assisted him, but what
6     extent I really do not recall, ma'am.
7  Q   Do you recall whether you set him up with CLS
8     or a similar vendor?
9  A  I do not recall, but that's the only way to
10    move forward.  It has to move forward that
11    way.  I'm not technically qualified to set
12    policies and procedures and technical
13    assistance.
14  BY MS. ARMSTRONG:
15    I'm going to show you another document that
16    I'll mark as Exhibit 22.  This is Kumar-Email
17    22421.
18  (GOVERNMENT'S EXHIBIT NO. 22 MARKED)
19  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
20  Q   This looks like an email between you and Dr.
21    Nickels, is that correct, or a string of
22    emails?  (Tenders)
23  A  (Upon Review)  Yes, ma'am.
24  Q   In the middle of Page 1, there is an email
25    from what appears to be Dr. Nickels to Jay

38  (Pages 146 to 149)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
                      ars@ashevillereporting.com
           Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 118 of 283

1        Chambers. Who is Jay Chambers?

2  A   I do not know, ma'am.

3  Q   Dr. Nickels asked Mr. Chambers to send him

4      "current billing and collecting data on the

5      urine drug screens so I can discuss with Mr.

6      Kumar. He wants to meet to over the numbers."

7      Why did you want to meet with Mr. Nickels to

8      go over the collections and billing numbers?

9  BY MR. CAUDILL:

10     Objection. You can answer.

11  BY THE DEPONENT:

12     I'm hazy on the -- Dr. Nickels, but I believe

13     that he was sending his samples to United Oral

14     Fluids and it was known -- or the word-of-

15     mouth in the community was that United Oral

16     Fluid used to pay their physicians and -- this

17     was -- this was to see how much they are

18     paying him, compare it to what he's

19     collecting. I think this Mr. John must have

20     been his billing -- Mr. Chambers must have

21     been his billing people and they're sending

22     the report to how does it compare of what he's

23     collecting himself vis a vis what United Oral

24     Fluid was paying him.

25  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:

1  Q   Is United Oral Fluids still in business?

2  A   I have no idea, ma'am.

3  Q   Do you know what happened to its owner Bill

4     Hughes?

5  A   I've never talked with him or anything.

6  Q   Let's see, going up on that page to Dr.

7     Nickels' email to you, he indicates he has

8     "$8,410.75 in expenses that I need to be

9     reimbursed for per my agreement with Bill."

10    Do you know what he's talking about?

11  A   I really do not recall. I really do not

12     recall much about Mr. Nickels.

13  Q   Do you recall anything about an agreement Dr.

14     Nickels had with Mr. McHugh?

15  A   I'm not privy to that agreement if there was

16     an agreement.

17  Q   But you don't know anything about it, is that

18     your testimony?

19  A   I do not recall. I really do not recall.

20  BY MS. ARMSTRONG:

21     I'm going to mark Kumar-Email 22429 as Exhibit

22     23.

23  (GOVERNMENT'S EXHIBIT NO. 23 MARKED)

24  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:

25  Q   This looks like an email from you to Mr.

1     McHugh in November of 2012, is that correct?

2     (Tenders)

3  A   (Upon Review) Yes, ma'am.

4  Q   It looks like you were sharing with him an

5     email that you sent to Dr. Nickels, is that

6     correct?

7  A   Yes, ma'am.

8  Q   You indicate at the bottom of the email that

9     "you will plan to see him this week and see

10    how we can get all his samples instead of the

11    measly number he is sending right now." What

12    did you mean by that?

13  A   What page is that, ma'am?

14  Q   The first page, the bottom of the email, the

15    last paragraph.

16  A   It means that he was sending a small number of

17    samples to PCLS at that time. I do not know

18    how much. And I was not his rep. His rep

19    must have told me how many samples he would

20    send.

21  Q   If you were not his rep, why were you

22    interested in seeing "how we can get all his

23    samples"?

24  A   I was not his rep, but I was assisting in

25    sending up the analyzer and doing a comparison

1     for him of the analyzer, what he's getting vis

2     a vis what he was getting paid by United Oral

3     Fluid. So only if he sees that yes, United

4     Oral Fluid has been cheating him all this

5     while -- that he will not send them any more.

6  Q   The we in "we can get all his samples" is

7     PCLS, is that correct?

8  A   Yes, ma'am.

9  Q   Did you get a response from Mr. McHugh to this

10    email?

11  A   I do not recall, ma'am.

12  Q   Do you recall if you ever talked to Mr. McHugh

13    about how PCLS could get all of Dr. Nickels'

14    samples?

15  A   I don't recall, ma'am.

16  BY MS. ARMSTRONG:

17     I'm going to hand you another document. This

18     one is going to be Exhibit 23 -- 24. It is

19     Kumar-Email 22535.

20  (GOVERNMENT'S EXHIBIT NO. 24 MARKED)

21  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:

22  Q   It looks like this is an email from Dr.

23     Nickels to you in November of 2012 and he has

24     attached a document. The named attachment

25     looks like it was expenses for Manoj and the

828-254-9230      ASHEVILLE REPORTING SERVICE      800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK  Document 129-4  Filed 12/08/20  Page 119 of 283

1  last page appears to be the attachment. It
2  appears Dr. Nickels has sent to you basically
3  an invoice for $14,777.52. Why is Dr. Nickels
4  asking you to pay him almost $15,000?
5  BY MR. CAUDILL:
6     Objection to the characterization. You can
7  answer.
8  BY THE DEPONENT:
9     I really do not recall, ma'am.
10  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
11  Q    In this email, he references, "Your last
12  payment of $9,000 on 9-11-12" -- do you recall
13  paying Dr. Nickels $9,000 in September of
14  2012?
15  A    No, ma'am.
16  Q    Do you recall if one of your entities paid Dr.
17  Nickels $9,000 in September of 2012?
18  A    Ma'am, I do not recall.
19  Q    Do you have any recollection as to why you or
20  one of your entities would be paying Dr.
21  Nickels money?
22  A    Ma'am, I don't recall anything about Dr.
23  Nickels.
24  Q    Do you recall whether or not Dr. Nickels
25  eventually got an analyzer placed in an in-

1  house lab in his practice?
2  A    I think he did and that I'm corroborating from
3  the billing reports.
4  Q    I'm sorry?
5  A    I think he did and that -- when I say that,
6  I'm corroborating that from the billing
7  reports that have been presented.
8  Q    Do you think Dr. Nickels paid anything towards
9  that analyzer?
10  A    The analyzer was on a per-click. So he's
11  paying ABS on this which is per sample, he has
12  written here.
13  Q    Were you or any of your entities reimbursing
14  Dr. Nickels for what he was paying for the
15  analyzer?
16  A    I do not recall, ma'am.
17  BY MS. ARMSTRONG:
18     I'll show you another document I'll mark as
19  Exhibit 25. It's Kumar-Email 22437.
20  (GOVERNMENT'S EXHIBIT NO. 25 MARKED)
21  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
22  Q    This looks like an email from you to Mr.
23  McHugh sent April 30, 2012, is that correct?
24  (Tenders)
25  A    (Upon Review) Yes, ma'am.

1  Q    Subject Jay Nickels, I assume that's Dr. John
2  Nickels?
3  A    Yes, ma'am.
4  Q    "The expense till date has been approximately
5  $4,000." Do you know what that's in relation
6  to?
7  A    I do not recall, but it specifies here what it
8  is for.
9  Q    Great and let's go through that. Two thousand
10  seven hundred and twenty six for COLA. What
11  is COLA?
12  A    That is the licensure authority.
13  Q    Did you pay money to COLA on behalf of Dr.
14  Nickels?
15  A    I do not recall, ma'am.
16  Q    What about 276 for API? What is API?
17  A    American Proficiency Institute, once again
18  towards setting up of the laboratory.
19  Q    Did you pay $276 for API?
20  A    Ma'am, I really do not remember.
21  Q    "Seven hundred and fifty for CLC first
22  installment and 120 for advertisement."
23  A    Yes, ma'am. That's the contract he signed
24  with CLC.
25  Q    The contract who signed with CLC?

1  A    Dr. Nickels to set up the laboratory.
2  Q    "The next envisaged expenditure is another
3  2,000 for CLC." Do you recall MK Land
4  Holdings making payments directly to CLC?
5  A    I do not remember, ma'am.
6  Q    I should ask it in a better way. Do you
7  recall MK Land Holdings making payments to CLC
8  on behalf of Dr. Nickels?
9  A    Ma'am, I do not remember.
10  Q    Do you recall Dr. Nickels' clinic name?
11  A    Sorry, say it again, ma'am.
12  Q    I'm sorry?
13  A    Say it again, the question.
14  Q    Do you recall the name of Dr. Nickels' clinic?
15  A    No, ma'am.
16  Q    Does Cleveland Back and Pain sound familiar?
17  A    It sounds familiar.
18  BY MS. ARMSTRONG:
19     I'm going to show you -- I'll mark this as 26.
20  It's three pages. These I believe we obtained
21  pursuant to one of our Rule 45 subpoenas to
22  the financial institution. So they don't have
23  a Bates number on them.
24  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
25  Q    Mr. Kumar, I'll represent there are more

828-254-9230       ASHEVILLE REPORTING SERVICE       800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 120 of 283

1    checks that I'm going to show you, but in
2    order to move along I'll show you a couple
3    right now.
4    A    Yes, ma'am.
5    BY MR. CAUDILL:
6        Can I just clarify something real quick?
7    BY MS. ARMSTRONG:
8        Yes.
9    BY MR. CAUDILL:
10       When you said yes, ma'am, a second ago to her
11       representation that there are more checks,
12       that wasn't you answering a question about
13       whether there were more ---
14   BY THE DEPONENT:
15       (Negative nod).
16   BY MR. CAUDILL:
17       Okay, I just wanted to make sure that that was
18       clear.
19   (GOVERNMENT'S EXHIBIT NO. 26 MARKED)
20   DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
21   Q    Again, Mr. Kumar, I'll represent this is a
22       sampling of checks.  I'm not asking you to
23       agree or disagree with me on that.  The first
24       document appears to -- the first page of
25       Exhibit 26, is that a check issued by MK Land

1        Holdings, LLC?
2    A    Yes, ma'am.
3    Q    Payable to who?
4    A    CLC.
5    Q    What's the amount?
6    A    Thirteen hundred dollars.
7    Q    The memo says, "October for Cleveland," is
8        that correct?
9    A    Yes, ma'am.
10   Q    Do you recall why you were paying CLC for
11       Cleveland Clinic?
12   A    I do not recall, ma'am.
13   Q    Cleveland Back and Pain, I'm sorry.
14   BY MR. CAUDILL:
15       Objection to the characterization.
16   DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
17   Q    The second page of that document is another
18       check from MK Land Holdings to CLC, is that
19       correct?
20   A    Yes, ma'am.
21   Q    Another thirteen hundred dollars?
22   A    Yes, ma'am.
23   Q    What does the memo say?
24   A    Cleveland Back and Pain, November.
25   Q    Is that your signature?

1    A    Yes, ma'am.
2    Q    The third check, MK Land Holdings to CLC, what
3        is the amount?
4    A    Thirteen hundred dollars.
5    Q    What's the memo?
6    A    Cleveland, December.
7    Q    Did you sign that?
8    A    Yes, ma'am.
9    Q    Do you recall why MK Land Holdings issued any
10       of these three checks to CLC?
11   A    I do not recall.
12   BY MS. ARMSTRONG:
13       Let's do Exhibit 27.
14   (OFF THE RECORD)
15   BY MS. ARMSTRONG:
16       All right, let's take an hour.
17   (OFF THE RECORD)
18   (GOVERNMENT'S EXHIBIT NO. 27 MARKED)
19   DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
20   Q    Mr. Kumar, we took a break and we're now on
21       the record.  I'm going to try to get through
22       some things as quickly as I can.  I'll show
23       you what I marked as Exhibit 27.  Is this a
24       check from MK Land Holdings written to John
25       Nickels?  (Tenders)

1    A    (Upon Review) Yes, ma'am.
2    Q    In the amount of $3,000?
3    A    Yes, ma'am.
4    Q    Is that your signature?
5    A    Yes, ma'am.
6    Q    Do you recall what this check was for?
7    A    No, ma'am.
8    Q    Flip the next page.  This appears to be a
9        check from MK Land Holdings payable to John
10       Nickels, is that correct?
11   A    Yes, ma'am.
12   Q    This one is for twenty-five hundred dollars?
13   A    Yes, ma'am.
14   Q    Is that your signature?
15   A    Yes, ma'am.
16   Q    Do you recall why you made this payment ---
17   A    No, ma'am.
18   Q    --- or why you -- I apologize -- why MK Land
19       Holdings made this payment to John Nickels?
20   A    No, ma'am.
21   (GOVERNMENT'S EXHIBIT NO. 28 MARKED)
22   DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
23   Q    I'm going to hand you what I've marked as
24       Exhibit 28.  This is a check from Alternative
25       Biomedical Support, Inc.  What is Alternative

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 121 of 283

```
1        Biomedical Support, Inc?
2    A   This is the company that provided analyzers on
3        per-click basis.
4    Q   This is a check written from Alternative
5        Biomedical to you personally, is that correct?
6    A   Yes, ma'am.
7    Q   In the amount of $1,000?
8    A   Yes, ma'am.
9    Q   What does the memo say?
10   A   "Cleveland signed CPS agreement, EXP."
11   Q   What is a CPS agreement?
12   A   I do not know, ma'am.
13   Q   Do you know why you received $1,000 from
14       Alternative Biomedical Support?
15   A   No, ma'am.
16   Q   Do you not remember or do you not ---
17   A   I do not remember at all.
18   (GOVERNMENT'S EXHIBIT NO. 29 MARKED)
19   DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
20   Q   Thank you.  Okay, I'm going to hand you
21       Exhibit 29.  This appears to be a bank
22       statement, is that correct?  (Tenders)
23   A   (Upon Review)  Yes, ma'am.
24   Q   The statement period appears to be April 17,
25       2012, through May 15, 2012, is that correct?
```

```
1    A   Yes, ma'am.
2    Q   Is this a statement from your account?
3    A   Yes, ma'am.
4    Q   If you will go down to the deposits and
5        additions section, you will see an entry on
6        May 2nd, federal wire credit.  It appears that
7        on that date Mr. McHugh wired you $10,000, is
8        that correct?
9    A   Yes, ma'am.
10   Q   What was that for?
11   A   I don't recall, ma'am.
12   BY MS. ARMSTRONG:
13       I think this is going to be Exhibit 30.
14   (GOVERNMENT'S EXHIBIT NO. 30 MARKED)
15   DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
16   Q   Switching gears, we talked briefly about a
17       doctor by the name of Dr. Jayachandran.
18   A   Yes, ma'am.
19   Q   Do you recall that?
20   A   Yes, ma'am.
21   Q   Who is Jayachandran?
22   A   A psychiatrist or psychologist in Northern
23       Indiana.
24   Q   Northen Indiana, okay.  Was he a customer of
25       PCLS at the time?
```

```
1    A   For a short while, yes.
2    Q   Do you recall when about he was a customer?
3    A   No, ma'am.
4    Q   Was he one of your accounts as a channel
5        partner?
6    A   He was not initially my account.  It was -- if
7        I remember, it was a United Oral Fluid account
8        and then I got him.  Once PCLS left United
9        Oral Fluid, then I went and met him and got
10       him.
11   Q   Did PCLS have a business relationship with
12       Universal Oral Fluid at some point?
13   A   I have no idea, ma'am.
14   Q   When you say he left UOFL, he wasn't yours and
15       then he came to PCLS, can you explain that?
16   A   He was sending samples earlier to United Oral
17       Fluid is what I mean to say.
18   Q   Thank you.  Did Dr. Jayachandran sign a
19       promissory note for a $50,000 loan?
20   A   Yes, ma'am.
21   Q   I'm going to hand you Exhibit 30.  Do you see
22       that promissory note on Page 30?  (Tenders)
23   A   (Upon Review)  Yes, ma'am.
24   Q   What is M Holdings, LLC?
25   A   This was one of the companies that Phil owned.
```

```
1    Q   What did that company do or what was its
2        business?
3    A   I do not know, ma'am.
4    Q   Do you know when that company was set up?
5    A   No, ma'am.
6    Q   Do you have any ownership interest in that
7        company?
8    A   No, ma'am.
9    Q   Do you know why M Holdings, LLC, was lending
10       Dr. Jayachandran $50,000?
11   A   Dr. Jayachandran wanted to buy an analyzer and
12       he wanted to borrow money and he agreed to pay
13       a high rate of interest for that.
14   Q   Were you involved in discussing that loan with
15       Dr. Jayachandran?
16   A   Yes, ma'am.
17   Q   Who else, if anyone, was involved in
18       discussing that loan with Dr. Jayachandran?
19   A   Only myself.
20   Q   Was Mr. McHugh involved in discussing that
21       loan with Dr. Jayachandran?
22   A   No, ma'am.
23   Q   Did Mr. McHugh know you were involved in
24       discussing the loan with Dr. Jayachandran?
25   A   I believe so because I asked him to loan the
```

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
                        ars@ashevillereporting.com
          Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 122 of 283

1　　　money at a good rate of interest.
2　Q　Whose idea was the loan?
3　A　I'm not clear on the question.
4　Q　Did Dr. Jayachandran ask for a loan or did you
5　　　offer him a loan?
6　A　He asked for a loan.
7　Q　How did he come to ask for a loan?
8　A　During our conversations when we had talked
9　　　about the analyzer, he shared with me that he
10　　was already in great debt and he did not have
11　　the money and if he can get a loan, then he
12　　would like to do it.
13　Q　What do you recall about the debt that Dr.
14　　Jayachandran was in while you guys was
15　　discussing the analyzer?
16　A　I do not know the particulars, ma'am.
17　Q　Do you know the amount of the debt he was in?
18　A　No, ma'am.
19　Q　Did you do anything to vet Dr. Jayachandran's
20　　ability to make payments on the loan to pay
21　　back the loan?
22　A　Say it again, ma'am.
23　Q　Sure.  Did you do anything to vet Dr.
24　　Jayachandran's ability to pay the loan back?
25　A　I have not understand what you want to ask me.

1　Q　Before negotiating this loan with Dr.
2　　　Jayachandran or at any time during the
3　　　negotiations of this loan, did you do any sort
4　　　of research or due diligence to determine
5　　　whether or not he would actually be able to
6　　　pay the loan back?
7　A　No, I did not.
8　Q　Did you ask him to see any sort of bank
9　　　statements or personal financial statements?
10　A　No, I did not.
11　Q　Did you ask him to provide information about
12　　any of his outstanding debt at that time?
13　A　No, but I made him personally guarantee the
14　　loan.
15　Q　Who was the loan named to?  Was it made to Dr.
16　　Jayachandran or to a practice?
17　A　I do not recall, ma'am.
18　Q　What was the source of the funds for the loan?
19　A　Twenty-five thousand Phil put and twenty-five
20　　I put.
21　Q　Why would you put in 25,000?
22　A　Getting a good return.
23　Q　Did Dr. Jayachandran pay back the loan?
24　A　Yes, ma'am.
25　Q　When did he pay the loan back?

1　A　I do not remember the date, ma'am.
2　BY MS. ARMSTRONG:
3　　　I'll show you what I have marked as Exhibit --
4　　　let's call this 31, please.
5　(GOVERNMENT'S EXHIBIT NO. 31 MARKED)
6　DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
7　Q　Does this appear to be a check from Dr.
8　　　Jayachandran to Silent Storm Holdings?
9　　　(Tenders)
10　A　(Upon Review)  Yes, ma'am.
11　Q　What's the amount of the check?
12　A　Fifty thousand.
13　Q　What date was it written on?
14　A　December 20th.
15　Q　In 2014?
16　A　Twenty-fourteen, yes, ma'am.
17　Q　Thank you.  What's the memo?
18　A　Repayment of loan.
19　Q　Do you believe this is a check representing
20　　Dr. Jayachandran's repayment of the loan from
21　　M Holdings, LLC?
22　A　Yes, ma'am.
23　Q　Do you know why he wrote the check to Silent
24　　Storm Holdings?
25　A　I do not know, ma'am.

1　Q　Do you recall the terms of the loan and
2　　　specifically when repayment was due from Dr.
3　　　Jayachandran?
4　A　I do not recall.
5　Q　If we look at the promissory note, Section 1 -
6　　　- I'm back to Exhibit 30, please -- "repayment
7　　　shall be made in full within one calendar year
8　　　from the agreement date or date of receipt of
9　　　funds, whichever is later."
10　A　Uh-huh (affirmative).
11　Q　So this agreement, it appears from your email,
12　　was signed on August 24th of 2014, is that
13　　correct?
14　A　Yes, ma'am.
15　Q　The loan wasn't due and payable until August
16　　of 2015, is that correct?
17　A　Yes, ma'am.
18　Q　Do you know why Dr. Jayachandran paid it
19　　early?
20　A　Because he was asked to pay it back.
21　Q　Who asked to pay him back?
22　A　I think the lab did not like that the loan had
23　　been given and they asked Phil to get it back.
24　Q　What lab did not like ---
25　A　PCLS.

43  (Pages 166 to 169)

828-254-9230　　　ASHEVILLE REPORTING SERVICE　　　800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK　Document 129-4　Filed 12/08/20　Page 123 of 283

1    Q    Thank you.  Who is the they you're referring
2          to?
3    A    I'm sorry, I do not get that.
4    Q    You said they asked ---
5    A    The lab.  I do not know who in the lab.
6    Q    Did you have any conversations with anyone at
7          PCLS about the loan to Dr. Jayachandran before
8          it was made?
9    A    No, ma'am.
10    Q    With the exception of Phil McHugh, did you
11          have any conversations with anyone at PCLS
12          before the loan to Dr. Jayachandran was made?
13    A    No, ma'am.
14    Q    Do you know if, with the exception of Phil
15          McHugh, anyone at PCLS knew about the loan to
16          Dr. Jayachandran before it was made?
17    A    I have no idea.
18    Q    Did Dr. Jayachandran ever pay any interest on
19          the loan?
20    A    This time I don't think he's paid -- he has
21          paid 50,000, just three months.
22    Q    Did anyone ever go after him for the interest
23          owed on those three months?
24    A    I have no idea, ma'am.
25    Q    You have not personally ---

1    A    No.
2    Q    At the time the loan was made, was Dr.
3          Jayachandran a current customer of PCLS?
4    A    He was.
5    Q    Do you know how long he had been referring to
6          PCLS before the loan was made?
7    A    I do not recall, ma'am.  Not very long.  I do
8          not recall how long.
9    Q    Do you remember who the sales rep was?
10    A    He was with UOFL, United Oral Fluid, and after
11          -- after that MHS got him.
12    Q    Who was his PCLS sales representative?
13    A    MHS is a channel partner.
14    Q    Had you gone to see Dr. Jayachandran before
15          you negotiated this loan with him?
16    A    Please say it again, ma'am.
17    Q    Sure.  Had you gone to see Dr. Jayachandran
18          before you negotiated this loan?
19    A    Yes.
20    Q    In your capacity as a sales rep?
21    A    I think this is when PCLS had exited from its
22          relationship or -- with United Oral Fluids and
23          at that time, the list of clients that United
24          Oral Fluid had -- so that was distributed and
25          whoever was in the area went and met those

1          clients.
2    Q    What do you mean PCLS had exited its
3          relationship with United Oral Fluids?
4    A    From what I understand, PCLS and -- was no
5          longer taking samples from United Oral Fluids.
6    Q    When was PCLS taking samples from United Oral
7          Fluids?
8    A    Before exiting.  I do not know the dates.
9    Q    Do you know why PCLS was taking samples ---
10    A    No, ma'am.
11    Q    --- from United Oral Fluids?
12    A    No, ma'am.
13    Q    Do you know why PCLS stopped taking samples
14          from United Oral Fluids?
15    A    No, ma'am, I have no idea.
16    Q    Do you know when Dr. Jayachandran stopped
17          sending samples to PCLS?
18    A    No, ma'am.
19    Q    Is it you don't know or you don't remember?
20    A    I do not know.
21    Q    As a sales rep, is that something you would
22          typically know, when one of your customers
23          stops sending samples to the lab?
24    A    You would know, yes.
25    Q    Is that something that you tracked as a

1          channel partner?
2    A    I did, but that time once the loan was
3          recalled and PCLS had made a conscious
4          decision to end the relationship with that
5          clinic and they returned the -- whatever money
6          they got for the testing of the samples from
7          the government as well.
8    Q    Who at PCLS made a conscious decision to stop
9          the relationship with Jayachandran?
10    A    I do not know, ma'am.
11    Q    How do you know that happened?  What is the
12          source of that information?
13    A    I do not recall who said that, but it
14          happened.
15    Q    Did you ever discuss with Dr. Jayachandran
16          whether he would be expected to send samples
17          to PCLS because of the loan you were making?
18    A    No, ma'am.
19    Q    You recall that you did not have that type of
20          discussion?
21    A    Yes, ma'am.
22    Q    Are you currently involved in any business
23          ventures with McHugh?
24    A    I have invested in a credit card processing
25          company with him.

828-254-9230      ASHEVILLE REPORTING SERVICE      800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 124 of 283

1  Mr. Kumar, I think that is everything I have.
2  I appreciate your patience with me today. I
3  know we've talked about reconvening at a later
4  date. Do you all want to go ahead and start
5  questioning?
6  BY MR. CAUDILL:
7  Can we go off the record for a second?
8  (OFF THE RECORD)
9  BY MR. CAUDILL:
10  So thank you, Kat. Mr. Kumar, my name is Bill
11  Caudill for the record. We met earlier.
12  Thank you for taking time to be here today.
13  As we were just discussing off the record, in
14  lieu of asking you a series of questions that
15  may take us past 4:00, which I understand to
16  be sort of the hard stop for the convenience
17  of folks here, I'm going to submit written
18  questions to your counsel for you to review
19  and answer under oath, and I will do that in
20  the very near future. And so we'll hold this
21  open for the purpose of me doing that and I
22  think that's it.
23  BY MS. ARMSTRONG:
24  I think that makes sense and certainly no
25  prejudice to the government in the event we

1  needed to ask any follow-up.
2  BY MR. CAUDILL:
3  I'll stipulate to that.
4  BY MS. ARMSTRONG:
5  Thank you.
6  BY MS. OWEN:
7  The one clarification I would like to make is
8  I know that Mr. Kumar is going to be traveling
9  out of the country in a period of time, so I
10  think that we can probably coordinate answers
11  via email. We can have communications, but in
12  case we would need to notarize anything, it
13  may take a little bit ---
14  BY MR. CAUDILL:
15  What is the time frame associated with your
16  travel, Mr. Kumar?
17  BY THE DEPONENT:
18  I'm leaving on the 3rd or the 4th of November
19  to India and I'll be back on the -- November
20  20th.
21  BY MR. CAUDILL:
22  I will have questions to you, Missy, either
23  Monday or Tuesday.
24  BY MS. OWEN:
25  Okay.

1  BY MR. CAUDILL:
2  And I don't think that they will be
3  voluminous. So fingers crossed we could
4  resolve it before he departs.
5  BY MS. OWEN:
6  Okay.
7  BY MS. ARMSTRONG:
8  I think certainly if we had to continue this
9  after November 20th but before his positive
10  motions, we're agreeable to that. I know we
11  have formal close of discovery on the 20th,
12  but ---
13  BY MR. CAUDILL:
14  With respect to this deposition, we would
15  stipulate to that, sure.
16  BY MS. ARMSTRONG:
17  Thank you.
18  (PROCEEDINGS ADJOURNED AT APPROXIMATELY 3:35 P.M.)
19
20
21
22
23
24
25

189
CERTIFICATE

I, Mai-Beth Ketch, CVR-M, CCR, Court Reporter
and Notary Public, do hereby certify that the
foregoing is an accurate transcript of the
deposition of Manoj Kumar, taken by me and
transcribed under my supervision.

I further certify that I am not financially
interested in the outcome of this action, a
relative, employee, attorney or counsel of any of
the parties, nor am I a relative or employee of
such attorney or counsel.

This is the 29th day of October, 2020.

_____

MAI-BETH KETCH, CVR-M, CCR

Notary Public No.: 19981410006

(The foregoing certification of this transcript
does not apply to any reproduction of the same by
any means, unless under the direct control and/or
supervision of the certifying reporter.)

Asheville Reporting Service
111 McDowell Street, Asheville, NC 28801
828-254-9230

48 (Pages 186 to 189)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 125 of 283

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                     CHARLOTTE DIVISION

 3

 4
   UNITED STATES OF AMERICA      )
 5 ex rel. TARYN HARTNETT, and   )
   DANA SHOCHED,                 )
 6                               )
                 Plaintiffs,     )
 7                               )
                 -v-             ) CIVIL FILE NO.
 8                               ) 3:17-CV-37
   PHYSICIANS CHOICE LABORATORY ) (CONSOLIDATED WITH
 9 SERVICES, DOUGLAS SMITH,      )  CIVIL FILE
   PHILIP McHUGH and             )  NO. 3:17-CV-46)
10 MANOJ KUMAR,                  )
                                 )
11               Defendants.     )

12

13         The videotaped deposition upon oral

14 examination of GREGORY SCOTT MASIMORE, M.D., a witness

15 produced and sworn before me, Julie A. Nicholson, RPR,

16 CRR, Notary Public in and for the County of Hamilton,

17 State of Indiana, taken on behalf of the Plaintiffs at

18 the offices of Dentons Bingham Greenebaum, LLP, 2700

19 Market Tower, 10 West Market Street, Indianapolis,

20 Indiana, on September 25, 2020, at 10:04 a.m.,

21 pursuant to the Federal Rules of Civil Procedure.

22              STEWART RICHARDSON & ASSOCIATES
23            Registered Professional Reporters
                One Indiana Square, Suite 2425
24                Indianapolis, IN  46204
                       (317)237-3773
25
```

```
 1     have?
 2  A  Two currently.
 3  Q  Who are those?
 4  A  They're medical assistants named Lori -- Lori
 5     Hewitt and Kameko Fowler.
 6  Q  Is Pain Management Solutions, as the name would
 7     imply, a pain management practice?
 8  A  Yes, it is.
 9  Q  Could you just generally tell me what a pain
10     management practice is?
11  A  I see patients on a regular basis and follow their
12     medical management, as well as injections and try
13     to mitigate their pain.  I also do -- treat
14     addiction.
15  Q  Do you have an estimate of how many patients per
16     month you see?
17  A  My current practice is about 25 patients a day from
18     Tuesdays through Thursdays.  I see about 25
19     patients a day.
20  Q  Fair enough.  Where did you work prior to Pain
21     Management?
22  A  I worked for another physician.  It was called Pain
23     Management of Southern Indiana.
24  Q  Was that Dr. Tiwari's practice?
25  A  Dr. Kamal Tiwari, correct.
```

```
 1   Q  Did you also work with a Dr. Yunus Shah there?
 2   A  I did.  Not -- we worked independently.  We both
 3      worked for Dr. Tiwari, but I did not actually work
 4      with Dr. Shah, per se.
 5   Q  Why did you leave Dr. Tiwari's practice?
 6         MR. GAERTE:  Mr. Johnson, good morning.  My
 7      name is Michael Gaerte.  We spoke off record.  I
 8      represent Dr. Masimore.  At this point, I'm going
 9      to interject and object to the question and
10      instruct Dr. Masimore to not answer that question
11      based upon his Fifth Amendment privilege to avoid
12      incrimination.
13   Q  Are you relying on the advice of your counsel to
14      decline to answer that question?
15   A  I am.
16   Q  Do you have an office manager at Pain Management
17      Solutions?
18   A  I do not currently.
19   Q  Did you have one previously?
20   A  Yes.
21   Q  Who was that?
22         MR. GAERTE:  Same objection, Mr. Johnson, and
23      same instruction to my client.  I can reincorporate
24      the longer record.  I don't think you need me to.
25         MR. JOHNSON:  That's fine.
```

1          MR. JOHNSON:  Sure.

2          MR. GAERTE:  -- then I'll interject and

3     instruct him to answer.  Let's just do it that way.

4     And that puts the burden on me.  Is that cool?

5          MR. JOHNSON:  Fair enough.

6          MR. GAERTE:  Okay.

7          MR. JOHNSON:  Yeah.  And again, I'm not going

8     to quibble over the form --

9          MR. GAERTE:  No, no, no.

10         MR. JOHNSON:  -- of how he's --

11         MR. GAERTE:  You've been --

12         MR. JOHNSON:  -- invoking the Fifth --

13         MR. GAERTE:  Of course.

14         MR. JOHNSON:  -- but, yeah, just as long as

15     it's clear he's invoking the Fifth to the question.

16     And it's probably easier, yeah, just to have him --

17     you object and him say that and then we --

18         MR. GAERTE:  One less step.  I agree.

19         MR. JOHNSON:  -- move on.

20         MR. GAERTE:  Yes, sir.

21   Q  Okay.  We'll start fresh.

22         Did you ever pay Manoj Kumar a salary?

23   A  I invoke my Fifth Amendment rights.

24   Q  Did Pain Management Solutions ever pay Manoj Kumar

25     a salary?

1  A  I invoke my Fifth Amendment rights.

2  Q  Did you ever pay Manoj Kumar a monthly check based

3     on 7 percent of the gross income of your practice?

4  A  I invoke my Fifth Amendment rights.

5         (Plaintiffs' Exhibit 1 was marked for

6      identification.)

7         MR. GAERTE:  Seth, can we go off record real

8      quick?

9         MR. JOHNSON:  Sure.

10        THE VIDEOGRAPHER:  Okay.  Just a moment.  It's

11     10:15.  Off the record.

12        (A discussion was held off the record.)

13        THE VIDEOGRAPHER:  It's 10:16.  We're back on

14     the record.

15 Q  Dr. Masimore, do you see --

16        THE VIDEOGRAPHER:  Microphone.

17        MR. JOHNSON:  Oh, sorry.

18 Q  Dr. Masimore, do you see Exhibit 1 in front of you?

19 A  Yes, I do.

20 Q  Exhibit 1 is a series of checks.  The first one on

21     page 1 is made -- is from you, Gregory S. Masimore.

22     Do you see that?

23 A  Yes.

24 Q  Is this a check from your bank account?

25 A  Yes.

1   Q   And is that your signature on the check?

2   A   Yes.

3   Q   And is the check made out to Manoj Kumar?

4   A   Yes.

5   Q   And it's for $90?

6   A   Yes.

7   Q   And it's dated 7/13/2010?

8   A   It's hard to see, but it looks like that.

9   Q   Fair enough.

10  A   Yes.

11  Q   If you turn to page 2 of this exhibit, is this a

12      copy of a check from Gregory S. Masimore and Pain

13      Management Solutions, LLC?

14  A   Yes, it is.

15  Q   At Fifth Third Bank?

16  A   That's correct.

17  Q   Was Fifth Third Bank the bank you -- or Pain

18      Management Solutions had an account at?

19  A   That's correct.

20  Q   Is that your signature on the check?

21  A   Yes, it is.

22  Q   Okay.  And is this an accurate copy of a check from

23      Pain Management Solutions and yourself?

24  A   It is.

25  Q   And it's made out to Manoj Kumar?

```
 1    A   Correct.

 2    Q   For $3,500?

 3    A   Correct.

 4    Q   And it's dated 10/28/2010?

 5    A   That is correct.

 6    Q   If you would, turn to page 8 in this exhibit.  And

 7        you should be looking at check number 0554.

 8            MR. GAERTE:  I think that's it.

 9            THE WITNESS:  554 he said.

10            MR. GAERTE:  554?

11            MR. JOHNSON:  554.

12    Q   Are you there with me?

13    A   Yes, I am.

14    Q   Okay.  And is this also an accurate copy of a check

15        from Pain Management Solutions?

16    A   It is my check.

17    Q   Okay.  And it's made out to MK Land Holdings?

18    A   That is correct.

19    Q   For the amount of $427.14?

20    A   Yes.

21    Q   And is that your signature on the check?

22    A   Yes, it is.

23    Q   Do you know who MK Land Holdings is?

24    A   It's a company of Manoj Kumar.

25    Q   So you would agree with me based on the checks in
```

```
 1      Exhibit 1 that Pain Management Solutions has paid
 2      money to Manoj Kumar?
 3           MR. GAERTE:  Object and instruct the witness
 4      to rely upon his Fifth Amendment privilege.
 5  Q  Are you relying on the advice of counsel in
 6      declining to answer this question?
 7  A  I am invoking my Fifth Amendment rights.
 8  Q  When Pain Management Solutions employed Manoj
 9      Kumar, what services did he perform for the
10      practice?
11           MR. GAERTE:  Object and instruct the witness
12      not to answer.
13  A  I invoke my Fifth Amendment rights.
14  Q  Does your practice currently send urine drug
15      samples to a confirmation lab for testing?
16           MR. GAERTE:  Same objection.
17  A  I -- I invoke my Fifth Amendment rights.
18           MR. JOHNSON:  For him currently sending urine
19      drug samples?
20           MR. GAERTE:  That's correct.
21  Q  Has your practice ever sent urine drug samples to
22      Physicians Choice Laboratory Services for urine
23      drug testing?
24           MR. GAERTE:  Same objection.
25  A  I invoke my Fifth Amendment rights.
```

```
 1   Q  Did Manoj Kumar ever tell you to send urine drug
 2       samples to Physicians Choice Laboratory Service for
 3       confirmation testing?
 4           MR. GAERTE:  Same objection.
 5   A  I invoke -- I invoke my Fifth Amendment rights.
 6   Q  Did you refer urine drug samples to PCLS in
 7       exchange for PCLS not billing cash customers?
 8           MR. GAERTE:  Same objection.
 9           MR. CAUDILL:  I object to the form of that
10       question.
11   A  I invoke my Fifth Amendment rights.
12   Q  When did you first hear of PCLS?
13           MR. GAERTE:  Same objection.
14   A  I invoke my Fifth Amendment rights.
15   Q  Did anyone other than Manoj Kumar ever recommend
16       that you use PCLS for urine drug samples?
17           MR. GAERTE:  Same objection.
18   A  I invoke my Fifth Amendment rights.
19   Q  Have you ever seen any marketing materials from
20       PCLS?
21           MR. GAERTE:  Same objection.
22   A  I invoke my Fifth Amendment rights.
23   Q  Did anyone from PCLS ever come to your office to
24       explain their services?
25           MR. GAERTE:  Same objection.
```

1    A   I invoke my Fifth Amendment rights.

2    Q   Did you review any documents of any kind related to

3        PCLS's services?

4            MR. GAERTE:   Same objection.

5    A   I invoke my Fifth Amendment rights.

6    Q   Did PCLS ever provide software for your practice?

7            MR. GAERTE:   Same objection.

8    A   I invoke my Fifth Amendment rights.

9    Q   Did you ever pay PCLS for software provided to your

10       practice?

11           MR. GAERTE:   Same objection.

12   A   I invoke my Fifth Amendment rights.

13           (Plaintiffs' Exhibit 2 was marked for

14       identification.)

15   Q   Do you see Exhibit 2 in front of you?

16   A   I do.

17   Q   Okay.   Is this a document entitled, Provider

18       Acknowledgment Form?

19   A   Yes, it is.

20   Q   There's a signature on the bottom right corner of

21       this document.   Is that your signature?

22           MR. GAERTE:   Object and instruct not to

23       answer.

24   A   I invoke my Fifth Amendment rights.

25   Q   There's also other handwriting on this document.

```
 1    Is that your handwriting?
 2         MR. GAERTE:  Object and instruct not to
 3    answer.
 4  A  I invoke my Fifth Amendment rights.
 5  Q  Do you know whether Manoj Kumar was employed by
 6    PCLS while he was working as your business manager?
 7         MR. GAERTE:  Same objection.
 8  A  I invoke my Fifth Amendment rights.
 9  Q  Did Manoj Kumar ever assist with your practice
10    getting a desktop analyzer?
11         MR. GAERTE:  Same objection.
12  A  I invoke my Fifth Amendment rights.
13  Q  When did Manoj Kumar stop serving as your business
14    manager?
15         MR. GAERTE:  Same objection.
16  A  I invoke my Fifth Amendment rights.
17  Q  Do you know how much you paid to Manoj Kumar during
18    the course of his employment at Pain Management
19    Solutions?
20         MR. GAERTE:  Same objection.
21  A  I invoke my Fifth Amendment rights.
22  Q  Why did you refer urine drug samples to PCLS?
23         MR. GAERTE:  Same objection.
24  A  I invoke my Fifth Amendment rights.
25  Q  Has PCLS ever provided you anything for free?
```

```
1  STATE OF INDIANA
2  COUNTY OF HAMILTON

3

4         I, Julie A. Nicholson, RPR, CRR, a Notary
5  Public in and for said county and state, do hereby
6  certify that the deponent herein was by me first duly
7  sworn to tell the truth, the whole truth, and nothing
8  but the truth in the aforementioned matter;
9         That the foregoing videotaped deposition was
10 taken on behalf of the Plaintiffs; that said
11 videotaped deposition was taken at the time and place
12 heretofore mentioned between 10:04 a.m. and
13 10:36 a.m.;
14         That said videotaped deposition was taken down
15 in stenograph notes and afterwards reduced to
16 typewriting under my direction; and that the
17 typewritten transcript is a true record of the
18 testimony given by said deponent;
19         And thereafter presented to said witness for
20 signature; that this certificate does not purport to
21 acknowledge or verify the signature hereto of the
22 deponent.
23         I do further certify that I am a disinterested
24 person in this cause of action; that I am not a
25 relative of the attorneys for any of the parties.
```

```
1           IN WITNESS WHEREOF, I have hereunto set my

2    hand and affixed my notarial seal this 9th day of

3    October, 2020.

4

5

6

7

8

9

10

11

12   My Commission Expires:
     September 1, 2022
13
     Job No. 156336
14

15

16

17

18

19

20

21

22

23

24

25
```

Julie A. Nicholson
NOTARY PUBLIC SEAL
STATE OF INDIANA
Commission No. NP0657532
My Commission Expires Sept. 1, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL FILE NO. 3:17-CV-37
(CONSOLIDATED WITH CIVIL FILE NO. 3:17-CV-46)

```
_____
                              )
UNITED STATES OF AMERICA ex rel.  )
TARYN HARTNETT, and DANA SHOCHED,  )
                              )
          Plaintiff,          )
                              )
     v.                       )  DEPOSITION OF PHILIP MCHUGH
                              )
PHYSICIANS CHOICE LABORATORY  )
SERVICES, DOUGLAS SMITH, PHILIP  )
MCHUGH AND MANOJ KUMAR,       )
                              )
          Defendants.         )
_____)
```

On Thursday, November 19, 2020, commencing at 9:33 a.m.,
the deposition of Philip McHugh was taken on behalf of the
Plaintiff at the United States Attorney's Office, 227 West Trade
Street, Suite 1650, Charlotte, North Carolina, and was attended by
Counsel as follows:
APPEARANCES:

        SETH JOHNSON, ESQ.
        KATHERINE ARMSTRONG, ESQ.
        BILL STETZER, ESQ.
        Assistant United States Attorney
        US Attorney's Office
        227 West Trade Street, Suite 1650
        Charlotte, North Carolina  28202
        on behalf of the Plaintiff


        BO CAUDILL, ESQ.
        MATTHEW M. VILLMER, ESQ.
        Weaver, Bennett & Bland, PA
        196 North Trade Street
        Matthews, North Carolina  28105
        on behalf of the Defendant Philip McHugh


ATTENDING:     Cathleen Hollowell

REPORTED BY:   Barbie M. Lane, CVR-M, CCR
               ASHEVILLE REPORTING SERVICE

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
                    ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 139 of 283

1 education sense?
2 A Yes.
3 Q Classes, courses, things like that?
4 A Yes.
5 Q Good. Talk to me about those. What kind of
6 continuing education courses and classes have
7 you done?
8 A Leadership courses.
9 Q How many of those have you done?
10 A Four or five.
11 Q Were they all with one company or separate
12 companies?
13 A Might be separate. They are separate.
14 Q Just can you give me a general overview of
15 what these leadership courses would be? How
16 many days it lasted, who presented, that kind
17 of thing?
18 A Sure. I'm sorry, say -- say your order of the
19 question again?
20 Q Sorry. I'm just looking at kind of generally
21 -- you sign up for one of these leadership
22 courses presumably; right?
23 A Yes, sir.
24 Q And then you go and attend it; right?
25 A Yes, sir.

1 Q And just generally what happens there? How
2 long do they last, what gets taught, that kind
3 of thing?
4 BY MR. VILLMER:
5 Objection to the form of the question. You
6 can answer.
7 BY THE DEPONENT:
8 They lasted several days, multiple presenters.
9 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
10 Q Was this something that you did in your own
11 individual capacity or was it something that
12 PCLS would pay for?
13 A Both.
14 Q Other than these leadership courses any other
15 education you received?
16 A Yes.
17 Q Could you tell me about that?
18 A Sure. Individual teachers, presenters coming
19 in and educating on certain subjects.
20 Q You mentioned coming in. Coming in to where?
21 A Coming to me or me going to them.
22 Q What subjects would you seek out these
23 individual teachers on?
24 BY MR. VILLMER:
25 Objection to the form of the question. You

1 can answer.
2 BY THE DEPONENT:
3 I don't remember.
4 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
5 Q Do you remember how often you've done this?
6 A A few times.
7 Q Was this in your individual capacity or was
8 this something that was done through PCLS?
9 A Both.
10 Q If PCLS was bringing in an individual teacher
11 would that be just for you or would that be
12 for presenting to the -- more members of the
13 company?
14 A Both.
15 Q Anything else in terms of your educational
16 background that we haven't talked about?
17 BY MR. VILLMER:
18 Objection to the form of the question. You
19 can answer.
20 BY THE DEPONENT:
21 I don't believe so.
22 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
23 Q Let's talk about your work history. Where are
24 you currently employed?
25 A Through Silent Storm Holdings.

1 Q Do you own Silent Storm Holdings?
2 A A portion of it.
3 Q Who else has an ownership interest in Silent
4 Storm Holdings?
5 A Various trusts.
6 Q Who controls those trusts?
7 BY MR. VILLMER:
8 Objection to the extent his response calls for
9 a legal conclusion. You can answer.
10 BY THE DEPONENT:
11 I'm not sure.
12 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
13 Q How many trusts have an ownership interest in
14 Silent Storm Holdings?
15 A One, perhaps two.
16 Q What are the names of those trusts?
17 A I can't recall.
18 Q Do you know who the trustee of those trusts
19 are?
20 A Yes.
21 Q Who is that?
22 A Jason McHugh.
23 Q Is Jason McHugh related to you?
24 A He is.
25 Q What's your relation to Jason McHugh?

4 (Pages 10 to 13)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 140 of 283

1　A　Brother.
2　Q　Do you know who the beneficiary of these
3　　　trusts is?
4　BY MR. VILLMER:
5　　　Objection to the form of the question but you
6　　　can answer.
7　BY THE DEPONENT:
8　　　Yes.
9　DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
10　Q　Who?
11　A　People.
12　Q　Who are those people?
13　A　My children.
14　Q　So as far as the current ownership of Silent
15　　　Storm Holdings goes I've got yourself, and
16　　　then one to two trusts where Jason McHugh is
17　　　the trustee, and those trusts are in the
18　　　benefit of your children; is that accurate?
19　A　I believe so.
20　Q　Anyone else have an ownership in Silent Storm
21　　　Holdings currently?
22　A　I don't know.
23　Q　You don't know?
24　A　I don't.
25　Q　What is your ownership percentage in Silent

1　　　Storm Holdings currently?
2　A　I don't know.
3　Q　Who would you say has control of Silent Storm
4　　　Holdings?
5　BY MR. VILLMER:
6　　　Objection to the form of the question.  You
7　　　can answer.
8　BY THE DEPONENT:
9　　　From a legal perspective I'm not exactly sure.
10　DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
11　Q　Who makes the decisions about what the company
12　　　does?
13　A　Myself, I believe.
14　Q　Anyone else?
15　A　I would have to reference my attorney.
16　Q　Has anyone other than yourself made any
17　　　decision about what the company Silent Storm
18　　　Holdings does?
19　A　I'm not sure.
20　Q　None come to mind?
21　BY MR. VILLMER:
22　　　Objection, asked and answered, but you can
23　　　answer.
24　BY THE DEPONENT:
25　　　I'd have to reference my attorney.

1　DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
2　Q　Do you have a title with Silent Storm
3　　　Holdings?
4　A　Manager.
5　Q　What type of company is Silent Storm Holdings?
6　A　I'm not sure.
7　Q　You don't know if it's like an LLC,
8　　　partnership, corporation?
9　A　I'm not sure.
10　Q　Has the ownership structure of Silent Storm
11　　　Holdings always been split between yourself
12　　　and one of the two trusts?
13　A　I'm not sure.
14　Q　You're not sure if there was ever at one point
15　　　where you were the sole owner of Silent Storm
16　　　Holdings?
17　BY MR. VILLMER:
18　　　Objection, asked and answered, but you can
19　　　answer.
20　BY THE DEPONENT:
21　　　Correct.
22　DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
23　Q　By current you mean you're not sure?
24　A　Correct.
25　Q　What does Silent Storm Holdings do?

1　A　Can you define your question?
2　Q　Sure.  It's a company; correct?
3　A　Correct.
4　Q　So what's it's purpose?  What does it do?  How
5　　　does it make money?
6　A　It's a holding company.
7　Q　It's a holding company for other company's;
8　　　right?
9　A　I believe so.
10　Q　What other companies does Silent Storm
11　　　Holdings hold?
12　A　I'm not sure, sir.
13　Q　How does Silent Storm Holdings make money?
14　A　I'm not sure it does.
15　Q　Do you derive any income from Silent Storm
16　　　Holdings?
17　A　I don't believe so.
18　Q　Do you receive any distributions from Silent
19　　　Storm Holdings?
20　A　No.
21　Q　I earlier asked you if you were currently
22　　　employed and you said you're sole employment
23　　　was for Silent Storm Holdings; correct?
24　A　Correct.
25　Q　But you're not making any money from Silent

828-254-9230　　　　ASHEVILLE REPORTING SERVICE　　　800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 141 of 283

DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

1  
2  Q  Can you correct me on my timeline?
3  A  Yeah.  It closed when Government orders for
4     businesses to be closed down approximately in
5     February.  We reopened approximately 30 days
6     ago, and decided on closing our doors
7     permanently October 31st.
8  Q  You closed the doors on October 31st.  When
9     were the assets liquidated?
10 A  They're currently being liquidated.
11 Q  So they have not yet been liquidated?
12 A  Not all of them.
13 Q  Some of them have?
14 A  Yes.
15 Q  Other than Silent Storm Holdings and PIM do
16    you currently have an ownership interest in
17    any other companies?
18 A  Ownership interest?  Yes.
19 Q  What companies are those?
20 A  MP Associates.
21 Q  What does MP Associates do?
22 A  A holding company.
23 Q  What's it a holding company for?
24 A  For stock.
25 Q  Does anyone else have an ownership interest in

1     MP Associates?
2  A  They do.
3  Q  Who's that?
4  A  Manoj Kumar.
5  Q  What's the split between your ownership
6     interest and his ownership interest in MP
7     Associates?
8  A  It's approximately 50/50.
9  Q  Any other companies that you currently own?
10 A  Yes.
11 Q  What are those?
12 A  M Holdings.
13 Q  And what's M Holdings?
14 A  Just a holding company.
15 Q  And what is it a holding company for?
16 A  Other assets.
17 Q  What assets are those?
18 A  I'm not sure.
19 Q  Does anyone else have an ownership interest in
20    M Holdings?
21 A  I'm not sure.
22 Q  Any other companies?
23 A  I don't believe so.
24 Q  Let's go back to -- we've kind of talk about
25    your current interest.  I want to kind of go

1     back to the beginning.  When you first entered
2     the workforce what were you doing?
3  A  Sales.
4  Q  Sales for who?
5  A  Rubico.
6  Q  And what type of company was that?
7  A  Datacard company, franchise.
8  Q  Do you remember roughly when you were at
9     Rubico?
10 A  '98.
11 Q  Until?
12 A  2000 approximately.
13 Q  After Rubico what did you do?
14 A  Opened up a business.
15 Q  What business was that?
16 A  Joe Picasso's.
17 Q  Say that again?
18 A  Joe Picasso's.
19 Q  What was Joe Picasso's?
20 A  A retail store.
21 Q  What type of goods did it sell?
22 A  I'm sorry?
23 Q  What type of goods did it sell?
24 A  Pottery, café items.
25 Q  How long did you work at Joe Picasso's?

1  A  Approximately two and a half years.
2  Q  How did the Joe Picasso's business end?
3  A  Selling my shares to my partner.
4  Q  After you sold your shares in Joe Picasso's to
5     your partner what did you do?
6  A  I purchased a home.
7  Q  In terms of your employment and work what did
8     you do?
9  A  Purchased a home to fix up and sell it.
10 Q  So you flipped a house; right?
11 A  Correct.
12 Q  After you flipped that house what did you do?
13 A  I flipped more homes.
14 Q  How long were you flipping homes for?
15 A  I'm not sure.
16 Q  Can you give me just a ballpark; two, three,
17    five years?
18 BY MR. VILLMER:
19    Objection to the form of the question.  You
20    can answer.
21 BY THE DEPONENT:
22    I'm not sure, sir.
23 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
24 Q  Fair enough.  After you were flipping homes
25    did you do anything else work-wise?

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 142 of 283

1           system that PCS ultimately used; right?
2  A  Yes.
3  Q  What was your contribution to PCS?
4  A  Organizing.
5  Q  How long was PCS in business for?
6  A  About one year.
7  Q  What did you do after that?
8  A  Started PCLS.
9  Q  And that was also with Smith and Sowinski;
10    correct?
11 A  Correct.
12 Q  Can you tell me a little bit about how PCLS
13    came to be?
14 BY MR. VILLMER:
15    Objection to the form of the question.  You
16    can answer.
17 BY THE DEPONENT:
18    Because the referrals to outside laboratories
19    was not a good relationship.
20 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
21 Q  What do you mean by not a good relationship?
22 A  They were not listening to doctors.  They were
23    not processing the samples quickly,
24    efficiently.  They were not focused on the
25    doctors.

1  Q  By referrals, what type of referrals were you
2     referencing?
3  A  Physicians.
4  Q  Referrals for what?
5  A  I'm sorry.  Can you speak louder?
6  Q  Sure.  You mentioned that there was a need to
7     listen to doctors with respect to referrals to
8     labs; right?
9  A  Uh-huh.  (Affirmative)
10 Q  What type of referrals were those to labs?
11 A  Patient samples.
12 Q  Urine drug samples?
13 A  Yes.
14 Q  Any other types of samples?
15 A  Not at the time.
16 Q  What about later?
17 A  I don't believe so.
18 Q  So PCLS was in the business of testing urine
19    drug samples; correct?
20 BY MR. VILLMER:
21    Objection to the form of the question.  You
22    can answer.
23 BY THE DEPONENT:
24    Yes.
25 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

1  Q  Did it test any other types of samples?
2  A  Not that I remember.
3  Q  What about oral samples?
4  A  Not that I remember.
5  Q  When yourself, Smith and Sowinski started PCLS
6     what were the ownership shares in the company
7     between the three of you?
8  BY MR. VILLMER:
9     Objection to the form of the question, but you
10    can answer.
11 BY THE DEPONENT:
12    Doug Smith had the majority of shares.  I came
13    next, and then Marcus Sowinski underneath us.
14 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
15 Q  Do you remember what your percentage was?
16 A  Approximately 25 percent.
17 Q  Do you remember what Smith's was?
18 A  Approximately 50 percent.
19 Q  What about Sowinski?
20 A  Somewhere around 20 percent.
21 Q  At PCLS's founding what was your title?
22 A  CEO.
23 Q  How long were you the CEO of PCLS?
24 A  Approximately two years or less.
25 Q  Who became the CEO after you?

1  A  Joe Wiegal.
2  Q  Did he ultimately also acquire an ownership
3     interest in the company?
4  A  He did.
5  Q  And what was his ownership interest?
6  A  Approximately 10 percent.
7  Q  Did your ownership interest in the company
8     ever change with regard to its percentage?
9  A  Yes.
10 Q  What did it change to?
11 A  I don't remember exactly.
12 Q  Did it increase or decrease?
13 A  Decrease.
14 Q  Do you remember by how much?
15 A  No, not exactly.
16 Q  Do you remember when that was?
17 A  Yes.  In the very beginning.
18 Q  When you say the very beginning is that -- are
19    you talking about 2009?
20 A  Yes.
21 Q  Was that prior to the roughly 50/25 split that
22    you were talking about?
23 A  Uh-huh.  (Affirmative)
24 Q  So it changed into that 25 percent interest?
25 A  Yes.

10 (Pages 34 to 37)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 143 of 283

1  Q    And then remained constant after that?
2  A    Yes.
3  (GOVERNMENT'S EXHIBIT NO. 1 MARKED)
4  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
5  Q    Mr. McHugh, I am showing you what has been
6       marked as Government's Exhibit 1.  Do you
7       recognize this document?
8  A    Not really.
9  Q    I will -- if you'll turn to the second page of
10      the document.
11 A    Oh, okay.
12 Q    That might help you.  I'll represent to you
13      this is the Articles of Organization for a
14      Florida Limited Liability Company, that
15      company being Physicians Choice Laboratory
16      Services.  Do you see that?
17 A    I do.
18 Q    And these were filed January 7th, 2009?  Do
19      you see the little file stamp?
20 A    I do now.
21 Q    If you will turn to the last page.  It's got
22      Article 4, which is Management, and that says,
23      "The Limited Liability Company is to be
24      managed by one or more members and is,
25      therefore, a Member Managed Company."  Did I

1  read that correctly?
2  A    Yes.
3  Q    And it lists two managing members; yourself
4       and Douglas Smith?
5  A    Yes.
6  Q    Is that your signature at the bottom?
7  A    It is.
8  BY MR. CAUDILL:
9       Seth, I'm sorry to interrupt.  Phil, please
10      make sure not to mark -- put any markings on
11      that exhibit with that pen.
12 BY THE DEPONENT:
13      Okay.
14 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
15 Q    Mr. McHugh, I'm going to show you what's being
16      marked as Government's Exhibit 2.
17 (GOVERNMENT'S EXHIBIT NO. 2 MARKED)
18 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
19 Q    Do you recognize this document?
20 A    Yes.
21 Q    What is it?
22 A    Operating Agreement for Physicians Choice
23      Laboratory Services.
24 Q    And was this the operating agreement for PCLS?
25 A    It appears to be.

1  Q    If you will turn to the last page you will see
2       signatures for yourself, Mr. Smith and Mr.
3       Sowinski; correct?
4  A    Yes.
5  Q    And is that your signature on this document?
6  A    It appears to be.
7  Q    And it's dated May 28th, 2019; correct?
8  A    Correct.
9  Q    When you were at PCLS, Mr. McHugh, how were
10      you paid?
11 BY MR. VILLMER:
12      Objection to the form of the question.  You
13      can answer.
14 BY THE DEPONENT:
15      By salary.
16 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
17 Q    You received a salary in your role as CEO?
18 A    I did.
19 Q    How much was that?
20 A    It varied.
21 Q    Can you give me a ballpark?
22 A    Two thousand dollars.
23 Q    Did it start at $2,000?
24 A    Yes.
25 Q    And that was in 2009?

1  A    Yes.
2  Q    And then what did it vary to?
3  A    I'm not sure.
4  Q    Did it increase?
5  A    It did.
6  Q    Do you know by how much it increased?
7  A    It might have been 100,000.
8  Q    Do you know when that would have been?
9  A    Maybe in 2010.
10 Q    Did it remain relatively constant after that
11      increase to 100,000?
12 A    Yes.
13 Q    What about -- you said you were CEO until Joe
14      Wiegal became CEO.  After Joe Wiegal became
15      CEO what was your role at the company?
16 A    President.
17 Q    And did you serve in that role for the
18      remainder of PCLS's existence?
19 A    No.
20 Q    How long were you president?
21 A    Several years.
22 Q    Do you have an estimate of the timeframe for
23      those several years?
24 A    Yes.
25 Q    What was that?

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 144 of 283

1  A   2010 to 2013.
2  Q   After your role as president what was your
3      role at PCLS?
4  A   I did not have a role.
5  Q   You were an owner of PCLS the entire time the
6      company was in existence; correct?
7  A   Yes.
8  Q   And as an owner you received distributions;
9      right?
10 A   Yes.
11 Q   Do you know roughly how much you received in
12     distributions from PCLS?
13 A   I do not.
14 Q   Let's turn your attention to what's being
15     marked as Government's Exhibit 3.
16 (GOVERNMENT'S EXHIBIT NO. 3 MARKED)
17 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
18 Q   Do you recognize the documents in Government's
19     Exhibit 3?
20 A   Yes.
21 Q   What are they?
22 A   Owner's/Shareholder's Share of Income,
23     Deductions, Credits, et cetera, for 2011.
24 Q   Through 2014; correct?  If you'll flip,
25     there's multiple pages.

1  A   Thank you.  Yes.
2  Q   This is a Schedule K-1 which is a tax form
3      that you filed; right?
4  A   I believe so.
5  Q   And if you'll look at box B.
6  A   Which page?
7  BY MR. VILLMER:
8      Which page are you talking about, Seth?
9  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
10 Q   Sorry.  Good question.  Just go to the first
11     page for the 2011 K-1.
12 A   Okay.
13 Q   It's the same form throughout, but we'll start
14     at 2011 and continue on.  You'll see Part 1
15     which has information about the past through
16     entity; right?  The left-hand column.
17 BY MR. VILLMER:
18     Objection to the form, but you can answer.
19 BY THE DEPONENT:
20     Say your question again, sir.
21 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
22 Q   Sure.  Do you see on the left-hand column
23     where it says, "Part 1, Information About the
24     Pass Through Entity"?
25 A   Yes.

1  Q   And you see where it lists Physicians Choice
2      Laboratory Services in box B?
3  A   Yes.
4  Q   And you see where it lists owner or
5      shareholder's name as Silent Storm Holdings,
6      LLC, Attention Phil McHugh in box D?
7  A   I do.
8  Q   And if you'll go down you'll see where it says
9      "Owner's/Shareholder's percentage of profit
10     and loss sharing," and it has 26.75 percent
11     in ---
12 A   Yes.
13 Q   --- in box I?
14 A   Yes.
15 Q   Was that your specific ownership share in
16     PCLS?
17 A   I believe so.
18 Q   And then if you will go to the other column,
19     which is at the top, entitled
20     Owner's/Shareholder's Share of Current Year
21     Alabama Income, Deductions, Credit, and Other
22     Items.  Do you see that?
23 A   Uh-huh.  (Affirmative)
24 Q   Do you see box X where it says withdrawals and
25     distributions?

1  A   No.
2  Q   It is five up from the bottom.
3  A   Yes, now.  Thank you.
4  Q   And the withdrawals and distributions listed
5      for 2011 are $1,890,000.68 -- sorry, let me
6      say that again.  The withdrawals and
7      distributions for 2011 are $1,890,068;
8      correct?
9  A   Correct.
10 Q   So you received $1,890,068 in distributions
11     from PCLS in 2011; correct?
12 A   It appears to be.
13 Q   You have no reason to dispute the tax forms
14     that you filed; right?
15 A   I don't believe so.
16 Q   Let's go to the 2012 K-1.
17 A   Uh-huh.  (Affirmative)
18 Q   Similar form.  This one's with the IRS?  Do
19     you see that?
20 A   Yes.
21 Q   Box B lists Physicians Choice?
22 A   Yes.
23 Q   Box F lists Silent Storm, Attention Phil
24     McHugh?
25 A   Yes.

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 145 of 283

1  Q   Same ownership percentage in box J?
2  A   Yes.
3  Q   And for distributions in this year it has
4      $9,350,794?
5  A   Yes.
6  Q   So in 2012 you received $9,350,794 from PCLS;
7      correct?
8  A   It appears to be.
9  Q   2013, same form.  Lists distributions as
10     $8,594,785?  Is that -- did I read that right?
11 A   Yes.
12 Q   So in 2013 you received $8,594,785 from PCLS;
13     correct?
14 A   It appears to be.
15 Q   If you'd turn to the 2014 one.  Same form.
16     Lists distributions as $7,604,390 from PCLS;
17     correct?
18 A   Yes.
19 Q   So in 2014 you received $7,604,390 from PCLS
20     in distributions; right?
21 A   It appears to be.
22 Q   Do those numbers comport with your
23     recollection of the distributions you have
24     received from PCLS?
25 BY MR. VILLMER:

1      Objection, asked and answered, but you can
2      answer.
3  BY THE DEPONENT:
4      Can you clarify your question?
5  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
6  Q   We went through your tax filings with regard
7      to the distributions you received from PCLS;
8      right?
9  BY MR. VILLMER:
10     Objection to the form of the question, but you
11     can answer.
12 BY THE DEPONENT:
13     Yes.
14 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
15 Q   And do the numbers you've listed on your tax
16     filings with regard to the distributions you
17     received from PCLS generally comport with your
18     recollection of the amounts of distributions
19     you received from PCLS?
20 BY MR. VILLMER:
21     Objection to the form of the question.  You
22     can answer.
23 BY THE DEPONENT:
24     I'm not sure.
25 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

1  Q   You're not sure?
2  BY MR. VILLMER:
3      Objection, asked and answered.  You can
4      answer.
5  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
6  Q   As you sit here today do you know how much
7      money you received in distributions from PCLS?
8  A   No.
9  Q   Do you have any reason to dispute the numbers
10     in any of the tax filings we looked at?
11 A   I'm unsure.
12 Q   Going back to PCLS's inception, what did Smith
13     contribute to PCLS?
14 A   Money.
15 Q   Anything else?
16 A   Time.
17 Q   What did he do?
18 A   I'm not sure how to answer that.
19 Q   What was his role, what did he contribute,
20     what projects did he work on?  Just generally
21     what was he doing at the company in the
22     beginning?
23 BY MR. VILLMER:
24     Objection to the form of the question.  You
25     can answer.

1  BY THE DEPONENT:
2      He was an investor and he contributed into
3      everything.
4  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
5  Q   Do you know how much money he invested into
6      PCLS?
7  A   I'm unsure.
8  Q   Do you have a ballpark?
9  A   Less than a half a million.
10 Q   Does about 400,000 sound right?
11 BY MR. VILLMER:
12     Objection, asked and answered.  You can
13     answer.
14 BY THE DEPONENT:
15     I'm unsure.
16 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
17 Q   Did anyone else contribute money to PCLS back
18     in the beginning in 2009?
19 A   Yes.
20 Q   Who?
21 A   Joe Wiegal.
22 Q   How much did Joe contribute?
23 A   Approximately 30,000.
24 Q   Did Mr. Sowinski contribute anything?
25 A   No.

828-254-9230      ASHEVILLE REPORTING SERVICE      800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 146 of 283

1  Q   Did you yourself contribute any money in 2009?
2  A   Yes, but I'm unsure how much.
3  Q   Do you have a ballpark?
4  A   I would just be guessing and I don't want to
5      do that.
6  Q   Less than Smith?
7  A   Yes.
8  Q   Less than Wiegal?
9  BY MR. VILLMER:
10     Objection, asked and answered, but you can
11     answer.
12 BY MR. JOHNSON:
13     When did I ask him if the money was less than
14     Joe Wiegal?
15 BY MR. VILLMER:
16     If you want to get into it, you've asked him
17     several times how much it was.  He said he
18     doesn't know.  He doesn't want to guess.  And
19     now you're giving him specific amounts of
20     money and asking if it was more or less.  He
21     said he doesn't know and he doesn't want to
22     guess, but you can answer again.
23 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
24 Q   Do you remember if the money you contributed
25     was more or less than the money that Joe

1      Wiegal contributed in 2009?
2  A   I'd rather not speculate, sir.
3  Q   Have you contributed money to PCLS at any
4      other point?
5  A   Yes.
6  Q   How much?
7  A   More than a million, less than three.
8  Q   Why were you contributing to PCLS?
9  A   Because when the Government inquiry
10     investigation started we were not able to
11     receive any outside funding from banks.
12 Q   Did you contribute the one to three million
13     all at once?
14 A   No.
15 Q   Do you recall like how many specific
16     contributions that was?
17 A   I don't.
18 Q   But it was after the Government's
19     investigation started?
20 A   Correct.
21 Q   Contribute anything other than the 2009
22     contributions you mentioned prior to that?
23 A   No.
24 Q   At the beginning, other than yourself, Smith
25     and Sowinski, were there any employees there

1      at PCLS?
2  A   Yes.
3  Q   Who were those employees?
4  A   Katie Small, Mark Roth, Shirley Liu, Joe
5      Wiegal, Sandy Weaver.
6  Q   What about Dinah Myers?
7  A   Dinah Myers, yes.
8  Q   Anyone else?
9  A   Ralph Smith.
10 Q   When did PCLS's lab get up and running?
11 A   2009.
12 Q   Can you be more specific when in 2009?
13 Q   Can you define your question more?
14 Q   Sure.  I assume that when you set out to start
15     a lab it didn't just open up on day one;
16     correct?
17 A   That's correct.
18 Q   But at some point it would have had the
19     capacity to you, you know, accept a sample for
20     testing and test that sample; right?
21 A   Correct.
22 Q   At what point was that?
23 A   Approximately August.
24 Q   Prior to starting PCLS did you have any
25     experience operating or running a lab?

1  A   I did not.
2  Q   Did Mr. Sowinski?
3  A   He did not.
4  Q   What about Dr. Smith?
5  A   Not that I'm aware of.
6  Q   We've been going about an hour.  Do you want
7      to take a five minute break?
8  A   I'm okay.
9  BY MR. VILLMER:
10     Seth, I need to go to the restroom.  So I'm
11     going to take you up on that, if that's all
12     right.
13 BY MR. JOHNSON:
14     Okay.
15 (OFF THE RECORD)
16 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
17 Q   Do you know a Dr. Orlando Florete, Mr. McHugh?
18 A   Yes.
19 Q   How do you know Dr. Florete?
20 A   He was a referral at the lab.
21 Q   So Dr. Florete referred urine drug samples for
22     testing to PCLS; correct?
23 A   Yes.
24 Q   Do you know what time period Dr. Florete
25     referred urine drug samples to PCLS?

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 147 of 283

```
1   A   I do not.
2   Q   And his practice was the Institute of Pain
3       Management in Jacksonville, Florida; correct?
4   A   I believe so.
5   Q   Do you know if other doctors at his practice
6       also referred samples to PCLS?
7   A   I believe so.
8   Q   Do you know generally when they referred
9       samples?
10  A   I do not.
11  Q   Do you know who those doctors were?
12  A   I do not.
13  Q   How did you come to meet Dr. Florete?
14  A   He was visiting the lab.
15  Q   Can you talk a little bit more about that?  I
16      mean, did he just show up at the lab one day?
17  BY MR. VILLMER:
18      Objection to the form of the question.  You
19      can answer.
20  BY THE DEPONENT:
21      Yes.
22  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
23  Q   And that's how you met him?
24  A   Yes.
25  Q   Do you remember when that was?
```

```
1   A   No.
2   Q   Who introduced you to Dr. Florete?
3   A   I'm not sure.
4   Q   Did you make a loan to Dr. Florete?
5   A   I did.
6   Q   When was that?
7   A   I'm unsure of the date.
8   Q   I have some documents for you.
9   (GOVERNMENT'S EXHIBIT NOS. 4, 5, 6, 7 MARKED)
10  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
11  Q   Mr. McHugh, I have handed you, for time saving
12      purposes, a stack of exhibits labeled 4
13      through 7.  Do you see those?
14  A   Yes.
15  Q   Let's start with Exhibit 4.  This is an
16      October 18th, 2013 Promissory Note with the
17      Institute of Pain Management, Aries Medical
18      Corporation, and Silent Storm Holdings, LLC.
19      Do you see that?
20  A   I see Promissory Note.  I see October 18th,
21      2013.  And I see, Th undersigned Maker,
22      Institute of Pain Management, P.A., a Florida
23      Professional Association and Aries Medical
24      Corporation."
25  Q   "Hereinafter collectively referred to as
```

```
1       'Make' promises to pay to the order of Silent
2       Storm Holdings, LLC" -- do you see that?
3   A   I do.
4   Q   "The principal sum of $1,700,000?
5   A   I do.
6   Q   Does this help refresh your recollection as to
7       when you made the original loan to Dr. Florete
8       and his practice?
9   A   Yes.
10  Q   And that was October 18, 2013?
11  A   I believe so.
12  Q   And the original amount that you loaned Dr.
13      Florete was for 1.7 million dollars; correct?
14  A   I believe so.
15  Q   You don't remember specifically how much you
16      loaned him?
17  BY MR. VILLMER:
18      Objection to the form of the question, but you
19      can answer.
20  BY THE DEPONENT:
21      It was a long time ago.
22  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
23  Q   You don't have any reason to dispute the 1.7
24      million dollar amount in this promissory note,
25      do you?
```

```
1   A   I don't believe so.
2   Q   When did you first discuss loaning Dr. Florete
3       money with him?
4   A   When he came up to the laboratory.
5   Q   Did he ask you for a loan?
6   A   He did.
7   Q   Did he tell you why he wanted a loan?
8   A   He did.
9   Q   What did he say?
10  A   To pay the IRS, to consolidate debt, and to
11      pay off an individual.
12  Q   Was that individual Bill Hughes?
13  A   It was.
14  Q   And who is Bill Hughes?
15  A   Bill Hughes is the owner of UOFL.
16  Q   What is -- what type of company is UOFL?
17  A   I don't know.
18  Q   What you don't know what type of company it
19      is?
20  A   I don't.
21  Q   Do you know generally what they did business-
22      wise?
23  A   I believe so.
24  Q   What is that?
25  A   They were a laboratory.
```

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
                       ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 148 of 283

1 Q And that's actually what I was asking you with
2 regard to what type of company. So UOFL was a
3 laboratory; correct?
4 A Yes.
5 Q They also did testing?
6 A Yes.
7 Q On what type of samples did UOFL do testing?
8 A Oral.
9 Q Did PCLS ever do confirmation testing on
10 samples that were first tested by UOFL?
11 A Yes.
12 Q When did that start?
13 A I don't remember.
14 Q Do you remember when it ended?
15 A I do not.
16 Q We'll circle back to UOFL. So in terms of the
17 reasons Florete gave you as to why he wanted
18 the loan, I have pay off the IRS; is that
19 right?
20 A Correct.
21 Q Pay off Bill Hughes?
22 A That was the third one.
23 Q Right. That was one of the reasons; correct?
24 A That's correct.
25 Q Do you know how much he owed to Bill Hughes?

1 A No.
2 Q And then the second reason you mentioned was
3 consolidate debts?
4 A Correct.
5 Q Is that another term for pay off debts?
6 A Perhaps.
7 Q By consolidating the debt you would use the
8 money received from a borrower to pay off
9 another borrower; right?
10 A Correct.
11 Q Other than -- so Florete tells you he needs a
12 loan. Did he tell you how much money he
13 needed?
14 A 1.7.
15 Q So that number came from Florete?
16 A I'm unsure.
17 Q I guess, did Florete ask for more than that
18 and you guys settled on 1.7? Did he just ask
19 for the 1.7? How did you arrive at the 1.7
20 million dollar figure?
21 BY MR. VILLMER:
22 Objection to the form of the question. You
23 can answer.
24 BY THE DEPONENT:
25 I'm not exactly sure, sir.

1 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
2 Q Did you suggest the 1.7 million dollar figure?
3 A I don't believe so.
4 Q So you believe that came from Dr. Florete?
5 BY MR. VILLMER:
6 Objection, asked and answered, but you can
7 answer.
8 BY THE DEPONENT:
9 For his business partners, or business people.
10 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
11 Q And that would have been Travis Guthrie?
12 A Yes.
13 Q Anyone else?
14 A Robert Dobbs.
15 Q What's your understanding of Travis Guthrie's
16 role with Florete?
17 A Business manager.
18 Q What's your understanding of Robert Dobbs'
19 role?
20 A He was brought on board to straighten out the
21 financial situation going on with Orlando and
22 his practice.
23 Q Was he brought on back in October -- or the
24 time period around October, 2013?
25 A I believe so.

1 Q When Florete broached the subject of a 1.7
2 dollar -- 1.7 million dollar loan with you
3 while he was visiting PCLS, what else did you
4 discuss with him regarding the loan?
5 A Just that I was in the business of lending
6 institutions and individuals' monies that I
7 was already doing. Thus it broached the
8 subject of could I -- could I give a loan to
9 his company.
10 Q And that's IPM and Aries Medical; right?
11 A Correct.
12 Q Dr. Florete knew you were associated with
13 PCLS; right?
14 BY MR. VILLMER:
15 Objection. Calls for speculation, but you can
16 answer.
17 BY THE DEPONENT:
18 I believe so.
19 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
20 Q He was meeting with you at PCLS' facility;
21 right?
22 A I don't know how to answer your question, sir.
23 Can you -- can you rephrase that?
24 Q You said that you first discussed the loan
25 with PCLS when he came to PCLS; right?

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 149 of 283

1 A    Correct.
2 BY MR. VILLMER:
3      Objection to the form of the question, but you
4      can answer.
5 BY THE DEPONENT:
6      Sorry.  Correct.
7 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
8 Q    But you would have been discussing the loan
9      with Dr. Florete while at PCLS?
10 A    Yes.
11 Q    Was that in your office?
12 A    No.
13 Q    Where was it at in PCLS?
14 A    The cafeteria.
15 Q    Did you ever tell Dr. Florete what your role
16      at PCLS was?
17 A    I'm unsure.
18 Q    Did anyone else tell him what your role was?
19 A    I'm unsure.
20 Q    Why did you loan Dr. Florete the 1.7 million?
21 A    Because my attorney said it was okay for me to
22      do so.
23 Q    And what attorney was that?
24 A    Anna Winger.
25 Q    Did you consult with any other attorneys back

1      in October, 2013 when you made the loan?
2 BY MR. VILLMER:
3      Objection to the form of the question, but you
4      can answer.
5 BY THE DEPONENT:
6      I don't recall if I spoke to them or Anna
7      Winger spoke to them of -- back in October,
8      2013, but I know other attorneys were
9      involved.
10 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
11 Q    In the loan deal?
12 A    Correct.
13 Q    But any -- I guess any communication with
14      those other attorneys would have been through
15      Ms. Winger, if it wasn't through yourself;
16      right?
17 A    Correct.
18 Q    You mentioned that your attorney said it was
19      okay to do it.  My specific question to you
20      thought is why did you do it?
21 A    Because I believed in him and the team that
22      was with him.  Robert Dobbs, a banking
23      executive, that had come onboard his team.  I
24      believed in Travis Guthrie.  And they were
25      showing me a solid turnaround plan for the

1      practice.
2 Q    So you knew the practice was in financial
3      trouble when you made the loan; correct?
4 A    I don't know if that statement's true.
5 Q    Well, you knew Florete had to pay off the IRS;
6      right?
7 A    I was told that, yes.
8 Q    And you were told that he had to consolidate
9      some debts; right?
10 A    I was told that.
11 Q    And you were told that he had to pay off Bill
12      Hughes; right?
13 A    I was told that.
14 Q    You mentioned that you were presented with a
15      turnaround plan?
16 A    Yes.
17 Q    Can you tell me about that?  Was that a
18      document?  Was that something they discussed
19      with you?  What was the turnaround plan?
20 BY MR. VILLMER:
21      Objection to the form of the question, but you
22      can answer.
23 BY THE DEPONENT:
24      All the above.
25 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

1 Q    What documents did they show you?
2 A    Balance sheets, proformas.
3 Q    In terms of the due diligence that you did
4      prior to making the October, 2013 loan, what
5      documents did you review?
6 A    Everything that I've already said; balance
7      sheets, proformas, current -- current volume
8      of a clinic patient, where they were AR.
9      People that they had replaced.
10 Q    For what years did you review balance sheets
11      for?
12 A    I believe the last two years.
13 Q    So 2013 and 2012?
14 A    I believe so.
15 Q    Do you know if you've produced those balance
16      sheets to the Government?
17 A    I'm not sure.
18 Q    Did you provide the balance sheets that you
19      received to anyone else?
20 A    I'm unsure.
21 Q    Did you give them to your lawyer or
22      accountant?
23 BY MR. VILLMER:
24      Objection, asked and answered, but you can
25      answer.

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 150 of 283

## Page 66

BY THE DEPONENT:

 Same answer, sir. I'm unsure if I gave them to Anna Winger or not.

DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

Q Were the balance sheets for Aries or IPM?

A I'm unsure, sir.

Q Do you know if whatever company the balance sheets were for, do you know if that company was profitable?

A Again, I don't recall.

Q Who at PCLS knew that you were loaning Dr. Florete money in October of 2013?

A I don't believe anyone.

Q Did Manoj Kumar know?

A I don't believe so.

Q Did you talk to anyone in PCLS's compliance department regarding the October, 2013 loan to Dr. Florete?

A I don't ---

BY MR. VILLMER:

 Objection to the form of the question, but you can answer.

BY THE DEPONENT:

 I don't believe so.

DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

## Page 67

Q If you will look at Exhibit 5. This is a March 24th, 2014 Promissory Note Modification Agreement. Do you see that?

A I do.

Q Did you in March, 2014 loan Dr. Florete an additional $300,000?

A I believe so.

Q If you could turn -- why did you loan Dr. Florete an additional $300,000 in March of 2014?

A Because Robert Dobbs approached me.

Q Did he ask you for the $300,000?

A Either him or Travis, or both.

Q Did they tell you why IPM or Aries needed the additional $300,000?

A Further consolidation of debt.

Q At that time in March, 2014 was Aries and IPM current in terms of their payments on the original October, 2013 loan?

A I'm not sure, sir, but I believe so.

Q You believe that they were?

A I believe so. Yes, sir.

Q If you'd turn your attention to Exhibit 6. This is a Wells Fargo Bank account statement for Silent Storm Holdings, LLC; correct?

## Page 68

A It appears to be that way, yes.

Q And you had access to Silent Storm Holding's bank accounts; right?

A I did.

Q You had signature authority on the account?

A Yes, I did.

Q Did anyone else?

A I don't believe so.

Q And this is an account statement for October, 2013; right?

A Yes.

Q If you would, turn to the second to the last page. Do you see the third entry from the top dated 10/18 for 1.7 million dollars?

A I do

Q And that's a wire transfer to Aires Medical Corporation?

A Yes.

Q So you, in fact, wired the 1.7 million dollars for the loan to Aries Medical Corporation; right?

A Yes.

Q If you could turn to Exhibit 7. This is a also a bank account statement from Wells Fargo. And do you see where it says Phillip

## Page 69

T. McHugh, Jr. On the front page?

A I do.

Q For March of 2014?

A Yes.

Q It's a PMA account? Is that a yes?

A What was your -- I'm sorry. What is your question?

Q The account statement is for a PMA account?

A Okay, yes.

Q And this is one of your accounts; correct?

A I believe so.

Q If you could turn to the 4th page from the back, and it has a Bates labeled number of 61 at the bottom, and you'll see a transaction history list; correct?

A Yes.

Q And the very last transaction on that page is dated 3/24 and it's an online transfer regarding the loan to IPM. Do you see that?

A I do.

Q And it's for $300,000?

A Yes.

Q So you, in fact, did give IPM $300,000 in March of 2014; right?

BY MR. VILLMER:

828-254-9230  ASHEVILLE REPORTING SERVICE  800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK Document 129-4 Filed 12/08/20 Page 151 of 283

1  Objection to the form of the question, but you
2  can answer.
3  BY THE DEPONENT:
4  I lent them.
5  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
6  Q   Sorry.  You, in fact, transferred the $300,000
7  that you lent to IPM to them in March of 2014;
8  right?
9  A   That's correct.
10 (DEFENDANT'S EXHIBIT NO. 8 MARKED)
11 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
12 Q   If you would turn your attention to Exhibit 8,
13     Mr. McHugh.
14 A   Yes.
15 Q   This is an email chain which you were
16     forwarded in July, 2013.  Do you see that?
17 BY MR. JOHNSON:
18     Why don't you let him read the document.  It's
19     a two page document.
20 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
21 Q   Do you need time to read the document, Mr.
22     McHugh?
23 A   If you want me to comment on it, yes.
24 Q   Sure.  Please go right ahead.
25 A   Thanks.  Okay.

1  Q   So what is in Exhibit 8 is an email regarding
2      Dr. Florete's practice that you were forwarded
3      in July of 2013; correct?
4  A   I believe so.
5  Q   And the underlying email is from Chris Kemp to
6      several individuals at PCS?
7  A   Yes.
8  Q   And he's giving generally a status update with
9      regard to Dr. Florete; right?
10 A   Yes.
11 Q   And then Todd Seder?  Is that -- did I say
12     that right?
13 A   Seder.
14 Q   Todd Seder, forwarded that email to you and
15     said, "Here's the update from Chris.  He's
16     doing a great job of staying on top of Dr.
17     Florete, and building the foundation of a
18     strong long lasting relationship.  Will you be
19     available August 15th and 16th to reschedule
20     the trip?"  Did I read that correctly?
21 A   Yes.
22 Q   Was that trip referencing the trip you were
23     talking about when Dr. Florete came to visit
24     PCLS?
25 BY MR. VILLMER:

1      Objection, calls for speculation, but you can
2      answer.
3  BY THE DEPONENT:
4      Can you state your question again?
5  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
6  Q   Sure.  Earlier you mentioned that you had
7      discussions with Dr. Florete at PCLS regarding
8      the loan; correct?
9  A   Correct.
10 Q   And that was prior to the October, 2013 loan
11     being made; right?
12 A   Correct.
13 Q   This email references a trip of Dr. Florete to
14     PCLS on the dates of August 15th and August
15     16th; right?
16 A   Yes.
17 Q   Was the August 15th and August 16th trip that
18     was referenced in this mail the trip that
19     Florete took to PCLS where you talked about
20     the loan with them?
21 A   I'm not sure.
22 Q   You're not sure.  Would this have been about
23     -- would August have been about that general
24     timeframe?
25 A   Perhaps.

1  Q   Do you think it was earlier than August?
2  A   I don't know.
3  (GOVERNMENT'S EXHIBIT NO. 9 MARKED)
4  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
5  Q   If you could look at Exhibit 9, and this is an
6      email titled Dr. Florete's Flights.  Do you
7      see that?
8  A   Okay.
9  Q   And this email attaches a flight itinerary for
10     Orlando G. Florete and Christopher Scott Kemp;
11     right?
12 A   It appears to be.
13 Q   Did PCLS fligh Chris Kemp and Dr. Florete up
14     to Charlotte to visit PCLS's lab?
15 A   I'm unsure.
16 Q   They got there somehow, right, at some point?
17 A   Yes.
18 Q   And in the second email from the bottom on the
19     first page Ms. Kass notes, "Hi, Guys, please
20     see below for Dr. Florete's August 15th and
21     16th trip here"; right?
22 A   Yes.
23 Q   And then later on July, 2019 Mr. Seder, in
24     response to a question about their car
25     arrangements it says, "Please check with Phil.

19 (Pages 70 to 73)

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 152 of 283

1  BY MR. VILLMER:
2      Objection, calls for speculation, but you can
3      answer.
4  BY THE DEPONENT:
5      Say your question again.  I'm sorry.
6  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
7  Q    Do you know why Mr. Kumar sent you this email
8      asking you about a $50,000 investment to humor
9      Dr. Florete?
10 BY MR. VILLMER:
11     Objection, calls for speculation.  You can
12     answer.
13 BY THE DEPONENT:
14     I do not.
15 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
16 Q    Do you remember discussing this with Mr.
17     Kumar?
18 A    No.
19 Q    And this email's in June of 2014; right?
20 A    Yes.
21 Q    So in June of 2014 employees at PCLS, Mr.
22     Kumar, yourself and Paul Smith, were on an
23     email chain about investing $50,000 to humor
24     Dr. Orlando Florete; correct?
25 A    How I'm understanding this email is asking for

1      sponsorship for a certain organization.  I
2      have no idea about that organization or why it
3      would humor Dr. Florete.
4  Q    You would agree with me that Mr. Kumar uses
5      Orlando at the beginning of the email; right?
6  A    Yes.
7  Q    And that's referring to Dr. Orlando Florete?
8  A    I believe so.
9  Q    And then he asks, "I don't see the upside of
10     this investment we are just doing this to
11     humor him."  "Him," referring to Dr. Florete;
12     correct?
13 A    Yes.
14 Q    And he asks for your opinion on the matter?
15 A    Yes.
16 Q    When you made the October, 2013 loan to Dr.
17     Florete did you consider whether that would
18     improve his relationship with PCLS?
19 A    Define the question more.
20 Q    Sure.  You mention that at some point in time
21     Orlando Florete referred samples to PCLS;
22     right?
23 A    Correct.
24 Q    And Dr. Florete in general in his practice was
25     a pain management practice; right?

1  A    Correct.
2  Q    And that's a type of doctor that would refer
3      samples to PCLS; right?
4  A    Yes.
5  Q    And so, when you made the loan to Dr. Florete
6      as someone who could potentially refer samples
7      to PCLS, did you consider whether making that
8      loan to him would improve PCLS's business
9      relationship with Dr. Florete?
10 BY MR. VILLMER:
11     Objection to the form of the question, but you
12     can answer.
13 BY THE DEPONENT:
14     No.
15 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
16 Q    Didn't consider it at all?
17 BY MR. VILLMER:
18     Objection, asked and answered, but you can
19     answer.
20 BY THE DEPONENT:
21     Correct.
22 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
23 Q    Did you consider at all whether making a 1.7
24     million dollar loan to Dr. Florette in October
25     of 2013 would impact his relationship with

1      PCLS at all?
2  A    Yes.
3  Q    In what way did you consider that?
4  A    I asked my attorney if this was legal.
5  Q    And what attorney was that?
6  A    Anna Winger.
7  Q    You mentioned you asked her if it was legal.
8      What do you mean by legal?
9  A    Compliant.
10 Q    Did you ask her whether or not making this
11     loan would violate the Anti-Kickback Statute?
12 A    Yes.
13 Q    When did you do that?
14 A    Before the loan.
15 Q    It's your testimony that you asked Ms. Winger
16     that prior to the October, 2013 loan?
17 BY MR. VILLMER:
18     Objection, asked and answered, but you can
19     answer.
20 BY THE DEPONENT:
21     Correct.  I remember saying any and all
22     aspects of the loan as long as it was
23     compliant.
24 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
25 Q    My question was did you specifically ask Ms.

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 153 of 283

1    Winger whether or not the loan complied with
2    the Anti-Kickback Statute.
3    BY MR. VILLMER:
4        Objection, asked and answered, but you can
5        answer.
6    BY THE DEPONENT:
7        I believe so.
8    DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
9    Q    Do you know for sure?
10   BY MR. VILLMER:
11       Objection, asked and answered, but you can
12       answer.
13   BY THE DEPONENT:
14       I believe so.
15   DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
16   Q    You said, "I believe so." Is that a
17       definitive yes.
18   BY MR. VILLMER:
19       Objection to the form of the question, but you
20       can answer.
21   BY THE DEPONENT:
22       I believe so.
23   DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
24   Q    When you say, "I believe so," does that mean
25       definitively your testimony is that, yes, you

1    did ask Ms. Winger prior to October, 2013
2    specifically whether or not the loan to Dr.
3    Florete would violate the Anti-Kickback
4    Statute?
5    BY MR. VILLMER:
6        Objection to the form of the question.
7        Objection asked and answered, but you can
8        answer.
9    BY THE DEPONENT:
10       Correct.
11   DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
12   Q    Are you aware that Ms. Winger testified that
13       you did not?
14   A    I am not.
15   Q    Did you ask Ms. Winger orally? Did you put
16       anything in writing?
17   BY MR. VILLMER:
18       Objection to the form of the question, but you
19       can answer.
20   BY THE DEPONENT:
21       I believe it was orally.
22   DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
23   Q    What did you tell Ms. Winger about the loan
24       when you asked her whether or not it was
25       legal?

1    A    Ask your question again.
2    Q    Sure. I'm just -- I'm trying to understand
3        the specifics of how you asked Ms. Winger
4        about the legality of the loan and/or whether
5        or not it complied with the Anti-Kickback
6        Statute. Did you just generally ask her is it
7        legal? Did you provide her with any specific
8        facts regarding the loan?
9    BY MR. VILLMER:
10       Objection to the form of the question. You
11       can answer.
12   BY THE DEPONENT:
13       Yes, I did supplier her with all the
14       information about who Dr. Florete was and that
15       he was a referring doctor to the laboratory,
16       and that if it was compliant and would -- is
17       legal in order to provide a loan to him.
18   DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
19   Q    Did Ms. Winger give you an answer?
20   A    She did.
21   Q    What was that answer?
22   A    That is legal and compliant.
23   Q    Did she give you an answer specific to the
24       Anti-Kickback Statute, or did she just say
25       generally it was legal and compliant?

1    BY MR. VILLMER:
2        Objection to the form of the question, but you
3        can answer.
4    BY THE DEPONENT:
5        She provided all the information stating that
6        it was a legal and compliant loan.
7    DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
8    Q    Did Ms. Winger tell you specifically the loan
9        did not violate the Anti-Kickback Statute?
10   A    It was either her or another attorney.
11   Q    Do you know who that other attorney was?
12   A    It was an attorney that was on Dr. Florete's
13       side. Later on it was also Trish, and I
14       forget her last name. Markus sounds familiar.
15       And then last but not least there was a fourth
16       attorney, Jane Pine Wood who the laboratory
17       worked with for a number of years who was
18       known in the nation as a healthcare compliant
19       attorney, and she said specifically that the
20       loan was compliant and it was okay to do. I'm
21       sorry. I can't hear.
22   Q    Sure. Let's take those in turn. You
23       mentioned there was a lawyer on Dr. Florete's
24       side.
25   A    Yes.

22 (Pages 82 to 85)

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 154 of 283

1     --- legalities.  So -- so in other words, I
2     reviewed it again.  And I'm not sure if I
3     reviewed it again before -- in March, whatever
4     date.
5   DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
6   Q   They're separate loans; right?
7   A   They are.  A modification.
8   Q   And I think we've talked about the October,
9     2013 loan and what advice you sought there;
10    right?
11  A   Correct.
12  Q   I'm just trying to figure out if with regard
13    to the March, 2013 loan you resought advice or
14    the advice you were relying on would have been
15    the same advice that you received back in
16    October.
17  BY MR. VILLMER:
18     Objection to the form of the question, but you
19     can answer.
20  BY THE DEPONENT:
21     And that I'm unsure of if -- if I gained any
22     more insight to March compared to the other
23     date for the loan.
24  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
25  Q   And that applies to all the attorneys that

1     you've listed previously; right?  Ms. Winger,
2     the lawyer on Florete's side, Ms. Markus and
3     Ms. Wood; right?
4   BY MR. VILLMER:
5     Objection to the form of the question, but you
6     can answer.
7   BY THE DEPONENT:
8     I believe so.
9   BY MR. JOHNSON:
10    Let's take a five minute break.
11  (OFF THE RECORD)
12  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
13  Q   Did you ever obtain any written opinion from
14    any lawyer retained by you regarding the
15    October, 2013 loan's compliance with the Anti-
16    Kickback Statute?
17  A   Yes.
18  Q   Who was that written opinion from?
19  A   Trish Markus.
20  Q   Was that the opinion that she provided in
21    October of 2014?
22  A   I don't know what date it was.
23  Q   We can look at it.
24  A   I'm sorry?
25  Q   I said we can look at it.

1   A   Okay.
2   Q   Other than Ms. Markus did you retain -- other
3    than Ms. Markus did you receive any other
4    written opinions from any lawyer regarding the
5    October, 2013 loan's compliance with the AKS?
6   A   I'm unsure.
7   Q   Same question as to the March, 2014
8    modification.  Have you obtained any written
9    opinion from a lawyer retained by you
10    regarding the March, 2014 loan modification?
11  A   Unsure.
12  Q   You mentioned with regard to when you first
13    loaned Florete the money that you were big in
14    the lending institutions and individuals
15    money.  Do you remember that?
16  A   I do.
17  Q   In 2013 how many loans did you make to
18    individuals or institutions?
19  A   Approximately two dozen.
20  Q   For those 24 loans were any of them PCLS
21    customers?
22  A   There was one other.
23  Q   Who was that?
24  A   I believe his name was Jayachandran.
25  Q   Dr. Sanker Jayachandran?

1   A   Yeah.
2   Q   Jayachandran.  I've always said it as
3    Jayachandran.  I learned it yesterday that it
4    was pronounced Jayachandran (different
5    pronunciation).  Is that who you're referring
6    to?
7   A   Yes.
8   Q   Any other PCLS customers that you've made
9    loans to?
10  A   I don't believe so.
11  Q   Any other physicians or physician's practices
12    that you've made loans to?
13  A   I don't believe so.
14  Q   Does that apply in any year or just 2013?
15  BY MR. VILLMER:
16    Objection to the form of the question, but you
17    can answer.
18  BY THE DEPONENT:
19    Say your question again.
20  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
21  Q   Sure.  I believe I originally asked you
22    specifically with respect to the year 2013 and
23    the loans that you have made and you testified
24    that the only physicians or physician
25    practices to which you had made loans or Dr.

24  (Pages 90 to 93)

828-254-9230      ASHEVILLE REPORTING SERVICE      800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 155 of 283

1  Florete's practice and Dr. Jayachandran;
2  right?
3  A  Correct.
4  Q  Have you, outside of that year, made any loans
5  to PCLS customers?
6  A  I don't believe so.
7  Q  Outside of that year have you made any loans
8  to physicians or physician practices?
9  A  I don't believe so.
10  Q  Dr. Florete eventually defaulted on his loan;
11  correct?
12  A  He did.
13  Q  I'm going to show you what's being marked as
14  Exhibits 11 and 12.
15  (GOVERNMENT'S EXHIBIT NOS. 11 AND 12 MARKED)
16  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
17  Q  You sued him over that default; right?
18  A  I did.
19  Q  When did you sue him?
20  A  I'm not exactly sure.
21  Q  If you could turn your attention to Exhibit
22  11.  This is a file stamp Final Summary
23  Deficiency Judgment Against Aries Medical
24  Corporation and Institute of Pain Management.
25  Do you see that?

1  A  I do.
2  Q  It's in the case that's captioned Silent Storm
3  Holdings, LLC verses Aries Medical, Institute
4  of Pain Management and Orlando Florete, and a
5  couple other Defendants?  Do you see that?
6  A  I do.
7  Q  And this is the case that you were referring
8  to where you sued Orlando Florete and IPM for
9  their default on the loan?
10  A  Yes.
11  Q  If you'd turn your attention to page two.
12  Paragraph B of the court's order notes that
13  there was a final judgment -- summary judgment
14  of foreclosure for Plaintiff, being Silent
15  Storm, that was entered in the action on
16  January 13th, 2009 (sic) awarding Silent Storm
17  a total sum of $2,885,206.91?
18  BY MR. VILLMER:
19  To clean up the record, it's 2019, not 2009.
20  BY MR. JOHNSON:
21  I apologize.  Yeah, 2019.
22  BY THE DEPONENT:
23  Yes.
24  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
25  Q  So at this point in the litigation IPM, Aries

1  and Florete owed you $2,885,206 -- sorry.  At
2  this point in the litigation Aries, IPM and
3  Florete owed you $2,885,206.91?
4  BY MR. VILLMER:
5  Objection to the form of the question, but you
6  can answer.
7  BY THE DEPONENT:
8  Yes.
9  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
10  Q  And there was a foreclosure sale of the
11  property that was mortgaged to you as
12  collateral scheduled; right?
13  A  Yes.
14  Q  And you, in fact, foreclosed on and sold that
15  collateral; right?
16  BY MR. VILLMER:
17  Objection to the form of the question, but you
18  can answer.
19  BY THE DEPONENT:
20  I believe so.
21  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
22  Q  If you'd look at paragraph D it mentions that,
23  "The property was sold by Plaintiff, Silent
24  Storm, to an unrelated third party and closing
25  was held on March 20, 2019.  The contract

1  sales price was $431,000."
2  A  Yes.
3  Q  Was that the amount that you sold the property
4  Florete offered as collateral for the loan?
5  BY MR. VILLMER:
6  Objection to the form of the question, but you
7  can answer.
8  BY THE DEPONENT:
9  Yes.
10  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
11  Q  And Exhibit 12, Mr. McHugh, is an affidavit
12  that you signed in support of that foreclosure
13  amount; correct?
14  BY MR. VILLMER:
15  Again, I just ask that you let him review it
16  first.
17  BY MR. JOHNSON:
18  Sure.
19  BY MR. VILLMER:
20  Thank you.
21  BY THE DEPONENT:
22  What was your question, Seth?
23  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
24  Q  Exhibit 12 is an affidavit that you signed;
25  right?

25 (Pages 94 to 97)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
                        ars@ashevillereporting.com
          Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 156 of 283

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And this affidavit sets forth the |
| 3 | | circumstances of the foreclosure sale and the |
| 4 | | foreclosure amount of $431,000; right? |
| 5 | A | Correct. |
| 6 | Q | And it notes in paragraph five that there was |
| 7 | | an unrelated party bid on the foreclosure sale |
| 8 | | of $250,000 worth of property? |
| 9 | A | Yes. |
| 10 | Q | And it notes in paragraph two that the |
| 11 | | property that was foreclosed on and offered as |
| 12 | | collateral is the 4243 Sunbeam Road, |
| 13 | | Jacksonville, Florida property; right? |
| 14 | A | I believe so.  I'm not seeing the address on |
| 15 | | here. |
| 16 | Q | Sure.  It's the second sentence.  It says, |
| 17 | | "The property at issue is known as 4243 |
| 18 | | Sunbeam Road, Jacksonville, Florida." |
| 19 | A | Which paragraph are you on? |
| 20 | Q | Paragraph two, top of the page. |
| 21 | A | Thank you, yes. |
| 22 | Q | And just to wrap that up.  The Sunbeam Road |
| 23 | | property that was Florete's office was the |
| 24 | | property that you foreclosed on; right? |
| 25 | A | One of them, yes. |

| | | |
|---|---|---|
| 1 | Q | There was two buildings? |
| 2 | A | At least. |
| 3 | Q | And you foreclosed on one? |
| 4 | A | Multiple. |
| 5 | Q | You foreclosed on multiple buildings from |
| 6 | | Florete, Sunbeam properties being one of them; |
| 7 | | right? |
| 8 | A | Correct. |
| 9 | Q | I believe you also foreclosed on a condo he |
| 10 | | had? |
| 11 | A | No. |
| 12 | Q | But some type of personal real estate? |
| 13 | A | No. |
| 14 | Q | What other properties did you foreclose on |
| 15 | | then? |
| 16 | A | I'm in current foreclosure on a commercial |
| 17 | | piece of land that's scheduled to foreclose |
| 18 | | before the end of the year. |
| 19 | Q | How much money does Orlando Florete currently |
| 20 | | owe you with regard to the 2 million dollar |
| 21 | | loan you made him? |
| 22 | A | I'm not sure. |
| 23 | Q | Does he still currently owe you money? |
| 24 | A | He does. |
| 25 | Q | Have you had any discussions with him |

| | | |
|---|---|---|
| 1 | | regarding the forgiveness of that debt? |
| 2 | A | No. |
| 3 | Q | Other than the property that you mentioned is |
| 4 | | about to be foreclosed on, are there any other |
| 5 | | steps that you're currently taking to recoup |
| 6 | | the money that Dr. Florete owes you? |
| 7 | A | Yes. |
| 8 | Q | What steps are those? |
| 9 | A | Technically I'm not sure how to describe it as |
| 10 | | Eric Kolar is in charge of that. |
| 11 | Q | Just in laymen's terms.  Are you foreclosing |
| 12 | | on property?  Are you -- what are you doing? |
| 13 | A | I'm attacking the situation as best possible |
| 14 | | in order to recover the full value that is |
| 15 | | outstanding. |
| 16 | Q | As part of that attack what steps are you |
| 17 | | taking? |
| 18 | A | Hiring Eric Kolar to legally obtain as many |
| 19 | | assets or -- to turn into cash equivalents as |
| 20 | | possible. |
| 21 | Q | Other than the one commercial property what |
| 22 | | other assets of Florete's is that attorney |
| 23 | | going after? |
| 24 | A | I'm unsure. |
| 25 | Q | Do you know if IPM was operating at a loss in |

| | | |
|---|---|---|
| 1 | | 2013? |
| 2 | A | I don't believe so. |
| 3 | Q | Do you know for sure? |
| 4 | A | I don't remember. |
| 5 | Q | Do you know what Dr. Florete's credit score is |
| 6 | | -- or was in 2013?  Sorry. |
| 7 | A | I don't remember. |
| 8 | Q | Did you ever see a credit report on him? |
| 9 | A | I don't remember. |
| 10 | Q | You also mentioned that you made a loan to Dr. |
| 11 | | Sanker Jayachandran; right? |
| 12 | A | Yes. |
| 13 | Q | How do you know Dr. Jayachandran? |
| 14 | A | I don't know him. |
| 15 | Q | Have you ever met him? |
| 16 | A | Never. |
| 17 | Q | What do you know about him? |
| 18 | A | He's a pain care physician. |
| 19 | Q | Do you know if he referred samples to PCLS? |
| 20 | A | I do. |
| 21 | Q | Do you know if he was referring samples to |
| 22 | | PCLS at the time you made the loan? |
| 23 | A | I do. |
| 24 | Q | Was he? |
| 25 | A | I believe so. |

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 157 of 283

1  Q    Do you know what the volume of the samples he
2       was referring was?
3  BY MR. VILLMER:
4       Objection to the form of the question, but you
5       can answer.
6  BY THE DEPONENT:
7       I do not know.
8  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
9  Q    What discussions did you have with Dr.
10      Jayachandran prior to loaning him the money?
11 A    I did not.
12 Q    Have you ever -- you've never talked to him?
13 A    Never.
14 Q    How did it come to pass that you loaned Dr.
15      Jayachandran money?
16 A    Manoj contacted me as far as a physician
17      needing funds in order to purchase equipment,
18      and because I had compliantly been given
19      information that it was okay through Orlando I
20      replicated that process with Jayachandran.
21 Q    So any advice of counsel that you relied on
22      with the Dr. Jayachandran loan would have been
23      the advice of counsel you received with regard
24      to Dr. Florete's loan; correct?
25 A    Correct.

1  (GOVERNMENT'S EXHIBIT NOS. 13 AND 14 MARKED)
2  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
3  Q    Mr. McHugh, I am going to show you what has
4       been marked as Exhibits 13 and 14.  If you
5       will first look at Exhibit 13.
6  A    I'm sorry.  Say again?
7  Q    If you will first look at Exhibit 13.
8  A    Sure.
9  Q    Would you like a chance to review this
10      document?
11 A    Only -- do you have questions about it?
12 Q    I do, but they may be self-explanatory.
13 A    Okay.
14 Q    So the attachment to this email is a
15      promissory note between Dr. Sanker
16      Jayachandran and M Holdings, LLC; right?
17 A    Yes.
18 Q    And M Holdings, LLC is a company of yours;
19      right?
20 A    It is.
21 Q    Who has access to M Holdings' bank accounts?
22 A    Just myself, I believe.
23 Q    And it's for $50,000?
24 A    The promissory note, yes.
25 Q    And it's dated in August of 2014?

1  A    Yes.
2  Q    And then if you will look back to the -- is
3       that the promissory note for the $50,000 loan
4       that you made to Dr. Jayachandran?
5  A    I believe so.
6  Q    If you will turn your attention to the emails
7       on the first page.
8  A    Yes.
9  Q    The first is an email from Mr. Kumar to
10      yourself at your Silent Storms Holding email
11      address.  Do you see that?
12 A    Yes.
13 Q    And he says, "Phil, Attached is the promissory
14      note that Dr. Jayachandran signed"; right?
15 A    Yes.
16 Q    He notes that he'll be depositing a check of
17      $75,000 in the SS account.  I assume that
18      refers to Silent Storm?
19 A    I don't know.
20 Q    You don't know.  He notes that that would be
21      for 50,000 that he had borrowed from his
22      cousin, and 25,000 as his contribution to the
23      promissory note; is that right?
24 A    That's what it -- that's what it appears to
25      say here.

1  Q    Did Mr. Kumar contribute $25,000 towards this
2       loan?
3  A    He did.
4  Q    And you contributed the other $25,000?
5  A    I did.
6  Q    And he notes a total of 50,000 needs to be
7       wired into Dr. Jayachandran's account and
8       gives you the account information; right?
9  A    Yes.
10 Q    And then you forwarded that email to Shayla
11      Mujic.  Did I say that right?
12 A    I believe so.
13 Q    Who is Ms. Mujic?
14 A    She was my assistant.
15 Q    And then you told her, "Shayla, here's the
16      bank info below for the wire.  50K today
17      please"; right?
18 A    Yes.
19 Q    And was that money wired to Dr. Jayachandran?
20 A    I believe so.
21 Q    Was Ms. Mujic your assistant at Silent Storms
22      or your assistant at PCLS?
23 A    Silent Storm.
24 Q    She wasn't affiliated with PCLS in any way;
25      right?

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 158 of 283

1 A Right.
2 Q Did anyone at PCLS know about the loan you
3 made to Dr. Jayachandran in August, 2014 when
4 you made it?
5 A I don't believe so.
6 Q Other than Mr. Kumar?
7 A Correct.
8 Q Did you tell anyone about the loan?
9 A I don't believe so.
10 Q Did you talk to PCLS Compliance about the
11 loan?
12 A I did not.
13 Q If you would turn your attention to -- never
14 mind. Let me ask you this. You mentioned
15 earlier that Mr. Kumar told you that Dr.
16 Jayachandran wanted the loan to purchase
17 equipment; right?
18 A I believe so.
19 Q Do you know what equipment that was?
20 A I'm not exactly sure.
21 Q Why did you make the loan to Dr. Jayachandran?
22 A Because it was compliant.
23 Q Notwithstanding it's compliance or non-
24 compliance, what specific reason did you make
25 the loan to Dr. Jayachandran?

1 A Because one of my businesses was in the entity
2 of making loans to businesses as well as
3 individuals on a select basis.
4 Q Did you know when you made the loan whether or
5 not Dr. Jayachandran was a customer of PCLS?
6 A I did.
7 Q So you know that he was a customer?
8 A I did.
9 Q Did you consider at the time you made the loan
10 whether or not making a loan to a customer of
11 PCLS would impact the volume of samples that
12 he referred?
13 A No.
14 Q You didn't consider it one way or the other?
15 BY MR. VILLMER:
16 Objection, asked ---
17 BY THE DEPONENT:
18 No.
19 BY MR. VILLMER:
20 --- asked and answered, but you can answer.
21 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
22 Q If you could turn to Exhibit 14. Actually
23 before you look at Exhibit 14, Mr. McHugh,
24 prior to making the loan with Dr. Jayachandran
25 in August of 2014 what due diligence did you

1 do to determine that he would be able to pay
2 back the loan?
3 BY MR. VILLMER:
4 If you're going to ask him a question about a
5 document, I'd like for him to be able to
6 review the document.
7 BY MR. JOHNSON:
8 I said prior to turning to that document. I'm
9 not asking him a question about a document.
10 BY MR. VILLMER:
11 Okay.
12 BY THE DEPONENT:
13 I don't recall.
14 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
15 Q You don't recall what due diligence you did?
16 A Correct.
17 Q Do you know if you did any?
18 A I don't recall. Do you want me to review this
19 now, Seth?
20 Q Yeah, go ahead and look at document 14.
21 A Okay.
22 Q So Exhibit 14 is an email between yourself and
23 Mr. Kumar forwarding some other emails;
24 correct?
25 A Yes.

1 Q And attached to these emails is the promissory
2 note with Dr. Jayachandran; right?
3 A Yes.
4 Q And you forwarded this to Mr. Kumar and note,
5 "They are investigating me on this now. How
6 the heck did they get this doc?" Do you see
7 that?
8 A I do.
9 Q Did -- how did PCLS eventually learn about
10 this loan?
11 A I told them.
12 Q Why did you tell them?
13 A They asked if -- Alan Campbell asked if I had
14 any other loans with physicians.
15 Q Did PCLS eventually learn about the Florete
16 loan as well?
17 A They did.
18 Q Did they learn about that one before the
19 Jayachandran loan?
20 A They did.
21 Q How did they learn about the Florete loan?
22 A I don't know.
23 Q Do you remember when that was?
24 A I do not.
25 Q What they did -- and I don't want you to go

828-254-9230      ASHEVILLE REPORTING SERVICE      800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 159 of 283

1  into any attorney/client privilege specifics,
2  but PCLS did investigate the loans to Dr.
3  Jayachandran and Dr. Florete; right?
4  A  They did.
5  Q  And that's the investigation you're referring
6  to in this email to Mr. Kumar?
7  A  I don't know.
8  Q  Would you be referring to any other
9  investigation regarding the loan?
10 A  I'm not sure on the time factor with your
11 question.
12 Q  Let's go -- let's look at the initial email in
13 the -- in the chain.
14 A  Okay.
15 Q  It's an email from Matt Hughes (sic) attaching
16 the promissory note in October of 2014; right?
17 A  Correct.
18 Q  And then Matt emails yourself, Ms. Winger --
19 yourself and Ms. Winger and says, "Hi, guys.
20 This is what Womble Carlyle and the internal
21 PCLS review called me about.  Let me know your
22 thoughts"?
23 A  Correct.  So it came from Womble Carlyle to
24 Matt Hodges, from Matt Hodges to myself.
25 Q  Right.  And this was with regard to the

1  Jayachandran loan; correct?
2  A  Correct.
3  Q  What was PCLS' ultimate response regarding the
4  Jayachandran and Florete loans?
5  A  We conducted a independent investigation with
6  an outside expert.  Jane Pine Wood gave a --
7  gave her summary that while the loans were
8  compliant ---
9  Q  I don't -- we don't want to know about ---
10 BY MR. VILLMER:
11 Well, yeah.  You're asking him a question and
12 he's going to answer the question.  So please
13 allow him to finish answering the question.
14 BY MR. JOHNSON:
15 I don't want him to disclose privileged
16 information.  Let me ---
17 BY MR. VILLMER:
18 Well then, don't ask him the question and he
19 won't.
20 BY THE DEPONENT:
21 I don't understand you.  You asked what was
22 the result?
23 BY MR. JOHNSON:
24 Hold on.
25 BY MS. ARMSTRONG:

1  We're not asking what legal opinion you may
2  have obtained as a result of PCLS'
3  investigation ---
4  BY MR. VILLMER:
5  I don't mean to interrupt you.  Can Seth tell
6  me what he's asking, and then we can talk
7  about this then.
8  BY MR. JOHNSON:
9  I'm not asking regarding any legal opinion
10 that was given.  I'm just asking regarding
11 actions that PCLS took.
12 BY MR. VILLMER:
13 What was the question though, so we can all be
14 clear.
15 BY MR. JOHNSON:
16 Sure.
17 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
18 Q  As a result of the investigations into the
19 Florete and Jayachandran loan, what actions,
20 if any, did PCLS ultimately take?
21 BY THE DEPONENT:
22 Can I answer that?
23 BY MR. VILLMER:
24 Sure, yes.
25 BY THE DEPONENT:

1  We immediately stopped doing -- taking
2  referrals from these two doctors.  We, as a
3  board, Joe Wiegal, Bob Smith, the chairman of
4  the board from American Express, so forth,
5  other members of the board, we all voted to
6  refund Government payers from any samples that
7  we had taken.  I was asked to see if I could
8  reclaim the monies for the loans that had been
9  done.  I was able to do that with
10 Jayachandran.  I was not able to do that with
11 Florete.  And those were the specific actions
12 that were taken from these loans.
13 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
14 Q  Why weren't you able to reclaim the funds from
15 Dr. Florete?
16 A  Because the loan amount was too large for him
17 to absorb all at once.  A 2 million dollar
18 loan versus $25,000 is world of difference.
19 Q  Did Dr. Jayachandran also pay back the $25,000
20 that Manoj Kumar loaned?
21 A  I don't know.
22 Q  You just know you got your $25,000?
23 A  I was asked to get my $25,000 back and I did.
24 Q  You mentioned ---
25 A  And I provided that proof to PCLS.  Alan

29 (Pages 110 to 113)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 160 of 283

```
 1        Campbell specifically.
 2  Q     You mentioned that the board voted to refund
 3        Government payors of the samples related to
 4        Florete and Jayachandran?
 5  A     Correct.
 6  Q     Did you have any personal involvement in
 7        making a refund payment to Medicare?
 8  A     Never.
 9  Q     You didn't have any personal involvement?
10  BY MR. VILLMER:
11        Objection, asked and answered.  You can
12        answer.
13  BY THE DEPONENT:
14        I had no involvement in billing receivables or
15        refunding any of the payors involved
16        throughout the history of PCLS.
17  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
18  Q     Do you have any personal knowledge of whether
19        or not a repayment was made?
20  A     Yes.
21  Q     What's the extent of your personal knowledge?
22  A     Seeing Alan Campbell a week later in the
23        hallways and asking him if it was done and he
24        said yes.
25  Q     Other than your conversation in the hallway
```

```
 1        with Mr. Campbell regarding the repayment, any
 2        other facts you know about it?
 3  BY MR. VILLMER:
 4        Objection to the form of the question.  You
 5        can answer.
 6  BY THE DEPONENT:
 7        I don't know why I would need any more facts
 8        when the person that's in charge tells me that
 9        something was done.
10  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
11  Q     So to close the loop in this.  The extent of
12        your personal knowledge about whether or not a
13        repayment was made was your conversation in
14        the hallway with Mr. Campbell?
15  A     Not just to the extent.  Joe Wiegal also
16        confirmed it.
17  Q     Did you speak with Joe Wiegal?
18  A     At some point, yes.
19  Q     And what did he tell you regarding the
20        repayment?
21  A     That it was done.
22  Q     Did you speak to anyone else regarding the
23        repayment?
24  A     I believe Bob Smith.
25  Q     Anyone else?
```

```
 1  A     Perhaps Marcus -- I forget his last name.
 2  Q     Sowinski?
 3  A     No, sir.  There was another Marcus in the
 4        group and he was a controller that worked
 5        under Paul Schmidt.
 6  Q     Do you know how much was reportedly repaid?
 7  A     Over 1 million dollars.
 8  Q     Do you know how that money was purportedly
 9        repaid?
10  A     It would have just been remunerated through
11        the computer system.
12  Q     What do you mean by remunerated through the
13        computer system?
14  A     I'm not sure as far as how to -- I've never
15        done a physical billing myself, but I just
16        know a bit about the process as far as it all
17        being computerized, so no.
18  Q     Are you talking about a wire transfer?
19  A     I don't know.  I don't know if it would be a
20        wire transfer or just -- I don't know.  Money
21        is constantly coming back and forth, and
22        perhaps we just said no to certain monies.  I
23        don't know.
24  Q     Do you know when that purported repayment was
25        made?
```

```
 1  A     No.
 2  Q     Do you know who made the purported repayment?
 3  A     The people that were in charge.  Paul Schmidt,
 4        Alan Campbell, Marcus.  I can't -- again, I
 5        can't recall his last name.  Can I look at my
 6        phone?
 7  Q     Have you -- let me ask you this.
 8  BY MR. VILLMER:
 9        Just answer his questions.
10  BY THE DEPONENT:
11        Okay, sorry.
12  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
13  Q     We can maybe get Marcus' last name on break.
14  A     Sure.
15  Q     Thanks for that.  Have you seen any
16        documentation regarding the purported
17        repayment?
18  A     No.
19  Q     Again, without telling me anything that could
20        be attorney/client privilege with PCLS, do you
21        know whether or not PCLS followed HHS OIG
22        self-reporting protocol with regard to either
23        the Jayachandran or Florete loan?
24  BY MR. VILLMER:
25        Objection.  Calls for a legal conclusion.  You
```

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
                       ars@ashevillereporting.com
            Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 161 of 283

1  email Dinah Myers?
2  A    It is.
3  Q    So you hadn't obtained any business from Mr.
4       Kumar or Dr. Tiwari's practice in 2009;
5       correct?
6  BY MR. VILLMER:
7       Objection to the form of the question, but you
8       answer.
9  BY THE DEPONENT:
10      I don't believe so.
11 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
12 Q    At some point Mr. Kumar became an independent
13      contractor for PCLS; right?
14 A    Yes.
15 Q    How did that come about?
16 A    Dr. Tiwari's clinics were closed.  He had
17      completed everything that he was working on
18      out in Indiana and was looking for additional
19      work.
20 Q    Do you know why Dr. Tiwari's clinic closed?
21 A    He was doing unscrupulous things.
22 Q    Was he indicated on healthcare fraud?
23 A    I don't know.
24 Q    You mentioned Mr. Kumar was looking for work.
25      Did he reach out to PCLS, did PCLS reach out

1  to him?
2  A    I don't remember.
3  Q    Who at PCLS was involved in hiring Mr. Kumar
4       as an independent contractor?
5  A    John Grove, Marcus Sowinski, myself, Sandy
6       Weaver, probably and Doug Smith, too, and
7       probably also Joe Wiegal.
8  Q    What was Mr. Wiegal's role in hiring Mr.
9       Kumar?
10 A    I don't really know specifically.
11 Q    What was Dr. Smith's role in hiring Mr. Kumar?
12 A    Sounding board.
13 Q    What about Ms. Weaver?
14 A    Clerical.
15      Is that processing paperwork, that kind of
16      thing?
17 A    Correct.
18 Q    What about Mr. Sowinski's role?
19 A    Compliance, legal, sounding board.
20 Q    What about Mr. Grove's role?
21 A    Working with all the independent contractors,
22      training.
23 Q    So is it that Mr. Grove would have been the
24      one who trained Mr. Kumar when he came onboard
25      PCLS?

1  A    One of them.
2  Q    Did he have any other role in Mr. Kumar's
3       hiring?
4  A    I would say general input.
5  Q    What was your role in Mr. Kumar's hiring?
6  A    The same of everyone else's.
7  Q    But you described various different roles for
8       each of those individuals.  So what
9       specifically was your role?
10 A    Understanding of the person coming --
11      understanding the person coming onboard where
12      and how they fit into the organization.
13      Confirming with all the other individuals if
14      they would concur, and being able to make sure
15      that everything would get executed.
16 Q    Who communicated with Mr. Kumar regarding his
17      hiring as an independent contractor?
18 A    The entire team.
19 Q    How did they do that?  Email, phone?
20 A    Correct.
21 Q    Both?
22 A    Yes.
23 Q    What specifically did Marcus Sowinski do in
24      terms of compliance and legal with regard to
25      hiring Manoj Kumar?

1  A    I don't quite recall.
2  (GOVERNMENT'S EXHIBIT NO. 16 MARKED)
3  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
4  Q    Mr. McHugh, I'm going to show you what's been
5       marked as Government's Exhibit 16.
6  A    Okay.
7  Q    Exhibit 16 is an email chain between yourself
8       and Mr. Kumar in December of 2019 that was
9       ultimately forwarded to Mr. Sowinski; correct?
10 A    That's correct.
11 Q    And there's no one else on this email chain
12      between yourself and Mr. Kumar until it was
13      forwarded to Mr. Sowinski; right?
14 A    Not that I know of.
15 Q    None depicted in the document; right?
16 A    It appears that way, yes.
17 Q    And when you forwarded it to Mr. Sowinski Mr.
18      Kumar was not copied; right?
19 A    It appears that way.
20 Q    The initial email in December 11, 2010 is you
21      writing to Mr. Kumar; right?
22 A    Yes.
23 Q    And you discuss several different potential
24      roles with Mr. Kumar at PCLS; right?
25 A    Yes.

828-254-9230    ASHEVILLE REPORTING SERVICE    800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 162 of 283

1  A    No, that's okay.
2  Q    I'll ask a -- before hiring -- it's fine.
3       Before PCLS hired Mr. Kumar as an independent
4       contractor you were aware that he had been
5       paid for some services that he did with Dr.
6       Shah?
7  A    Yes.
8  Q    Same thing with Dr. Masimore?
9  BY MR. VILLMER:
10      Objection, asked and answered, but you can
11      answer.
12 BY THE DEPONENT:
13      Yes, to him, too.
14 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
15 Q    What did Mr. Kumar do in his role as an
16      independent contractor for PCLS?
17 A    He helped in a number of different categories.
18 Q    Could you expound a little bit on those?
19 A    He helped with data entry, offshoring that.
20      He helped manage or/and organize our billing
21      of the laboratory.  He ran his own independent
22      sales team, and he would also meet with
23      physicians himself.
24 Q    That independent sales team, they would have
25      been employed by MK Land Holdings; correct?

1  A    That's correct.
2  Q    Any other job duties that Mr. Kumar had as an
3       independent contractor?
4  A    That was pretty much it.
5  BY MR. JOHNSON:
6       Let's take a -- let's take a five minute
7       break.
8  (OFF THE RECORD)
9  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
10 Q    When we broke, Mr. McHugh, we were talking
11      about Mr. Kumar's role at PCLS as an
12      independent contractor.  Did Mr. Kumar
13      ultimately become an employee of PCLS?
14 A    Yes.
15 Q    When was that?
16 A    I don't recall.
17 Q    Whose idea was it to convert Kumar from an
18      independent contractor to am employee?
19 A    I don't remember.
20 (GOVERNMENT'S EXHIBIT NO. 18 MARKED)
21 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
22 Q    I'm going to show you what's been marked as
23      Government's Exhibit 18.  This is an email
24      from yourself to Mr. Kumar in September of
25      2012; correct?

1  A    Yes.
2  Q    The subject is "future"?
3  A    Yes.
4  Q    And you write, "Hey, buddy.  I wanted to put
5       this in writing and then discuss," and then
6       you list some job characteristics such as
7       position, title, description, salary,
8       commission, current revenue, that kind of
9       thing?
10 A    Yes.
11 Q    Was this in regard to Mr. Kumar's transition
12      to a W-2 employee at PCLS?
13 A    It appears that way.
14 Q    And the position title there is "to be
15      determined."  Do you know what Mr. Kumar's
16      ultimate position title as an employee at PCLS
17      was?
18 A    I do not.
19 Q    The description is, "To manage all aspects of
20      1099 relations while adding and implementing
21      additional channel partnerships."  Is that
22      what Mr. Kumar ended up doing as an employee
23      at PCLS?
24 A    I believe so.
25 Q    Did he do any -- have any other job duties as

1       an employee?
2  A    I'm not sure.
3  Q    Salary, you mentioned, "$80,000, plus
4       healthcare, 401K, and other fun perks."  Do
5       you know if that was the salary that Mr. Kumar
6       was ultimately paid?
7  A    I do not.
8  Q    Commission you note, ".001 percent of all
9       income from channel partners."  Would that be
10      the channel partners that Mr. Kumar was
11      managing the 1099 relations for?
12 A    No.
13 Q    What channel partners would those be?
14 A    All channel partners.
15 Q    So every channel partner of PCLS?
16 A    I believe so.
17 Q    And for the record, what is a channel of PCLS?
18 A    Someone that is marketing for PCLS.
19 Q    So a sales representative?
20 A    Essentially.
21 Q    You note, "Current revenue, approximately 2.5
22      million per month which would translate into
23      2,500 per month in commissions."  That would
24      be the commissions from the channel partners
25      described above; right?

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
                         ars@ashevillereporting.com
        Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 163 of 283

1   A    I believe so.
2   Q    And finally you note in the proposal to Mr.
3        Kumar, "In addition, you keep all business and
4        revenues flowing from current book of
5        business, approximately 30K per month."  Is
6        that the commissions that Mr. Kumar was
7        receiving as an independent contractor?
8   A    I believe so.
9   Q    And that would include commissions from Dr.
10       Masimore's practice; correct?
11  A    I don't know.
12  Q    Was Dr. Masimore's practice one of the
13       practices that Manoj Kumar received
14       commissions for as an independent contractor?
15  A    I'm not sure.
16  Q    Same thing as with Dr. Shah.  Do you know if
17       Manoj Kumar received commissions based on
18       samples referred from Dr. Shah's practice as
19       an independent contractor?
20  A    I do not.
21  Q    You don't know whether or not he kept those
22       commissions as an employee?
23  A    I do not.
24  BY MR. VILLMER:
25       Objection to the form of the question, but you

1        can answer.
2   DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
3   Q    But your email references keeping all of his
4        current book of business, i.e commissions;
5        correct?
6   A    Correct.
7   Q    You note, "As previously discussed, PCLS will
8        put phantom shares into the employment
9        contract."  What do you mean by that?
10  A    We had phantom shares of equity for people
11       that exhibited -- I don't know how to classify
12       it.  Outstandingness for the company.  There
13       were, I believe, five individuals that upon a
14       sale or transfer of business entity of PCLS,
15       these five individuals would be -- would take
16       part in the financial reward.
17  Q    So they would receive a payout based on the
18       phantom shares they had?
19  A    Essentially.
20  (GOVERNMENT'S EXHIBIT NO. 19 MARKED)
21  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
22  Q    Do you recognize the document in Exhibit 19,
23       Mr. McHugh?
24  BY MR. VILLMER:
25       And I would say just take a moment to review

1        the document before answering the question.
2   BY THE DEPONENT:
3        Do you have this in larger print?
4   BY MS. ARMSTRONG:
5        That's all we have.
6   BY MR. JOHNSON:
7        We do not.
8   DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
9   Q    Mr. McHugh, this is a lengthy document.  I'm
10       going to ask you questions on just very
11       specific parts of it.  So I don't think you
12       need to take the time to read the whole thing
13       through.  Just generally ---
14  A    How long should I read?
15  BY MR. VILLMER:
16       Just read over the document before you ask
17       your questions about it, please.
18  BY MR. JOHNSON:
19       I don't ---
20  BY MR. VILLMER:
21       And we're not stalling time or anything.  Just
22       let him look at the document you've handed him
23       before you ask him questions about it.  I
24       think that's a fair thing.
25  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

1   Q    Mr. McHugh, just let me know generally if
2        you've seen this document before.
3   A    I believe that I have.
4   Q    What do you believe it to be?
5   A    The title of it says Employment Agreement.
6   Q    And it's an employment agreement between PCLS
7        and Manoj Kumar; correct?
8   A    Yes.
9   Q    Dated and entered into as of February 4th,
10       2013?
11  A    Yes.
12  Q    And I'm going to ask you to turn all the way
13       to what is Bates labeled 28426.  Do you see
14       that page?
15  A    Yes.
16  Q    And there's signatures on this page; correct?
17  A    Yes.
18  Q    And one of those is Manoj Kumar?
19  A    Yes.
20  Q    As the employee?
21  A    Yes.
22  Q    And the other is your signature; correct?
23  A    Yes.
24  Q    On behalf of PCLS?
25  A    Yes.

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 164 of 283

1      right?

2  A  Yes.

3  Q  SLP one of those companies?

4  A  Yes.

5  Q  Did you -- did PCLS have a marketing agreement

6      with SLP?

7  A  Yes.

8  Q  What are some other companies that set up

9      desktop analyzers that PCLS had a marketing

10     agreement with?

11  A  I can't recall the names right now.  There

12     were many.

13  Q  What about ADS?

14  A  Yes.  Although I'm not sure if there was

15     anything formally, but I do recall that there

16     was something more formal with SLP.  Maybe 10

17     more minutes can we take a break?

18  Q  Yeah, that would be a good time.

19  (GOVERNMENT'S EXHIBIT NO. 27 MARKED)

20  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

21  Q  If you could turn your attention to what's

22     been marked as Exhibit 27.

23  A  Okay.

24  Q  Have you seen this email before, Mr. McHugh?

25  A  I don't recall it.

1  Q  It's an email from Mr. Kumar to yourself and

2     Mr. Sowinski; correct?

3  A  Yes.

4  Q  In February of 2011?

5  A  Yes.

6  Q  And Mr. Kumar writes, "This is a followup on

7     my earlier email on a simplified analysis of

8     the current trend in CPT codes."  Skipping

9     ahead.  "The trend is clear.  The great window

10     of making money for the physicians by UDS

11     screening is closing fast unless they keep

12     pace with the changing scenario." I believe

13     that this is a stage where we step in by

14     offering them a package deal of basically

15     setting up their moderate complexity lab

16     wherein they are assured that our lives are

17     intertwined and that we are vested in their

18     progress."  He notes a few points of concerns,

19     and therefore says, "Therefore, if we have a

20     package that assures them that they can get

21     the certification, get the right equipment and

22     compliance monitoring at some cost they would

23     be interested, as that would allow them to

24     continue billing and collecting money.  Keep

25     in mind, they want to get the money and yet

1     not pay much for the service."  Did I read

2     that correctly?

3  A  Yes.

4  Q  What is your understanding of Mr. Kumar's

5     proposal here?

6  A  My understanding is he was suggesting

7     essentially some form of, I believe, a

8     management program, or a -- as he referenced

9     here, a package program, in order to create a

10     tighter network with us and physicians as it

11     -- as it sound like on here.

12  Q  Was the management program suggested by Mr.

13     Kumar ever implemented?

14  A  No.

15  Q  Why not?

16  A  Because I think for like his last sentence,

17     "Want to add more to your overflowing plate."

18     It was -- I don't know exactly why we never

19     did it.  Just like as an organization we

20     discussed many times of selling or providing

21     cups into the field, as you discussed earlier,

22     but that was something that we never entered

23     into also.  We had also heard our competition

24     was buying desktop analyzers and playing them

25     out into the field.  That is something that

1     PCLS discussed at length and decided never to

2     do also.  Why did specifically we not take --

3     take part in this program that Manoj is

4     saying?  I can't say for exact bullet point

5     reasons of why we did not.  I just know that

6     instead of doing this we partnered with

7     companies that we would provide information to

8     the doctors and allow those other companies to

9     do what they do.

10  Q  Let me back up a little bit.  You mentioned

11     that you heard that competitors were buying

12     desktop analyzers and placing them in doctors'

13     practices; correct?

14  A  Yes.

15  Q  Who -- what competitors were those?

16  A  I can't remember the names for them right now.

17     But those would have been other urine drug

18     labs right?

19  Q  Correct.

20  Q  And it's your testimony that PCLS, with regard

21     to analyzers, would partner with the analyzer

22     company to suggest that company to doctors;

23     right?

24  A  Essentially, yes.

25  Q  Did PCLS ever -- or anyone at PCLS ever

44  (Pages 170 to 173)

828-254-9230       ASHEVILLE REPORTING SERVICE      800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 165 of 283

1    negotiate with those analyzer companies on
2    behalf of the doctors?
3  A    What do you mean by negotiate?
4  Q    Let's say negotiate price for the analyzer.
5  A    I'm not sure.
6  Q    What would be the extent of PCLS's involvement
7    once the introduction to the analyzer company
8    was made?
9  BY MR. VILLMER:
10    Objection to the form of the question.  You
11    can answer.
12  BY THE DEPONENT:
13    Say -- say the question again, please?  What
14    was our extent what?
15  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
16  Q    Sure.  You mentioned that as, you know, with
17    regard to analyzers PCLS would, you know, in
18    some circumstances had marketing agreements
19    with an analyzer company, and in other
20    circumstances just had a company they would
21    recommend to physician practices; correct?
22  A    Correct.
23  Q    And so, at some point PCLS would introduce the
24    analyzer company, such as SLP, and the
25    physician practice; right?  Put them in

1    contact?
2  A    Correct.
3  Q    After that point what was PCLS's involvement
4    in the physician setting up or acquiring a
5    desktop analyzer?
6  A    Our involvement was nothing official.  If we
7    talked about it in as a matter of how is the
8    program going, how is the person doing for
9    you, how is select labs doing, just as far as
10    a followup, because if we were recommending a
11    company or placing two people in touch with
12    each other we knew that it was essentially a
13    representation of us and we wouldn't want
14    anything to happen to a doctor feeling like
15    nothing was going on.  So there was nothing
16    official.
17  Q    It sounds like PCLS would essentially monitor
18    the arrangement between the analyzer company
19    and the physicians?
20  A    To some degree.
21  BY MR. JOHNSON:
22    I think you mentioned you wanted a break.  We
23    can go ahead and take that now.
24  BY THE DEPONENT:
25    Sounds good.

1  (OFF THE RECORD)
2  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
3  Q    Do you know a Dr. John Nickels?
4  A    Yes.
5  Q    How do you know him?
6  A    Pain care physician working with the
7    laboratory.
8  Q    Did Dr. Nickels refer samples to PCLS?
9  A    Yes.
10  Q    Do you know what time period Dr. Nickels
11    referred samples to PCLS?
12  A    No.
13  Q    When did you first meet Dr. Nickels?
14  A    I don't know.
15  Q    Did you ever meet with Dr. Nickels in person?
16  A    Yes.
17  Q    Where was that?
18  A    At his office.
19  Q    And that's in Cleveland?
20  A    I don't remember.
21  Q    Why did you meet with Dr. Nickels in person in
22    his office?
23  A    I don't remember exactly.
24  Q    Did you have any involvement with setting up
25    an analyzer lab in Dr. Nickels' practice?

1  BY MR. VILLMER:
2    Objection to the form of the question, but you
3    can answer.
4  BY THE DEPONENT:
5    No.
6  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
7  Q    Did you have any involvement with attempting
8    to set up an analyzer lab in Dr. Nickels'
9    practice?
10  BY MR. VILLMER:
11    Objection to the form of the question.  You
12    can answer.
13  BY THE DEPONENT:
14    No.
15  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
16  Q    Did you have anything to do whatsoever with
17    Dr. Nickels procuring a desktop analyzer?
18  A    I don't remember.
19  Q    Did you have anything to do whatsoever with
20    Dr. Nickels attempting to procure a desktop
21    analyzer?
22  A    I don't remember.
23  Q    Did you ever receive a request from Dr.
24    Nickels to pay expenses related to setting up
25    a desktop analyzer lab?

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 166 of 283

1  A  I believe so.
2  Q  Did you ever pay those expenses?
3  A  No.
4  Q  Did you ever give Manoj Kumar money to pay
5     those expenses?
6  A  Not that I remember.
7  Q  Did you ever direct Manoj Kumar to pay any of
8     Dr. Nickels' expenses?
9  A  No.
10  Q  Do you know if Manoj Kumar ever paid any of
11     Dr. Nickels' expenses?
12  A  No.
13  Q  That's no, you don't know whether he did?
14  BY MR. VILLMER:
15     Objection to the form of the question, but you
16     can answer.
17  BY THE DEPONENT:
18     Correct.  No, I do not have any knowledge.
19  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
20  Q  I'm going to show you what's being marked as
21     Exhibit 28.
22  (GOVERNMENT'S EXHIBIT NO. 28 MARKED)
23  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
24  Q  Have you ever seen this email before?
25  A  I have.

1  Q  And this email subject is J. Nickels?
2  A  Yes.
3  Q  And that's the Dr. Nickels we've been speaking
4     about?
5  A  I believe so.
6  Q  And it's dated April 30th, 2012?
7  A  Yes.
8  Q  And the email's from Manoj Kumar?
9  A  Yes.
10  Q  And he writes, "Hi Phil.  The expense till
11     date has been approximately $4,000.  The break
12     up is $2,760" -- sorry, "The break up is
13     $2,726 for COLA, $276 for API, $750 for CLC
14     first installment and $120 for advertisement."
15     Do you see that?
16  A  Yes.
17  Q  What is COLA?
18  A  Laboratory regulation agency.
19  Q  That would be for a licensure?
20  A  I don't know.
21  Q  What's API?
22  A  I don't know.
23  Q  What is CLC?
24  A  I don't know.
25  Q  Mr. Kumar writes, "The next envisaged

1     expenditure is another $2,000 for CLC,
2     approximately $1,000 for consumables, and
3     $1,500 for the first month for the lab
4     director."  Did I read that correctly?
5  A  Yes.
6  Q  What's the lab director?
7  A  Someone that is director of a lab.
8  Q  What does a lab director do?
9  A  I don't know.
10  Q  You don't know what specific duties a lab
11     director would have directing a lab?
12  A  I'm not sure that I can adequately answer
13     that.  I might leave out some duties,
14     responsibilities.
15  Q  The duties that you know of, what are they?
16  A  They're in charge of a lab.
17  Q  And this would be an in-house lab at a
18     physician's office could have a lab director;
19     correct?
20  A  Say your question again?
21  Q  Sure.  If a physician had an in-house lab at
22     their practice, that lab could have a lab
23     director; correct?
24  A  Yes.
25  Q  Mr. Kumar asked if you could send him a check

1     for $9,000; right?
2  (GOVERNMENT'S EXHIBIT NO. 29 MARKED)
3  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
4  Q  I'm showing you what's been marked as
5     Government's Exhibit 29.  Do you recognize
6     this document?
7  A  Yes.
8  Q  What is it?
9  A  Wells Fargo statement.
10  Q  And this is from one of your bank accounts;
11     correct?
12  A  It appears to be.
13  Q  For the May, 2012 time period?
14  A  Yes.
15  Q  If you'll look at the second page.  The second
16     entry down dated 5/2 is a $10,000 transfer to
17     Manoj Kumar; right?
18  A  Yes.
19  Q  So on 5/2 you transferred Mr. Kumar $10,000;
20     right?
21  A  It appears to be.
22  Q  And that was several days after he asked you
23     for a check for $9,000; correct?
24  A  Yes.
25  (GOVERNMENT'S EXHIBIT NO. 30 MARKED)

46 (Pages 178 to 181)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
                        ars@ashevillereporting.com
        Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 167 of 283

DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

Q   I'm going to show you what's been marked as
Government's Exhibit 30.  Do you remember what
the $10,000 you transferred to Manoj Kumar on
5/2 was for?

BY MR. VILLMER:

    I would say just let him read the email first
if you're going to ask him a question about
it.

BY MR. JOHNSON:

    I'm not asking him a question about the email.

DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

Q   Mr. McHugh, do you remember what the $10,000
that you transferred to Manoj Kumar on 5/2 was
for?

A   I do not.

Q   Have you seen the emails in Exhibit 30?

A   Not from memory.

Q   They're between yourself, Mr. Kumar and Marcus
Sowinski?

A   Okay.

Q   Is that right?

A   Yes.

Q   Your email address is pmmchugh@pclabservices;
right?

---

A   Correct.

Q   And Manoj Kumar's email address is
Mkumar@pclservices; right?

A   Correct.

Q   And Marcus Sowinski's PCLS email address was
msowinski@pclabservices; right?

A   Correct.

Q   In the original April 8, 2012 email Mr. Kumar
writes to Mr. Sowinski, "Marcus.  As you are
aware, Phil is attempting to get back Dr. John
Nickels from Cleveland.  It is expected that
he will be back with us by July, slash,
August."  Did I read that correctly?

A   Yes.

    How were you attempting to get back John
Nickels from Cleveland?

A   I don't know.

    And then on May 9th, 2012 Sowinski writes to
yourself and Mr. Kumar, "is Dr. Nickels still
a," quote/unquote, "priority?"  Did I read
that correctly?

A   Yes.

Q   And then that same day in response Mr. Kumar
writes, "Marcus.  His lab is likely to be up
and running by mid-June.  It is expected that

---

he would switch to us at that stage or soon
after.  What do you opine, Phil?"  Did I read
that correctly?

A   Yes.

Q   And then you reply, "Yes.  Let's chat
tomorrow"; right?

A   Yes.

Q   Do you know what lab Mr. Kumar was referencing
when he said, "Dr. Nickels' lab is likely to
be up and running by mid-June"?

A   I do not.

Q   When Mr. Kumar writes, "It is expected that he
would switch to us at that stage or soon
after," did you understand that to mean he
would switch to referring samples to PCLS?

A   I don't know.

    (GOVERNMENT'S EXHIBIT NO. 31 MARKED)

DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

Q   Mr. McHugh, I'm going to show you what's been
marked as Government's Exhibit 31.  Let me
know when you've had a chance to review this
exhibit, Mr. McHugh.

A   Okay.

Q   I'd like to turn your attention to the second
to the last page of this email stream which is

---

Bates labeled 22509.

A   Okay.

Q   Are you there with me?

A   I am.

Q   And them middle email is from
JNick98909@aol.com to Manoj Kumar at PCLS.  Do
you see that?

A   Uh-huh.  (Affirmative)

Q   I'll represent to you that Dr. Nickels has
testified in this case that is his email
address.  He writes, "Manoj, Happy
Thanksgiving."  He encloses some figures.  And
then the last three sentences he writes, "I
have also $8,410.75 in expenses that I need to
be reimbursed for per my agreement with Phil.
Let me know what day is good for you.  I'm
good Monday through Thursday."  Do you see
that?

A   I do.

Q   Did I read that correctly?

A   It appears, yes.

Q   Do you know what agreement with Phil that Mr.
-- or that Dr. Nickels is referencing?

A   No.

Q   Do you understand the Phil referenced there to

---

47  (Pages 182 to 185)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDC-DCK   Document 129-4   Filed 12/08/20   Page 168 of 283

1      be yourself?
2  BY MR. VILLMER:
3      Objection to the form of the question.  You
4  can answer.
5  BY THE DEPONENT:
6      I don't know.
7  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
8  Q    Ultimately, if you'll turn to the first page
9       of this email chain, Mr. Kumar forwards it to
10      yourself.  Do you see that?
11 A    I do.
12 Q    And on November 25th, 2012 Mr. Kumar writes,
13      "The ticket is a bit expensive, but
14      considering the potential gain in the number
15      of samples, I will be going to meet with him
16      on Thursday for dinner."  Did I read that
17      correctly?
18 A    Yes.
19 Q    And you replied, "Agree."
20 A    Yes.
21 Q    What were you agreeing about?
22 A    I don't know.
23 (GOVERNMENT'S EXHIBIT NO. 32 MARKED)
24 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
25 Q    I'm going to show you what's been marked as

1       Government's Exhibit 32.  Have you ever seen
2       this document before?
3  A    Yes.
4  Q    What is it?
5  A    It's an email.
6  Q    From Dr. Nickels to Manoj Kumar; correct?
7  A    Yes.
8  Q    And it attaches a bill; correct?
9  A    Yes.
10 Q    And that attachment is entitled Expenses for
11      Manoj; right?  If you look at the attachment
12      title under the email.
13 A    Yes.
14 Q    And in the attachment it lists 37 separate
15      expenses; right?
16 A    Yes.
17 Q    And the total due at the bottom is $16,413.03?
18 A    Yes.
19 Q    And Dr. Nickels writes to Mr. Kumar, "Happy
20      New Year.  I've enclosed the updated bill so
21      you can bring funds with you next week.  I'm
22      looking forward to seeing you and Phil.  Do
23      you know what day you are coming on yet?  Take
24      care, John."  Did I read that correctly?
25 A    Yes.

1  Q    Do you understand the Phil referenced in this
2       email to be yourself?
3  A    I don't know.
4  Q    How have you seen this email before?
5  A    Through ---
6  BY MR. VILLMER:
7       I'm going to just -- I'm going to instruct the
8       witness, to the extent you're going to reveal
9       confidential correspondence or communications
10      between yourself and any attorney or staff
11      member of our office, please do not answer
12      that question.  To the extent you can answer
13      that question outside of that, then please
14      answer his question.
15 BY THE DEPONENT:
16      Just from this case.
17 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
18 Q    So it's a document you've reviewed in this
19      litigation?
20 A    Yes.
21 Q    Do you know a Dr. John Johnson?
22 A    I do.
23 Q    How do you know him?
24 A    From the laboratory.
25 Q    Was he a doctor that referred samples to PCLS?

1  A    Yes.
2  Q    Do you know the time period of which Dr.
3       Johnson referred samples to PCLS?
4  A    I do not.
5  Q    When did you first meet Dr. Johnson?
6  A    I don't remember.
7  Q    Have you ever met with him in person?
8  A    Yes.
9  Q    When was that?
10 A    I don't remember.
11 Q    Where was that?
12 A    I believe at his office.
13 Q    And that was in Pennsylvania?
14 A    I don't remember.
15 Q    Did you ever have any involvement with helping
16      Dr. Johnson set up an analyzer lab in his
17      practice?
18 BY MR. VILLMER:
19      Objection to the form of the question.  You
20      can answer.
21 BY THE DEPONENT:
22      Outside of giving information, no.
23 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
24 Q    What information did you give to Dr. Johnson
25      regarding an analyzer lab?

48  (Pages 186 to 189)

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
                    ars@ashevillereporting.com
          Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 169 of 283

1 A    General information that he had inquired
2      about.
3 Q    Did you assist Dr. Johnson in any other way
4      with setting up his analyzer lab other than
5      giving him general information?
6 BY MR. VILLMER:
7      Objection to the form of the question.  You
8      can answer.
9 BY THE DEPONENT:
10      I don't believe so.
11 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
12 Q    Did you ever direct Manoj Kumar to make a
13      $17,000 down payment on an analyzer for Dr.
14      Johnson?
15 A    No.
16 Q    Are you aware that Manoj Kumar did so?
17 A    From this case, yes.
18 Q    Outside of this case you have no knowledge of
19      Manoj Kumar making a $17,000 down payment on
20      an analyzer for Dr. Johnson?
21 BY MR. VILLMER:
22      Objection to the form of the question, but you
23      can answer.
24 BY THE DEPONENT:
25      Correct.

1 (GOVERNMENT'S EXHIBIT NOS. 33 AND 34 MARKED)
2 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
3 Q    I'm going to show you what's been marked as
4      Government's Exhibit 33 and Government's
5      Exhibit 34.  Would you take a look at Exhibit
6      33 for me, Mr. McHugh.
7 A    Okay.
8 Q    Have you seen this document before?
9 A    Yes.
10 Q    What is -- what's in Exhibit 33?
11 BY MR. VILLMER:
12      Objection to the form of the question, but you
13      can answer.
14 BY THE DEPONENT:
15      It appears to me it's the generic list of what
16      it takes to put a laboratory together.
17 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
18 Q    So Exhibit 33 is an email from yourself to
19      Manoj Kumar in April of 2012; right?
20 A    Yes.
21 Q    And the subject is Dr. Johnson Checklist?
22 A    Yes.
23 Q    And the attachment is entitled Dr. Johnson's
24      Lab List?
25 A    Yes.

1 Q    And the attachment is a document that has Dr.
2      Johnson's Lab at the top, and then it has 14
3      bullet points underneath it?
4 A    Correct.
5 Q    And those are all tasks that come with setting
6      up a lab; right?
7 A    Yes.
8 Q    Would you take a look at Exhibit 34.
9 A    Okay.
10 Q    If you could turn to the second page which is
11      Bates labeled 27679 at the bottom.  There's an
12      original message from Steve Glenn to John
13      Johnson with the subject Lab Info.  Do you see
14      that?
15 A    Yes.
16 Q    Who is Steve Glenn?
17 A    I don't know.
18 Q    And that email is forwarded from John Johnson
19      on Monday, May 14th to yourself, Mr. Glenn and
20      Manoj Kumar; correct?
21 A    Yes.
22 Q    And he writes, "Phil and Manoj, we are now a
23      go for this.  Will get this signed and faxed
24      in ASAP today.  Ready to rock and roll.  Sorry
25      for the delay.  Will put the lab in the

1      proposed location for now.  Will need to move
2      the lab by the end of the year.  Thanks, JJ."
3      Did I read that correctly?
4 A    Yes.
5 Q    Do you know what lab that Dr. Johnson was
6      referencing in this email?
7 A    I don't.
8 Q    Do you know what he was getting signed and
9      faxed in?
10 A    I don't.
11 Q    If you would turn to the first page of the
12      email.  You respond to Dr. Johnson; correct?
13 A    Yes.
14 Q    On Monday, May 14th, 2012?
15 A    Yes.
16 Q    And you write, "Dr. Johnson, great letter.
17      Manoj and I will take care of the rolling.
18      You handle to rockin," smiley face?
19 A    Yes.
20 Q    "Will also tell Dr." -- is that Colon or Colon
21      (different pronunciation), do you know?
22 A    Colon.
23 Q    Colon.  "Will also tell Dr. Colon to start
24      working on a time table, with your business
25      associate, and getting up to your clinics and

49  (Pages 190 to 193)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
                      ars@ashevillereporting.com
        Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 170 of 283

1  switching over from Millennium.  Call with
2  anything.  Thank you, Phil McHugh."  Did I
3  read that correctly?
4  A    Yes.
5  Q    And your signature block in this email
6  indicates you were the president of PCLS at
7  the time; correct?
8  A    Yes.
9  Q    Do you know what Millennium you were
10 referencing in this email was?
11 A    I assume a laboratory.
12 Q    And that was a competitor laboratory to PCLS;
13 correct?
14 A    Yes.
15 (GOVERNMENT'S EXHIBIT NO. 35 MARKED)
16 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
17 Q    I'm going to show you what's been marked as
18 Government's Exhibit 35.  Have you seen the
19 document in Exhibit 35 before?
20 A    I do not recall it.
21 Q    If you could -- it's an email from Meg Wood to
22 Dr. Johnson cc'ing yourself; correct?
23 A    Yes.
24 Q    And attached to the email is a Verified
25 Statement on Physicians Choice, you know,

1  letterhead that discusses the fact that Dr.
2  Johnson is interested in submitting urine
3  samples to PCLS.  He's currently a lab
4  director with UOFL, and disclaims any
5  ownership interest in UOFL; correct?
6  A    It seems -- seems to be.
7  Q    Do you know why this verified statement was
8  sent to Dr. Johnson?
9  A    I do not.
10 Q    Do you know why PCLS would have wanted Dr.
11 Johnson to declare that he did not have any
12 ownership interest in UOFL?
13 A    I do not.
14 Q    And if you'll look to the very last page it
15 has space for signatures.  The first being
16 John H. Johnson, M.D.; right?
17 A    Yes.
18 Q    And then for PCLS it has yourself ---
19 A    Yes.
20 Q    --- as president of Strategic Business
21 Development?
22 A    Yes.
23 (GOVERNMENT'S EXHIBIT NO. 36 MARKED)
24 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
25 Q    I'm going to show you what's been marked as

1  Government's Exhibit 36.  Do you recognize the
2  document that's in Exhibit 36?
3  A    I do not recall it.
4  Q    It's an email chain that was ultimately -- I
5  guess ultimately you were added to the email
6  chain as a carbon copy; correct?
7  A    Yes.
8  Q    And this is in May, 2012?
9  A    Yes.
10 Q    In the underlying email Dr. John Johnson is
11 emailing Mr. Kumar and Mr. Glenn asking, "What
12 is my next step in setting up the lab?"  Do
13 you see that?
14 A    Yes.
15 Q    And Mr. Kumar writes back, cc'ing you,
16 stating, "Dear JJ.  We have started the
17 process of obtaining the CLIA licensure.  The
18 following information is required for
19 completing the application."  Do you see that?
20 A    Yes.
21 Q    What is a CLIA licensure?
22 BY MR. VILLMER:
23 Objection, asked and answered, but you can
24 answer.
25 BY THE DEPONENT:

1  Licensure as being licensed with CLIA.
2  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
3  Q    And that's a regulatory authority for the
4  labs?
5  A    Yes.
6  Q    Was PCLS handling the process of obtaining the
7  CLIA licensure for Dr. Johnson's lab?
8  BY MR. VILLMER:
9  Objection to the form of the question, but you
10 can answer.
11 BY THE DEPONENT:
12 Not that I know of.
13 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
14 Q    Do you know what Mr. Kumar was referencing
15 when he said, "Dear JJ.  We have started the
16 process of obtaining the CLIA licensure"?
17 A    No.
18 Q    But you would agree with me that you were
19 copied on this email; correct?
20 A    Yes.
21 BY MR. JOHNSON:
22 Let's take five.
23 BY MR. VILLMER:
24 Sounds good.
25 (OFF THE RECORD)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 171 of 283

1  A    Yes.

2  Q    Did you express your displeasure regarding the

3       case to Ms. Hartnett?

4  A    I did.

5  Q    Did you discuss anything else with her?

6  A    That was the basic of the conversation.

7  Q    Did you ask her to testify on your behalf in

8       this case?

9  A    I don't remember.

10 Q    You're aware that Mr. Kumar has settled in

11      this case with the United States; correct?

12 A    Yes.

13 Q    Did you contribute any money to the settlement

14      amount that he paid?

15 A    No.

16 Q    Have you ever paid any money towards Manoj

17      Kumar's legal fees in this case?

18 A    No.

19 BY MR. JOHNSON:

20      I'll pass the witness.

21 BY MR. VILLMER:

22      Let's take five and then we'll come back.

23      Thank you.

24 (OFF THE RECORD)

25 CROSS-EXAMINATION BY MR. VILLMER:

1  Q    Mr. McHugh, I just have a few quick questions

2       for you.  Do you recall earlier when Mr.

3       Johnson was asking you questions about an

4       analyzer and Dr. John Johnson?

5  A    Yes.

6  Q    Do you remember that you mentioned that you

7       might provide general information to a doctor

8       about lab setup requirements?

9  A    Yes.

10 Q    As an example of you providing such general

11      information, did you reach out to Diamond

12      Diagnostics to obtain a price quote on an

13      analyzer to ultimately provide to Dr. Johnson?

14 A    Yes.

15 BY MR. VILLMER:

16      No further questions.  Thank you.

17 REDIRECT EXAMINATION BY MR. JOHNSON:

18 Q    One followup question.  With respect to Dr.

19      Johnson, you did reach out to Diamond

20      Diagnostics regarding his analyzer?

21 A    Yes.

22 BY MR. VILLMER:

23      Objection to the form of the question, but you

24      can answer.

25 BY MR. JOHNSON:

1       Nothing further.

2  (PROCEEDINGS CONCLUDED AT APPROXIMATELY 3:49 P.M.)

209

CERTIFICATE

I, Barbie M. Lane, CVR-M, CCR, Court Reporter

and Notary Public, do hereby certify that the

foregoing is an accurate transcript of the

deposition of Philip McHugh, taken by me and

transcribed under my supervision.

I further certify that I am not financially

interested in the outcome of this action, a

relative, employee, attorney or counsel of any of

the parties, nor am I a relative or employee of

such attorney or counsel.

This is the 27th day of November, 2020.

_____

BARBIE M. LANE, CVR-M, CCR

Notary Public No.: 19953050008

(The foregoing certification of this transcript
does not apply to any reproduction of the same by
any means, unless under the direct control and/or
supervision of the certifying reporter.)

Asheville Reporting Service
111 McDowell Street, Asheville, NC 28801
828-254-9230

**Page 1**

```
1        UNITED STATES DISTRICT COURT
    WESTERN DISTRICT OF NORTH CAROLINA
2          CHARLOTTE DIVISION
    ----------------------------------------X
3   UNITED STATES OF AMERICA, et al., ex
    rel. TARYN HARTNETT and DANA
4   SCHOCHED,
5            Plaintiffs,
6            v,
7   PHYSICIANS CHOICE LABORATORY
    SERVICES, LLC, DOUGLAS SMITH,
8   PHILIP MCHUGH, and MANOJ KUMAR,
9            Defendants.
    ----------------------------------------X
10       CASE NO.:  3:17-cv-37-KDB-DCK
11
         Deposition of JOSEPH MUNDEN
12
    DATE TAKEN:   November 10, 2020
13
    TIME:         9:00 a.m.
14
    PLACE:        Remote Location via Zoom
15
    REPORTED BY:  Janine A. Sedacca
16                Professional Shorthand
                  Reporter and Notary Public
17                State of Florida
18
19
20
21
22
23
24
25
```

**Page 2**

```
1      A P P E A R A N C E S
2   U.S. ATTORNEY'S OFFICE
    Attorneys for Plaintiff United States of
3   America
         227 West Trade Street, Suite 1650
4        Carillon Building
         Charlotte, North Carolina  28202
5
    BY:  KATHERINE T. ARMSTRONG, ESQ.
6        KATHLENE HOLLOWELL, ESQ.
         P:  (704) 344-6222
7        E:  Katherine.Armstrong@usdoj.gov
8
9
    WEAVER, BENNETT, & BLAND, P.A.
10  Attorneys for Defendant Philip McHugh
         196 North Trade Street
11       Matthews, North Carolina  28105
12  BY:  MATTHEW M. VILLMER, ESQ.
         P:  (704) 850-5498
13       F:  (704) 845-1503
14
15  ALSO PRESENT:
16  JENNIFER KRAHN, Videographer
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1   November 10, 2020
2
3              I N D E X
4   EXAMINATION BY                      PAGE
5   Mr. Villmer                          8
6   Ms. Armstrong                        41
7
8
9         E X H I B I T S
10  MARKED FOR IDENTIFICATION
11  NO.                                 PAGE
12  1:  E-mail chain, "FW: Collectors    61
13      and Hardware for PCLS Clients
14
15  2:  E-mail chain, "RE: CPPM          61
16      Pennsylvania"
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1
2      S T I P U L A T I O N S
3        IT IS HEREBY STIPULATED AND AGREED
4   by and between the attorneys for the
5   respective parties herein that filing
6   and sealing be and the same are hereby
7   waived.
8        IT IS FURTHER STIPULATED AND
9   AGREED that all objections, except as to
10  the form of the question, shall be
11  reserved to the time of the trial.
12       IT IS FURTHER STIPULATED AND
13  AGREED that the within deposition may be
14  signed and sworn to before any officer
15  authorized to administer an oath with
16  the same force and effect as if signed
17  and sworn to before the Court.
18
19
20
21
22
23
24
25
```

Page 37

1          THE VIDEOGRAPHER:  We're going back
2    on the record at 9:39 a.m.
3    BY MR. VILLMER:
4        Q.    Okay.  Mr. Munden, after a quick
5    technical glitch with Zoom, I've shared my
6    screen again.
7          So can you see this e-mail?  And
8    again, that's apparently from Elan Colon to you
9    dated December 31st, 2012.  The subject is CPPM
10   Pennsylvania.
11         First of all, who is Elan Colon?
12       A.    He was somebody that I believe was
13   on the 1099 side of the company.
14       Q.    You mean the 1099 sales team?
15       A.    Yes.
16       Q.    And there were some 1099
17   salespeople and some W-2 salespeople; is that
18   fair?
19       A.    Yeah.  And my core responsibility
20   was the W-2, and then we have this bridge over
21   of -- and that's probably the way PCLS started.
22       Q.    Okay.  So it looks like here that
23   Mr. Colon is asking you for authorization for
24   equipment to be installed in Dr. Johnson's
25   office in Pennsylvania.

Page 38

1          Do you remember a Dr. Johnson?
2        A.    I do not.
3        Q.    Does Johnson ring a bell at all?
4        A.    I -- I don't --
5        Q.    Okay.
6        A.    I never met these doctors.
7        Q.    Okay.  And it says, "At a minimum,
8    we would need to have collector work stations
9    installed at the busiest facilities in main
10   location."
11         What's a collector work station?
12       A.    That would be a -- the computer and
13   the printer.
14       Q.    Okay.  Not -- not potentially a
15   desktop analyzer?
16       A.    I -- no, not at all.
17       Q.    Okay.  So it looks like further up,
18   you bring in Marcus Sowinski, and you say,
19   "Marcus, do you want hardware in Pennsylvania?
20   This is a followup to our quick call in the
21   a.m."
22         Why were you bringing in Marcus
23   Sowinski into this kind of exchange?
24       A.    I believe that prior to the person
25   that assisted Meg, I believe that's Dinah; is

Page 39

1    that right?
2        Q.    Yeah.  Dinah Myers.
3        A.    Marcus ran the -- that department
4    reported to him, the compliance department.
5        Q.    Okay.  And -- and if -- if anyone
6    would send you an e-mail like this on the sales
7    team asking about collectors or replacement of
8    hardware, was that kind of your standard
9    practice, you loop in Marcus Sowinski so he can
10   be in the loop and give you some advice or
11   guidance on some of this stuff?
12       A.    Marcus or Meg depending on -- I
13   don't think that -- I don't remember the dates
14   of me being there, but I think that I had only
15   been there for a couple of months and I
16   probably was working -- communicating with
17   Marcus being in transition over to Meg.
18       Q.    Got it.  And then it looks like you
19   jump back on January 2nd after a couple days
20   asking if there are any updates?
21       A.    Yeah.
22       Q.    Looks like Marcus responds and
23   said, "I didn't know it was in PA.  Did Dinah
24   give you any updates?  I will need to talk to
25   her."

Page 40

1          Dinah as in Dinah Myers?
2        A.    I think that's safe to assume.
3        Q.    Okay.  And this is a long shot, but
4    down here it says, "Marcus can you loan
5    hardware in Pennsylvania?  This is a followup
6    to our quick call this a.m."
7          Do you remember having a phone call
8    with Joe -- for Marcus Sowinski towards the end
9    of 2012 about this particular issue?
10       A.    I really don't.
11       Q.    Do you remember --
12       A.    And reading that, it would be that,
13   you know, somebody has a need and can you
14   expedite this if there was a phone call or
15   something.
16       Q.    Sure.  Do you remember what
17   ultimately occurred, whether there was any
18   hardware placed with Dr. Johnson?
19       A.    I don't recall if there was or
20   there was not, but I know that the compliance
21   department was tracking every place they put a
22   computer and a printer as well as a collector,
23   so that information should be available.
24       Q.    All right.  I don't think I have
25   any more questions for you at this time.  I may

Page 57

1     A.   That's correct, yes.
2     Q.   Thank you.
3          Prior to your phone call from Mr.
4  McHugh two months ago, when is the last time
5  you talked to Mr. Munden?
6     A.   Maybe six months or something.  I
7  don't know.  Eight months.
8     Q.   And what did y'all talk about when
9  you talked six or eight months prior to your
10 last conversation?
11    A.   Probably more of how's it going,
12 whatever.  If we did talk about something
13 like this, it was about the same amount of
14 tension given to it.
15         I talk to my father about all this
16 stuff.  I'm pretty private.  That's why we're
17 on a deposition and I'm not freely talking
18 about anybody.
19    Q.   Understood.
20         Did you maintain any relationship,
21 whether it be personal or business
22 relationship, with Mr. McHugh after you left
23 PCLS?
24    A.   No.
25    Q.   Do you owe him any money?

Page 58

1     A.   No.
2     Q.   Have you ever owed him any money?
3     A.   No.
4     Q.   When's the last time you talked to
5  Doug Smith?
6     A.   Oh, Lord.  It was while I was at
7  PCLS.
8     Q.   Did you have any interactions with
9  Mr. Smith while you were at PCLS?
10    A.   I -- I can count the times I saw
11 him on more than one -- on one hand.  So few
12 and far between.
13    Q.   What was your understanding of his
14 role of the company while you were there?
15    A.   I think that he moved into more of
16 a silent investor role when I got there.  I
17 didn't see him much at the organization at all.
18         MS. ARMSTRONG:  If we can go off
19 the record for two minutes, I'm just going to
20 check my notes to make sure I've covered
21 everything and then I'm probably done.  Is that
22 okay with you guys?  Give me two minutes,
23 please.
24         MR. VILLMER:  All right.  Hey,
25 Kat --

Page 59

1          MS. ARMSTRONG:  Yeah.
2          MR. VILLMER:  -- if we can just get
3  a two-minute break overall, I can probably get
4  my ducks in a row on whether I have any
5  additional questions.
6          MS. ARMSTRONG:  Yeah.  That sounds
7  great.  We'll be back in a minute.
8          THE VIDEOGRAPHER:  We're going off
9  the record at 10:07 a.m.
10         (Recess taken.)
11         THE VIDEOGRAPHER:  We are back on
12 the record at 10:09 a.m.
13         MS. ARMSTRONG:  Joe, thank you.  I
14 have no more questions for you.
15         MR. VILLMER:  Thanks for your time,
16 Mr. Munden.  I have no further questions
17 either.
18         THE WITNESS:  Okay.  Thank you.
19         MS. ARMSTRONG:  Thank you guys.
20         THE VIDEOGRAPHER:  We do ask that
21 all participants stay connected briefly to
22 provide your transcript and video orders, other
23 than you, Mr. Munden, are free to go.
24         THE WITNESS:  Okay.  Thank you.
25 Bye-bye.

Page 60

1          THE VIDEOGRAPHER:  You're welcome.
2          Would anyone like a copy of the
3  video?
4          MS. ARMSTRONG:  Not at this time,
5  but we may later down the road.
6          THE VIDEOGRAPHER:  Okay.
7          MR. VILLMER:  Yeah.  We don't need
8  a copy of the video right now.  We may down the
9  road.
10         We do want a transcript, PDF, with
11 the exhibits.
12         And Janine, if you don't mind, can
13 you shoot me an e-mail so I can respond back
14 with these exhibits, and I'll include Kat on
15 that e-mail as well.
16         MS. ARMSTRONG:  Can we just get an
17 E-tran with exhibits, please?
18         THE VIDEOGRAPHER:  And Kathlene,
19 would you like a copy of the video, or is she
20 with you guys?
21         MS. ARMSTRONG:  She's with me.
22 Yeah.  Thank you.
23         THE VIDEOGRAPHER:  All right.
24 Awesome.
25         This concludes the videoconference

**Page 61**

1  deposition of Mr. Munden.  We are going off the
2  record on November 10th, 2020, at 10:11 a.m.
3           (Exhibit No. 1, e-mail chain, "FW:
4  Collectors and Hardware for PCLS Clients,"
5  marked for identification as of this date.)
6           Exhibit No. 2, e-mail chain, "RE:
7  CPPM Pennsylvania," marked for identification
8  as of this date.)
9           (Time Noted:  10:10 a.m.)
10
11
12
13
14           JOSEPH MUNDEN
15
16  Subscribed and sworn to before me
17  this _____ day of _____, 2020.
18
19
20
21
22
23
24
25

**Page 62**

1              C E R T I F I C A T E
2  STATE OF FLORIDA    )
3  COUNTY OF ORANGE    )
4
5           I, JANINE A. SEDACCA, a Notary Public
6  within and for the State of Florida, do
7  hereby certify:
8           That JOSEPH MUNDEN, the witness
9  whose deposition is hereinbefore set
10  forth, was sworn and that such
11  deposition is a true record of the
12  testimony given by such witness.
13           I further certify that I am not
14  related to any of the parties to this
15  action by blood or marriage and that I
16  am in no way interested in the outcome
17  of this matter.
18           IN WITNESS WHEREOF, I have hereunto
19  set my hand this 19th day of November, 2020.
20
21
22
23  _____
          JANINE A. SEDACCA
24  Notary Public, State of Florida
     Commission No.:  GG284654
25  Commission Expires:  12/16/2022

**Page 63**

1                DEPOSITION ERRATA SHEET
2
3  Esquire Deposition Assignment No.:  J6126045
4  Case Caption:  UNITED STATES OF AMERICA, et
   al., ex rel. TARYN HARTNETT and DANA SCHOCHED
5  v. PHYSICIANS CHOICE LABORATORY SERVICES, LLC,
   DOUGLAS SMITH, PHILIP MCHUGH, and MANOJ KUMAR
6
7
      DECLARATION UNDER PENALTY OF PERJURY
8        I declare under penalty of perjury that
9  I have read the entire transcript of my
10  deposition taken in the captioned matter or
11  the same has been read to me, and the same is
12  true and accurate, save and except for changes
13  and/or corrections, if any, as indicated by me
14  on the DEPOSITION ERRATA SHEET hereof, with
15  the understanding that I offer these changes
16  as if still under oath.
17        Signed on the _____ day of
18  _____,20___
19
20  _____
          JOSEPH MUNDEN
21
22
23
24
25

**Page 64**

1                DEPOSITION ERRATA SHEET
2  Page No._____ Line No._____ Change to:_____
3  _____
   Reason for change:_____
4  Page No. _____ Line No._____ Change to:_____
5  _____
   Reason for change:_____
6  Page No. _____ Line No._____ Change to:_____
7  _____
   Reason for change:_____
8  Page No. _____ Line No._____ Change to:_____
9  _____
   Reason for change:_____
10  Page No. _____ Line No._____ Change to:_____
11  _____
   Reason for change:_____
12
   Reason for change:_____
13
14  Page No. _____ Line No._____ Change to:_____
15  _____
   Reason for change:_____
16  Page No. _____ Line No._____ Change to:_____
17  _____
18
   Reason for change:_____
19  Page No. _____ Line No._____ Change to:_____
20  _____
21
   Reason for change:_____
22  SIGNATURE:_____DATE:_____
23
          JOSEPH MUNDEN
24
25

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION


UNITED STATES OF AMERICA ex rel.

TARYN HARNETT, and DANA SHOCHED,

     Plaintiffs,          Case No.

   vs.                 3:17-CV-37

PHYSICIANS CHOICE LABORATORY SERVICES,

DOUGLAS SMITH, PHILIP MCHUGH

and MANOJ KUMAR,

     Defendants.

              - - - - -

VIDEOTAPED DEPOSITION OF JOHN H. NICKELS, M.D.

Taken on Friday, September 11, 2020 at 9:42 o'clock a.m.


At The Offices Of:

U.S. Attorney's Office

801 West Superior Avenue

Suite 400

Cleveland, Ohio 44113


Before Kelly A. Dell'Anno, a Court Reporter and

Notary Public in and for the State of Ohio

Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787   www.cefgroup.com   fax: 216.687.0973
Cleveland: 1300 East 9th Avenue, Cleveland, OH 44103 - 216.696.1083
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308 - 330.253.8119

1  And so '85 to '19, enough years.
2         Q.  How many of those years did
3  you have a pain management practice,
4  roughly?
5         A.  At least 20 years.  And at
6  the end of my career the last two years
7  I was really doing exclusively a
8  Suboxone clinic.  And Suboxone is the
9  drug that we would give to opioid
10  addicts that would take away their
11  craves.  So initially we started with 30
12  patients, we built that and we were
13  allowed then to see a hundred patients.
14         So I had a hundred patients and
15  that was just so rewarding to take
16  somebody that had basically lost their
17  life to drugs and give them hope.  And
18  give them some ... something that they
19  could use to fight those craves.
20         Q.  Before the last two years in
21  the Suboxone clinic, what was your pain
22  management practice called?
23         A.  Cleveland Back and Pain
24  Management Center.
25         Q.  Do you remember when you

1  opened up Cleveland Back and Pain
2  Management Center?
3         A.  Oh, boy, let's see, '85,
4  three years, '88, '89, probably around
5  '92 or '93.  Somewhere in there.
6         Q.  And when did you stop
7  practicing with Cleveland Back and Pain
8  Management?
9         A.  It was a year and a half
10  ago, past June so ...
11         Q.  So the Suboxone clinic was
12  also at the Cleveland Back and Pain
13  Management?
14         A.  Well, no, I was still the --
15  I was still the director of Cleveland
16  Back and Pain Management Center and then
17  I sold my practice to a Dr. Kozmary.
18  And Dr. Kozmary, again, kept me on to
19  continue to see the Suboxone patients.
20  And then we had midlevel practitioners,
21  nurse practitioners, physician
22  assistants, and I was still there to
23  help guide them through the, you know,
24  anything pain management wise that they
25  couldn't handle.  So -- and they were

1  great.
2         Q.  In the, you know, 2010 to
3  let's say 2014 time period, what types
4  of patients did Cleveland Back and Pain
5  Management see?
6         A.  We would see any patients.
7  We would see Medicaid and Medicare
8  patients, we would see every insurance
9  that you could think of.  We had some
10  self-pay patients that would come see
11  us. But the majority were either --
12  well, Grace Hospital is actually in the
13  inner city here, so we had a heavy
14  Medicaid population.  But we would see
15  anybody that -- well, anybody that had
16  insurance or wanted to pay for an office
17  visit we would see them.
18         Q.  And just generally why would
19  a patient come to a pain management
20  clinic?
21         A.  Obviously because of pain.
22         Q.  So in a pain management
23  clinic are you prescribing drugs to help
24  with the pain?
25         A.  Yes, sir.  Our approach was

1  really first in evaluation, to find out
2  why you had your pain.  You know, and
3  it could be your neck, your back, your
4  lower back, your arms, your legs,
5  anywhere there.  So we do all the
6  diagnostics to diagnose why you're
7  having your pain.  And then we would
8  use two different treatments, one was
9  medications and the other was physical
10  therapy. So those are the two -- the
11  three modalities that we would use.
12         Q.  Before you sold your interest
13  in the practice, did anyone else have an
14  ownership interest in Cleveland Back and
15  Pain Management?
16         A.  Never.
17         Q.  So from 2010 to 2014 you
18  were the sole owner, so to speak?
19         A.  Yes, sir.
20         Q.  You mentioned the prescribing
21  of medications, what type of medications
22  would you all prescribe generally?
23         A.  We would typically prescribe
24  an anti-inflammatory, a muscle relaxer,
25  and a pain med.

1     Q. Can you give me examples of
2  the types of pain meds?
3     A. Certainly. My practice I
4  decided I wasn't going to go to any of
5  the stronger narcotics, so the strongest
6  we used was Hydrocodone and Vicodin. So
7  we didn't go up to the OxyContins or
8  Oxycodones or Fentanyl or anything like
9  that. We either treated you with
10  Vicodin, if you needed something
11  stronger, we would send your records
12  wherever you could find that type of
13  help.
14     Q. Is drug testing part of a
15  pain management practice?
16     A. Huge, huge part of it.
17     Q. Why is that?
18     A. Well, there's two things that
19  really revolutionized pain management,
20  one was the development of an OARRS
21  program. And OARRS is the Ohio
22  something reporting, but heretofore we
23  would never know if you had seen three
24  different doctors in one day and ended
25  up with three prescriptions. There was

1  no way to track that. So when they
2  developed this OARRS system now we could
3  get a report of, you know, where you
4  got your controlled substances from, so
5  that helped.
6     And then urine drug screens came
7  and that kind of really was the key to,
8  you know, weeding out the bad people,
9  let's say versus somebody or, you know,
10  why their level of narcotic is not where
11  it should be. You know, are you
12  skipping doses or what's going on or why
13  is it higher, you know, everything we
14  could find, are you using elicit drugs,
15  are you, you know, taking your
16  medications we gave you?
17     Q. So with urine drug screens
18  you're testing to see if, you know, kind
19  of, A, people are taking what they
20  should be taking. And, B, people aren't
21  taking things they shouldn't, like
22  cocaine or Fentanyl, things like that?
23     A. That's correct.
24     Q. Do you know what a desktop
25  analyzer is?

1     A. I believe so.
2     Q. Can you tell me what that
3  is?
4     A. Yeah, there's different types
5  of testing that could be done, there's
6  clia-waived urine cups that are just
7  dipsticks that are in urine and they
8  give you a positive or a negative,
9  there's no levels given on that.
10  Typically a desktop unit would basically
11  sit on a cart or wherever you have it,
12  it's a smaller machine. But it gives a
13  more accurate accounting for the initial
14  evaluation of drugs. So from that we
15  would get a number so we can know what
16  the levels were.
17     And then that urine is then sent
18  to a reference lab where they use liquid
19  and gas chromatography, which is
20  standard of care to evaluate and that's
21  defensible in court, if it -- you know,
22  if it shows cocaine you had cocaine in
23  your system, so ...
24     Q. Have you heard the terms
25  qualitative versus quantitative testing?

1     A. Yes, I have.
2     Q. Is that kind of what you
3  were talking about with the positive and
4  negative and the more specific testing?
5     A. That's exactly what it is.
6  Qualitative is again a positive/negative
7  test. And it's -- desktop analyzers give
8  that same qualitative, but more
9  accurate. And then from there complex
10  labs have the gas chromatography and
11  that gives us the reference back that we
12  can count on.
13     Q. Is -- when it's sent to the
14  -- when a sample is sent to the complex
15  lab, is that called confirmation
16  testing?
17     A. Yes, sir.
18     Q. Did your practice have an
19  analyzer in it?
20     A. We did.
21     Q. Do you know who Manoj Kumar
22  is?
23     A. Oh, yeah. Yeah, absolutely.
24     Q. Do you know who Phil McHugh
25  is?

1    A. Phil I believe I only met
2  once or twice. You could put him in a
3  lineup and I doubt I could identify him
4  for you.
5    Q. You know Manoj better?
6    A. Correct.
7    Q. Did either Manoj Kumar or
8  Phil McHugh have anything to do with
9  your practice receiving a desktop
10  analyzer?
11    A. Well, no, they were the
12  reference lab. We got our analyzer from
13  a different company.
14    Q. Who did you get your
15  analyzer from?
16    A. A company called Alternative
17  Bio something, ABS Services. And Ray
18  Fuller was the agent in charge of the
19  analyzers.
20    Q. Did Manoj Kumar or Phil
21  McHugh ever pay for expenses related to
22  your analyzer?
23    A. I've reviewed the e-mails
24  and, no, I don't think they ever ...
25  ever paid me for that. So I'm still --

1  I can't recollect from the last time I
2  saw you guys as to what that list was
3  and what the payments that were on that
4  showed.
5    Q. Let me ask you this, did you
6  ever send lists of expenses to Manoj
7  Kumar or Phil McHugh?
8    A. I did.
9    Q. Why did you do that?
10    A. Again, I can't recall whether
11  I was just itemizing what I was paying
12  for certain things and, you know, I was
13  paying ABS for reagents on a sliding
14  scale was the way that worked. So if
15  we did from 150 to 200 tests that was
16  $22. If we did 200 to 300 that was, I
17  think $17. So it was on a sliding
18  scale that they used for what I needed
19  to reimburse them for the machine, which
20  was leased as long as we used their
21  reagents.
22    Q. So you leased the machine
23  from ABS, correct?
24    A. Correct.
25    Q. Did you pay any upfront

1  costs?
2    A. None.
3    Q. And then it sounds like you
4  paid a cost per sample, that would be
5  either $22 or $17 based on volume?
6    MR. CAUDILL: Objection to the
7  question, leading.
8    A. Yes.
9    MR. CAUDILL: I'm sorry, you can
10  still answer.
11    THE WITNESS: I'm sorry.
12    A. It's --
13    Q. Let me just ask you that
14  question again.
15    A. Okay.
16    Q. How did you pay for the
17  machine?
18    MR. CAUDILL: I'm going to object
19  to the questions because you've already
20  given him the information. But you can
21  go ahead and answer.
22    A. Short term memory loss here,
23  would you repeat the question?
24    Q. Sure. The desktop analyzer
25  in your practice, how was it paid for?

1    A. It was paid on a per test
2  rate. So, again, as I just said if we
3  did up to 200 tests it was $22. And it
4  was various if we had over 500 or so it
5  might have been 13 or $12. So, you
6  know, that was, again, based on testing.
7  So the more tests that it was -- you
8  know, everything was based on a set fee
9  on a sliding scale.
10    Q. You testified earlier that
11  Manoj Kumar and Phil McHugh were
12  associated with the confirmation testing
13  company, right?
14    A. You know, initially when I
15  reviewed I seriously was under the
16  impression that Ray Fuller worked for
17  ABS. I thought he was an agent for
18  ABS.
19    Q. And I'm not asking about Ray
20  Fuller, I'm asking about Manoj Kumar and
21  Phil McHugh.
22    Who did you think they worked
23  for?
24    A. Well, eventually I learned
25  that -- and Phil McHugh I knew was with

1  the lab, Physician Choice.  Again, I
2  thought that Manoj Kumar was part of
3  ABS.  And then I later, you know,
4  discovered that he is an agent for
5  Physician Choice Laboratories.
6      Q.  I want to go back to, you
7  know, when you first got the analyzer at
8  that time, did you think that Manoj
9  Kumar was a representative or agent for
10  ABS?
11      A.  I did not.
12      Q.  When did you think that
13  Manoj Kumar was a representative or
14  agent for ABS?
15      A.  Pretty early on when we got
16  the machine and it took awhile to get
17  it calibrated and get the CLIA
18  certificate to use it, to hire a
19  certified lab technician, to hire a
20  collector to collect the urine.  But at
21  the beginning, you know, I really felt
22  that Manoj Kumar was part of ABS.
23      Q.  When did Manoj Kumar become
24  involved with the analyzer in your
25  office?

1      A.  I would say probably as soon
2  as we started to be able to run samples
3  through it. Because like I said, it's a
4  process, you know, you can't just turn
5  it on and run tests.  It has ... it has
6  to go through a certain verification
7  process.  I had to take a CLIA test,
8  which is the lab company that certifies
9  all the machines.  So I had to get a
10  CLIA license to operate the machine.
11      Again, we had to hire a lab tech
12  or a lab technician, because every day
13  you had to run a series of tests to
14  confirm that it is analyzing the way it
15  should be and then you move on.  So I
16  would think he appeared at the beginning
17  because that's why I thought he was part
18  of ABS.
19      Q.  So when Manoj did first
20  appear that's when you thought he was
21  associated with ABS?
22      A.  Correct.
23      Q.  And that was the time period
24  when you started to be able to run
25  samples?

1      A.  Correct.
2      Q.  Was Mr. Kumar involved at
3  all with any of the CLIA licensure,
4  getting the analyzer up to speed,
5  anything like that?
6      A.  No, that was all through the
7  technicians that came to get the machine
8  calibrated, get it set up, make sure it
9  was running properly.  So they were in
10  charge of that.
11      Q.  Once Mr. Kumar became
12  involved with the analyzer, what was his
13  role?
14      A.  His role I thought, again,
15  when I finally found out he was part of
16  Physician Choice Labs was to push us to
17  do more labs.  In the beginning, you
18  know, we probably do 800 urine drug
19  screens a month.  Obviously he wanted
20  all 800 of them.  We started off very
21  slow to really verify that the machine
22  was accurate.  We would do -- we would
23  look at the urine cup, see if that
24  matched it, we would look at whatever we
25  could to really verify that the machine

1  was accurate.
2      And then also what the billings
3  were, because the purpose of putting the
4  analyzer in was to be able to bill for
5  the use of it, you know, for profit.
6  So he was always coming in and wanting
7  to do more and more tests.  You got to
8  do more and more tests.
9      And, you know, he worked with my
10  billing company, Physician Choice --
11  Physician Services Bureau, Jay Chambers
12  was the fellow that did my billing for
13  about 15 years.  And he worked with
14  them to see what these collections would
15  be and, you know, it started out pretty
16  slow and that's why we'd only send like
17  100 or 150 samples through them of all
18  insurances to really get a read on what
19  the reimbursements were going to be, and
20  then what -- how accurate the machine
21  was.
22      Q.  How often would Mr. Kumar
23  visit your practice?
24      A.  I think at the beginning it
25  was probably about once a month.

## Page 26

1    Q. Did that change over time?
2        A. Yeah, it got to the point
3  that he might come every two months, and
4  then it would finally -- I didn't see
5  him, and that could have been after we
6  changed analyzers. But at some point he
7  stopped coming to see us.
8        Q. You mentioned you changed
9  analyzers, can you tell me about that?
10       A. Yeah, at that point because
11 we were doing 800 tests this machine
12 couldn't handle that amount of tests.
13 So we brought in our own analyzer, and
14 that was a high complex analyzer. So we
15 were like using a machine that would
16 give us confirmations basically, we
17 didn't have to send that urine out to
18 any place else.
19       And we -- I don't know what
20 period of time, but we got that machine
21 up and running, certified all the things
22 you need to make it accurate and such.
23 And then we stopped using the Ray Fuller
24 machine from ABS, and they came and
25 picked it up and took it away.

## Page 27

1    Q. So the second machine that
2  you got that wasn't the Ray Fuller
3  machine from ABS, that machine didn't
4  need confirmation testing?
5        A. Correct.
6        Q. The Ray Fuller machine did
7  need confirmation testing?
8        A. Correct.
9        Q. Where was the samples sent
10 from the Ray Fuller machine?
11       A. The samples, again, would be
12 -- you know, we would use a urine cup
13 that I paid about $6.50 for them just
14 so we could get at least a 12-panel
15 read of certain drugs. I mean, there
16 are several false positives and false
17 negatives that we call on that. It
18 might not show a drug that you're asking
19 or might know a drug that you're not
20 using. So that's why it needed to go
21 for further testing.
22       You know, Ray Fuller's machine
23 was a step above that, that would give
24 us a certain security because it was a
25 very accurate machine. And we verified

## Page 28

1  that by doing tests with other labs and
2  then getting the results of those. And
3  for those we didn't bill them, but we
4  just wanted to see how accurate the
5  machine was. So that was a different
6  level, and then the new machine was at
7  a high complex level.
8        Q. For the tests from the Ray
9  Fuller machine that were sent for
10 confirmation testing, what lab did those
11 go to?
12       A. Physician Choice Labs.
13       Q. PCLS?
14       A. Yes.
15       Q. You mentioned that you had
16 to hire lab techs?
17       A. Correct.
18       Q. Did you have to hire a lab
19 director?
20       A. Eventually with the high
21 complex. With Ray Fuller's machine an
22 M.D. could be the director of it. So I
23 did 20 hours of CME, I took their test
24 and passed it, fortunately, and I became
25 the lab director of the Ray Fuller

## Page 29

1  machine.
2        Q. For the lab techs were those
3  individuals that were employed by your
4  practice, were they from another
5  company, how did that work?
6        A. They were employed by me.
7  Pearl Whitley who was the certified lab
8  technician, and she had to have certain
9  credentials to be able to run the
10 machine. So we had to look for
11 somebody that could run the machine and
12 do what was necessary, so we hired her.
13 And then we hired -- well, we didn't --
14 I don't think Kiana, the collector, I
15 think they paid for the collector. As
16 did Ameriatox and most all the labs
17 provided a collector for you.
18       Q. By they do you mean PCLS?
19       A. Yes, correct.
20       Q. So PCLS paid for Kiana, the
21 collector?
22       A. Correct.
23       Q. You mentioned that you, you
24 know, got the analyzer from Ray Fuller.
25 How did that come about, did you meet

Cefaratti Group
THE LITIGATION SUPPORT COMPANY
1.800.694.4787        www.cefgroup.com        fax: 216.687.0973
Cleveland: 1468 West 9th Avenue, Cleveland, OH 44103 - 216.687.0973
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308 - 330.253.8119

1  with Ray Fuller; did he come to your
2  office?
3           A.  We did meet with him as we
4  met with probably ten other companies
5  that were trying to come in and get our
6  business.  And we met with Ray and
7  there was another fellow with him, I
8  don't recall his name, but I think we
9  met in my office.  And they presented
10 their machine and what it could do and
11 the tests it could run, and that's the
12 one we chose out of them all.
13          Q.  Do you remember if Phil
14 McHugh was that other fellow with Ray
15 Fuller?
16          A.  No, I don't believe so.
17 And, again -- and I don't remember is
18 the truthful answer.
19          Q.  Fair enough.
20          Do you remember around what time
21 period you first got the ABS desktop
22 analyzer?
23          A.  I believe either February or
24 March 4th of 2012, I believe is when I
25 signed the contract for ABS.

1           Q.  Do you remember roughly when
2  you stopped using the ABS analyzer for
3  your practice?
4           A.  That would have been -- and,
5  again, don't hold me to this, I think
6  it was towards the end of 2012 or
7  probably into 2013.
8           Q.  Do you remember -- the new
9  analyzer that you got that didn't need
10 confirmation testing, do you remember
11 what company you got that from?
12          A.  I do it was called Carolina
13 Liquids something, something.  Carolina
14 Liquid, I forget the rest of it, but
15 ...
16          Q.  So if we found out when you
17 purchased it from Carolina Liquids, we
18 could probably figure out when you
19 stopped using the ABS machine.
20          Fair?
21          A.  Fair enough.
22               - - - - -
23          (Thereupon, Deposition
24          Exhibit-1 was marked for
25          purposes of identification.)

1               - - - - -
2           Q.  I'm going to show you what
3  is being marked as Exhibit 1.
4           MR. CAUDILL:  Do you have a copy
5  for me?
6           MR. JOHNSON:  I just have three.
7           MR. CAUDILL:  Do we have a copy
8  machine in this building?  I'm going to
9  need to see the exhibit.
10          MR. WARD:  You can have mine.
11          MR. CAUDILL:  Do you have a
12 copy?
13          MR. WARD:  I do.
14          MR. JOHNSON:  You'll probably
15 have a copy of the rest of ours.
16          MR. WARD:  Right.  That's what I
17 think.
18          MR. JOHNSON:  Right.  Or maybe
19 we can just -- if you want to look at
20 it and share it with Bo --
21          MR. WARD:  No, that's fine.  As
22 long as I got it, I'm fine.
23          MR. JOHNSON:  All right.
24          Q.  Dr. Nickels, is your e-mail
25 jnick98909@aol.com?

1           A.  It is.
2           Q.  And that was the e-mail that
3  you were using back in --
4           A.  That's right.
5           Q.  -- 2012 or so?
6           A.  Yes.
7           Q.  And what's in Exhibit 1 is
8  an e-mail chain between yourself and
9  Manoj Kumar, correct?
10          A.  That's correct.
11          Q.  If you could go to the third
12 to last page you'll see it's numbered in
13 the bottom right-hand corner with 22467.
14          A.  I have it.
15          Q.  And in that e-mail you
16 state, Manoj, I hope all is well with
17 you.  We were starting to get our
18 collection numbers up and trying to test
19 a wide range of insurance groups.  So
20 far I have paid Kiana for 108 tests at
21 $5 per collection.
22          And then below that there's a
23 list of ten expenses.  Did I read at
24 that correctly?
25          A.  You did.

1    Q.  Okay.  And then if you'll
2  flip to the next page, the expenses
3  total $8,103.32, right?
4    A.  Correct.
5    Q.  You note that there's been
6  paid $3,000?
7    A.  Correct.
8    Q.  And that was $3,000 that
9  Manoj Kumar paid to you, correct?
10    A.  Correct.
11    Q.  Okay.  And then it says owed
12  $5,103.32?
13    A.  That's correct.
14    Q.  And then after that you ask
15  Mr. Kumar, why don't you send me a
16  check for $9,000 to cover this and the
17  next months expenses.  You can make out
18  the check to John Nickels and mail it
19  to your address?
20    A.  That's correct.
21    Q.  And then if you will turn
22  forward to the page that's Bates labeled
23  22466, you'll see Mr. Kumar's reply.
24    Do you see that it's dated
25  8-16-2012 at 10:37:54?

1    A.  Yes, I do.
2    Q.  mkumar@pclabservices.com,
3  right?
4    A.  Correct.
5    Q.  And the last line of the
6  second full paragraph states, I will
7  personally deliver funds as well.
8    Did I read that correctly?
9    A.  So I'm looking at the last
10  Dr. JN, and I don't see that there.
11  Was it the one above it?
12    Q.  Oh, sure.  So his message it
13  says, Dr. JN, first it says, thanks for
14  the update.
15    Right?
16    A.  Yeah.
17    Q.  And then, you know, next
18  sentence has a couple of paragraphs
19  before the kindly let me know, it
20  states, I will personally deliver funds
21  as well.
22    Do you see that?
23    A.  Yes, I do see that.
24    Q.  And I read that correctly?
25    A.  You did.

1    Q.  Did Mr. Kumar ever personally
2  deliver funds to you?
3    A.  He did.
4    Q.  How often?
5    A.  I'm sorry?
6    Q.  How often did he do so?
7    A.  How often?  That I can't
8  tell you.  I know maybe every other
9  month or something like that.  I just
10  -- I don't recall how frequently he
11  would come in to see me and give me a
12  check.
13    Q.  So when he delivered the
14  funds was it cash, check?
15    A.  Check.
16    Q.  Was it always a check?
17    A.  Always a check.
18    Q.  What bank did you use at the
19  time?
20    A.  Fifth Third Bank.
21    Q.  Would you deposit those
22  checks into Fifth Third Bank?
23    A.  I would.
24    Q.  Was that a bank account for
25  your practice, yourself personally?

1    A.  No, it was a business
2  account for Cleveland Back and Pain
3  Management Center.
4    - - - - -
5    (Thereupon, Deposition
6    Exhibit-2 was marked for
7    purposes of identification.)
8    - - - - -
9    Q.  I'm going to show you what's
10  been marked as Exhibit 2.
11    MR. WARD:  There are two checks
12  in that exhibit.
13    Q.  So what's in Exhibit 2, Dr.
14  Nickels, are two checks written out to
15  yourself, correct?
16    A.  Correct.
17    Q.  One dated 3-21-2012 and the
18  other dated 9-11-2012?
19    A.  I believe that should be
20  8-21-12.
21    Q.  8-21?
22    A.  I believe so.  I mean, we
23  weren't -- the machine wasn't even
24  running in March so ...
25    Q.  You mentioned you signed the

Case: 1:17-cv-01086-DCN  Doc #: 118-1 Filed: 08/20/21  184 of 283.  PageID #: 1283

Cefaratti Group
THE LITIGATION SUPPORT COMPANY
1.800.694.4787          www.cefgroup.com          fax: 216.687.0973
Cleveland: 1468 West 9th Avenue, Cleveland, OH 44103 - 216.696.9181
Akron: 140 S. Main Street, Suite 1445, Akron, OH  44308 - 330.253.8119

1 contract in February of 2012 earlier?
2        A. February or March.
3        Q. February. So you signed the
4 contract around February or March?
5        A. Right. But it took us
6 probably six months to get everything
7 certified, get me certified, get the
8 machine calibrated to get the testing
9 accurate. And I would -- I believe
10 this check was from 8-21. And I think
11 probably these e-mails were around
12 August 14, August 16, August 23rd. So
13 I got to believe that is August 21st.
14        Q. Yeah. So handwriting aside
15 we can probably figure out when the
16 check was written from the bank, but
17 you'd agree that this is a check written
18 to you?
19        A. Correct.
20        Q. Okay. Do you know who MK
21 Land Holdings, LLC is?
22        A. I do not.
23        Q. Okay. Do you know why MK
24 Land Holdings, LLC would have written
25 you a check?

1        A. I do not.
2        Q. I will represent to you that
3 MK Land Holdings, LLC is a company of
4 Manoj Kumar's.
5        A. That's new to me.
6        Q. You mentioned that, you know,
7 Mr. Kumar brought you checks, were the
8 checks he brought to you usually from
9 himself personally?
10        A. I thought these checks were
11 from, you know, a subsidiary of
12 Physician Choice Labs. And just -- I
13 didn't even consider that not being part
14 of Physician Choice Labs. And, again, I
15 thought he was an agent for Physician
16 Choice Labs. So I didn't even blink or
17 say anything about the MK Land Holdings,
18 LLC.
19        Q. So you felt the checks were
20 coming from PCLS?
21        A. I did.
22          - - - - -
23          (Thereupon, Deposition
24          Exhibit-3 was marked for
25          purposes of identification.)

1          - - - - -
2        Q. I'm going to show you what's
3 been marked as Exhibit 3. And Exhibit
4 3 is also e-mail correspondence between
5 yourself and Manoj Kumar, correct?
6        A. That's correct.
7        Q. And I'd ask you to turn to
8 the second to last page, Bates labeled
9 22523.
10        A. I have it.
11        Q. And in this part of the
12 e-mail chain is correspondence between
13 yourself and Jay Chambers?
14        A. Correct.
15        Q. And could you just explain
16 to me who Jay Chambers was again?
17        A. Certainly. Jay Chambers
18 operated a company, I think it was
19 Physicians Service Bureau on Mayfield
20 Road in Cleveland. And he did all my
21 billing for probably at least 15 years
22 of my practice.
23        Q. If you'll turn to the first
24 page, which is where the e-mail
25 correspondence between yourself and Mr.

1 Kumar begins on November 24th, 2012.
2 Do you see that?
3        A. I do.
4        Q. You're forwarding the
5 correspondence from Mr. Chambers to Mr.
6 Kumar?
7        A. Correct.
8        Q. And in that e-mail you say,
9 Manoj, Happy Thanksgiving. And then
10 second line, it looks like we are
11 finally seeing some collections. I do
12 have the numbers from Oral Solutions
13 that show how much they collect from
14 commercial and federal plans at this
15 time.
16        Did I read that correctly?
17        A. You did.
18        Q. Who was Oral Solutions?
19        A. Good question. I believe I
20 meant to say from Physician Choice Labs,
21 because I never dealt with an Oral
22 Solutions before.
23        Q. So you think you would have
24 been referencing, you know, the numbers
25 from PCLS in terms of collections from

Cefaratti Group - DC
THE LITIGATION SUPPORT COMPANY
1.800.694.4787          www.cefgroup.com          fax: 216.687.0973
Cleveland: 1468 West 9th Avenue, Cleveland, OH 44113 - 216.687.0973
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308 - 330.253.8119
Case: 1:17-cv-01188-DCN Doc #: 42-11 Filed: 08/20/21 Page 185 of 283

**Page 42**

1 commercial and federal plans?
2     A. Correct. Because that's what
3 we were looking for to show him what
4 our collections were. Because, again,
5 every time he came he pushed, you got
6 to do more tests, you got to do more
7 tests, you got to do more tests.
8     And I kept saying, well, we're
9 not making any money on your tests, so
10 I'm going to just continue to do what I
11 do.
12     And Manoj actually went to talk
13 to Jay Chambers, and Laura Wolmak was
14 his assistant in the billing company
15 that did most of my billings, and he
16 was trying to get me to get some
17 payouts. And that's where the above
18 e-mail came from, and these are his
19 numbers what we collected, and the
20 number of samples, and the average
21 collection per sample. And so it
22 appears that, you know, we're -- you
23 know, we're doing well, so you need to
24 start sending more samples.
25     Q. So would Jay Chambers'

**Page 43**

1 billing company, would they be
2 collecting for the confirmation samples
3 that were sent?
4     A. No, not at all.
5     Q. So they would be collecting
6 for samples sent on your desktop
7 analyzer?
8     A. Correct.
9     Q. In that e-mail that we're
10 talking about from yourself to Manoj
11 Kumar, next line you state, let's get
12 together next week if possible to
13 discuss. I also have $8,410.75 in
14 expenses that I need to be reimbursed
15 for per my agreement with Phil.
16     Did I read that correctly?
17     A. You did.
18     Q. Who is the Phil that you
19 were referencing in that sentence?
20     A. I believe probably Phil
21 McHugh, but I don't remember for sure.
22     Q. What was the agreement with
23 Phil McHugh that you were referencing in
24 that sentence?
25     A. I truly can't remember. I

**Page 44**

1 mean, it might have been just for the
2 ... Kiana's salary as a collector, but
3 that would have been it. I mean, at
4 this point I'm sure we're running
5 samples in their machines, so ...
6     Q. You mentioned their machine,
7 who do you mean by their?
8     A. Ray Fuller's machine.
9     Q. So as you sit here today you
10 don't remember the details of what
11 agreement you had with Phil McHugh, is
12 that right?
13     MR. CAUDILL: That's asked and
14 answered.
15     A. That's correct.
16     Q. But you would agree with me
17 that your e-mail correspondence in
18 November of 2012 references an agreement
19 with Phil McHugh?
20     MR. CAUDILL: It's also asked and
21 answered.
22     A. Yes, it does.
23         - - - - -
24     (Thereupon, Deposition
25     Exhibit-4 was marked for

**Page 45**

1 purposes of identification.)
2         - - - - -
3     Q. I'm going to show you what's
4 been marked as Exhibit 4. And Exhibit
5 4 is likewise e-mail correspondence
6 between yourself and Manoj Kumar in
7 November of 2012, correct?
8     A. That's correct.
9     Q. And this is actually, if
10 you'll turn back, additional e-mails on
11 the chain that we were talking about in
12 Exhibit 3, right?
13     A. Correct.
14     Q. And in the latest e-mail in
15 this chain there's an attachment to it
16 entitled, expenses for Manoj, right?
17     A. I'm sorry, on what page?
18     Q. Certainly. On page 1 --
19     A. Okay.
20     Q. -- the very latest in time
21 e-mail on November 26th, 2012 from
22 yourself to Manoj Kumar. There's an
23 attachment, one of which is entitled,
24 expenses for Manoj, correct?
25     Do you see the attachments line

1  under from sent to?
2      A. I'm sorry, I do see that.
3      Q. Yes. Yes, sir. And it says
4  expenses for Manoj?
5      A. Right.
6      Q. And then in the body of the
7  e-mail you state, Manoj, I have attached
8  an update of what is owed to me. I
9  forgot to add the additional urine cups
10 we purchased to do the tests that you
11 said you would pay for. After your
12 last payment of $9,000 on 9-11-12 I gave
13 you a credit of $4,546 when it should
14 have been only $454.60. I've made the
15 corrections and have attached the most
16 current amount due.
17     Did I read that correctly?
18     A. Yes, you did.
19     Q. Okay. So on 9-11-2012 Manoj
20 Kumar paid you $9,000?
21     MR. CAUDILL: Objection. You can
22 answer, I'll just object to the form.
23     A. Specifically for that I don't
24 recall.
25     Q. Your e-mail references a

1  payment of $9,000 from Manoj Kumar on
2  9-11-12, correct?
3      MR. CAUDILL: That's asked and
4  answered.
5      A. Correct.
6      THE WITNESS: Sorry.
7      Q. Let's turn to the very last
8  page of this exhibit, which is the
9  expenses for Manoj attachment.
10     Do you see that, it's Bates
11 labeled 22540?
12     A. I do.
13     Q. And then you'll see the
14 expenses start and they're numbered 1
15 through 10, and they total $8,103, paid
16 $3,000, balance $5,103.32?
17     A. I see that.
18     Q. Is that the same expenses
19 that we were talking about earlier? We
20 can look back, if you want to.
21     A. Well, I'm sure that check
22 that we have here probably corresponds
23 to that same date that it -- I was paid
24 $3,000.
25     Q. Right. So there's a $3,000

1  check we looked at, and then the expense
2  list says paid $3,000?
3      A. Correct.
4      Q. And then if you'll just turn
5  back to Exhibit 1 for me, just so we
6  can make sure we're on the same page.
7  There's a list of ten expenses in
8  Exhibit 1, right?
9      A. Correct.
10     Q. And those are the same ten
11 expenses totalling the same amount in
12 this exhibit?
13     A. That's correct.
14     Q. So going back to the expense
15 list in Exhibit 4, you pick up from
16 there and list, you know, more expenses
17 starting at number 11 through 17,
18 correct?
19     A. Correct.
20     Q. And those expenses total
21 $8,845.40, right?
22     A. I would believe so, but I
23 think that would include expenses 1
24 through 10 also, because I can't see
25 where 11 through 17 would equal $8,845.

1      Q. Fair enough. So the total
2  below 17 would be the total outstanding
3  expenses to date when you take into
4  account, you know, expenses 1 through
5  10, and the $3,000 paid plus the 11 to
6  17?
7      A. That's correct. I don't
8  have a calculator, but I think that's
9  accurate probably accounting.
10     Q. And then after that you note
11 there was a payment of $9,000?
12     A. Correct.
13     Q. And that leaves a credit of
14 $454.61?
15     A. Correct.
16     Q. And then you also list
17 expenses 18 through 32, right?
18     A. Correct.
19     Q. And the Pearl salary and
20 Kiana's salary, that's the Pearl and
21 Kiana you've talked about earlier, the
22 lab tech and the collector, right?
23     A. That's correct.
24     Q. And then those expenses total
25 or the expenses to date through expense

1 32 totals $15,232.13, right?
2        A. I will trust your
3 calculations.
4        Q. Well, that's -- I haven't
5 done any calculations, but that's just
6 what the expense list that you sent Mr.
7 Kumar states, right?
8        A. Yes, sir, that's correct.
9        Q. Okay. And then the expense
10 list you sent Mr. Kumar states total due
11 $14,777.52?
12        A. Correct.
13        Q. I'm a lawyer, we don't do
14 math, so ... (Laughter.)
15        - - - - -
16        (Thereupon, Deposition
17        Exhibit-5 was marked for
18        purposes of identification.)
19        - - - - -
20        Q. I'm going to show you what's
21 being marked as Exhibit 5.
22        MR. WARD: Thank you.
23        MR. JOHNSON: Yeah, okay. Make
24 sure I mark the right one for you.
25        Q. And Exhibit 5 begins with

1 e-mail correspondence between yourself
2 and Manoj Kumar in December of 2012,
3 correct?
4        A. January 2nd of 2013, I
5 believe.
6        Q. So --
7        A. Oh, I'm sorry, December 31st,
8 '12, you're correct.
9        Q. So this is an e-mail that
10 Mr. Kumar forwarded to himself, but the
11 underlying e-mail correspondence from
12 yourself and Mr. Kumar was December
13 31st, 2012, right?
14        A. I believe so, yes.
15        Q. Okay. And you state, I've
16 enclosed the updated bill so you can
17 bring funds with you next week. I'm
18 looking forward to seeing you and Phil.
19        Did I read that correctly?
20        A. You did.
21        Q. Okay. And then if you'll
22 turn to the attachment, that's another
23 expense list, correct?
24        A. That's correct.
25        Q. And the total due there is

1 $16,413.03?
2        A. Correct.
3        - - - - -
4        (Thereupon, Deposition
5        Exhibit-6 was marked for
6        purposes of identification.)
7        - - - - -
8        Q. I'm going to show you what's
9 been marked as Exhibit 6. This is
10 another e-mail correspondence between
11 yourself and Mr. Kumar that Mr. Kumar
12 forwarded to himself, correct?
13        A. That's correct.
14        Q. Okay. And this is -- the
15 underlying correspondence between
16 yourself and Mr. Kumar is dated January
17 2nd, 2013, right?
18        A. I'm sorry, what date did you
19 say?
20        Q. January 2nd, 2013.
21        A. Oh, I'm sorry, you're
22 correct. That's absolutely right.
23        Q. And in this e-mail you write
24 to Mr. Kumar, Manoj, I just received
25 this report from Jay. I wanted to get

1 it to you before our meeting. I also
2 have two additional payments to add to
3 our current bill of $16,413.03. Pearl's
4 salary of $439.38 and ABS' fee for 150
5 tests of $3,879. That brings the total
6 to $20,731.41. Please bring funds to
7 cover these expenses. Looking forward to
8 seeing you tomorrow. Please check out
9 these enclosed numbers. John.
10        Did I read that correctly?
11        A. You did.
12        Q. I want to go back to Exhibit
13 5. In your e-mail to Mr. Kumar on
14 December 31st, 2012 in Exhibit 5, you
15 note, I'm looking forward to seeing you
16 and Phil.
17        What Phil are you referencing
18 there?
19        A. It has to be Phil McHugh.
20        Q. Why were you meeting with
21 Manoj Kumar and Phil McHugh in December
22 to January of 2012 to 2013?
23        MR. CAUDILL: Objection to form.
24 You can answer.
25        A. I can't remember. I don't

1   think I saw Phil many times, because
2   like I said I don't think I could
3   identify him today.  But, you know, he
4   ran the lab, I believe and, you know, I
5   guess he wanted to come talk about the
6   number of samples.  Because that's all
7   we baffled with, and that still is what
8   baffles me with these expenses is
9   they're, you know, samples that we use
10  their machine for.  That, you know, I
11  paid from Cleveland Back and Pain to
12  them, and that's where eventually I get
13  to the point that, you know, the
14  numbers, because we were so low, were
15  costing me more money than what we were
16  bringing in.  So, you know, I was able
17  to reduce the price, you know, from the
18  $22 to $17, it helped tremendously.
19      Q.  I know you mentioned you
20  couldn't pick Mr. McHugh out of a
21  lineup, you did meet with him, correct?
22      A.  I did.
23      Q.  Do you remember roughly how
24  many times you met with Mr. McHugh?
25      A.  And I misspoke, this meeting

1   that we planned on January 2nd, again, I
2   don't recall meeting with Phil -- that's
3   not the one that said Phil, did it?
4   But, again, I don't recall Manoj ever
5   coming with Phil.  He could have, but I
6   don't remember that time.
7       Q.  The meetings with Phil that
8   you do remember, what were the
9   circumstances of those meetings?
10      MR. CAUDILL:  Objection, lacks
11  foundation.
12      A.  I think that was at the
13  beginning when we were, you know,
14  getting our reference lab in order.
15  And, you know, he was talking about the
16  company that was going to be doing the
17  confirmation testing.  And I think, you
18  know, it was just about the business
19  going through, you know, what they do.
20      Again, we had to pick out what
21  drugs we wanted to test so that, you
22  know, they could set up our panels.
23  Because we could only run 12 tests on
24  the machine.  And then I'm sure he came
25  just to introduce himself, say hi and --

1   you know, and that's probably the only
2   time I recall meeting him.  And to be
3   honest, I don't recall that meeting, but
4   I'm assuming he came to meet with me.
5       Q.  Just so we're all clear on
6   the record, regardless of the specifics
7   of any meeting, you do recall physically
8   meeting in person with Phil McHugh,
9   correct?
10      A.  I do not.
11      Q.  You don't?
12      A.  I do not.
13      Q.  Can you say that you didn't
14  meet with him?
15      MR. CAUDILL:  Objection, he's
16  answered this question.
17      A.  I don't recall meeting him.
18      Q.  But you're familiar with who
19  he is?
20      A.  Correct.
21      MR. CAUDILL:  Objection.  You've
22  answered that question, sir.
23      - - - - -
24      (Thereupon, Deposition
25      Exhibit-7 was marked for

1       purposes of identification.)
2       - - - - -
3       Q.  I'm going to show you what's
4   being marked as Exhibit 7.  Exhibit 7
5   is an e-mail from Vera, and I'm probably
6   going to mess the pronunciation of this,
7   Beqaj, to Manoj.  Within subject line of
8   invoice for Cleveland Back and Pain from
9   CLC, and an attachment entitled,
10  Cleveland Back and Pain Center
11  September.pdf.
12      MR. CAUDILL:  So I'm going to
13  object to that question.  He's not -- I
14  don't know how he would know what this
15  document is.
16      MR. JOHNSON:  I was just
17  describing what the exhibit was to him,
18  I don't think it was a question.
19      Q.  Do you see the document I
20  just referenced?
21      MR. CAUDILL:  Objection.  Again,
22  I don't know how he would know what
23  this is.
24      MR. JOHNSON:  I'm asking if he
25  can see the document in front of him

Page 58

```
1    that I just described, not if he knows
2    what it is.
3         MR. CAUDILL:  The way you
4    described it as an e-mail from someone
5    to someone, and he's not copied on this
6    e-mail.  The question lacks foundation.
7         MR. JOHNSON:  You're saying the
8    witness doesn't have a foundation to
9    testify to something he's physically
10   looking at right now?
11        MR. CAUDILL:  He doesn't know
12   what it is.  For all he knows you could
13   have typed this up this morning.
14        MR. JOHNSON:  But my question was
15   not what is this document.  My question
16   is, do you see the document I just
17   described in front of you.
18        MR. CAUDILL:  All right.  I'll
19   be -- he can answer that question.
20        MR. JOHNSON:  I think he can.
21        A.  I do see that document.
22        Q.  If you will turn to the
23   second page of that document, there is
24   an invoice from Clinical Lab Consulting,
25   LLC, do you know who Clinical Lab
```

Page 59

```
1    Consulting, LLC is?
2         A.  I do not.
3         Q.  Okay.  It says bill to
4    Cleveland Back and Pain Center, John
5    Nickels, and it has an address.
6         Is that the address of Cleveland
7    Back and Pain Center where you operated?
8         A.  Yes, it is.
9         Q.  And the invoice is for
10   $1300, correct?
11        A.  That's correct.
12        Q.  And it has -- the
13   description of the invoice is
14   directorship fee for the month of
15   September.
16        Do you know what directorship fee
17   is referencing?
18        A.  I do not.
19        Q.  Do you know why Clinical Lab
20   Consulting, LLC would have sent an
21   invoice for your practice to Manoj?
22        MR. CAUDILL:  Objection, lacks
23   foundation.
24        A.  I have no idea.
25        Q.  Did you yourself ever have
```

Page 60

```
1    any communications with Clinical Lab
2    Consulting, LLC?
3         A.  Not that I remember.
4         - - - - -
5         (Thereupon, Deposition
6         Exhibit-8 was marked for
7         purposes of identification.)
8         - - - - -
9         Q.  I'm going to show you what's
10   being marked as Exhibit 8.  What's in
11   Exhibit 8 is a series of checks from MK
12   Land Holdings, LLC to CLC.
13        MR. CAUDILL:  Objection.
14        MR. JOHNSON:  What's the basis
15   for your objection?
16        MR. CAUDILL:  Well, I mean, again
17   are you going to ever ask him if he's
18   ever seen these documents before or
19   knows anything about them?
20        MR. JOHNSON:  Well, Bo, I think
21   I'm entitled to just describe the
22   exhibits for the reference point.
23        MR. CAUDILL:  So just to be
24   clear, your question here is, are these
25   pictures of checks?
```

Page 61

```
1         MR. JOHNSON:  That wasn't a
2    question, that was a statement, Bo --
3         MR. CAUDILL:  All right.
4    Well ...
5         MR. JOHNSON:  -- as a helpful
6    reference to what we were talking about
7    in Exhibit 8.
8         MR. CAUDILL:  Okay.
9         Q.  Dr. Nickels, Exhibit 8 is a
10   series of copies of checks from MK Land
11   Holdings, LLC to CLC.  Do you know why
12   MK Land Holdings would have been writing
13   checks to CLC?
14        MR. CAUDILL:  So I'm going to
15   object again because there's no
16   foundation for this question.  He
17   doesn't -- he's not testified that he
18   even knows that this occurred, let alone
19   why it would have occurred.
20        MR. JOHNSON:  Right.  So I'm
21   asking him what his personal knowledge
22   of whether it happened was.  And he can
23   answer, I do know why or I don't know
24   why.
25        MR. CAUDILL:  Well, the question
```

Case: 1:17-cv-01570-DCC  Doc #: 42-13  Filed: 08/20/21  Page 190 of 283

Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787          www.cefgroup.com          fax: 216.687.0973
Cleveland: 1468 West Ninth Avenue, Cleveland, OH 44113 - 216.687.9000
Akron: 140 S. Main Street, Suite 220, Akron, OH 44308 - 330.253.8119

## Page 62

1   calls for speculation, and it lacks
2   foundation. That's my objection.
3       Q. We'll do this another way.
4   Could you turn to the second to last
5   page. You'll see a -- in the second to
6   last page, Dr. Nickels, you'll see a
7   copy of a check entitled from MK Land
8   Holdings, LLC paid to the order of CLC,
9   that in the memo line references
10  Cleveland Back and Pain.
11      Did I read that correctly?
12      A. You did.
13      Q. Okay. Do you know why MK
14  Land Holdings, Manoj Kumar's company,
15  would have been writing checks to CLC
16  referencing Cleveland Back and Pain,
17  your practice?
18      MR. CAUDILL: Same objection.
19      A. I have no idea why.
20          - - - - -
21      (Thereupon, Deposition
22      Exhibit-9 was marked for
23      purposes of identification.)
24          - - - - -
25      Q. I'm showing you what's being

## Page 63

1   marked as Exhibit 9. What's in Exhibit
2   9 is an e-mail chain from Manoj Kumar
3   and yourself, correct?
4       A. That's correct.
5       Q. And if you'll see on the
6   Wednesday, December 12th, 2012 e-mail,
7   Phil McHugh is blind carbon copied,
8   correct?
9       A. Phil McHugh is what?
10      Q. Bcc'd?
11      A. I'm sorry, is -- what was
12  the question?
13      Q. Is Bcc'd, blind carbon
14  copied?
15      A. Oh, I'm sorry, yes. But I
16  don't see the cc, but ...
17      Q. You'll see under the --
18  there's a from, sent, to, and then a
19  bcc line at the top?
20      A. I see attachments.
21      Q. Two up from attachments.
22      A. Oh, I'm sorry, yes, bcc.
23      Q. And that says Phil McHugh?
24      A. I didn't know what that bcc
25  meant.

## Page 64

1       Q. If you will turn to the end
2   of this e-mail correspondence or the
3   earliest e-mail correspondence on pages
4   -- the second and third pages, Dr.
5   Nickels. The first e-mail is an e-mail
6   from Jay Chambers to yourself in
7   November of 2012, correct?
8       A. Yes, the bottom paragraph is
9   from Jay Chambers 11-28-2012.
10      Q. And it's to you and the
11  subject is UDS, right?
12      A. Correct.
13      Q. And UDS is short for urine
14  drug screen?
15      A. Correct.
16      Q. And Jay attaches a
17  spreadsheet with totals and then there's
18  a recap of that spreadsheet in the body
19  of the e-mail, correct?
20      A. That's correct.
21      Q. Okay. And if you'll look at
22  the spreadsheet reproduced in the body
23  of the e-mail on the last page of this
24  exhibit it's got a section for Medicaid,
25  and it's got a section for Medicare,

## Page 65

1   correct?
2       A. Yes, that's correct.
3       Q. And the far left column is
4   entitled code, right?
5       A. Correct.
6       Q. What codes are being
7   referenced there?
8       A. Codes are how we bill
9   medically. So if I have an office
10  visit the code for that is 99213. And
11  that way when it's submitted to the
12  insurance company they know what
13  happened. These codes are all the
14  specific codes for urine drug screens.
15      I'm not sure why -- well, below
16  is that -- the top one has eight, the
17  bottom one has ten codes. And I'm
18  pretty sure it was the ten codes that
19  we were billing even on the top, but
20  these were the numbers we were looking
21  for to see what we were being paid per
22  code. I'm sorry, those are number 1,
23  2, 3, 4, I'm sorry, on the bottom were
24  only five codes.
25      Q. So the 81003 that's a code,

Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787          www.cefgroup.com          fax: 216.687.0973
Cleveland: 1285 West Third Avenue, Cleveland, OH  44113          216.696.1616
Akron: 140 S. Main Street, Suite 1445, Akron, OH  44308          330.253.8119

Page 66

1  right?
2        A.  Correct.
3        Q.  And then the -- at the end
4  the G0434 that's also a code?
5        A.  Exactly.
6        Q.  And the -- there's an
7  average paid column under that, and for
8  example the 81003 that has a $3.18
9  average pay.  And then the last code,
10 the G0434 has $12.24 average paid,
11 right?
12       A.  Correct.
13       Q.  And then the G0431 has an
14 average paid of $61.20?
15       A.  Correct.
16       Q.  Do you know why the G0431
17 code had the highest average paid?
18       A.  I have no idea.
19       Q.  For Medicaid codes there's
20 only one code listed there and it's
21 80101, correct?
22       A.  Correct.
23       Q.  And that has an average paid
24 of $221, right?
25       A.  Correct.

Page 67

1        Q.  Do you know why that code
2  paid so much more on average?
3        A.  I do not.
4        Q.  What does the column entitled
5  encounters mean?
6        A.  I believe that would be the
7  amount of urine drug screens that we
8  billed for.
9        Q.  How is that different from
10 the units column?
11       A.  I don't know.
12       Q.  With Medicare at least the
13 numbers are the same.  I was just
14 curious if you knew why the -- what the
15 difference between encounters and units
16 would be?
17       A.  I don't know.  It should be
18 the same.
19       Q.  And then the total billed is
20 I assume what it means, the total
21 billed?
22       A.  Correct.
23       Q.  What does total allowed mean?
24       A.  I believe that means what
25 the insurance would allow in payment for

Page 68

1  those tests.
2        Q.  And then the total paid I
3  assume would mean the total that was
4  actually paid by the insurance company?
5        A.  You know, I believe so.  I
6  never dealt any with the billings I was
7  just send -- well, not even me, the
8  office staff would send all the bills to
9  Jay Chambers and he would do the
10 billing.  And this I'm sure was what
11 Manoj was looking for to show us exactly
12 what we were being paid per test in
13 hopes that we would start sending more
14 tests to them.
15       Q.  Did Mr. Kumar ever pressure
16 you to send more tests to PCLS?
17       A.  Pressure?  I don't think he
18 was a pressure guy.  I don't think he
19 -- you know, you got to do this, you
20 got to do that.  But, you know, he kept
21 trying to show me the numbers and say
22 here, here's what you're collecting on
23 this machine, you know, you need to
24 start doing more tests through that.
25 And I believe that's -- was his

Page 69

1  statement to me.
2        Q.  Did Mr. Kumar ever indicate
3  that he would like for you to send more
4  tests to PCLS?
5        A.  Do what now?
6        Q.  Did Mr. Kumar ever indicate
7  to you that he would like for you to
8  send more tests to PCLS?
9        A.  Yes, absolutely.
10       Q.  In the body of the, you
11 know, e-mail that Jay sent to you on
12 11-28-2012, the I guess the second to
13 last sentence in the first paragraph
14 states, I hope this, plus the small
15 recap below, will give you the data and
16 insight you need to make a good
17 decision.
18       Do you know what decision Mr.
19 Chambers was referencing there?
20       A.  Absolutely.  I'm pretty sure
21 it had to do with, you know, the
22 decision whether to run more tests
23 through the machine or to not.
24       Q.  I'd like you to turn your
25 attention to the e-mail above where

Cefaratti Group - DC
THE LITIGATION SUPPORT COMPANY
1.800.694.4787          www.cefgroup.com          fax: 216.687.0973
Cleveland: 1360 East 9th Avenue, Cleveland, OH 44103     330.696.1283
Akron: 140 S. Main Street, Suite 1445, Akron, OH  44308  ·  330.253.8119
Case: 1:17-cr-00169-DCN Doc #: 142-2 Filed: 08/20/21  Page 1 of 1

## Page 62

1 calls for speculation, and it lacks
2 foundation. That's my objection.
3 Q. We'll do this another way.
4 Could you turn to the second to last
5 page. You'll see a -- in the second to
6 last page, Dr. Nickels, you'll see a
7 copy of a check entitled from MK Land
8 Holdings, LLC paid to the order of CLC,
9 that in the memo line references
10 Cleveland Back and Pain.
11        Did I read that correctly?
12     A. You did.
13     Q. Okay. Do you know why MK
14 Land Holdings, Manoj Kumar's company,
15 would have been writing checks to CLC
16 referencing Cleveland Back and Pain,
17 your practice?
18     MR. CAUDILL: Same objection.
19     A. I have no idea why.
20        - - - - -
21     (Thereupon, Deposition
22     Exhibit-9 was marked for
23     purposes of identification.)
24        - - - - -
25     Q. I'm showing you what's being

## Page 63

1 marked as Exhibit 9. What's in Exhibit
2 9 is an e-mail chain from Manoj Kumar
3 and yourself, correct?
4     A. That's correct.
5     Q. And if you'll see on the
6 Wednesday, December 12th, 2012 e-mail,
7 Phil McHugh is blind carbon copied,
8 correct?
9     A. Phil McHugh is what?
10     Q. Bcc'd?
11     A. I'm sorry, is -- what was
12 the question?
13     Q. Is Bcc'd, blind carbon
14 copied?
15     A. Oh, I'm sorry, yes. But I
16 don't see the cc, but ...
17     Q. You'll see under the --
18 there's a from, sent, to, and then a
19 bcc line at the top?
20     A. I see attachments.
21     Q. Two up from attachments.
22     A. Oh, I'm sorry, yes, bcc.
23     Q. And that says Phil McHugh?
24     A. I didn't know what that bcc
25 meant.

## Page 64

1     Q. If you will turn to the end
2 of this e-mail correspondence or the
3 earliest e-mail correspondence on pages
4 -- the second and third pages, Dr.
5 Nickels. The first e-mail is an e-mail
6 from Jay Chambers to yourself in
7 November of 2012, correct?
8     A. Yes, the bottom paragraph is
9 from Jay Chambers 11-28-2012.
10     Q. And it's to you and the
11 subject is UDS, right?
12     A. Correct.
13     Q. And UDS is short for urine
14 drug screen?
15     A. Correct.
16     Q. And Jay attaches a
17 spreadsheet with totals and then there's
18 a recap of that spreadsheet in the body
19 of the e-mail, correct?
20     A. That's correct.
21     Q. Okay. And if you'll look at
22 the spreadsheet reproduced in the body
23 of the e-mail on the last page of this
24 exhibit it's got a section for Medicaid,
25 and it's got a section for Medicare,

## Page 65

1 correct?
2     A. Yes, that's correct.
3     Q. And the far left column is
4 entitled code, right?
5     A. Correct.
6     Q. What codes are being
7 referenced there?
8     A. Codes are how we bill
9 medically. So if I have an office
10 visit the code for that is 99213. And
11 that way when it's submitted to the
12 insurance company they know what
13 happened. These codes are all the
14 specific codes for urine drug screens.
15        I'm not sure why -- well, below
16 is that -- the top one has eight, the
17 bottom one has ten codes. And I'm
18 pretty sure it was the ten codes that
19 we were billing even on the top, but
20 these were the numbers we were looking
21 for to see what we were being paid per
22 code. I'm sorry, those are number 1,
23 2, 3, 4, I'm sorry, on the bottom were
24 only five codes.
25     Q. So the 81003 that's a code,

Cefaratti Group
THE LITIGATION SUPPORT COMPANY
1.800.694.4787      www.cefgroup.com      fax: 216.687.0973
Cleveland: 1468 West Ninth Avenue, Cleveland, OH 44103 - 216.685.9791
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308 - 330.253.8119

**Page 86**

1     ERRATA SHEET
2   PAGE LINE          CORRECTION AND REASON
3     .
4     .
5     .
6     .
7     .
8     .
9     .
10    .
11    .
12    .
13    .
14    .
15    .
16    .
17    .
18    .
19    .
20    .
21    .
22    .
23    .
24    .
25    .

**Page 88**

1        I am not, nor is the court
2   reporting firm with which I am
3   affiliated, under a contract as defined
4   in Civil Rule 28 (D).
5        IN WITNESS WHEREOF, I have
6   hereunto set my hand this _____ day of
7   _____ , 2020.
8     .
9     .
10
11    _____
12        Kelly A. Dell'Anno, Notary Public
13        within and for the State of Ohio
14    .
15    .
16    .
17    .
18   My commission expires
19   October 8, 2023.
20    .
21    .
22    .
23    .
24    .
25    .

**Page 87**

1            CERTIFICATE
2     .
3   State of Ohio      )    SS.:
4   County of Cuyahoga )
5        I, Kelly A. Dell'Anno, a Notary
6   Public within and for the State of Ohio,
7   duly commissioned and qualified, do
8   hereby certify that the within named
9   witness, was duly sworn to testify the
10  truth, the whole truth and nothing but
11  the truth in the cause aforesaid; that
12  the testimony then given by the witness
13  was by me reduced to stenotypy in the
14  presence of said witness; afterwards
15  transcribed, and that the foregoing is a
16  true and correct transcription of the
17  testimony so given by the witness.
18       I do further certify that this
19  deposition was taken at the time and
20  place in the foregoing caption
21  specified.
22       I do further certify that I am
23  not a relative, counsel or attorney for
24  either party, or otherwise interested in
25  the event of this action.

Deposition of Mark Roth

U.S.A. et rel HARTNETT v. PHYSICIAN'S CHOICE
LABORATORY SERVICES, ET AL.

November 10, 2020



P.O. Box 33364
Charlotte, NC 28233
(704) 300-9770

office@queencitycourtreporting.com
www.queencitycourtreporting.com

| | | |
|---|---|---|
| 1 | A. | Same -- same thing. |
| 2 | Q. | Okay. What were your, and, again, I don't need some |
| 3 | | granular detail on this, but in general, as a lab tech, |
| 4 | | other than physically processing samples, did you have |
| 5 | | any other duties? |
| 6 | A. | At PCLS? |
| 7 | Q. | Yes; correct. |
| 8 | A. | I processed samples. I answered the phones. I helped |
| 9 | | build software systems, helped develop processes. It |
| 10 | | was a small company back in 2009, so there were a lot |
| 11 | | of things to do. |
| 12 | Q. | Okay. And how many people -- so did you physically |
| 13 | | work in the lab? |
| 14 | A. | Yes. |
| 15 | Q. | Okay. And how many people physically worked in the lab |
| 16 | | with you in 2009? |
| 17 | A. | Two to three; two to four. |
| 18 | Q. | Got it. And what were their roles? |
| 19 | A. | One was a scientist. One was another lab tech. One |
| 20 | | was a part-time quality person. One was a data entry |
| 21 | | person. |
| 22 | Q. | Okay. So after -- well, between 2009 and 2011 when you |
| 23 | | were promoted to lab manager, did the lab itself, the |
| 24 | | way it was staffed, did that change in any way, meaning |
| 25 | | did it grow? Did it shrink? |

| | | |
|---|---|---|
| 1 | A. | Yeah. The lab grew. |
| 2 | Q. | Okay. And how so? |
| 3 | A. | Hired more people, signed more customers, ran more |
| 4 | | samples. |
| 5 | Q. | Okay. And by the time you were promoted to lab manager |
| 6 | | in 2011, what did the lab look like at that time? How |
| 7 | | many employees in the lab? |
| 8 | A. | I don't have an exact number. I would estimate about |
| 9 | | 20. I -- you know, I -- |
| 10 | Q. | Sure. |
| 11 | A. | Something like that. |
| 12 | Q. | Okay. So when you started it was four or five |
| 13 | | including yourself. By the time you were promoted to |
| 14 | | lab manager, it was roughly give or take 20. When you |
| 15 | | were the Vice President of Operations in 2013, how big |
| 16 | | was the lab department itself, meaning how many |
| 17 | | employees roughly worked in the lab for Physician's |
| 18 | | Choice? |
| 19 | A. | Probably between 50 and 100. |
| 20 | Q. | Got it. How many -- I mean, if you were to ballpark |
| 21 | | me, how many samples were you all testing on a monthly |
| 22 | | basis back in 2009 when you first started? |
| 23 | A. | When I first started, it was between zero and 1,000 |
| 24 | | samples a month. |
| 25 | Q. | Okay. And by the time you became the Vice President of |

| | | |
|---|---|---|
| 1 | | Operations in 2013, ballpark me, how many samples was |
| 2 | | Physician's Choice testing per month at the lab? |
| 3 | A. | Between 20,000 and 40,000 samples a month |
| 4 | | approximately. |
| 5 | Q. | So I guess it's fair to say Physician's Choice was a |
| 6 | | company that experienced expodential growth between the |
| 7 | | time you started in 2009 and when you were promoted to |
| 8 | | Vice President of Operations in 2013; is that fair? |
| 9 | A. | I would say that it's fair to say that the company grew |
| 10 | | significantly over that time period. |
| 11 | Q. | Okay. And when did you stop working for Physician's |
| 12 | | Choice? |
| 13 | A. | In 2016. |
| 14 | Q. | Okay. And did you resign? Were you terminated? Did |
| 15 | | you just kind of walk out the door when its assets were |
| 16 | | sold? How did that go down? |
| 17 | A. | I don't know the technical definition of how my |
| 18 | | employment ended. I would probably say I was let go at |
| 19 | | some point in 2016. I was not part of the transition |
| 20 | | and sales of the new business. |
| 21 | Q. | Okay. So around the time that Physician's Choice was |
| 22 | | working on selling off its assets, at that time you |
| 23 | | were let go and weren't part of that transition team; |
| 24 | | is that what you're saying? |
| 25 | A. | I was part of the transition team, but I did not go to |

| | | |
|---|---|---|
| 1 | | the new company. So from the time the company -- I was |
| 2 | | let go some time in the transitional period. |
| 3 | Q. | In 2016? |
| 4 | A. | Correct. |
| 5 | Q. | Okay. All right. So we talked about your duties and |
| 6 | | what you did as a lab tech. How about when you were a |
| 7 | | lab manager, from a 30,000 foot view? Again, I don't |
| 8 | | need granular detail, but what were your job |
| 9 | | responsibilities as a lab manager? |
| 10 | A. | Managed customer service, managed logistics, made sure |
| 11 | | turnaround time was good, took care of customers and |
| 12 | | supported sales with whatever they needed from the lab |
| 13 | | side. |
| 14 | Q. | Okay. And then how about as Vice President of |
| 15 | | Operations? Again from a 30,000 foot view, what were |
| 16 | | your job responsibilities? |
| 17 | A. | I would say it's a similar -- similar responsibilities |
| 18 | | on a bigger level: supported the sales team, managed |
| 19 | | the customer service, managed the logistics department, |
| 20 | | you know, worked on new product development. And |
| 21 | | again, just supported the other departments, sales, |
| 22 | | billing, all of those other functions, however I could. |
| 23 | Q. | Just looking back, well, let's take each one of those. |
| 24 | | So when you say you supported sales, give me some idea |
| 25 | | as to what were some things that you did to support the |

**17**

1    last few years, Phil left the company on a full-time
2    basis. Marcus was responsible for legal, compliance.
3    Again, I don't know if he had a -- what -- if there was
4    a full-time involvement beyond that. Joe was CEO of
5    the company, so he was ultimately responsible for
6    everything. And then Dinah was the Chief Quality
7    Officer or Chief Compliance, something with compliance
8    and quality.
9    Q.   Okay. Got it. At its largest, if you were to ballpark
10        me, how many employees did PCLS have?
11   A.   I think it was I would say several hundred, 400 to 500,
12        something like that.
13   Q.   Got it. So as the company grew, was it your
14        understanding that in the lab industry in general, kind
15        of the compliance needs of any lab company kind of
16        change over time in accordance with new rules and
17        regulations that are sent out by state and federal
18        government agencies; is that fair?
19              MR. JOHNSON: Objection. Calls for
20              speculation.
21   Q.   You can still answer.
22   A.   It is my understanding that the rules and regulations
23        change over time.
24   Q.   And was there a compliance department, to your
25        understanding, at Physician's Choice while you were --

**18**

1    while you were there?
2    A.   Yes.
3    Q.   All right. And I'm just going to just briefly use some
4        names. You tell me whether it's your recollection as
5        to whether these individuals were involved in the
6        compliance department. Marcus Sowinski?
7    A.   Yes.
8    Q.   Dinah Meyers, was she involved in compliance?
9    A.   Yes.
10   Q.   How about Meg Wood?
11   A.   Yes. She was the general counsel. I'm not sure
12        there's a distinction between legal and compliance.
13        There probably is. So she was our lawyer. I think
14        it's a little bit different, but I would say yes.
15   Q.   Okay. How about Julie Szeker, S-z-e-k-e-r?
16   A.   I have no recollection of that person.
17   Q.   All right. How about Alan Campbell?
18   A.   Yeah. Well, yes, Alan was Executive Vice President of
19        Finance and I think the legal team and the compliance
20        team reported up through him.
21   Q.   Okay. And do you remember an outside counsel named
22        Jane Pine-Wood?
23   A.   Yes.
24   Q.   Okay. So if there was a compliance or legal question
25        that was posed by someone below the executive team, can

**19**

1    you give me some sense of who typically would field
2    that question and how it would be fielded, where it
3    would be sent to?
4    A.   It depends on the time period. So I never had a great
5        relationship with Dinah, so most of my experience, and
6        I can only really tell, talk about my experience, I
7        would send most of my questions through Alan or Mike
8        Monroe, who was our other in-house counsel. That's the
9        route that I typically took to get compliance feedback.
10   Q.   Okay. And if you ran that question through any of
11        them, what would that person typically do to get you an
12        answer to that question? Who would they consult, do
13        you know?
14              MR. JOHNSON: Objection.
15   A.   I can only speak on what I'm aware of. I know that
16        Mike Monroe had regular calls with McDonald Hopkins and
17        Jane Pine Wood. So it's my understanding that that's
18        where a lot of that feedback probably would have come
19        from.
20   Q.   Okay. Got you. Were you aware of whether Physician's
21        Choice at one point in time had a risk management
22        committee?
23   A.   Yes.
24   Q.   And just to be clear since that was a bad question, did
25        it have a risk management committee?

**20**

1    A.   I believe -- I believe so, yes.
2    Q.   All right. Do you have any sense of who was on that
3        risk management committee?
4    A.   I may have been on the committee. I'm trying to
5        remember. I'm not one thousand percent certain, but I
6        think I was on the committee at one point. I don't --
7    Q.   Okay. Anybody else? Anybody else to your
8        recollection?
9    A.   I mean, Dinah was definitely on a committee. I'm sure
10        Mike Monroe was on the committee. I'm sure Alan was on
11        the committee. You know, I remember being in a lot of
12        meetings with those people. I think it's risk
13        management. I'm not one thousand percent sure.
14   Q.   That's fine. All right. Well, let me switch gears for
15        just a second and I want to talk a little bit about
16        physician acknowledgment forms. So while you were
17        employed at Physician's Choice, did you have occasion
18        to deal with physician's acknowledgment forms?
19   A.   I believe we called them provider acknowledgment forms.
20   Q.   Okay.
21   A.   And provider acknowledgment forms, yes.
22   Q.   All right. And just because I think in this
23        litigation, everybody has referred to them as physician
24        acknowledgment forms, if I occasionally accidentally
25        say physician acknowledgment forms, I mean, for the

1      make changes to the physician acknowledgment form that

2      it would have physicians sign?

3    A.   I mean, ballpark would be in the dozens of times. You

4      know, every time we -- every time the lab added a new

5      test, every time there was -- there were new LCDs

6      passed. I would say dozens of times.

7    Q.   All right. When you say new LCDs passed, for the

8      uninitiated, what's an LCD?

9    A.   An LCD is a local coverage determination that is put

10     out by Medicare MAC to govern their payment policies.

11   Q.   And what is a MAC?

12   A.   A mac is -- Medicare -- Medicare has regional private

13     companies that administer their benefits programs and I

14     think they're referred to as MACs for short.

15   Q.   Got it.

16   A.   I don't -- I don't know if I know the acronym.

17   Q.   Okay. Any other -- I mean, if state or federal

18     government passed new rules and regulations and laws

19     related to lab testing, would that require updates to

20     provider acknowledgment forms potentially?

21   A.   Potentially, yes.

22   Q.   Okay. Any other reasons we haven't covered why

23     Physician's Choice may update a provider acknowledgment

24     form to your knowledge?

25   A.   It's hard for me to say. It's hard for me to answer

1      that absolutely -- well, it's hard for me to answer

2      that with certainty. I would say that these are the

3      primary reasons. Could there be another reason?

4      Possibly, but these are the primary reasons.

5    Q.   All right. And I just want to put a bow on this. The

6      primary reasons are what? I think you mentioned three,

7      but what are they?

8    A.   Adding tests, new LCDs, new regulations, anything

9      compliance related, things like that.

10   Q.   Okay. Got it. All right. I'm going to mark this as

11     McHugh Exhibit 3.

12      (WHEREUPON, McHugh Exhibit 3 was marked for

13            identification.)

14   Q.   And, again, this is an e-mail. It's just one e-mail.

15     There's not a big thread. It looks like it's from

16     Michelle Dean, the Sales and Marketing Coordinator.

17     And if you want to just take a second and review this,

18     I'm going to ask you a couple questions.

19   A.   (Reviewing.) Okay.

20   Q.   All right. And, again, my question is kind of more of

21     the same. Is this another example of how Physician's

22     Choice would update provider acknowledgment forms and

23     policies for various reasons that you and I have

24     already talked about and identified, and then make

25     announcements to Physician's Choice employees that says

1      look, there are new forms, please use these new forms?

2    A.   Yes.

3    Q.   All right. And who is Michelle Dean?

4    A.   She was a marketing associate coordinator.

5    Q.   Got it. Okay. So I want to shift gears and talk about

6      physician -- provider acknowledgment forms. And I want

7      to talk a little bit about assisting doctors with

8      setting up laboratories; okay? So in the lab testing

9      industry, for as long as you've known it, was a common

10     topic of discussion amongst individuals who owned or

11     worked in laboratories, was a common topic of

12     discussion whether the laboratories could assist

13     doctors with setting up a lab in their office?

14         MR. JOHNSON: Objection. Calls for

15           speculation.

16         MR. KING: Objection. You can answer.

17   A.   There were many discussions in my career about helping

18     doctors set up labs, including with owners of PCLS.

19   Q.   Got it. Okay. Were there discussions about -- and

20     let's -- I mean, let's go back. When you worked at --

21     when you were a lab tech at LabCorp, were there ever

22     any discussions about setting up labs in doctors'

23     offices?

24   A.   No. I was a lab tech in a small lab with other entry

25     level lab techs. We didn't really understand, no.

1    Q.   Okay. Fair enough. So let's talk a little bit about

2      desktop analyzers. Were there ever any discussions

3      while you were employed by Physician's Choice, not

4      about setting one up, but whether you could or could

5      not set up a desktop analyzer let's say within a

6      doctors' office?

7    A.   Yes. There were discussions.

8    Q.   Okay. What does a desktop analyzer do for a doctor if

9      they have one in a lab that's within their office?

10   A.   It provides a qualitative screening result for a

11     sample.

12   Q.   Okay. Did Physician's Choice develop any of its own

13     internal compliance rules or guidance related to

14     whether you could assist a doctor in any way with

15     obtaining a desktop analyzer?

16   A.   I'm not sure if we had an internal compliance memo.

17     I'd have to -- I'm not sure if there was an internal

18     compliance memo. There was internal compliance

19     discussions that happened. I, off the top of my head,

20     can't remember a specific policy.

21   Q.   Okay. And tell me a little bit about those internal

22     compliance discussions. What do you remember about

23     those?

24   A.   It is -- I'm not a lawyer, but it is my understanding

25     that it was a sensitive topic and the major

Page 33

1    stakeholders wanted to use third party companies to do
2    this rather than to have the laboratory do it
3    themselves.
4    Q.   Meaning have third parties assist doctors with placing
5         analyzers within their office as opposed to Physician's
6         Choice itself doing it?
7    A.   That is correct.
8    Q    Okay.  Gotcha.  I'm going to share what I'm going to
9         mark as McHugh Exhibit 4.
10             (WHEREUPON, McHugh Exhibit 4 was marked for
11              identification.)
12   Q.   So, again, I'm going to start us up at the top.  It's
13        an e-mail from you, Michelle Dean, John Grove, and Mark
14        Roth, I guess yourself being -- from Marcus Sowinski,
15        sorry, to Michelle Dean, John Grove, and Mark Roth, you
16        dated December 2, 2011.  And I'm going to go to the
17        bottom and work my way up; okay?  So here's the bottom
18        e-mail, and just read that and then I'll scroll up.
19   A.   Okay.  (Reviewing.)  Okay.
20   Q.   Okay.  So first of all, it looks like Michelle Dean is
21        a sales assistant with Physician's Choice; is that
22        fair?
23   A.   Yes.
24   Q.   Okay.  And who's John Grove?
25   A.   He's the sales manager.

Page 34

1    Q.   So Marcus Sowinski, in December of 2011, what was he?
2    A.   An owner and over billing, compliance, and IT.
3    Q.   Okay.  And this mentions from Michelle, Randy Rowell.
4         Who was Randy Rowell?
5    A.   I have no idea.
6    Q.   Okay.  Do you recall whether Randy Rowell was an
7         employee or independent contractor of Physician's
8         Choice?
9    A.   I don't remember him as an independent employee, he or
10        she, so I'm going to guess.  I mean, I don't want to
11        guess.  I don't -- I -- the name sounds vaguely
12        familiar but I can't place it.
13   Q.   Okay.  Got it.  And Michelle said, "Randy Rowell wanted
14        to know if any of you would be available around 10:30
15        a.m. Monday morning to assist him in speaking with the
16        Institute of Pain Management on placing an analyzer in
17        their office."  So do you recall anything about where
18        the Institute of Pain Management is located?
19   A.   I mean, I guess Pennsylvania based on the P.A. after
20        that.
21   Q.   Okay.  Fair enough.  It looks like after that, Marcus
22        Sowinski responds back and says, "I can join that
23        call."  I mean, was anything surprising to you at the
24        time by getting an e-mail like this related to the
25        placement of an analyzer in a doctors' office?

Page 35

1    A.   No.  I mean, I think that in 2011 I was -- I don't
2         think I understood this particular idea or strategy, so
3         I can't say that I was surprised.
4    Q.   Gotcha.  And, I mean, at the time, it looks like Marcus
5         Sowinski, who's head of compliance and an owner of the
6         company, responds back and it doesn't appear that
7         there's any shock or surprise there.  He says he can
8         join the call to talk about it; is that fair?
9              MR. JOHNSON:  Objection.
10   A.   I can't speculate on what Marcus did or didn't do.  He
11        says there he joined the call.  Maybe he joined the
12        call.  I don't know.
13   Q.   Okay.  That's fair.  Do you recall any discussions
14        after this e-mail about the placement of an analyzer
15        for the Institute of Pain Management?
16   A.   I recall discussions about analyzer placements, but I
17        can't say for certain it's for the Institute of Pain
18        Management.
19   Q.   Okay.  Gotcha.  All right.  So let's -- I'm going to
20        mark this as, I think I'm McHugh Exhibit 5.]
21             (WHEREUPON, Exhibit 5 was marked for
22              identification.)
23   Q.   And I'm going to start, again, at the bottom and work
24        my way up.  But at the top it's an e-mail from Joe
25        Wiegel to Michelle Dean with a carbon copy to yourself

Page 36

1    and Marcus Sowinski.  The original e-mail looks like
2    it's from Michelle Dean to Marcus December 13, 2011.
3    Go ahead and review this and I'll scroll up when you're
4    ready.
5    A.   (Reviewing.)  Okay.  Okay.  Okay.  Okay.
6    Q.   All right.  So going down to the bottom, it looks like
7         Michelle e-mails Marcus Sowinski and says, "We want to
8         get a training session about our analyzer offerings
9         through Select Labs in Texas for the reps."  So my
10        question about that is what do you recall about
11        Physician's Choice and any analyzing -- analyzer
12        offerings it had through Select Labs?
13   A.   Select Labs helps physicians build -- they place
14        analyzers and helps physicians build labs.
15   Q.   Okay.
16   A.   We had a partnership with them.  They were a third
17        party company.
18   Q.   Okay.  And is that kind of what you were talking about
19        earlier, that there were discussions about working
20        through third parties to assist, third parties other
21        than Physician's Choice to assist doctors with setting
22        up labs?
23   A.   Yes.
24   Q.   Okay.  It looks Marcus then responds back to Michelle
25        and says, "You might want to ask Joe if it's best we

1   back and amend that after Seth Johnson asks his
2   questions, but for now I think I'm good. Thank you
3   very much for your time. I really appreciate it.
4   A.   Sure.
5           MR. KING: Do you mind if we take a short
6               break to use the restroom before we get
7               going?
8           (WHEREUPON, a brief recess was observed.)
9   EXAMINATION BY MR. JOHNSON:
10  Q.   Mr. Roth, my name is Seth Johnson. I'm an assistant
11       United States attorney for the Western District of
12       North Carolina and I represent the United States in
13       this case. Do you understand that?
14  A.   Yes.
15  Q.   When we were talking earlier about your experience, is
16       it fair to say that you were on the operations side?
17  A.   Yes.
18  Q.   How much interaction did you have with specific
19       customers or doctors?
20  A.   Early on, I had more interaction; we had fewer people.
21       And as time went on and I had multiple levels and
22       multiple direct reports, I had less involvement
23       directly.
24  Q.   Was that usually handled by the sales team?
25  A.   The sales team had the best relationships with the

1   doctors. They talked to the doctors the most. Then it
2   was probably the customer service team which did report
3   up through me later on in the company.
4   Q.   Are you familiar with the doctor John Johnson?
5   A.   I am familiar with the name of the doctor John Johnson.
6   Q.   What do you know about him?
7   A.   He was a doctor in Pittsburgh that was sending samples
8        through another lab, then came to PCLS, something like
9        that.
10  Q.   Do you remember the name of that other lab?
11  A.   Universal Oral Fluids.
12  Q.   Did I hear you right that you said he was sending
13       samples through another lab or was that through another
14       lab or to another lab?
15  A.   To another lab, through -- the samples I think went to
16       Universal, were run for screening, and then came to us
17       for confirmation.
18  Q.   Okay. That's actually what I wanted to talk to you
19       about. So PCLS and Universal had a business
20       arrangement; correct?
21  A.   There was a -- there was some relationship. I don't
22       know if it was contractual relationship or just a
23       talking and working together, but, yeah, there was some
24       relationship there.
25  Q.   Whatever that relationship was, do you remember when

1   that started?
2   A.   2000 -- it was 2010, 2011 I think. I think it was
3        probably 2010 or 2011.
4   Q.   Do you remember how long that lasted?
5   A.   I think it lasted about a year plus or minus. Maybe a
6        little bit less, maybe a little bit more.
7   Q.   And correct me if I'm wrong, but I believe you
8        described the nature of that relationship as doctors
9        would send samples first to Universal for testing and
10       then those samples would be sent on to PCLS for
11       confirmation testing?
12  A.   That is my understanding.
13  Q.   Okay. And the testing at Universal, was that -- that
14       would have been qualitative testing; right?
15  A.   That is my understanding, correct.
16  Q.   And then PCLS would do the quantitative confirmation
17       after for the same sample sent by that particular
18       doctor?
19  A.   That is my understanding, yes.
20  Q.   Do you know why the arrangement between PCLS and
21       Universal ended?
22  A.   I am not one hundred percent certain, but I believe
23       Universal was bringing in the confirmation equipment
24       and thereby competing and eliminating the need to work
25       with PCLS and that, I believe, unraveled the

1   relationship.
2   Q.   Did you yourself ever deal with or talk to anyone from
3        Universal?
4   A.   There were two people I talked to. One was Bill Hughes
5        who owned Universal. The other was his lab manager. I
6        can't remember his name, but I remember because I ran
7        into him in the last few years.
8   Q.   Are you aware that Mr. Hughes recently pled guilty to
9        healthcare fraud charges?
10  A.   I believe so. I don't know how recently. I know that
11       I read the file in this case and John Johnson seems to
12       be in jail and I assumed that Phil Hughes was in a
13       similar, but I don't know if I knew that for certain.
14  Q.   Sure. And I was just asking if you yourself were
15       aware. Do you know, at the time you were interacting
16       with Mr. Hughes, what time period would that have been?
17  A.   2010, 2011, 2012, something like that.
18  Q.   During that time, were you or anyone else that you know
19       of at PCLS aware that Hughes and Universal were paying
20       kickbacks to doctors?
21           MR. VILLMER: Objection. You can answer.
22  A.   I am aware that Bill Hughes had convinced physicians
23       that as long as he did the billing for them, it was all
24       a kosher thing. I believe we -- I believe the company
25       had a -- I believe PCLS did not believe that that was a

1        that -- something like that. But I'm not a hundred

2        percent sure.

3  Q.  Fair enough. I just want to you know what you -- what

4        you're sure about -- Mr. Roth. I apologize for having

5        to drag you up the screen. The same question, do you

6        know who a Dr. John Nichols is?

7  A.  I believe I'm familiar with Dr. John Nichols, but I

8        think that I'm familiar with him because I think,

9        correct me if I'm wrong, wasn't his name in one of

10       these filings? I think I read the filings and I think

11       that that's how I'm familiar with him. I can't

12       remember really otherwise.

13  Q.  Correct. He was a pain management doctor at Cleveland

14       Back and Pain. But, yes, he is referenced in the

15       United States' Complaint. Outside of your just recent

16       reading, any knowledge of Dr. John Nichols?

17  A.  The name sounds familiar, but I don't know -- I can't

18       say for certain that I remember him. You know, we work

19       with thousands of physicians. I -- you know, the name

20       sounds familiar.

21  Q.  Did you have any involvement with setting up an

22       analyzer lab with either Dr. John Nichols or Dr. John

23       Johnson?

24              MR. VILLMER: Objection as to the form of the

25             question. You can answer.

1  A.  To my knowledge, I never set up a lab for either of

2        them. Whether -- whether I was asked to help with

3        something, I can't say for certain, but I'm not sure I

4        remember actually setting up a lab that ran for either

5        of them. You know, maybe there was discussions, but I

6        don't think either of them actually ever had a lab.

7  Q.  Were you ever involved with setting up any physicians

8        with an analyzer in the lab?

9  A.  During my time at PCLS, I don't remember. Through my

10       time at PCLS, I don't remember specifically setting up

11       a lab for a doctor. I remember using -- introducing

12       labs -- Select to doctors. I'm just trying to remember

13       whether or not -- I don't remember setting up a lab for

14       a doctor at PCLS. I really -- I really don't have that

15       memory.

16  Q.  Do you remember having knowledge of anyone else at PCLS

17       setting up a lab for a doctor?

18  A.  Yeah. I think that I -- I think that I had heard that

19       Manoj was working with Select and US Speciality to set

20       up labs for physicians.

21  Q.  Did you ever hear anything about PCLS paying expenses

22       associated with setting up analyzer labs for

23       physicians?

24  A.  The extent of my knowledge about that particular

25       question is what I read in the filings. Beyond that, I

1        don't remember. You know, maybe I -- maybe there was

2        an e-mail that came out. I don't remember specifically

3        PCLS setting up labs for physicians or my involvement

4        in that.

5  Q.  Going back more broadly, you mentioned that there was

6        discussions among, you know, the owners and people at

7        PCLS about helping doctors set up labs; right?

8  A.  Yes.

9  Q.  And when you mentioned owners there, that included Phil

10       McHugh; correct?

11  A.  Yes.

12  Q.  Who else would that have included?

13  A.  It would have included Doug Smith, Marcus Sowinski, and

14       Joe Wiegel.

15  Q.  And I believe you testified the issue was

16       controversial, something to that effect?

17  A.  Yes. It was controversial.

18  Q.  Can you expound on that a little bit for me?

19              MR. VILLMER: Objection to the form. You can

20             answer.

21  A.  I am not a lawyer, but there is an inherent -- there's

22       an inherent issue with a reference lab setting up a

23       physician lab that is refering samples. And I think -

24       - I believe that is why we wanted to use -- the company

25       decided to use third parties to do that.

1  Q.  When you say inherent issue, what's the inherent issue?

2  A.  There's an OIG advisory opinion that describes joint

3        venture relationships between reference labs and

4        referring physicians and there's inherent conflict

5        there when you turn a referral source into a management

6        customer.

7  Q.  What's that conflict?

8              MR. VILLMER: Objection to the form of the

9             question. You can answer.

10  A.  There appears to be enumeration and issues about fair

11       market value because the willingness of the reference

12       lab to help build a lab at cost or below cost is higher

13       when you're getting the referrals. So it's highly

14       advised that reference labs do not enter into these

15       joint venture agreements with referring customers.

16  Q.  And that advisory opinion, was that something you were

17       aware of when you were at PCLS?

18  A.  I'm not -- I'm not one thousand percent certain when I

19       first read the advisory opinion. I believe -- I read a

20       lot of opinions. I may have read it as PCLS. I may

21       have read it subsequently. I couldn't -- I don't want

22       to say for certain that I was aware of that at PCLS. I

23       may have.

24  Q.  In terms of the range of options that were discussed

25       with regard to setting doctors up with analyzers, can

1          you talk to me a little bit about that?

2                    MR. VILLMER:  Objection to the form of the

3                    question.  You can answer.

4     A.   I believe that, you know, there's several ways to

5          structure relationships with doctors.  There's

6          experience leases.  There's range and rental programs.

7          Most of these went through Select Labs and US

8          Speciality to my knowledge.

9     Q.   Was there any discussion of PCLS providing the services

10         directly or paying for those services?

11    A.   There was some discussion.

12                   MR. VILLMER:  Objection to the form of the

13                   question.  You can answer.

14    A.   There was discussion.

15    Q.   Can you elaborate a little bit on that discussion?

16         What were the details of it?

17    A.   You know, I think to the best of my knowledge, it came

18         up and, you know, the optics of providing -- the optics

19         of doing it as the referring lab regardless of, you

20         know, regardless of all the safe harbors and advisory

21         opinions were not particularly good.  You know, I think

22         at the time Millennium was giving free cups to all of

23         their clients.  And they settled for, you know, I think

24         700 million dollars.  And so I think the company

25         decided it wasn't the route it wanted to go given some

1          of those outcomes.

2     Q.   I'm going to try and show you Government's Exhibit 1.

3                    (WHEREUPON, Government's Exhibit 2 was marked

4                    for identification.)

5     Q.   Do you see that, Mr. Roth?

6     A.   Yes.  Give me a second.

7     Q.   There's a -- I'll start from the bottom.  That might

8          make a little bit more sense to you.

9     A.   Okay.

10    Q.   There's an initial e-mail and it's addressed from

11         Brianna Deal at PCLS to Team 1, which seems like an e-

12         mail for --

13    A.   Uh-huh.

14    Q.   And then as we go up, Larry Morgan sends an e-mail

15         around to the group and then Brian Morgan -- or Brian

16         Montgomery sends an e-mail around to the group.  And

17         I'll represent to you that you were included right here

18         in that e-mail chain.  Do you see that, Mr. Roth?

19    A.   Yes.  Yep.  Uh-huh.

20    Q.   Okay.  Let's go down to Mr. Montgomery's e-mail,

21         specifically the heading "Healthcare Associates."  It

22         says Manoj, Mark, and I had a meeting with CCO Joel and

23         Lab Director Grace on Tuesday.  Went great!  They want

24         to get analyzer and start using PCLS.  Waiting on Manoj

25         to get paperwork, then I will hand deliver them to

1          Joel."  Did I read that correctly?

2     A.   Yes.

3     Q.   Do you remember Healthcare Associates and anything to

4          do with an analyzer related to them?

5     A.   I do not.  I'm not sure if I'm the Mark in reference

6          there.  Based on the context, I believe that's Mark

7          Thrash.  I -- you know, I understand -- I understand

8          this e-mail chain.

9     Q.   And what's your understanding of the e-mail chain, Mr.

10         Roth?

11    A.   I believe we had a partnership with a group in Texas

12         and I believe they, again, competed with us and we were

13         trying to go market to their customers directly.  You

14         know, I think they had some relationship directly with

15         their customers on the revenue side.  I don't know

16         exactly what.  But I believe this is an e-mail chain

17         reflecting the work to market to these customers, have

18         them work with us directly.

19    Q.   Do you remember what that group in Texas was called?

20    A.   It went by several different names.  They had several

21         different laboratories.  One was called Medicus Labs.

22         One was called -- honestly, it's escaping me.  I can

23         confirm it if someone -- if you knew it, but I really

24         can't remember what the name of the entire group was

25         called.

1     Q.   That's fair.  Do you know what Mr. Montgomery was

2          referencing when he wrote that Healthcare Associates

3          wanted to get an analyzer and start using PCLS?

4     A.   They wanted to build their own in house screening

5          laboratory is my interpretation of this.

6     Q.   Do you know whether or not PCLS had or was going to

7          have any role in Healthcare Associates doing that?

8     A.   I believe that we were still going to introduce them to

9          US Speciality or Select Lab Partners.  I mean, I -- you

10         know, whether or not we contemplated doing it

11         internally, I really don't remember a time that we had

12         -- you know, we were sending analyzers to customers or

13         even had them available or helping with -- licenses.

14         So I think we were just introducing them to US

15         Speciality, is my understanding, who would them help

16         them build a screening lab.

17    Q.   Okay.  So if PCLS introduced a doctor to, you know, US

18         Specialty or another, you know, analyzer company,

19         setting up the lab, that would be handled between the

20         doctor and that company without any involvement from

21         PCLS other than the initial reference?

22                   MR. VILLMER:  Objection to the form of the

23                   question.  You can answer.

24    A.   To the extent of my knowledge, that is my

25         understanding.

Page 61

1  Q.  All right.  Thank you, Mr. Roth.  You can -- are you
2      aware of any instances at PCLS where that's not how it
3      worked, i.e., PCLS had more involvement other than just
4      the initial reference or referral to the lab company?
5  A.  I believe the knowledge that I have is again from the
6      filings that, you know, stated that PCLS was trying to
7      help a few doctors build labs.  You know, I think that
8      there were discussions, but I really don't know if any
9      labs for any customers, I don't think any of them got
10     off the ground with PCLS directly.  I think it's a lot
11     of work to set up a physician office lab and I highly
12     doubt anybody at PCLS had the time to do it.  So I do
13     think that for the most part it was through third party
14     introductions.
15 Q.  So if that was ever done at PCLS or by anyone at PCLS,
16     that was done without your involvement or knowledge;
17     correct?
18 A.  I may have been involved or was on an e-mail chain
19     talking about it, but I don't actually think -- I would
20     be surprised if anything was actually done, a lab was
21     started and I knew about it.  That would surprise me.
22 Q.  Sitting here today, you don't remember being involved
23     in anything like that?
24 A.  Correct.  I don't remember being involved in PCLS
25     getting a doctor's laboratory up and running.  I really

Page 62

1      -- to the best of my knowledge, I really -- I'm
2      struggling to remember that.
3  Q.  You don't remember being involved with, for example,
4      helping with the -- licensure?
5  A.  To the best of my knowledge, I don't think that was
6      something that I knew about it or did anything with at
7      PCLS.
8  Q.  You were not involved with paying any expenses to
9      doctors related to setting up their lab; correct?
10 A.  I was not involved in paying or, you know, getting a
11     doctor paid for setting up a lab other than, again,
12     what I read in the filings.
13 Q.  And to be clear, you personally did not have any
14     involvement with the matters that you read in the
15     filings; correct?
16 A.  To the best of my knowledge, I really don't think I
17     did.  You know, I don't think we -- I really don't
18     remember doing anything for any of those doctors at
19     all.
20 Q.  So if something like that was done, that would have
21     been separate and apart from what you were discussing
22     regarding setting up analyzers by referring them to a
23     third party company; correct?
24           MR. VILLMER:  Objection.  Asked and answered.
25           MR. KING:  Objection.  Answer.

Page 63

1  A.  Yeah.  If it was done, it was done outside of my
2      knowledge really.  I -- and, again, I thought that the
3      majority of these went through third party -- third
4      party vendors.
5  Q.  Do you know who Dr. Yunus Shah is?
6  A.  That name sounds familiar, but I'm not one thousand
7      percent.  I've worked with several different doctor --
8      is it Shaw or Shah?  Shaw?
9  Q.  Shah.  S-h-a-h.
10 A.  Yeah.  I've worked with several Dr. Shahs -- Shahs so
11     I'm not certain that I know the one you're referring
12     to.
13 Q.  But anything that jumps out as you're sitting here now
14     about Dr. Shah other than just your normal course of
15     dealings with him at PCLS?
16 A.  I believe there was a Dr. Shah we worked with very
17     early on in the company who was a stickler and sent us
18     a bunch of blinded samples and then crated us against
19     someone else.  I believe that was Dr. Shah, but I can't
20     -- I'm not one thousand percent.
21 Q.  What about a Dr. Gregory Masimore, any knowledge of
22     him?
23 A.  Dr. Masimore was a physician that Manoj had a
24     relationship with somewhere in the Midwest, maybe
25     Indiana, somewhere like that, Michigan.  I don't --

Page 64

1      somewhere in the Midwest.
2  Q.  What's your understanding of Mr. Kumar's relationship
3      with Dr. Masimore?
4  A.  I believe he was a -- he may have worked in the office.
5      He may have had some business relationship with him.
6      I'm not one thousand percent sure.  I think -- again,
7      I've read the filings.  I think in the filings it says
8      he was the officer manager, but I don't think I was
9      aware of that at the time.
10 Q.  Sure.  And I'm just asking for your independent
11     knowledge, you know, outside of the government's
12     complaint back when you were at PCLS.
13 A.  Yeah.  I don't think I really understood that
14     relationship to be completely honest.  And, again, I
15     had zero transparency into any of the sales and the
16     billing, who was getting paid commissions.  You know, I
17     was -- that was all above my level, so I don't think I
18     really understood any of those dynamics at the time.  I
19     do know that he had a relationship with Dr. Masimore
20     more than just being, you know, a friend.
21 Q.  What about Dr. Sinker Jahandra, have you ever heard
22     of him?
23 A.  It sounds familiar, but I can't place that one.
24 Q.  Fair enough.  What about a Dr. Orlando Peretti?
25 A.  He was a doctor in Florida that we worked with.  Again,

## 77

1     fair to say?

2   A.   Yes.

3   Q.   And that's despite due diligence that was done on that

4     particular loan; is that fair?

5   A.   I paid him back. I can't remember the due diligence

6     that was done.

7   Q.   Yeah. I mean, regardless of what level of due

8     diligence was done, you paid Mr. McHugh back at a high

9     rate of interest; right?

10   A.   Yes.

11   Q.   Okay. Based upon all the e-mail correspondence that

12     you've been presented with today by both myself and the

13     Government's lawyer, is it fair to say that when

14     discussions were had amongst Physician's Choice

15     executive team members that you were a part of about

16     what can or can't be done related to the placement of

17     analyzers in the doctor's office, that --

18        MR. JOHNSON: Objection. Calls for

19           speculation.

20        MR. VILLMER: Let me be clear and finish my

21           question. I'm asking specifically about

22           conversations that he was a part of.

23   Q.   So for the conversations that you were a part of with

24     the Physician's Choice executive management team

25     related to the placement of analyzers within doctors'

## 78

1     offices, were those discussions by and large

2     discussions that included at least one member from

3     compliance, mainly Marcus Sowinski, in those

4     discussions?

5   A.   Yes.

6   Q.   Okay. I don't believe I have any further questions.

7     Thank you very much for your time.

8        MR. JOHNSON: Nothing further from the

9           Government. Thank you for your time,

10           and, again, I apologize for the

11           technical difficulties we experienced on

12           our end.

13        (Deposition Completed.)

14        - - - - - - - -

15

16

17

18

19

20

21

22

23

24

25

## 79

STATE OF NORTH CAROLINA           CERTIFICATE

COUNTY OF MECKLENBURG

    I, EMILY HULLEY-ROACH, Verbatim Court Reporter and

a Notary Public in and for the County of Mecklenburg, State

of North Carolina, do hereby certify that there came before

me the following named person, to wit: MARK ROTH; that the

foregoing pages number 1 through 78 are a true and accurate

record of the testimony given by the witness, to the best of

my knowledge and belief.

    I further certify that I am neither attorney or

counsel, not related to or employed by, any of the parties

to the action in which this deposition is taken, and further

that I am not a relative or employee of any attorney or

counsel employed by the parties hereto, nor interested

directly or indirectly in the matter in controversy, or

financially interested in the action.

    IN WITNESS WHEREOF, I have hereunto set my hand on

this the 20th day of November, 2020.

_____

Emily Hulley-Roach
Notary No. 20033290011
My Commission Expires: December 7, 2023

## 80

WITNESS CERTIFICATION

    I, MARK ROTH, hereby certify,

    That I have read and examined the contents of the

foregoing 86 pages of record of testimony as given by me at

the time and place herein aforementioned;

    And that to the best of my knowledge and belief,

and foregoing pages are a complete and accurate record of

all of the testimony given by me at said time, except as to

where noted on the attached errata addenda.

      _____

      MARK ROTH

Sworn to and subscribed before me,
this the _____ day
of _____, 2020.

_____
Notary Public

Page 1

```
 1          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF NORTH CAROLINA
 2                CHARLOTTE DIVISION

 3

 4

 5
    UNITED STATES OF AMERICA,   )
 6  ex rel., TARYN HARTNETT,    )
    and DANA SHOCHED,           )
 7                              )
                                ) CIVIL FILE NO. 3:17-CV-37
 8       Plaintiffs,            ) (CONSOLIDATED WITH CIVIL
                                )   FILE NO. 3:17-CV-46)
 9  PHYSICIANS CHOICE           )
10  LABORATORY SERVICES,        )
    DOUGLAS SMITH, PHILIP       )
11  McHUGH AND MANOJ KUMAR      )
                                )
12       Defendants.            )
    _____  )
13

14

15       VIDEO TAPED DEPOSITION FOR PLAINTIFF

16

17              *  *  *  *  *

18

19          DEPONENT:  YUNUS SHAH, M.D.

20          DATE:  AUGUST 20, 2020

21

22

23              DENISE L. CLINE
                COURT REPORTER
24              P.O. BOX 197616
            LOUISVILLE, KY  40259
25              (502) 802-6544
             DLCLINE138@AOL.COM
```

Page 2

```
 1 APPEARANCES:

 2      FOR THE PLAINTIFFS:

 3           Seth Johnson
             NC Bar No. 53217
 4           Asst. United States Attorney
             Suite 1650, Carillon Building
 5           227 West Trade Street
             Charlotte, NC  28202
 6
        FOR THE DEFENDANTS:
 7
             Bo Caudill
 8           Matthew M. Villmer
             Weaver, Bennett & Bland, P.A.
 9           196 North Trade Street
             Matthews, NC  28105
10
        VIDEOGRAPHER:
11
             Brian Zirnheld
12           Soergel, Abell, Arnold & Davis
             2950 Breckenridge Lane
13           Suite 11A
             Louisville, KY  40220
14

15              *  *  *  *  *

16

17           The video taped deposition of YUNUS

18 SHAH, M.D. was taken on behalf of the Plaintiffs before

19 Denise L. Cline, Notary Public for the State of

20 Kentucky at Large, at the offices of Soergel, Abell,

21 Arnold & Davis, 2950 Breckenridge Lane, Suite 11A,

22 Louisville, Kentucky, on August 20, 2020, at about 1:00

23 p.m.  Said deposition was taken pursuant to notice for

24 purposes of discovery and as provided by the Federal

25 Rules of Civil Procedure.
```

Page 3

```
 1                I N D E X

 2

 3                                        PAGE

 4 DIRECT EXAMINATION BY MR. JOHNSON        4

 5 CROSS EXAMINATION BY MR. CAUDILL        87

 6 REDIRECT EXAMINATION BY MR. JOHNSON    110

 7

 8

 9 GOVERNMENT'S EXHIBIT 1                  50

10 GOVERNMENT'S EXHIBIT 2                  64

11 GOVERNMENT'S EXHIBIT 3                  67

12 GOVERNMENT'S EXHIBIT 4                  77
```

Page 4

```
 1           VIDEOGRAPHER:  And we are now on the
 2 record.  This is the beginning of media unit one of the
 3 backup recording and media unit one of the master
 4 recording.
 5           This is a video deposition of Yunus
 6 Shah.  Today's date is August 20th, 2020 and the time
 7 is 1:10 on the video monitor.  We are taking the
 8 deposition at the offices of Soergel, Abell, Arnold &
 9 Davis at 2950 Breckenridge Lane, Louisville, Kentucky.
10           This case is captioned Unites States of
11 America, ex rel., Plaintiff, versus Physicians Choice
12 Laboratory Services, et al, Defendant.  This case is
13 filed in the United States District Court, the Western
14 District of North Carolina, Charlotte, at Charlotte.
15 It's a Civil File 3:17-CV-37 consolidated with Civil
16 File No. 3:17-CV-46.
17           My name is Brian Zirnheld.  I'm the
18 videographer today.  The court reporter is Denise
19 Cline.  And if counsel will now please introduce
20 themselves and whom they represent.
21           MR. JOHNSON:  Seth Johnson, Assistant
22 United States Attorney for the United States of
23 America.
24           MR. CAUDILL:  Bo Caudill for the
25 defendant Philip McHugh.
```

1 correspondence though, right?

2    A    Yes.

3    Q    And that was after your attorney Khalid

4 Kahloon stated I could contact you directly, right?

5    A    Yes.

6    Q    And our email correspondence was just

7 about scheduling, correct?

8    A    Correct.

9    Q    And no substantive discussion between

10 us, i.e. you know, you're going to testify to this

11 today, anything of that nature?

12    A    No.

13    Q    And, Dr. Shah, you're a doctor, correct?

14    A    Yes.

15    Q    What type of doctor are you?

16    A    I'm an anesthesiologist.

17    Q    How long have you been practicing?

18    A    Since 2003.  Full-time practice since

19 2003.

20    Q    You said full-time since 2003.  Were you

21 part-time before that?

22    A    Well, I was -- I was a fellow.  So in

23 2002, I finished my residency.  I had a fellowship in

24 2002.  So I entered private practice in 2003.  It was

25 the same group that I was doing the fellowship with.

---

1 So that's why I ...

2    Q    You mentioned you're an anesthesiologist

3 now.  Where do you currently practice now?

4    A    I practice at Norton.

5    Q    Norton.  Is that here in Louisville,

6 Kentucky?

7    A    Yes.  It's a group of hospitals here in

8 Louisville, Kentucky.

9    Q    How long have you been at Norton?

10    A    Since 2002.  I mean, 2003, I apologize.

11    Q    You've been at Norton --

12    A    All this time.

13    Q    -- all the time?

14    A    Yeah, full-time.  You know, now, I'm not

15 employed by Norton.  We are a private practice, but

16 our -- the hospital we work at is Norton.  And we've

17 been at that hospital since long before 2003, but I've

18 been there with that group since 2003.

19    Q    You mentioned you were in private

20 practice.  What's the name of that practice?

21    A    OAC, Obstetrics & Anesthesia

22 Consultants.

23    Q    Let's -- I'd like to just get a general

24 overview of your kind of career and practice.  Let's

25 just go back to the beginning and start there --

---

1    A    Sure.

2    Q    -- and work our way through.  Where did

3 you go to med school?

4    A    In India.

5    Q    What was the name of the med school?

6    A    Government Medical College.

7    Q    When did you graduate?

8    A    I finished in -- I believe I finished

9 med school in '92.  I finished my internship in '93.

10 So '93 is when I was done basically.

11    Q    Did you specialize in anything there?

12    A    Well, the specialization comes after

13 that, and so I was working in a general capacity until

14 I came to U.S. in 1998 and did my residency in

15 anesthesia at University of Louisville here in

16 Louisville, Kentucky.  And then did my fellowship in

17 obstetric anesthesia, so that's a specialization in OB

18 anesthesia.  I did that fellowship in 2002 to 2003, and

19 then I entered private practice doing obstetric

20 anesthesia since then.  And somewhere around -- do you

21 want me to keep going and explain?

22    Q    Yes.  Yes, sure.

23    A    So somewhere around 2009 or '10,

24 somewhere around there, is -- I had an interest in

25 doing some interventional pain management.  So I was

---

1 doing some procedures and stuff at Norton's, and that

2 eventually led me to join a private practice in

3 southern Indiana where Manoj was the business manager.

4 So that was my first contact with Manoj.

5    And so that practice -- I was doing pain

6 management in New Albany, Indiana, for awhile with

7 them, but that practice eventually dissolved.  And

8 following that I started my own private practice in

9 Elizabethtown, Kentucky.

10    Q    Let me stop you there, and then we'll

11 kind of fill in some of the gaps and come back.  So

12 since 2003 on, you've been an anesthesiologist and

13 working at Norton, correct?

14    A    Yes.

15    Q    But you know, Norton is just the

16 hospital facility where you're --

17    A    Right.

18    Q    -- doing that, right?

19    A    Right.

20    Q    But you've had -- I guess, that's been

21 in your capacity as a private practice doctor?

22    A    Yes.

23    Q    Okay.  And in 2009, you started a

24 private practice in pain management -- or joined a

25 private practice?

---

1    A    Joined a private practice.  I think it
2 was 2009.  I may be mistaken on the date when I joined
3 the initial pain management in New Albany.  I'm not
4 quite sure when that was.  But somewhere around there I
5 joined the private practice in Indiana and started
6 doing some pain management there.
7    Q    Let me stop you there.
8    A    Yes.
9    Q    What was the name of that pain
10 management practice in Indiana?
11    A    I think it was called -- gosh, I
12 forgot -- Pain Management of Southern Indiana or
13 something like that.  Pain -- Pain -- Pain Management
14 Centers of Southern Indiana or something like that.  I
15 can't -- it was a longer name.  I don't exactly recall
16 what it was.
17    Q    Do you recall how many doctors were in
18 that practice?
19    A    Many.  There were one, two, three, four,
20 five, six including the owner, I believe.  Again, I may
21 be mistaken on that, but I think -- as far as I can
22 remember.  I'm trying to visualize who all I -- the
23 names or at least -- yeah, I think about six.  Six
24 sounds right.
25    Q    And you mentioned that's where you met

1 Manoj Kumar, correct?
2    A    Yeah.  He was the manager of -- the
3 business manager of the practice there.
4    Q    What did he do for that practice as the
5 business manager?
6    A    He was essentially the first point of
7 contact where you -- you know, so when you had the
8 first like an initial recruitment doc, he was the one
9 who would communicate with you.  And then less contact
10 while -- when you join the practice, other than, you
11 know, issues of reimbursement and things like that.  If
12 you had an issue, you would tell him, hey, you know,
13 this is this, this is that.
14    So other than that, there was not --
15 clinically there was not much that, you know, we needed
16 to interact on, unless there were like issues like
17 supplies or something that we needed and he would have
18 to authorize something like that.  Then otherwise, not
19 much.
20    Q    You mentioned you left the practice in
21 Indiana, correct?
22    A    That practice dissolved.
23    Q    Why did the practice dissolve?
24    A    I think the owner was -- well, let me
25 take it -- so they -- you know, we had an agreement

1 that I would be reimbursed a certain amount of money,
2 and they, you know, were telling me that I needed to
3 have -- bring in a certain amount of reimbursement.
4    And because I wasn't generating, meaning
5 I wasn't seeing that many patients, so -- but that's,
6 of course, not my function.  I don't schedule the
7 patients.  But regardless, they said, well, you're not
8 seeing enough patients to be able to justify that
9 salary.  So we're going to have to let you go.
10    And that was, you know, without giving
11 me due notice or anything like that.  There was a whole
12 other issue with that.  But regardless, they said,
13 well, we can't, so you'll have to -- you know, we'll
14 have to let you go.  And then while that process was
15 ongoing, they were investigated by the FBI, and their
16 offices got shut down.
17    Q    Do you know what the FBI was
18 investigating them for?
19    A    I'm not -- I had a conversation with the
20 FBI, but they wanted to ask primarily what -- you know,
21 how Dr. Tewari was -- you know, how he treated patients
22 and all of that stuff, you know, what things I had seen
23 in the practice and things like that.  So that was --
24 they were primarily investigating Tewari --
25    Q    Was Tewari --

1    A    -- who was -- who was the owner of the
2 practice.  So that was the main -- so again, I don't
3 know for a fact what they were investigating, but they
4 asked me, you know, questions about patient care and,
5 you know, how he -- you know, did he push for
6 procedures, was he giving out medications in exchange
7 for procedures, things like that, you know, just -- so
8 that was -- so the practice essentially was
9 investigated and dissolved.  At that point, you know,
10 once that thing came into -- so slowly all of those
11 sites shut down basically.
12    Q    But you were let go before that, right?
13    A    I was let go before that, yeah.  Yeah, I
14 was let go before that and I had -- by then -- because
15 I always had good relations with my previous OB
16 anesthesia practice, I continued doing locums with them
17 and then slowly, you know, looked around, found a place
18 in Elizabethtown and started my -- you know, eventually
19 started my own practice in Elizabethtown doing
20 interventional pain management.
21    Q    What's the name of the practice that
22 you -- the anesthesiology practice you just mentioned?
23    A    The obstetric anesthesia or the private
24 practice pain management that I started myself  in
25 Elizabethtown?

1    Q        Not the one you started, the one that
2 you -- in between starting that one --
3    A        Oh, Obstetric & Anesthesia Consultants,
4 OAC.
5    Q        And that's the one you're still with?
6    A        That's -- yeah.  I still work there.
7 Yes.
8    Q        So you've been with them from 2003?
9    A        Exactly.  And even when I was doing my
10 full-time private practice pain management in
11 Elizabethtown, I was still doing locums with them in OB
12 anesthesia.  So I was still with them in sort of a
13 part-time capacity even then.
14    Q        Let's turn to the practice you started.
15 When did you start that?
16    A        I believe it was 2010, late 2010.  I may
17 be mistaken on that, but I think it was late 2010.
18    Q        What was the name of that practice?
19    A        Avicenna Pain Relief.
20    Q        How many doctors were a part of that
21 practice?
22    A        Just me.
23    Q        How long did you practice under
24 Avicenna?
25    A        Up until 2014.  And then I went back to

1 doing obstetric anesthesia full-time at the hospital.
2    Q        And you mentioned it was located in
3 Elizabethtown, Kentucky?
4    A        Yes.  Yeah.
5    Q        And this was a pain management practice?
6    A        This was an interventional pain
7 management practice, yes.
8    Q        Can you just briefly tell me what that
9 is?
10    A        Well, interventional pain management is
11 basically -- it's a comprehensive pain management
12 solution for people that have, for example, herniated
13 discs or nerves that are -- you know, they have
14 chronically bad arthritis in their spine or anywhere in
15 the body they have chronic pain which is not treatable
16 by acute means, you know, something that's not expected
17 to go away within a month or two months.
18           If it hasn't gone away in about three
19 months, even with optimal management, then it's called
20 chronic pain.  So then it needs to be managed on a
21 longer term basis.  So if somebody has cancer pain,
22 somebody has chemotherapy-induced pain, somebody has
23 chronic arthritis of their spine that has caused, you
24 know, that's -- or they've had multiple surgeries of
25 their back and now the surgeon is no longer able to

1 manage anything, so then now they need to be on
2 something more, either medication-wise or their nerves
3 need to be burned or, you know, epidurals every six
4 months, or something, whatever it takes to keep them
5 comfortable.
6    Q        So there -- it sounds like there's a
7 procedure part to it and there's also a prescribing
8 part to it?
9    A        Correct.  Both.
10    Q        How many days a week was the practice
11 open?
12    A        I was -- I would work -- it was open
13 every day, but I was there Monday through -- usually
14 Monday -- well, you know, it obviously changed over
15 the -- since 2010 to 2014.  Initially, I started all
16 five days or less than five days and then eventually
17 moved up to all five days.  Then I backed off and was
18 doing Monday, Tuesday, Wednesday, Thursday and so I
19 could work Friday, Saturdays at the hospital, so
20 something like that.  So some combination of between
21 four days and -- you know, between four and five days
22 if you take an average of the total time I was there.
23    Q        Do you have an estimate in the average
24 week of how many patients you would see while at
25 Avicenna?

1    A        I would typically have no more than 20.
2 20, 25 maximum I think.  No more than 25, if I remember
3 correctly.
4    Q        And you did procedures as part of that
5 practice?
6    A        I did procedures.  I would usually have
7 a day that I would keep, you know, discreet for
8 procedures only.  So for example, some day, you know,
9 maybe Thursday only or Wednesday only I would do
10 procedures, and then the other days I would see the
11 patients.  And so evaluation and, you know,
12 non-interventional management of the patients on the
13 other days and then that one day was all of the
14 patients that I had seen and needed any kind of
15 procedure, those would be scheduled on that one day.
16    Q        What types of procedures would you do?
17    A        Typically epidurals, radio frequency,
18 ablations of the nerves, knee joint injections, you
19 know, hip joint injections, shoulder injections, but
20 mostly, epidurals and the radio frequency ablations,
21 sometimes spinal cord stimulators.
22           Sometimes intrathecal, which is pain
23 pumps for patients that have pain that cannot be
24 managed by oral means, or the doses are too high.  So
25 you don't want them on those doses.  So you implant

1 pain pumps into their spine so they get a -- it's like
2 having a medication infusion directly into the spinal
3 fluid, so trials for that.  So that was basically kind
4 of the usual run of patients.
5      Q      And you also prescribed pain medication
6 to patients?
7      A      Correct.
8      Q      What types of pain medication would you
9 prescribe?
10     A      All kinds.  Hydrocodone, Oxycodone.  And
11 those were probably the most common and, of course, you
12 know, combined with non-steroidals like Naproxen and
13 Celebrex and those kinds of medications, muscle
14 relaxers like Flexeril.  And anti-depressants like
15 tricyclic anti-depressants which are good for sleep.
16 So those.
17     Q      Was urine drug testing a part of that
18 practice?
19     A      Yes.
20     Q      How does urine drug testing fit into a
21 pain management practice?
22     A      Well, it's important for -- obviously if
23 you're going to give medication to patients, you have
24 to make sure that they're compliant with the
25 medication.  So both from a safety standpoint, meaning

1 are the patients taking it and are they taking it and
2 are they taking it like they're supposed to take it or
3 are they, you know, taking too much or too little.
4          You know, so from that standpoint it's
5 important to drug test.  But also from a diversion
6 standpoint, it's important to drug test them and make
7 sure that they're not, you know, not taking what you're
8 giving them or taking something else that you're not
9 giving them.  And so if they've taken, for example,
10 they -- you know, if they came in positive for
11 marijuana or something like that, then clearly, you
12 know, we wouldn't write a prescription for them.  So
13 things like that.
14          So it's important to -- you know, both
15 to ensure compliance but also to prevent diversion but
16 also to, you know, keep them accountable.  So for all
17 of those reasons.
18     Q      And let's go -- we'll get back to urine
19 drug testing.  I want to ask you a couple more
20 questions just about the practice itself.
21     A      Sure.
22     Q      You mentioned you were a solo
23 practitioner?
24     A      Yeah.
25     Q      Was anyone else employed by Avicenna?

1      A      Just some front office staff and medical
2 assistants.
3      Q      Roughly how many employees did those
4 constitute?
5      A      Again, it varied over the years, but I
6 would say probably there were at least two people at
7 the front desk typically, one or two MAs.  So typically
8 there would be four -- I would say four people, four
9 employees.
10     Q      Is that just four employees in the
11 office at any given time or kind of four employees
12 total?
13     A      Total, yeah.  Four -- between four and
14 five I would say is -- because at some point we may
15 have had more than three MAs.  But I think between four
16 and five was a, you know, total number.  And it wasn't
17 obviously the same person.  You know, we'd let go
18 somebody and then hire somebody, let go somebody.  So
19 yeah.
20     Q      But for -- generally, for the life of
21 Avicenna, four to five staff?
22     A      Yeah, somewhere around four to five,
23 yes.
24     Q      Okay.  You didn't have a nurse
25 practitioner there?

1      A      No.
2      Q      Physician assistant?
3      A      No.
4      Q      Did you employ Manoj Kumar there?
5      A      Not as an employee.  He was just a -- on
6 a consultant basis.  He would bill me just for --
7 initially just for hours.  And when we first started,
8 he would just bill me by the hour but -- you know, I
9 spent this much time managing.  And so that's how he
10 would bill.
11     Q      So he was a 1099 independent contractor?
12     A      Yeah, just basically.
13     Q      Did Kumar help you start the business?
14     A      Right.  Yes.  When I was starting, he
15 would provide the input on how to get the practice
16 started and, you know, what things we would need.
17 Because he had already had the experience in southern
18 Indiana and kind of, you know, gone through the same
19 process.  He was -- you know, because of the
20 investigation of the boss, he had lost the job, and so
21 he was looking around and trying to find different
22 places to help out.  So that's -- yeah, he did help.
23     Q      So you knew him from the Indiana
24 practice?
25     A      Yeah.

1      Q      And then you hired him as an independent
2 contractor to help you start Avicenna?
3      A      Correct.  Yeah, just as a -- just as a
4 consultant to help me start the practice, yeah.
5      Q      And then we'll both try and do a better
6 job of it, but let's try and not talk over each other
7 just so we can have a clean video and record.
8      A      Yes.
9      Q      Thanks, Dr. Shah.  What did Manoj Kumar
10 do to help you start Avicenna?
11      A      He -- I think we looked at the locations
12 together, what would be a good place.  Again, let me
13 preface, you know, it's been such a long that I don't
14 exactly recall what specific things he did.
15             But certainly in terms of the general --
16 general principles, he -- you know, we went to
17 locations together to see what would be a good
18 location, you know, talked about -- eventually once we
19 settled on a location, we talked to the landlord
20 together.  He helped, you know, with vetting the deal
21 to see if it was a decent -- you know, the rent was
22 okay or not okay.
23             And then eventually setting up, you
24 know, the actual office because I had never set up an
25 office.  So I had zero idea about how to set up an

1 office.  So more things we would eventually need, you
2 know, small nitty-gritty stuff like, okay, how many
3 organizers do we need in the front office, you know,
4 what kind of -- do we need five printers or two
5 printers.  So you know, things like that.  Do we need a
6 computer in each room and -- so things like that.
7      Q      Did he help with purchasing medical
8 equipment?
9      A      With -- yes, with the imaging table and
10 the C-arm and things like that.
11      Q      What type of medical equipment did
12 Avicenna have?
13      A      We had the -- you know, basically you
14 need something that every office has, which is
15 computers to do your charting and things like that.
16 But also, you need a dedicated fluoroscope, or a C-arm
17 as it's called, which is an x-ray mobile -- like a
18 mobile x-ray machine essentially.  And you need an
19 imaging table for that x-ray machine so you can
20 visualize peoples' spine and back and joints and that
21 kind of stuff.  And then we had other, for example,
22 radio frequency machines.
23      Q      Physically, how big was the office?  I'm
24 just trying to get a picture of what the office space
25 looked like.

1      A      I think it was about -- again, it was
2 two levels, basement and top level.  The basement is
3 where I had like a small -- my own separate office area
4 where I could keep my stuff.  And then we had a break
5 room and I would say probably 2,500 square feet or
6 something like that.  Again, I may be mistaken but I
7 think about 2,500.
8      Q      So I assume there was a receptionist
9 area?
10      A      Yeah.
11      Q      And then I assume there were patient
12 rooms where you saw patients?
13      A      There were -- there were, yeah, three
14 patient rooms.  There were two patient rooms, one
15 procedure room.  There was a front office area, there
16 was a waiting area, and there was a bathroom for the
17 patients.
18      Q      Was there a lab in that office?
19      A      Lab?  Well, initially we were just doing
20 the urine -- you know, the point of care testing which
21 is, you know, like a dipstick basically, which is a
22 rapid test you do instantly when the patient comes.
23 And then you dip the urine with -- you know, and you
24 find out what it's positive for.  There's multiple
25 reagents on that.

1             And so the stick tells you if they're
2 positive for, you know, something.  And that's a -- you
3 know, it's -- you don't make decisions based on that,
4 like discharge versus no discharge decisions, but you
5 do -- it gives you an instant idea of what to do.  So
6 that was the extent of -- initially when we started,
7 that was the extent of the initial.  And then once we
8 did that, then the urine would go to a lab for
9 confirmation testing.
10      Q      And then did that change at a certain
11 point in the practice?
12      A      Yes.  And at some point we started -- we
13 decided to get a lab that would give us a little more
14 detail in our own office.
15      Q      Is that a desktop analyzer?
16      A      Yeah.
17      Q      Do you remember when that occurred?
18      A      Not really.  I don't exactly recall when
19 it happened, but we had it for at least -- I would say
20 at least two and a half.  So if we started in 2010 and
21 we closed in 2014, I would say maybe about two and a
22 half, three years we had the analyzer.  Two -- two and
23 a half years, maybe two years, something like that.
24      Q      Okay.  So there was probably a year or
25 two where you didn't have the analyzer?

1 then, say, pick out five people that -- and then he
2 would, you know, give them a little mini test to take
3 and make sure they were -- at least had decent
4 processing capacity to be able to understand what was
5 going on in the office. And then we would talk to them
6 together.
7     Q     Were there any employees that he
8 interviewed alone?
9     A     I don't believe so. I believe we
10 talked to all of the people together.
11     Q     So he would find the employees
12 basically, review their resumes as kind of an initial
13 review --
14     A     Yeah.
15     Q     -- and then you two would interview them
16 together?
17     A     Correct.
18     Q     Anything else he did in terms of helping
19 start Avicenna?
20     A     I think help with the other supplies,
21 for example, with let's say Medline or, you know, those
22 companies that supply your needles and this and that
23 and medication companies, you know, things -- for
24 example, companies that sell contrast and things like
25 that.

1     Q     And you mentioned that he was paid
2 hourly, correct?
3     A     Yeah. For -- he would -- yeah, he would
4 charge and say, okay, I've spent five hours at this
5 time, six hours at this time. So yeah.
6     Q     What was his hourly rate?
7     A     I believe it was $50.00.
8     Q     Would he invoice you?
9     A     Yes.
10     Q     How often would he invoice you?
11     A     It depended I guess on how much time he
12 had put in. So I mean, if he just put in three hours,
13 there was -- if there was a month he didn't have to do
14 much, which was after the first few months of -- you
15 know, once the practice was up -- initially, obviously
16 he had to put in a lot more effort.
17     So once that was set up, then it was --
18 you know, it would depend on how many hours. Sometimes
19 if there were only two hours or three hours, he
20 wouldn't, you know, send me a bill at that point. Then
21 he would kind of lump it with the other payments.
22     Q     Did Manoj Kumar have a title with
23 Avicenna?
24     A     Not really. Not a formal title as in --
25 meaning it was understood he was, you know,

1 managing the -- like a business manager. Yeah.
2     Q     A business manager is --
3     A     Business manager, yeah.
4     Q     -- what you would call him? After the
5 practice was up and running, did he manage the
6 day-to-day operations?
7     A     Right. I didn't want to get involved
8 with hiring and firing of employees based on, you know,
9 what this person said they did or that person said they
10 did.
11     So I kind of routed all the staff
12 complaints and staff things to him so they would
13 communicate with him. And then if there was an issue
14 that he could not -- or there was a bigger decision
15 like actually firing somebody or things like that, or
16 hiring somebody new, then he would say, hey, Dr. Shah,
17 this is this, this is this. What do you want to do
18 with this. Do you want just let go of this person and
19 things like that.
20     Q     So he managed the staff?
21     A     Correct.
22     Q     Did he continue to handle purchasing of
23 equipment and supplies?
24     A     If -- you know, and -- so when you --
25 once you get the practice up and running in a couple of

1 years after starting, then you start to have -- then,
2 you know, you get your own, you know, obviously
3 connections and reps start showing up. And then you
4 get relations with them, and you're like, okay, you
5 know, what do you have, show me this, this, this.
6     And then -- so sometimes, you know, I
7 guess it could go both ways. Sometimes I would point
8 to him, hey, this company is making a cheaper tray with
9 more product in it. There are better needles, better
10 this. So let's switch over from them to this, so you
11 know, things like that. So I guess -- Medline for
12 example, things like that.
13     Q     What about the actual purchasing? So
14 let's say you were going to purchase from Medline. Who
15 would handle that?
16     A     I would -- I would pay for that the
17 majority of the time directly to Medline because I know
18 I paid Medline. You know, they were -- so I was paying
19 them directly. But there were times that he had bought
20 stuff because, you know, I have those invoices that he
21 invoiced me for. For example, you know, he bought
22 something, and then he would say, I bought, you know,
23 X, Y and Z on this day and, you know ...
24     Q     How were employees there paid?
25     A     How as in ...

1  not paid by the insurance companies.  So that was the
2  discussion we had, and that's why we switched.

3       Q       So Kumar was taking a percentage of the
4  billing revenue, correct?

5       A       As the -- again, I don't know legally
6  what standing he had in that company.  In other words,
7  was it incorporated in his name or he was just a
8  operating officer, I have no clue.  But he's the one
9  who brought that billing company to me, and he said,
10 you know, we have offices in India and here and we can
11 manage this.  And so he was -- so to that extent, yes,
12 his company was taking a percentage of the money, a
13 billing company, you know, whatever the billing revenue
14 was.

15      Q       Fair enough.  What -- do you know what
16 percentage it was that his company was taking of the
17 billing revenue?

18      A       I feel like -- I feel like the Florida
19 company was seven and a half or eight percent and Manoj
20 was five percent.  Again, I'm not 100 percent sure on
21 that, but I feel like that's -- I think that was the
22 calculation we made, was that it was seven and a half
23 or eight or seven percent or something versus five
24 percent.

25      Q       So if Avicenna billed out, for example,

1  $100,000.00 to patients and Manoj Kumar's billing
2  company was handling that, they would take five percent
3  of that 100,000 or $5,000.00?

4       A       I think it's not based on -- it's based
5  on collections.  In other words, not on how much you
6  billed the insurance company.  It's after you get back
7  the collection.  So if you ask the insurance company
8  for 100,000, you may get 20,000, and so five percent of
9  that 20,000 is what he would get.

10      Q       So five percent of what's ultimately
11 collected?

12      A       Correct.

13      Q       Who handled the accounts receivable at
14 Avicenna?

15      A       He handled all of that.

16      Q       Did he have access to the company bank
17 account?

18      A       Yes.

19      Q       Did he have signatory authority?

20      A       No.

21      Q       What was his access to the company bank
22 account for?

23      A       Just to see how much was coming in and
24 if I wanted him to kind of access together and say,
25 hey, can you look this up and see what is going on here

1  and things like that.

2       Q       Was it just one bank account?

3       A       Yes.

4       Q       What bank was that with?

5       A       Republic Bank.

6       Q       Did Manoj Kumar manage Avicenna's
7  practice for the entire time it was open?

8       A       He did.  I will say that at some
9  point -- and I think I mentioned this in the initial
10 testimony as well.  At some point, and again, I do not
11 recall when exactly, but at some point, he said that,
12 you know, the hourly billing is -- because I'm not here
13 that often anymore.  Once the practice was up and
14 running, he said, you know, just -- it's probably
15 better if I not charge like a hourly consulting fee.  I
16 think he said -- he said, I'll charge you only if I do
17 something that incurs a cost to me.  I don't remember
18 when exactly that was.

19      Q       Do you have a ball park, like a year,
20 two years, three years?

21      A       I would say probably two years I would
22 say is -- maybe a year and a half, two years, something
23 like that.

24      Q       But to be clear, the entire time he was
25 managing the practice and you were paying him, correct?

1       A       Yes.  Whatever time he put in, he was
2  paid.  In fact, I still owe him some money.  So ...

3       Q       How much do you still owe him?

4       A       I don't -- it's on -- there's an
5  invoice.  I have to pull it up, how much it is.

6       Q       Do you have copies of the invoices he
7  sent you?

8       A       I should be able to pull up many of
9  them, unless I paid and deleted some of them, the ones
10 that I paid already, but I should have some, yes.

11      Q       The ones that you do have, would you be
12 willing to provide us with those?

13      A       Sure.

14              MR. JOHNSON:  I think we're about out of
15 time.  Let's take a break.

16              VIDEOGRAPHER:  Okay.  One second here,
17 and we are going off the record.  The time on the video
18 monitor is 14:06, and we are ending back-up media unit
19 one and continuing on original media unit one.

20              (A short break was taken.)

21              VIDEOGRAPHER:  And we are back on the
22 record.  The time on the video monitor is 2:11 p.m.,
23 and we are beginning of back-up media unit one and
24 continuing on master media unit one.

25              Before we broke, you mentioned you still

1 owed some money to Manoj Kumar, correct?

2    A    Yes.

3    Q    Are you still in contact with him?

4    A    Off and on.

5    Q    Is that just in relation to the money
6 you owe him? Do you have any other type of, you know,
7 business, personal relationship with him?

8    A    No business relationship. Just you
9 know, hi, hello. You know, he wishes me -- if there's
10 a festival, he'll wish me, you know, greetings and vice
11 versa.

12    Q    I want to go back to the topic of
13 Kumar's payment for his business management services.
14 After he sent you an invoice, how is he then paid?

15    A    By check.

16    Q    Was it that consistent the whole time he
17 was the business manager for Avicenna?

18    A    I believe so, yeah. I can't recall
19 paying by credit card or anything -- or anything like
20 that, meaning it was always either a physical check or
21 more a online -- using online banking, meaning I would
22 use my bank's online banking to send him a check.

23    Q    Was that just through your bank? Was
24 that through the direct deposit system with the
25 employees?

1    A    No. That was -- you know, if you write
2 a -- like you have a --

3    Q    Sure.

4    A    If you pay a utility through the bank,
5 if you add a payer, then you just send them a -- then
6 the bank sends them a check.

7    Q    So he was being paid separately by
8 check, different from how the employees were being paid
9 through the payroll system?

10    A    Correct.

11    Q    And those were all directly from you?

12    A    Correct.

13    MR. JOHNSON: I'm going to introduce
14 what has been marked as Government's Exhibit 1.

15    (Whereupon Government's Exhibit 1 was
16    marked for identification.)

17    THE WITNESS: Is this for me?

18    Q    That's for you, Mr. Shah.

19    A    Okay.

20    Q    Do you recognize that?

21    A    Yes.

22    Q    What is it?

23    A    It's a check for Manoj, 5,000. It says,
24 "Avicenna set-up fees".

25    Q    Is that your handwriting on the check?

1    A    Yes.

2    Q    So you made this check out to --

3    A    Yeah.

4    Q    -- Manoj Kumar?

5    A    Uh-huh. Yes.

6    Q    We'll start clean. And the check's
7 dated December 29th, 2010?

8    A    Yes.

9    Q    So it's safe to say from at least
10 December of 2010, you were paying Manoj Kumar?

11    A    Yes.

12    Q    If you could turn to page three of this
13 exhibit, and this is a copy of a check to MK Land
14 Holdings, right?

15    A    Yes.

16    Q    Do you know what MK Land Holdings is?

17    A    I think it's -- if I remember correctly,
18 it was a company that Manoj had, but I -- that's -- I
19 believe it was a company that Manoj had. I think
20 that's how he got -- I'm trying to remember if I ever
21 wrote a check to MK Land Holdings, meaning he asked me
22 to write a check to MK Land Holdings.

23    Because he was -- so there was the
24 billing company reimbursement that was -- that we -- I
25 would pay him, which was, you know, like a separate

1 charge. And then whatever else he did, that was a
2 separate, of course, you know, because that was related
3 to how much the billing collection had been.

4    And then if he had gone and, you know,
5 spent, you know, a weekend going and talking to the --
6 let's say the company that -- you know, whoever set up
7 the desktop analyzer or something like that. And then
8 if there were hotel fees or whatever it is that he was
9 charging, that was a separate check.

10    So I'm trying to remember, and I don't
11 exactly remember if I made out a check myself to MK
12 Land Holdings. I'm thinking that's why I feel like I
13 remember the name because I made out a check to that,
14 but I don't remember for sure.

15    Q    And this check is from Avicenna Pain
16 Relief, LLC, right?

17    A    Yes, yes. Yeah. So that would have
18 been -- yes. I'm sorry, yes.

19    Q    Let's turn to the last page of this
20 exhibit.

21    A    I was thrown off by who had written --
22 who signed it. Because I was like, who's that person,
23 I don't ... To ...

24    Q    The very, very last.

25    A    The very last.

1    Q        This might help give you a little
2 clarity.
3    A        Yes.
4    Q        So the last page is a copy of a check
5 from Avicenna Pain Relief to Med Tech Healthcare
6 Solutions.
7    A        And I was going to mention as in during
8 the break, I looked it up and it -- his billing company
9 was called MedTech Healthcare Solutions.
10    Q        So this is a copy of a check from
11 Avicenna to Kumar's billing company, MedTech?
12    A        Correct.
13    Q        And it's dated March 10th, 2015?
14    A        Right.
15    Q        So safe to say that at least through
16 March 10th, 2015, Avicenna was paying Kumar's billing
17 company?
18    A        Yes.  Although, we ceased operations.  I
19 went back to full-time hospital practice, if I remember
20 correctly, in January of 2015.  So this was essentially
21 kind of the -- you know, the office was still open, and
22 we were making sure that all of the patients were
23 getting their charts and referrals back to their
24 primary care doctors and things like that.
25            This was a time, you know, that that

1 office was still open, but I wasn't -- after January,
2 I'm nearly 100 percent certain that I did not see any
3 patients after January 2015.  But obviously, there were
4 some, you know, leftover charges for whatever billing.
5 And he wasn't -- he hadn't been paid in full at that
6 point.  You know, so like I said, you know, that that
7 was being carried forward.
8    Q        Fair enough.  And going back to the MK
9 Land Holdings check on page three, does that help jog
10 your memory as to what MK Land Holdings was?
11    A        Yes.  Now it's clear that that was the
12 non-billing company reimbursement that he would charge
13 under.  He would say, you know, just write a check to
14 MK Land Holdings.
15    Q        So MK Land Holdings is a company that
16 Kumar asked you to write checks out to?
17    A        Correct.
18    Q        And that was for his business management
19 services for Avicenna's practice, correct?
20    A        Correct.
21    Q        Okay.  Did he ever tell you why he
22 wanted it made out to MK Land Holdings versus himself?
23    A        He didn't say.  I didn't ask.
24    Q        I want to switch topics to you and talk
25 with -- and talk with you about urine drug testing.

1 When you started Avicenna, which lab did you use for
2 its urine drug testing?
3    A        I think we carried over PCLS,
4 meaning -- because I had -- you know, awhile back I had
5 stopped working with Tewari.  You know, when we
6 stopped -- my last association with Manoj was at
7 Tewari's practice, and Tewari's practice had PCLS as
8 their lab.  So I was familiar with PCLS at Tewari's
9 lab.
10            So when we started Avicenna, we -- I
11 believe we started with PCLS.  I know we switched
12 billing companies.  I am almost certain we started with
13 PCLS and continued with PCLS.  Because it doesn't
14 come -- I can't recall any other lab that we -- the
15 name of any other lab that we were with before.  So I'm
16 pretty sure we started with PCLS.
17    Q        Did Kumar recommend PCLS to you?
18    A        Yeah, I mean, in the sense that I said,
19 so what should we use, and he said, well, you know, we
20 had seen PCLS reports.  You know, they were detailed
21 reports.  When we were at Tewari's practice, it was
22 comprehensive reporting and had easy access to their
23 pharmacists and their lab.  So it was easy to call up.
24            And so at least it had been a decent
25 experience for me.  So when he suggested that, you

1 know, we go with PCLS, I felt like it was a decent
2 choice.  And to be really honest, I -- I'm not 100
3 percent sure that he said, let's do PCLS.  It may have
4 been, you know, when we were talking, you know, that
5 both of us were saying, hey, you know, what lab should
6 we use, Quest, Labcorp, this, that, or, you know, PCLS.
7 And it's possible it was a -- just a simple joint
8 conversation.  But certainly, he was aware of PCLS and
9 I was aware of PCLS beforehand.  And he had a prior
10 relationship with them.
11    Q        Okay.
12    A        Sorry to interrupt.  Yeah.
13    Q        Sure.  So Kumar had a prior relationship
14 with PCLS?
15    A        Again, what the nature of that
16 relationship was, I'm not sure.  Obviously, I don't
17 know if he had -- if he knew them or didn't know them.
18 But all I'm saying is, he was at Tewari's practice for
19 a long time, and they had had PCLS for a long time.  So
20 he was already familiar with them for awhile, even
21 before I joined Tewari's practice.
22    Q        When you started Avicenna, did you
23 consider any other labs to use?
24    A        Not when we started.  We started with
25 PCLS and we stayed with them.  Although, later on,

1 again, you get multiple offers from different companies
2 coming, hey, you know -- Quest, the big -- you know,
3 there's only a few big companies in the country
4 obviously, Quest and Labcorp and these kinds of
5 companies. So everybody comes and wants to expand
6 their business. So they're ...
7    Q     Did you yourself talk to anyone at PCLS
8 before you signed up with them?
9    A     No.
10    Q     Did you see any marketing materials from
11 them?
12    A     No, not that I can recall at this point.
13    Q     Did Manoj Kumar present any documents,
14 materials related to PCLS before you signed up with
15 them?
16    A     I don't recall seeing anything that
17 would -- that would constitute like data or anything
18 like that. No, I don't remember anything like that.
19    Q     Did anyone from PCLS come to you or your
20 office to explain their services?
21    A     I do not believe so, but I could be
22 mistaken. But I don't believe so.
23    Q     Did you talk to anyone other than Manoj
24 Kumar about using PCLS?
25    A     No.

1 of a certain drug. So for example, oxycodone gets
2 metabolized to oxymorphone. If you saw a high level of
3 oxymorphone and then it went to PCLS and the level
4 was -- you know, either it was absent or something like
5 that or it had been absent in the desktop analyzer and
6 was present there, then we would call and ask, you
7 know, is there something -- you know.
8       Or we were concerned that, you know,
9 this is a patient we know intimately and she's an
10 80-year-old lady who has -- you know, she's been on
11 this medication for the last three years and has never
12 had a, you know, failed drug test and all of a sudden
13 she's positive for cocaine and this and this and this.
14 So we would call and find out what could possibly be
15 causing such a result. Is there any medication she
16 could be taking that might give us that result. So
17 those kinds of questions.
18    Q     What were the type of questions that
19 Manoj Kumar would handle with PCLS?
20    A     For example, you know, PCLS set up an
21 HLA bridge to be able to directly access the final
22 confirmations instead of having to wait for them to fax
23 the results to us, because that was taking time. And
24 so that was delaying our clinical decision-making, you
25 know, in certain instances.

1    Q     And was Kumar the only person who you
2 consulted with about which toxicology lab to use?
3    A     Yes.
4    Q     And after consulting with him, you
5 decided to use PCLS for Avicenna's practice, correct?
6       MR. CAUDILL:  Objection.
7    A     Correct.
8    Q     What can you tell me about PCLS's
9 operations or their lab?
10    A     I mean, nothing other than, you know, we
11 sent them the samples, they did the reports, they sent
12 us the reports kand if we had a question, we would call
13 them and ask their pharmacist. And that was it.
14    Q     Who handled the communications with
15 PCLS?
16    A     Manoj did, other than clinical
17 questions, of course, which anybody, I or my staff, you
18 know, the medical assistants or nurses, or whoever,
19 meaning the medical assistants or myself.
20    Q     What would be an example of a clinical
21 question?
22    A     So for example, you know, if there -- if
23 a patient's initial urine test shows -- shows a
24 certain, you know -- let's say we did a desktop
25 analyzer, and it showed high levels of the metabolite

1       So in order to make the process more
2 seamless and be able to access it within the context of
3 the electronic medical record system, you know, they
4 set up an HLA bridge, which would essentially, you
5 know, this software can talk to this software. They
6 set up that. And so that was -- Manoj would, you know,
7 handle all of that stuff.
8    Q     Did your practice have a PCLS
9 representative?
10    A     No.
11    Q     Did Kumar fill that role?
12    A     Not as a representative, but they did
13 at -- you know, when we were doing the initial -- not
14 initial -- at some point in the -- in the couple of
15 years that -- you know, that once we set up the PCLS
16 and they were doing this HLA bridge and merging with
17 the new EMR and things like, at some point, they did
18 say that, you know, if you dedicate one of your staff
19 to doing the drug testing and handling of the
20 specimens, then that -- you know, whatever time they
21 spend on our equipment doing all of the other stuff,
22 then we'll pay for that time. And that was, you know,
23 set up by -- you know, via in consultation with Manoj.
24    Q     Let's unpack that and just make sure I
25 understand that. So PCLS was paying one of your

1    Now, I don't know this for sure, but I
2 believe at some point after that he told me that he had
3 joined PCLS, or I noticed his email address as showing
4 @PCLS or something like that. But I had some
5 indication that he was, you know, with PCLS. And that
6 was -- but I don't -- I can't coincide the exact
7 timing, but at some point after he stopped being my
8 consultant is when he did that.
9      Q       Let me make sure I understand you
10 correctly, Dr. Shah. Earlier you testified that he was
11 your business manager throughout the entirety of
12 Avicenna's operations, correct?
13      A       Correct.
14      Q       So you learned that Kumar was associated
15 with PCLS in some capacity after Avicenna, you know,
16 closed?
17      A       No.
18      Q       So at some point during Avicenna's
19 operations, you learned that Kumar had an association
20 with PCLS?
21      A       Correct.
22      Q       And to be clear, he was still operating
23 as your business manager at the time?
24      A       Right, except for the fact that
25 initially, remember, he was an hourly basis, and then

1 he said, well, I'm just going to take -- you know,
2 I'm -- depending on what kind of work I do, if I do
3 something substantive, I'm going to charge you.
4 Otherwise I'm not going to charge you.
5      Q       But at that time you were still paying
6 Kumar for services for Avicenna, correct?
7      A       Yes. If he did any work, yes,
8 absolutely. And for his billing company and for any
9 other work that he would do, yes.
10      Q       So you learned he was associated with
11 PCLS you think through his email address changing?
12      A       I don't recall him saying anything
13 outrightly at -- initially. But at some point, and
14 this may -- honest -- to be clear, this may have been
15 after 2014 end. But at some point towards the end of
16 that, you know, our tenure together, at some point
17 there, he said I've taken up a position, you know, with
18 PCLS and I'm moving to North Carolina and da, da, da,
19 and you know, I'm no longer in Bloomington, I'm now in
20 North Carolina.
21      And that's -- because the address on the
22 checks had to change. So he said, well, you know, the
23 checks, when you send them, they'll -- you'll have to
24 send them to whatever, you know, High Point, or
25 whatever that -- wherever he had moved in North

1 Carolina. So and then he said, you know, I've taken up
2 a position with PCLS.
3      Q       So when Kumar explained to you that he
4 was moving to North Carolina and the checks would have
5 to go there, that's when he told you that he had a
6 position with PCLS?
7      A       I believe so. I could be mistaken, you
8 know, in all honesty, but he may have told me earlier
9 but I -- that's when I recall, you know, that he out
10 and -- outrightly said that, you know, he was employed
11 by or he had started with PCLS.
12      Q       And did you continue sending checks to
13 North Carolina after that?
14      A       Yes.
15      Q       Do you remember how many?
16      A       I don't, but I'm sure there's a record
17 invoice.
18      Q       Do you remember how long that you were
19 paying Kumar in North Carolina after he moved there for
20 services with Avicenna?
21      A       I don't exactly recall, but it was I'd
22 say at least -- at least a year or so. And I think
23 part of the confusion is because I -- you know, I owed
24 him the money. So I kept sending him checks even
25 afterwards.

1      So some of those checks were even --
2 even though we were no longer seeing patients, some of
3 those checks were going after that. But it certainly
4 was at some point towards the -- you know, maybe 2013,
5 2014, somewhere around there, 2013, maybe late 2013 or
6 something like that. But I could be wrong on that
7 date.
8      Q       When Avicenna closed, do you know
9 roughly how much money you owed Kumar?
10      A       I think probably close to -- I think it
11 was 25 or 30. I was just looking that there was -- you
12 know, in 2015, he had sent me an invoice for 23 for --
13 I believe 23 for some billing -- or no, not 23 for
14 billing. It was around 30,000 was what I owed him at
15 that time.
16      Q       Was that for his services as your
17 business manager or for the billing?
18      A       He broke it down. He would break it
19 down by MedTech this much for, you know, and prior
20 balance this much. So some of -- some of it was for
21 MedTech, but the other was for his capacity as, you
22 know, if he had gone somewhere, done something, bought
23 something that -- you know, like if he bought contrast
24 from the compounding company and, you know, brought it
25 with him or something like that and it didn't arrive or

1 something like that.  So he would -- you know, I would
2 reimburse him for that.
3        Q        So the roughly 30,000 you owed him at
4 the end of Avicenna was for both his business manager
5 services and for the MedTech billing?
6        A        Correct.
7        Q        When you started Avicenna, did you know
8 whether Kumar had any association with PCLS?
9        A        I did not.
10       Q        When you chose PCLS as the lab that you
11 were going to use for urine drug samples, did you know
12 if Kumar had any type of employment relationship with
13 PCLS?
14       A        I didn't.
15       Q        So he never disclosed to you whether he
16 did or did not have an employment relationship with
17 PCLS when you consulted him about the decision to use
18 PCLS for urine drug samples?
19                MR. CAUDILL:  Objection.  You can
20 answer.
21       A        Correct.
22                MR. JOHNSON:  I'm going to show you
23 what's been marked as Government's Exhibit 4.
24                (Whereupon Government's Exhibit 4 was
25                marked for identification.)

1        Q        Do you recognize this document, Dr.
2 Shah?
3        A        Yes.
4        Q        What is it?
5        A        It's a -- this is basically as a
6 consultant and -- basically, you know, detailing what
7 he's doing and no direct or indirect influence or say
8 in the samples and patients, meaning how -- you know,
9 who is going to be tested or not tested and how many
10 are going to be tested or sent to a lab.
11       Q        Okay.  Let's back up.  It's a document
12 entitled Statement, correct?
13       A        Yes.
14       Q        Did you prepare this Statement?
15       A        I don't recall preparing it.
16       Q        Do you know if Manoj Kumar prepared it?
17       A        That's my memory, but I -- I do not
18 recall making this print, you know, statement out
19 myself.  That's all I can say, which means that most
20 likely he made it and then -- yeah.
21       Q        So you don't remember drafting this?
22       A        I don't.
23       Q        Do you know why you would have drafted
24 it?
25       A        Why I would have drafted it or he

1 would have --
2        Q        I'll ask you a better question.  Can you
3 think of a reason why you would have drafted a
4 statement like this?
5        A        I can't.
6        Q        Do you remember discussing this
7 statement with Manoj Kumar?
8        A        No, not really.  I don't -- I don't
9 recall any big discussions about it.
10       Q        Is that your signature on it?
11       A        Yes.
12       Q        Do you remember signing it?
13       A        Yes, meaning I don't remember signing
14 but that is my signature.  It looks like my signature I
15 think.
16       Q        So that's your signature but you don't
17 remember signing it?
18       A        Correct.
19       Q        You don't remember discussing the
20 contents of this statement with Kumar?
21       A        Honestly, I don't.
22       Q        I want to turn your attention to the
23 last line of the first paragraph.  "He," meaning Kumar,
24 "is paid $200.00 every month for this assistance,"
25 referencing his business management --

1        A        Sure.
2        Q        -- services, correct?
3        A        Yes.
4        Q        Is that sentence accurate?
5        A        That -- this may have been -- that's
6 what I was looking at.  So I'm thinking the change
7 from -- remember, I was saying that he -- at some point
8 he changed from an hourly to, okay, I'm going to do
9 some work every month and you do -- but if I do
10 something, then I'm going to charge you for that.
11                I'm thinking this is around that time,
12 meaning after we had had the initial $50.00 an hour
13 thing, and he said, well, I'm not going to charge you
14 an hourly fee anymore.  I'm just going to charge you --
15 so I feel like that is what he had said okay that, you
16 know, just pay me $200.00 every month or whatever, you
17 know, and then I'll do -- if it's more than that, I do
18 more work, I'll charge you more for that.  But let's
19 just keep it like this since I'm not here, you know,
20 doing that much work.
21       Q        So you believe at a certain point you
22 went to a flat fee system with Kumar?
23       A        Correct, something like that.
24       Q        And that would be a minimum flat fee?
25       A        Yes.

1     A        The only thing I can recall is there was
2 a computer that was used to -- I don't know whether it
3 was a server or a computer or something, some kind of,
4 you know, like a computer-type device that was used
5 with the software to be able to access the reports.
6     Q        Do you know if Kumar managed any other
7 doctors' practices during the same time period he was
8 managing yours?
9     A        I know he was managing some in southern
10 Indiana.
11     Q        Do you know what practice that was?
12     A        The reason I know is because it was my
13 other colleague from Tewari's practice, Dr. Masimore.
14 So his practice was also being managed by Manoj, as far
15 as I know.
16     Q        Is that -- was that something that Dr.
17 Masimore told you?
18     A        Yeah.  I mean, again, I don't recall
19 like a discussion saying, okay, you know, yes, he
20 manages my practice.  But when we -- Greg and I would
21 talk, would say, yeah, Manoj told me to do this and
22 we're going to -- you know, I think he suggested this,
23 and I'm going to do this.  And so to that extent, yes,
24 I believe he was.
25     Q        Have you ever met Philip McHugh?

1     A        Not that I know of.
2     Q        Do you know who he is?
3     A        No.
4     Q        So you've never spoken to him,
5 corresponded with him, anything like that?
6     A        Unless it was some document like this
7 where -- you know, like that paper -- like this paper
8 that had his signature or -- I don't recall as far as I
9 can remember.
10     Q        Do you know Doug Smith?
11     A        No.
12     Q        Same questions, never talked to him,
13 corresponded with him, anything like that?
14     A        As far as I can remember, no.
15             MR. JOHNSON:  Let's take five.  I might
16 be about done.
17             VIDEOGRAPHER:  The time is now 2:05 --
18 I'm sorry, 3:05, and we are going off the record.  And
19 this will be end of back-up media unit two and
20 continuation of master media unit one.
21             (A short break was taken.)
22             VIDEOGRAPHER:  And the time is now 3:11
23 p.m. on the video monitor, and we are back on the
24 record.  This is beginning of back-up media unit three
25 and continuation of master media unit one.

1             MR. JOHNSON:  I'll pass the witness.
2
3 CROSS EXAMINATION BY MR. CAUDILL:
4     Q        Dr. Shah, my name is Bo Caudill.  We met
5 off the record.  I represent Philip McHugh.  I believe
6 you testified you don't remember meeting Philip McHugh
7 at any point, is that right?
8     A        I did.
9     Q        Dr. Shah, before we went on the record
10 this afternoon, I asked you where you had come from for
11 today's deposition.  What have you done today?
12     A        I was working at the hospital taking
13 care of a lady who almost died.  So gave her like 40
14 units of blood.  So that's what I was doing all night.
15     Q        And when did you start your shift at the
16 hospital?
17     A        7:00 a.m. yesterday morning.
18     Q        Wow.  And when did it end?
19     A        This morning at 7:00.
20     Q        Was it a busy shift?
21     A        Very.
22     Q        Are they usually pretty busy?
23     A        Yes, pretty, at one of the hospitals
24 where we work in the -- yes, it's pretty busy.  Last
25 night was unusually busy because of this lady who

1 almost died from this bleeding but ...
2     Q        I think you testified that you did your
3 medical school in India?
4     A        Yes.
5     Q        And that you came to the United States
6 in 1998?
7     A        Yes.
8     Q        Why did you come to the United States?
9     A        All of the -- you know, this is the
10 place where all of your people that you read books of,
11 they are the people that are actually working here.  So
12 everybody aspires to be working with them.  So all of
13 the -- and in my case actually, you know, the dean of
14 the medical school at that time was -- was Dr. Kaplan,
15 who's the guy who's written the big book on cardiac
16 anesthesia.
17             So we had read his books, and so he was
18 the dean.  And same thing with the -- you know, you
19 with the research head at University of Louisville.  It
20 was Dan Sessler.  He's a big -- you know, he's written
21 multiple books and chapters and things like that.  So
22 you get opportunities to work with them.  So that's
23 obviously a great draw.
24     Q        And after you had those opportunities to
25 work with them, what -- what made you decide to stay in

1          MR. CAUDILL:  I don't have anything

2 further for you either, Dr. Shah.  Thanks again for

3 your time today.

4          VIDEOGRAPHER:  And the time is now 3:45

5 on the video monitor.  This concludes all media units

6 and concludes the deposition.

7                    *  *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3 STATE OF KENTUCKY   )

4 COUNTY OF JEFFERSON )

5          I, DENISE L. CLINE, a notary public within

6 and for the State at Large aforesaid, do hereby certify

7 that the foregoing is a true, correct and complete

8 transcript of the deposition of YUNUS SHAH, M.D., taken

9 at the time and place and for the purpose set out in

10 the caption hereof; that said deposition was taken down

11 by me in stenotypy and afterwards transcribed on a

12 computer under my direction; that the appearances were

13 as set out in the caption hereof; and that it was not

14 requested that the deposition be submitted to the

15 witness for reading and signature.

16          Given under my hand as notary aforesaid, this

17 the 21st day of August, 2020.

18          My commission expires:  October 7, 2023

19

20

21                    /S/ DENISE L. CLINE

22          _____

23                    DENISE L. CLINE, Notary ID 631507

24                    Court Reporter and Notary Public

25

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL FILE NO. 3:17-CV-37
(CONSOLIDATED WITH
CIVIL FILE NO. 3:17-CV-46)

UNITED STATES OF AMERICA ex rel,
TARYN HARTNETT and DANA SHOCHED,
    Plaintiffs,
    v.
PHYSICIANS CHOICE LABORATORY
SERVICES, DOUGLAS SMITH,
PHILIP MCHUGH AND MANOJ KUMAR,
    Defendants.
            /

Via Zoom
Monday, September 14, 2020
9:42 a.m. - 2:08 p.m.

VIDEOTAPED DEPOSITION OF MARCUS SOWINSKI

Taken before Mary Ann Collier, a Court Reporter
and Notary Public for the State of Florida at Large,
pursuant to Notice of Taking Deposition filed in the
above cause.

## Page 2

1  APPEARANCES:  (Via Zoom)
2    KATHERINE T. ARMSTRONG, AUSA
    Suite 1650, Carillon Building
3    227 West Trade Street
    Charlotte, North Carolina 28202
4    704-344-6222
    Katherine.Armstrong@usdoj.gov
5    On behalf of Plaintiff USA
6    MATTHEW VILLMER, ESQ.
    BO CAUDILL, ESQ.
7    Weaver, Bennett & Bland
    196 North Trade Street
8    Matthews, NC 28105
    704-844-1400
9    mvillmer@wbbatty.com
    On behalf of Defendant McHugh
10
    BRIAN F. IRVING, ESQ.
11   Bass Berry & Sims
    150 Third Avenue South, Suite 2800
12   Nashville, TN 37201
    615-742-6200
13   birving@bassberry.com
    On behalf of the deponent
14
15 ALSO PRESENT:
16   PHILIP MCHUGH
    CATHLEEN HOLLOWELL
17   OLIVER LEE, Videographer
18
19     I N D E X
20 WITNESS    EXAMINATION BY    PAGE
21 MARCUS SOWINSKI  MS. ARMSTRONG    3
          MR. VILLMER    96
22
23     E X H I B I T S
24 FOR PLAINTIFFS    FOR I.D.
    No. 1    87
25

## Page 3

1      THE VIDEOGRAPHER:  In the case styled United
2  States of America, ex rel, versus Physicians
3  Choice Laboratory Services, et al., Civil File
4  Number 3:17-CV-37, consolidated with 3:17-CV-46,
5  this is the videotaped deposition of Marcus
6  Sowinski.  This deposition is taking place via
7  Zoom on September 14th, 2020.  The time is now
8  9:42 a.m.  our videographer is Oliver Lee.
9      Counsel will state your appearances for the
10 record, after which our court reporter, Mary Ann
11 Collier, will then swear in the witness.
12     MS. ARMSTRONG:  Katherine Armstrong,
13 Assistant U.S. Attorney, on behalf of the United
14 States.
15     MR. VILLMER:  Matt Villmer with Weaver,
16 Bennett and Bland, here on behalf of Defendant
17 Phil McHugh.
18     MR. CAUDILL:  Bo Caudill on behalf of
19 Defendant Philip McHugh.
20     MR. IRVING:  Brian Irving from Bass, Berry
21 and Sims on behalf of witness, Marcus Sowinski.
22 Thereupon,
23         MARCUS SOWINSKI
24 was called as a witness and, having been duly sworn,
25 testified as follows:

## Page 4

1      DIRECT EXAMINATION
2  BY MS. ARMSTRONG:
3      Q.  Mr. Sowinski, thank you very much for making
4  the arrangements to be here with us today via Zoom.
5  These are certainly different times and we appreciate
6  your patience with us, and particularly me and my
7  inability to do anything on a computer.
8      So thank you and just bear with me.  If for
9  some reason you can't hear me or something fails in
10 the technology on your end, please let us know.  Okay?
11     A.  Sure.
12     Q.  Great.  So you are here today pursuant to a
13 notice of deposition and consent.  Is that correct?
14     A.  Yes.
15     Q.  Great.  Have you ever had your deposition
16 taken before?  And by deposition I mean giving a --
17 giving a statement under oath in front of a court
18 reporter or a videographer?
19     A.  Yes.
20     Q.  Okay.  When was that?
21     A.  Many years ago.  I don't remember.
22     Q.  Okay.  Well since it's been a little while,
23 I'll just kind of go through some of the basic
24 housekeeping issues with you, if that's all right.
25     A.  Okay.

1 (Pages 1 to 4)

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 220 of 283

1    Q.  Okay.  Tell us just a little bit about that.
2  Are there different types of urine drug testing?
3    A.  Yes.
4    Q.  What are those?
5    A.  Drug screening, drug confirmations.
6    Q.  What is drug screening?
7    A.  It tests qualitative, positive or negative,
8  if a substance is present in a patient's system.
9    Q.  And what is drug confirmation testing?
10    A.  Quantitative testing to determine the level
11  of a specific drug in a patient's system.
12    Q.  Okay.  Did PCLS offer both qualitative and
13  quantitative drug testing?
14    A.  Yes.
15    Q.  Okay.  What specifically product did PCLS
16  offer?  Was it a certain test or a number of urine
17  drug tests?
18    A.  A variety of urine drug tests and saliva drug
19  tests.
20    Q.  And do you recall while you were there how
21  many different drug tests were offered?
22    A.  I believe it changed over time.  I don't know
23  the exact number of tests.
24    Q.  What year -- I'm sorry -- I think you
25  mentioned you left PCDS in 2009 and joined PCLS.  Did

1  you join PCLS in 2009?
2    A.  If I recall correctly, I believe so.
3    Q.  Do you remember what month?
4    A.  No.
5    Q.  I know I'm asking you to go far back here.  I
6  appreciate you trying your best to recall things.  I
7  should have mentioned this earlier.  If I ask you
8  something and you don't recall the answer, please tell
9  us you don't recall.  I certainly don't want you to
10  guess.  Is that okay?
11    A.  Okay.
12    Q.  Great.  Okay.  So you joined PCLS sometime in
13  2009.  What was your role when you joined the company?
14    A.  Chief operating officer.
15    Q.  And tell us what that role entailed.
16    A.  I was charged with setting up the laboratory
17  information system responsible for processing samples.
18    Q.  Okay.  And have you had prior experience
19  doing that before you joined PCLS?
20    A.  I don't understand your question.
21    Q.  Sure.  Have you had prior experience setting
22  up lab information systems for the collection of
23  samples?
24    A.  No.
25    Q.  Okay.  And how did you get training or learn

1  how to do that job at PCLS?
2    A.  I learned as I went, but I was familiar with
3  information systems in general.
4    Q.  When you joined the company you mentioned you
5  joined as an owner as well.  Is that correct?
6    A.  I'm sorry.  I didn't hear your question.
7    Q.  You mentioned when you joined the company you
8  also joined as an owner.  Is that correct?
9    A.  Yes.
10    Q.  Did you have to put in any type of
11  contribution equity into the company?
12    A.  My time and experience.
13    Q.  When you joined PCLS in 2009, who were the
14  other owners of the company?
15    A.  Doug Smith, Philip McHugh.
16    Q.  Just the three of you in 2009?
17    A.  Yes.
18    Q.  Okay.  Did you know if Mr. Smith put in any
19  type of equity or contribution when he became an owner
20  of PCLS?
21    A.  He was investing money to fund the company.
22    Q.  And in 2009 when you joined, what was
23  Mr. Smith's job title?
24    A.  Owner.
25    Q.  And what was his role at that time in 2009?

1    A.  Investor.
2    Q.  Did Mr. Smith in 2009 or any time after play
3  an active role in the company?
4    A.  No.
5    Q.  In 2009 what was Mr. McHugh's title?
6    A.  CEO.
7    Q.  And what do you recall was Mr. McHugh
8  responsible for back in 2009?
9    A.  Day-to-day operations, sales, administrative
10  duties.
11    Q.  Did Mr. McHugh's title ever change while you
12  were at PCLS?
13    A.  Yes.
14    Q.  Okay.  When was that?
15    A.  When Joe Weigel joined the company.
16    Q.  Do you recall approximately when that was?
17    A.  I do not.
18    Q.  How long were you with PCLS?
19    A.  I resigned from management in 2013, but I
20  remained an owner until the company was sold.
21    Q.  When you started with the company in 2009,
22  did you report to anybody?
23    A.  To Phil McHugh.
24    Q.  Okay.  And how were you compensated when you
25  joined PCLS, were you on a salary or did you receive

4 (Pages 13 to 16)

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK  Document 129-4  Filed 12/08/20  Page 221 of 283

1  another form of compensation?
2      A.  Initially, ownership equity.
3      Q.  And did that change?
4      A.  Yes.
5      Q.  When and how did that change?
6      A.  I don't recall when exactly that changed.  It
7  was around the time the company became profitable I
8  started to receive a salary.
9      Q.  Do you recall what year that would have been?
10     A.  No.
11     Q.  Okay.  When you started in 2009, other than
12 your two co-owners, Mr. Smith and Mr. McHugh, were
13 there any other individuals who were working in the
14 company?
15     A.  Working did you say?
16     Q.  Yes.
17     A.  Yes.
18     Q.  Okay.  About how many people were employed by
19 PCLS when you joined?
20     A.  Three to five.
21     Q.  Okay.  And do you recall what capacity those
22 three to five people were employed in?
23     A.  Yes.
24     Q.  Okay.  How were they employed?
25     A.  As employees.

1      Q.  What was their role or function at the
2  company?
3      A.  Which person?
4      Q.  Do you recall the names of the three to five
5  employees?  We can start there.
6      A.  A few of the names I recall.
7      Q.  Okay.  Tell us who you recall by name.
8      A.  Dinah Myers.
9      Q.  Okay.  Who else?
10     A.  Mark Ross.  Katie.  I don't recall her last
11 name.
12     Q.  Sorry.  I cut you off there.  Did you say
13 Katie?
14     A.  Katie.  I don't recall her last name.
15     Q.  Okay.  Do you recall anyone else?
16     A.  There was a scientist.  I don't recall her
17 name.  And we had a consultant, Joe Eagle.
18     Q.  What was Dinah Myers' role in the company?
19     A.  Quality and compliance for the laboratory.
20     Q.  Okay.  Tell us what you mean by both quality
21 and compliance for the laboratory.
22     A.  Setting up the testing and quality assurance
23 programs required by CLIA and state and regulatory
24 requirements and federal regulatory requirements for
25 compliance.

1      Q.  And, again, because this may be played for a
2  judge or a jury, people who are not as familiar with
3  the lab space as you are, what is CLIA?
4      A.  Clinical Laboratory Improvement Act.  It's
5  the regulatory agency that licenses and governs
6  clinical laboratories.
7      Q.  Who did Dinah Myers report to when she joined
8  the company in 2009?
9      A.  Phil McHugh.
10     Q.  Okay.  As part of Mr. McHugh's role as CEO in
11 2009, he was also over quality and compliance.  Is
12 that correct?
13     A.  Yes.
14     Q.  Other than Ms. Myers, was there anyone else
15 on or in the compliance group at PCLS?
16     A.  Yes.
17     Q.  Who else?
18     A.  Me.
19     Q.  Okay.  So compliance was part of your role as
20 well?
21     A.  I grew into that role.
22     Q.  Okay.  Was that something you had previous
23 job experience with or is it something you learned as
24 you went along?
25     A.  I learned as I went along.

1      Q.  Okay.  When do you recall your role
2  transitioning into compliance?
3      A.  As I started to learn more about the
4  requirements for the laboratory and started to
5  research more on what was required for our information
6  system, I started to learn more about compliance.
7      Q.  Was this within the first year or so you were
8  at the company or do you think that happened later?
9      A.  Yes, within the first year.
10     Q.  Okay.  Did you have any formal training in
11 compliance at any point in your career?
12     A.  No.
13     Q.  Did PCLS do any in-house compliance or
14 regulatory training while you were there?
15     A.  Yes.
16     Q.  Tell me about that.
17     A.  We had online compliance training.
18     Q.  What did that involve?
19     A.  It was a website provided by CodeMap that
20 allowed employees to log in and complete various
21 modules related to compliance in various areas of
22 laboratory business.
23     Q.  Do you recall any of those areas?
24     A.  Billing, antikickback, STARK, fraudulent
25 claims, laboratory compliance basics.

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com

1  which is something we're obviously going to have to
2  work through.
3       So without getting into that, ultimately,
4  what would you tell your sales reps about whether or
5  not PCLS could provide point of care testing cups to
6  physicians?
7    A.  The code of federal regulation states that a
8  laboratory can only provide supplies used solely for
9  collection, transportation and storage.
10   Q.  Was the answer to sales reps, no, we cannot
11  provide point of care testing cups for physician's
12  use?
13   A.  Yes.
14   Q.  And was the question whether PCLS could
15  provide them free of charge or whether PCLS could
16  provide them and then charge the physician?
17   A.  Both.
18   Q.  Both.  Okay.  And the answer to both
19  questions that you gave was no.  Is that correct?
20   A.  Yes.
21   Q.  To your knowledge, did PCLS ever provide free
22  point of care testing cups to physician practices?
23   A.  Not to my knowledge.
24   Q.  You also mentioned the analyzer.  Tell us
25  what an analyzer is and what it's used for.

1    Q.  You can answer.
2    A.  Should I answer?
3        MS. ARMSTRONG:  Yes.
4        MR. IRVING:  You can answer after an
5  objection.
6        THE WITNESS:  I don't know.
7  BY MS. ARMSTRONG:
8    Q.  Do you know anything about the reimbursement
9  for point of care testing?
10   A.  Yes.
11   Q.  Tell us what you know about that.
12   A.  I'm familiar with a CPT code that we used, or
13  the difference between CPT codes we should use and we
14  shouldn't use.
15   Q.  Okay.  Let me back up a step.  So PCLS used
16  analyzer equipment in the lab.  Is that correct?
17   A.  Yes.
18   Q.  Okay.  And there is a CPT code you said you
19  should use and one that you should not use.  Can you
20  talk us through that, please.
21   A.  Originally, there was a CPT code 80101 used
22  for drug screening.  But at some point in time I
23  believe it was Medicare, the AMA, that changed the
24  coding and came out with a different code for the use
25  of point of care cup versus instrument analysis, like

1    A.  Enzyme immunoassay instrument used for urine
2  drug screening quality testing.
3    Q.  Where could an analyzer be used?
4    A.  In a laboratory setting.
5    Q.  It's a piece of lab equipment?
6    A.  Yes.
7    Q.  Okay.  Could it also be used in any
8  physician's office?
9    A.  Yes.
10   Q.  What is the difference between using an
11  analyzer to test a sample versus a point of care
12  testing cup?
13   A.  I don't know the scientific difference.
14   Q.  Okay.  But ultimately they both of give you
15  qualitative results?
16   A.  Yes.
17   Q.  Positive or negative for the presence of
18  drugs?
19   A.  Yes.
20   Q.  Do you know if there are any benefits to the
21  physician in using an analyzer instead of a point of
22  care testing cup?
23       MR. VILLMER:  Objection.  Leading.  You can
24  answer.
25  BY MS. ARMSTRONG:

1  an analyzer.  Those codes were GO 431 and GO 434.  GO
2  431 for the use of an analyzer.
3    Q.  You mentioned a change in reimbursement, if I
4  understood you correctly.  At some point prior to that
5  change do you know how physicians were being
6  reimbursed for point of care testing cups?
7    A.  They were billing 80101.
8    Q.  Were they billing for each -- or were they
9  able to bill for each substance tested for in the
10  point of care testing cup?
11   A.  Yes.
12   Q.  And then I think you mentioned at some point
13  that changed?
14   A.  Yes.
15   Q.  Okay.  And what was the practical effect, if
16  you know, of that change --
17       (Technical difficulties.)
18   Q.  I think the question was what was the
19  practical effect of the regulatory change to how a
20  physician could bill for points of care testing using
21  GO 101?  And your answer again?
22   A.  I don't believe you said the right CPT code.
23   Q.  I didn't say the right CPT code.  What CPT
24  code should that have been?
25   A.  I'm not sure which test you're referring to.

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com

1　Q.　So we're talking about the point of care
2　testing cups prior to the change in billing
3　requirement.
4　A.　Okay.　Originally, I believe the code was
5　80101.　And after the change, the code for a cup was
6　GO 434.
7　Q.　Okay.　And in terms of the practical effect
8　of that change, did it affect the amount of money a
9　physician could be reimbursed for using a point of
10　care testing cup?
11　A.　Yes.
12　Q.　Okay.　Did it increase the amount they could
13　be paid?　Did it decrease the amount they could be
14　paid?
15　A.　Decrease.
16　Q.　Decrease.　Okay.　Do you know the amount or
17　the significance of the decrease?
18　A.　I believe the allowable amount for GO 434 at
19　the time was $20.
20　Q.　And prior to the use of GO 434 when
21　physicians were able to bill under 80101 -- do I have
22　that right?
23　A.　Yes.
24　Q.　-- what was the reimbursement like under that
25　prior model?

1　A.　I don't know.
2　Q.　Okay.　More than $20?
3　MR. VILLMER:　Objection.　Leading.
4　BY MS. ARMSTRONG:
5　Q.　If you know.
6　A.　Probably more.
7　Q.　You mentioned sale reps would come to you
8　with questions about analyzers.　What types of
9　questions about analyzers did sales reps have for you
10　in your compliance capacity?
11　A.　Could the company provide a physician with an
12　analyzer.
13　Q.　And what was your answer to that question at
14　the time?
15　A.　We need to discuss it with our attorney.
16　Q.　And, again, not going into anything you
17　discussed with your attorney, what did you ultimately
18　tell the sales team about whether or not PCLS could
19　provide physicians with analyzer equipment?
20　A.　PCLS is in the business of laboratory, not in
21　the business of providing analyzers.
22　Q.　Were the sales reps asking you if PCLS could
23　provide physicians with analyzer equipment free of
24　charge?
25　MR. VILLMER:　Objection.　Leading.

1　A.　I don't know.　I don't remember.
2　Q.　As compliance director, would it concern you
3　if you learned the company was providing physician
4　practices with analyzer equipment free of charge?
5　MR. VILLMER:　Objection to form.
6　A.　I'm not sure I understand the question.
7　Q.　Sure.　In your role as compliance director --
8　A.　I was not the compliance director.
9　Q.　Who was head of compliance?
10　A.　Dinah Myers.
11　Q.　I thought Dinah Myers reported to you on
12　compliance issues.
13　A.　As in administrative day-to-day operations,
14　yes.　But our compliance officer ultimately reported
15　directly to the board of directors per the OIG
16　guidelines.
17　Q.　So let me make sure I understand that.　So
18　Dinah was the head of the compliance group.　Is that
19　correct?
20　A.　Yes.
21　Q.　And she ultimately reported to the board of
22　directors.
23　A.　Yes.
24　Q.　But sometimes she also reported to you for
25　various things.　Correct?

1　A.　Day-to-day administrative performance
2　evaluations, days off, vacations, weekends, questions,
3　we did work together.　But she did report to me.　But she
4　also, under our org chart, she also reported directly
5　to the board of directors.
6　Q.　Getting back to the analyzer issue, I think
7　you told us that sales reps would come to you with
8　questions about the provision of analyzer.　Were you
9　the person who was charged with answering those
10　questions or was that somebody else?
11　MR. VILLMER:　Objection.　Mischaracterizes
12　previous testimony, but you can answer.
13　BY MS. ARMSTRONG:
14　Q.　Did that mischaracterize your previous
15　testimony?
16　A.　I'm not sure I understand the question.　Or
17　if you could repeat the question.
18　Q.　Of course.　You told us earlier that as part
19　of your day-to-day compliance role sales reps would
20　ask you questions and those would include questions
21　about analyzers.　Is that correct?
22　A.　Yes.
23　Q.　And then we talked more and you specified
24　sales reps would come to you with questions about
25　whether or not they could provide physician practices

10　(Pages 37 to 40)

Fernandez & Associates Court Reporters
305-374-8868　service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK　Document 129-4　Filed 12/08/20　Page 224 of 283

1    Q.  Do you recall any others?
2    A.  No.
3    Q.  What was the nature of the relationship
4  between PCLS and SLP?
5        MR. VILLMER:  Objection to form.
6    Q.  You can answer.
7    A.  Co-marketing.
8    Q.  Tell me what that means.
9    A.  They would introduce us to their customers
10  and we would introduce them to our customers.
11   Q.  Okay.
12       MR. VILLMER:  Would anybody mind if we just
13  took a quick break?  Is that all right?
14       MS. ARMSTRONG:  Ten minutes?  Five minutes?
15  Why don't we reconvene around 11.
16       (Thereupon, a brief recess was taken, after
17  which the following proceedings were had:)
18       THE VIDEOGRAPHER:  We're back on the record
19  at 11:03.
20  BY MS. ARMSTRONG:
21   Q.  Great.  Thank you guys.
22       Mr. Sowinski, before we broke we were talking
23  about analyzers and I frankly forgot the question I
24  was asking you, so let me try again with a new
25  question.

1        You had mentioned that PCLS did have a
2  co-marketing relationship with an analyzer vendor,
3  SLP.  Is that correct?
4    A.  Yes.
5    Q.  Okay.  What was the nature of that
6  co-marketing arrangement?  Can you describe it for us?
7    A.  I'm not sure what you mean by the nature of
8  that arrangement.
9    Q.  What does a co-marketing agreement entail?
10   A.  I don't recall exactly what the co-marketing
11  agreement said.  But my understanding of the
12  relationship was that they were introducing us to
13  their customers and we had the opportunity to
14  introduce them to our customers.
15   Q.  Was there any exchange of money between PCLS
16  and SLP as part of the co-marketing arrangement?
17       MR. VILLMER:  Objection to the form.  But you
18  can answer.
19   A.  There was no financial relationship to my
20  knowledge, with the exception of an analyzer Phil may
21  have purchased from SLP early on for the use in our
22  laboratory.
23   Q.  Gotcha.  Okay.  Are you aware of Mr. McHugh
24  being involved in the procurement of any other
25  analyzers?

1        MR. VILLMER:  Objection to the form.
2  Objection to the form.  But you can answer.
3    A.  No.
4    Q.  Are you familiar with a Dr. John Johnson?
5    A.  Yes.
6    Q.  What do you know about Dr. John Johnson?
7        MR. VILLMER:  Object to the form, but you can
8  answer.
9    A.  He was a customer of PCLS.
10   Q.  By customer what do you mean?
11   A.  He sent us patient specimens for laboratory
12  testing.
13   Q.  What type of doctor was he?
14   A.  I don't know.
15   Q.  Do you know who at PCLS handled Dr. Johnson's
16  account?
17   A.  I don't know.
18   Q.  Do you know what timeframe Dr. Johnson was a
19  customer of PCLS?
20   A.  I don't remember.
21   Q.  Do you have knowledge of any discussions
22  between Dr. Johnson and Manoj Kumar about the
23  provision of an analyzer for Dr. Johnson's office?
24       MR. VILLMER:  Objection to the form.
25   A.  No.

1    Q.  Do you have knowledge of any discussions
2  between Mr. McHugh and Dr. Johnson regarding the
3  provision of an analyzer for Dr. Johnson's office?
4        MR. VILLMER:  Same objection.
5    A.  No.
6    Q.  I'll ask it a different way.  Did Mr. McHugh
7  ever talk to you about getting an analyzer in Dr.
8  Johnson's office?
9        MR. VILLMER:  Objection to the form.
10  BY MS. ARMSTRONG:
11   Q.  Did that question make sense?
12   A.  Not that I remember.
13   Q.  Did Manoj Kumar ever talk to you about
14  putting an analyzer in Dr. Johnson's office?
15       MR. VILLMER:  Same objection.
16  BY MS. ARMSTRONG:
17   Q.  You can answer.
18   A.  No.
19   Q.  If PCLS was thinking about putting an
20  analyzer in a doctor's office, and I mean paying for
21  or reimbursing a doctor for expenses related to an
22  analyzer, is that something PCLS's compliance
23  department should vet?
24       MR. VILLMER:  Objection.  Calls for
25  speculation and objection to the form.

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 225 of 283

1 BY MS. ARMSTRONG:
2    Q. In your role as compliance and based on your
3 experience working in compliance at the company, what
4 is your answer?
5      MR. VILLMER: Same objection.
6    A. Yes, that should be reviewed by compliance
7 and legal.
8    Q. Tell us why.
9    A. If you are providing anything to a physician,
10 it needs to be compliant.
11    Q. Did anyone ever consult you at any time
12 related in any way to analyzer equipment for Dr.
13 Johnson?
14      MR. VILLMER: Objection to the form.
15    A. No.
16    Q. Did that question make sense?
17    A. Yes.
18    Q. Okay. Are you familiar with Dr. John
19 Nichols?
20    A. Sounds familiar.
21    Q. What do you know about Dr. Nichols?
22      MR. VILLMER: Objection to the form.
23    A. I don't know anything beyond that it sounds
24 familiar.
25    Q. Okay. Do you believe he was a PCLS customer

1 at one point?
2      MR. VILLMER: Objection to the form.
3    A. Yes.
4    Q. Why do you believe he was a PCLS customer?
5    A. Because it sounds familiar.
6    Q. Do you know who at PCLS handled the Nichols
7 account?
8    A. No.
9    Q. Do you know the timeframe during which he
10 referred samples to PCLS?
11    A. No.
12    Q. Did anyone at PCLS ever consult you regarding
13 the placement of an analyzer in Dr. Nichols' office?
14      MR. VILLMER: Objection to the form.
15    A. No.
16    Q. Did Mr. McHugh ever talk to you about the
17 provision of an analyzer in Dr. Nichols' office?
18      MR. VILLMER: Same objection.
19    A. No.
20    Q. Did Mr. McHugh ever talk to you about
21 reimbursing Dr. Nichols' for expenses related to
22 putting an analyzer in his office?
23      MR. VILLMER: Same objection.
24    A. No.
25    Q. Did Manoj Kumar ever talk to you about

1 reimbursement to Dr. Nichols for expenses related to
2 putting an analyzer in his office?
3      MR. VILLMER: Objection to form.
4    A. No.
5    Q. Is it fair to say while you were at PCLS from
6 2009 through 2016 you knew nothing about the provision
7 of an analyzer or analyzer equipment to Dr. Nichols?
8      MR. VILLMER: Object to the form.
9      THE WITNESS: Can you restate the question?
10 BY MS. ARMSTRONG:
11    Q. Sure. Is it fair to say during your time at
12 PCLS you had no knowledge of the provision of an
13 analyzer or analyzer equipment to Dr. Nichols?
14      MR. VILLMER: Same objection.
15    A. Yes, I had no knowledge.
16    Q. Okay. Same question as to Dr. Johnson.
17 During your time at PCLS, did you have any knowledge
18 about the provision of an analyzer or analyzer
19 equipment to Dr. Johnson?
20      MR. VILLMER: Objection to the form.
21    A. No.
22    Q. No knowledge. Is that correct?
23    A. No knowledge.
24    Q. Who is Manoj Kumar?
25    A. A friend of Phil McHugh.

1    Q. Did Manoj Kumar ever work for PCLS?
2    A. Yes.
3    Q. When did Manoj Kumar first come to work for
4 PCLS?
5    A. I don't remember.
6    Q. Was it after you had started with the
7 company?
8    A. Yes.
9    Q. Okay. Do you know who brought Manoj Kumar
10 into PCLS?
11      MR. VILLMER: Objection to the form.
12    A. Phil McHugh.
13    Q. What do you know about that?
14    A. That Phil McHugh wanted Manoj Kumar to come
15 work as a sales manager for PCLS.
16    Q. Do you have any information as to why Phil
17 McHugh wanted Manoj Kumar to come work as a sales
18 manager for PCLS?
19      MR. VILLMER: Objection to the form.
20    A. No.
21    Q. Were you involved in any way in the hiring of
22 Manoj Kumar?
23    A. Yes.
24    Q. Tell us about your involvement.
25    A. I worked with Joe Weigel and Phil McHugh to

Fernandez & Associates Court Reporters
305-374-8868   service@fernandezcr.com

1   develop a contract with our counsel, in-house
2   counsels, the terms of the agreement.
3       Q.   And let me clarify.  Was that when Mr. Kumar
4   was transitioning into his role as an employee of
5   PCLS?
6       MR. VILLMER:  Objection to the form.
7       A.   Yes.
8       Q.   Before he became an employee of PCLS, was
9   Mr. Kumar employed by the company as a contractor?
10      A.   Yes.
11      Q.   In what capacity?
12      A.   Sales representative.
13      Q.   Okay.  Did you have any role in bringing in
14  Mr. Kumar as a sales representative for PCLS?
15      A.   No.
16      Q.   Do you recall when he started as a sales
17  representative for PCLS?
18      A.   No.
19      Q.   And are you familiar with his entity MK Land
20  Holdings?
21      MR. VILLMER:  Objection to the form.
22      A.   Sounds familiar.
23      Q.   Was MK Land Holdings a sales representative
24  for PCLS.
25      A.   I don't know.

1       Q.   Would that be outside the scope of your
2   day-to-day?
3       MR. VILLMER:  Objection to the form.
4       A.   I don't know.
5       Q.   Was it part of your day-to-day
6   responsibilities to know who the PCLS sales reps were?
7       A.   No.
8       Q.   Was that a function of the sales team
9   management?
10      A.   Yes.
11      Q.   Did you ever have a role in signing up sales
12  reps?
13      MR. VILLMER:  Objection to the form.
14      A.   No.
15      Q.   What is a 1099 channel partner?
16      A.   Independent contractor sales representative.
17      Q.   When you joined the company in 2009, what was
18  the sales force made up of?
19      MR. VILLMER:  Objection to the form.
20      A.   Sales representatives.
21      Q.   I'm sorry?
22      A.   Sales representatives.
23      Q.   Were they 1099 or W-2 employees?
24      A.   Both, if I recall.
25      Q.   Okay.  Was there a higher percentage of 1099

1   to W-2 employees?
2       A.   Initially.
3       MR. VILLMER:  Objection to the form.
4       Q.   Initially?
5       A.   Yes.
6       Q.   Did that eventually change?
7       A.   Yes.
8       Q.   What was the reason for that change?
9       A.   Privileged.
10      Q.   Okay.  So the change was made based on
11  information that you obtained through counsel?
12      MR. VILLMER:  Just real quick for the record,
13  I think we -- you either need to get a foot in
14  the camp of asking him to answer these questions
15  about what counsel said or don't, one of the two.
16      MS. ARMSTRONG:  When he says privilege, I'm
17  just trying to understand whose privilege.  Was
18  it the company's privilege that you're asserting?
19  That's fine.  I don't think we want to wade into
20  that.
21      MR. IRVING:  Our position would be that Mr.
22  Sowinski is not in a position to waive the
23  company's privilege.  So, Mr. Sowinski, I would
24  instruct you not to answer any questions that
25  would require you to disclose your communications

1   with legal counsel for the company or for your
2   own personal attorneys, if that happens to be the
3   case.
4   BY MS. ARMSTRONG:
5       Q.   And the answer is privileged.  I'm just
6   trying to clarify privilege based on the company's
7   attorney-client privilege or your personal privilege
8   or some other privilege.
9       A.   Advice given by the company's attorney.
10      Q.   Okay.  Thank you.
11      Going back to Mr. Kumar, do you know how long
12  he was a 1099 sales rep?
13      A.   No.
14      Q.   Do you know if he had a written agreement
15  with PCLS to be a sales rep?
16      A.   I don't know.
17      Q.   Was that a standard procedure back in early
18  2009, 2010 when you started with the company?
19      MR. VILLMER:  Objection to the form.
20      A.   Yes.
21      Q.   Sales reps typically have written agreements
22  with the company?
23      A.   Yes.
24      Q.   Do you know if Mr. Kumar -- I think you said
25  you did not know if Mr. Kumar had a written agreement

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com

1  with the company.
2      A. I don't recall.
3      Q. Do you recall if any of the entities owned or
4  controlled by Mr. Kumar had written sales rep
5  agreements with the company?
6          MR. VILLMER: Objection to the form.
7      Q. You don't recall?
8      A. I don't know.
9          MR. IRVING: Mr. Sowinski, I just wanted to
10  thank you for repeating your answers occasionally
11  on the record. I believe your initial answers
12  are sometimes getting drowned out by objections,
13  so thank you.
14          THE WITNESS: Yeah. I'm going to try to
15  pause for potential objections before I give an
16  answer.
17          MS. ARMSTRONG: Sounds good.
18  BY MS. ARMSTRONG:
19      Q. Who was involved in signing Mr. Kumar up as a
20  sales representative for PCLS?
21      A. I don't know.
22      Q. But it wasn't you?
23      A. No.
24      Q. Do you believe Mr. McHugh was involved in
25  that?

1          MR. VILLMER: Objection to the form and calls
2  for speculation.
3      A. Yes.
4      Q. Why do you believe Mr. McHugh was involved in
5  bringing Mr. Kumar in as a sales representative?
6      A. Phil McHugh was the person that worked the
7  most closely with Manoj Kumar.
8      Q. Did Mr. McHugh as part of his
9  responsibilities as CEO have the ability to hire
10  employees?
11      A. Yes.
12          MR. VILLMER: Objection to the form.
13          THE WITNESS: Yes.
14  BY MS. ARMSTRONG:
15      Q. As CEO, did Mr. McHugh have the ability and
16  did he hire sales representatives?
17          MR. VILLMER: Objection to the form.
18      A. Yes.
19      Q. Did Mr. McHugh at the time have to get
20  approval from the other owners, you and Mr. Smith, to
21  make personnel decisions such as hiring?
22          MR. VILLMER: Objection to the form.
23      A. No.
24      Q. Are you aware that Mr. Kumar was managing two
25  physicians' practices in Indiana when he became a

1  sales representative for PCLS?
2          MR. VILLMER: Objection to the form.
3      A. No.
4      Q. You were not aware?
5      A. Not aware.
6      Q. I will clarify. When I say he became a sales
7  rep, I am referring to either Mr. Kumar or acting as
8  his company.
9          MR. VILLMER: Same objection.
10      A. I didn't hear your question.
11      Q. Sure. I wanted to clarify, when I say
12  Mr. Kumar as a sales representative, my understanding
13  is one of his entities actually entered into a sales
14  representative agreement with PCLS and was a 1099
15  general partner. Is that your understanding? Do you
16  have any knowledge about that?
17          MR. VILLMER: Objection to the form.
18          THE WITNESS: What's the question?
19  BY MS. ARMSTRONG:
20      Q. The question is, I'll ask it two different
21  ways. The question is are you aware that when
22  Mr. Kumar became a sales representative of PCLS that
23  he was managing two physician practices in Indiana?
24          MR. VILLMER: Objection to the form.
25      A. No.

1      Q. Did you ever become aware of that fact?
2          MR. VILLMER: Objection to the form.
3      A. No.
4      Q. Are you familiar with the name Gregory
5  Masimore?
6      A. Yes. Sounds familiar.
7      Q. Was Gregory Masimore a customer of PCLS?
8      A. I don't know.
9      Q. Who would know the answer to that?
10          MR. VILLMER: Objection to the form.
11      A. Phil McHugh.
12      Q. Are you familiar with the name Yunus Shaw?
13      A. Sounds familiar.
14      Q. Is he a customer or was he a customer of
15  PCLS?
16      A. I don't know.
17      Q. Is that also something that you believe Mr.
18  McHugh may know the answer to?
19          MR. VILLMER: Objection to the form.
20      A. Yes.
21      Q. All right. Let me ask the question another
22  way. Were you aware when MK Land Holdings became a
23  sales representative for PCLS that Manoj Kumar was
24  managing two physician practices in Indiana?
25          MR. VILLMER: Objection to the form.

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com

1    A. No.
2    Q. Do you know who at PCLS had the Masimore
3  account?
4         MR. VILLMER: Objection to the form.
5    A. No.
6    Q. Did the question make sense? My
7  understanding is a sales rep has a specific physician
8  practice for provider accounts. Am I using the right
9  terminology?
10    A. Yes.
11    Q. So you do not know who at PCLS had the
12  Masimore account. Correct?
13         MR. VILLMER: Objection. Asked and answered.
14    A. Correct.
15    Q. Do you know who at PCLS had the Yunus Shaw
16  account?
17    A. No.
18    Q. Around what time did Mr. Kumar's role at PCLS
19  transition from sales rep to W-2 employee?
20    A. I don't recall exactly when.
21    Q. But if I understood you correctly, you were
22  involved in that process. Is that correct?
23    A. I was made aware of it.
24    Q. When were you made aware of it?
25    A. I believe Phil presented it to the partners

1  or to the board about making Manoj a sales manager.
2    Q. Do you remember anything specific from Mr.
3  McHugh's presentation to the board on that topic?
4    A. No.
5    Q. Do you remember why Mr. McHugh -- what Mr.
6  McHugh said about why he was proposing that change?
7    A. He wanted Manoj Kumar to handle the 1099
8  channel partners.
9    Q. Do you recall any other reasons that Mr.
10  McHugh gave the board as to why he was suggesting this
11  change?
12    A. No.
13    Q. Was Mr. Kumar unable to manage the 1099
14  channel partners as a 1099 contractor for the company?
15         MR. VILLMER: Objection to the form.
16    A. I don't understand the question.
17    Q. Okay. I think you've told us that Mr. McHugh
18  in a meeting with the board presented this change in
19  employment for Manoj Kumar from 1099 contractor to W-2
20  employee. Is that correct so far?
21    A. Yes.
22    Q. Okay. And you told us the reason was given
23  by Mr. McHugh that this way he could handle the 1099
24  channel partners. Is that correct?
25    A. To manage the 1099 channel partners.

1    Q. Okay. So my question to you is did Mr. Kumar
2  need to be converted to a W-2 employee in order to
3  handle that task?
4         MR. VILLMER: Objection to the form.
5    A. Yes, to make him a manager.
6    Q. Okay. Okay. Do you recall any other
7  meetings or conversations with Mr. McHugh regarding
8  the change in Mr. Kumar's employment?
9    A. No.
10    Q. Who was on the board at the time of that
11  presentation that you mentioned earlier?
12    A. Joe Weigel. And I can't remember if it was
13  Doug Smith or Avery Chapman at the time.
14    Q. What was Joe Weigel's role at the company at
15  the time of this meeting?
16    A. CEO.
17    Q. And do you recall when that occurred? When
18  he became CEO?
19    A. He left his company he was working for and
20  came to work for PCLS. At that time all of the titles
21  and roles changed.
22    Q. How did Mr. McHugh's role change at PCLS
23  after Joe Weigel came over?
24    A. Joe became president and CEO to manage
25  operations of the laboratory, given his laboratory

1  background. And Phil McHugh focused primarily on
2  sales after that.
3    Q. After Joe Weigel came to PCLS, was Mr. McHugh
4  still in a management position?
5    A. Yes.
6    Q. Management of the sales team?
7         MR. VILLMER: Objection. Asked and answered.
8  BY MS. ARMSTRONG:
9    Q. I'm sorry. Was that a yes?
10    A. Yes.
11    Q. Did he manage any other teams?
12    A. Not that I'm aware of.
13    Q. What was your understanding of Mr. McHugh's
14  responsibilities in terms of his management of the
15  sales team at that time?
16    A. To work with the sales team to grow the
17  business.
18    Q. And did Mr. McHugh continue in that capacity
19  as manager of the sales team until the business was
20  sold in 2016?
21    A. Yes.
22    Q. Was there ever a point at which you recall
23  Mr. McHugh stepping down from management?
24    A. No.
25    Q. Mr. Kumar was eventually terminated from the

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com

Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 229 of 283

1    Q.   Did the company take any action upon learning
2  about the loan issues?
3    A.   Yes.
4    Q.   What action was that?
5    A.   Investigation with counsel.
6    Q.   And at the conclusion of the investigation,
7  did the company take any further action with regard to
8  the loans or Mr. McHugh?
9    A.   There was a special board meeting at which
10 counsel was present.  I was not present.
11   Q.   Are you aware of the company making any
12 repayments related to any loan given by or at the
13 direction of Mr. McHugh?
14       MR. VILLMER:  Objection to the form.
15   A.   I was told by Alan Campbell that they were
16 refunding Medicare for a doctor in Indiana I think it
17 was.
18   Q.   I'm sorry.  What was that?
19   A.   I was told by Alan Campbell that they were
20 refunding Medicare for the claims submitted for the
21 doctor in Indiana or Illinois, whichever.
22   Q.   Whichever it may turn out to be?
23   A.   I don't recall if it was Indiana or Illinois.
24   Q.   Okay.  Was Manoj Kumar to your knowledge
25 involved in the provision of the loans to these two

1  providers?
2        MR. VILLMER:  Objection to the form.
3    A.   That was something I was told.
4    Q.   Who told you that?
5    A.   Alan Campbell.
6    Q.   And what were you told about Manoj Kumar's
7  involvement in the loans?
8    A.   I don't remember.
9    Q.   How many conversations do you recall having
10 with your compliance department about these loan
11 issues?
12       MR. VILLMER:  Objection to the form.
13   A.   Maybe two or three.
14   Q.   Are you aware of any repayment being made by
15 PCLS to the MAC?  Are you aware this actually
16 happened?
17   A.   I don't know.
18   Q.   Did you ever take any steps to verify whether
19 or not the company actually made a repayment to the
20 MAC relating to one or more of the loans?
21   A.   No.  If Alan Campbell said -- if Alan Campbell said
22 they were going to do something, I trusted Alan
23 Campbell.
24   Q.   I want to be clear.  He said they were going
25 to do something, he did not tell you that they had

1  made a payment.  Is that correct?
2    A.   Correct.
3    Q.   Did anyone at PCLS consult you before either
4  of these two loans were made?
5    A.   No.
6    Q.   Are you familiar with the Department of
7  Health and Human Services Office of Inspector
8  General's fraud alert?
9    A.   Yes.
10   Q.   What do you know about those?
11   A.   That there's a link on their website where
12 you can report fraud.
13   Q.   Were you also familiar with the fraud alert
14 publications that were published by the agency or
15 disseminated by the agency?
16   A.   No, I'm not familiar with that.
17   Q.   I'm going to change topics here for a minute
18 and talk about Doug Smith.  You mentioned that you had
19 worked with Mr. Smith at PCDS prior to coming to PCLS.
20 How did you know Mr. Smith?
21   A.   He was introduced to me through a family
22 friend.
23   Q.   Was that before you started working with him
24 at PCDS?
25   A.   Yes.

1    Q.   What do you know about his professional
2  background?
3    A.   He's a physician.  I believe he worked as an
4  emergency medicine physician, and then practiced pain
5  management after that.
6    Q.   Do you recall where he was a practicing
7  physician?
8    A.   In Florida.  West Palm Beach.
9    Q.   To your knowledge, is he still a licensed
10 medical doctor?
11   A.   No.
12   Q.   Did he at some point lose his medical
13 license?
14   A.   Yes.
15   Q.   Do you know anything about the circumstances
16 surrounding that?
17   A.   Only what I read in the news.
18   Q.   What do you recall reading in the news?
19   A.   That a physician lost their license for the
20 death of a patient.
21   Q.   And that was Mr. Smith?
22   A.   Yes.
23   Q.   Okay.  Do you recall when he lost his
24 license?
25   A.   I don't recall exactly.

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 230 of 283

```
 1          CERTIFICATE OF OATH
 2
 3   STATE OF FLORIDA
 4   COUNTY OF BROWARD
 5
 6        I, the undersigned authority, certify that
 7   Marcus Sowinski appeared before me via Zoom on
 8   September 14, 2020, and was duly sworn.
 9        WITNESS my hand and official seal this
10   23rd day of September 2020.
11
12
13
14
15
16        Mary Ann Collier
          Commission #GG056076
          Expires 2/21/21
17
18
19
20
21
22
23
24
25
```

```
 1               ERRATA SHEET
 2   DO NOT WRITE ON TRANSCRIPT.  ENTER CHANGES HERE.
 3   NAME:  Marcus Sowinski
     RE:  USA v. PCLS
 4   DATE OF DEPOSITION:  9/14/20
     Page/Line  Change              Reason
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
     Under penalty of perjury, I declare that I have read
23   my deposition and that it is true and correct,
     subject to any changes in form or substance entered
24   above.
25   Deponent's signature     Date    (Print Name)
```

```
 1      REPORTER'S DEPOSITION CERTIFICATE
 2
 3        I, MARY ANN COLLIER, Court Reporter, certify
 4   that I was authorized to and did stenographically
 5   report the videotaped deposition of Marcus Sowinski,
 6   that a review of the transcript was requested, and
 7   that the foregoing transcript, pages 1 through 116, is
 8   a true and complete record of my stenographic notes.
 9
10        I further certify that I am not a relative,
11   employee, attorney or counsel of any of the parties,
12   nor am I a relative or employee of any of the parties'
13   attorney or counsel connected with the action, nor am
14   I financially interested in the action.
15
16        Dated this 23rd day of September 2020.
17
18
19               Mary Ann Collier
20
          MARY ANN COLLIER
21
22
23
24
25
```

```
          Fernandez & Associates, Inc.
          444 Brickell Avenue, Suite 718
               Miami, FL 33131
                 305-374-8868
             service@fernandezcr.com
                         September 23, 2020
     Brian F. Irving, Esq.
     Bass Berry & Sims
     150 Third Avenue South, Suite 2800
     Nashville, TN 37201
     birving@bassberry.com
                    Re:  USA v. PCLS
     Dear Mr. Irving:
     Please be advised that the deposition of
     Marcus Sowinski has been prepared and is awaiting
     signature.  Please call our office at the above number
     to make arrangements for your client to read and sign
     his deposition.
     The deponent has 30 days from this date to read and
     sign the deposition.  If we do not hear from you, it
     shall then be concluded that the reading and signing
     has been waived.

               Yours very truly,


               Fernandez & Associates


     cc:  Katherine Armstrong, AUSA
          Matthew Villmer, Esq.
```

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 231 of 283

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3    CHARLOTTE DIVISION

4  UNITED STATES OF AMERICA, ex rel.  )
   TARYN HARTNETT, and DANA           )
5  SHOCHED,                           )
                                      )
6         Plaintiff,                  )
                                      ) Civil File No.
7         vs.                         ) 3:17-CV-37
                                      ) (Consolidated with Civil
8  PHYSICIANS CHOICE LABORATORY       ) File No. 3:17-CV-46)
   SERVICES, DOUGLAS SMITH, PHILIP    )
9  MCHUGH AND MANOJ KUMAR,            )
                                      )
10        Defendants.                 )

11

12        Video Deposition of JEFFREY ALAN THOMAS

13            Wednesday, October 7, 2020

14

15        The deposition of JEFFREY ALAN THOMAS, called as a witness
   by the Plaintiff, pursuant to notice and the Federal Rules of
16 Civil Procedure 30, pertaining to the taking of depositions,
   taken before me, the undersigned, Jill A. Oliver, Notary Public
17 in and for the Commonwealth of Pennsylvania, via Zoom Video
   Conference, commencing at 9:30 o'clock a.m., the day and date
18 above set forth.

19

20            COMPUTER-AIDED TRANSCRIPTION BY
              MORSE, GANTVERG & HODGE, INC.
21              PITTSBURGH, PENNSYLVANIA
                   412-281-0189
22

23

24

25

1    Q.   When you started at PCLS, did you receive any training?

2    A.   Yes.

3    Q.   Can you talk about that with me?

4    A.   Sure.  It was -- I believe it was two days of training

5  that we had the conference room at the laboratory.  That

6  training really was with the lab director, Mark, who gave us the

7  science background of the testing was and the use of the

8  equipment and what the results were.  Other than that

9  background, there really was no sales training.  It was just the

10 technical background side of it and what the results were and

11 what the results meant and cutoffs and things like that for the

12 results.

13    Q.   As a sales rep, was there any periodic training, or was

14 it just that training at the outset?

15    A.   Initially, we did just the training at the outset.  It

16 was invited back to Charlotte for additional training with new

17 representatives, and that was just, again, my input and feedback

18 as to what was in the field.

19    Q.   How were you paid?

20    A.   I was paid monthly based on commissions based on the

21 reimbursement for the samples that were sent in.

22    Q.   Do you remember what percentage of that reimbursement

23 you would get in commissions?

24    A.   I want to say it was 8 percent.

25    Q.   Was that 8 percent of collections or just what was

1    A.   Yes.

2    Q.   How often?

3    A.   I would say mostly maybe a couple of times a month.

4    Q.   Just generally what would the substance of those
5  interactions be?

6    A.   Those interactions really had to do with reimbursements
7  and when the reimbursements would start coming in so I could
8  actually get a paycheck.

9         Then further on down from that really, again, I was
10 called into Charlotte to do training and have people ride with
11 me and train them in the field as sales people.  So I would have
12 interactions with him and conversations with him regarding those
13 folks and making arrangements for them to come to Pittsburgh or
14 me going to Charlotte, and then later on, just really the
15 general business and what was going on at PCLS.

16   Q.   What is your understanding of what Phil McHugh's role
17 in the company was?

18   A.   He was I believe CEO.  He was the investor; one of the
19 owners.

20   Q.   Did you also know Bill Hughes?

21   A.   Ask the question again.  I'm sorry.

22   Q.   Do you also know Bill Hughes?

23   A.   Yes.

24   Q.   Who is Bill Hughes?

25   A.   Bill Hughes is the owner of Universal Oral Fluid Labs

1 of Pennsylvania.

2     Q.   How did you first meet Bill Hughes?

3     A.   He contacted me in the course of me going around to,

4 again, different offices.  I had left my business card at an

5 office in Coraopolis, Pennsylvania where his wife was a

6 collector for another laboratory, and she gave that information

7 to her husband Bill, and he reached out to me.

8     Q.   What did you he reach out to you about?

9     A.   His lab was doing oral fluid testing.  He was doing

10 screenings.  Excuse me, and he was looking for a laboratory that

11 could do confirmations for those tests that he was screening

12 for.

13     Q.   You mentioned screenings and confirmations.  Can you

14 generally explain what those terms mean?

15       MS. ROBERTO:  I'm going to object and ask you rephrase

16 the question so he can answer form his personal knowledge rather

17 than give an opinion about what those terms mean.

18       MR. JOHNSON:  Sure.

19     Q.   You used the term "screening."  What do you understand

20 that term to mean?

21     A.   A screen is a qualitative testing for drugs that we

22 give you a detected or non-detected result.

23     Q.   So a binary yes or no?

24     A.   Correct.  That's correct.

25     Q.   And then I think that you also used the term

1  "confirmation."

2      A.   Sure.  Confirmation is a quantitative test result that
3  would provide you with per millimeter of the drugs found in oral
4  fluid or urine.

5      Q.   So the quantitative test give you the amount of
6  whatever you're testing for --

7      A.   Correct.

8      Q.   -- as the final result?

9      A.   Yes.

10     Q.   Bill Hughes at Universal was doing the qualitative
11  testing, the screening, and he was looking for someone to do the
12  quantitative tests on top of that?

13     A.   Correct.

14     Q.   And that would be testing for the same patient
15  sample; right?

16     A.   Yes.

17     Q.   It would first go to screening and then confirmation
18  testing?

19     A.   Correct.

20     Q.   Did you introduce Phil McHugh to Bill Hughes?

21     A.   Yes, I did.

22     Q.   Can you tell me about how that went down?

23     A.   Again, Bill Hughes reached out to me and looked for the
24  laboratory who could do oral fluid confirmation testing.  I knew
25  that PCLS was in the process of bringing on an oral fluid panel

1  for oral fluid testing, and so I reached tout the Phil McHugh

2  and let him know that I met somebody that was looking for a lab

3  to do confirmation testing of oral fluids.  That ended up being

4  why Phil McHugh came into Pittsburgh, and he met with

5  Bill Hughes.

6      Q.    Was that meeting, yourself, Bill Hughes and Phil

7  McHugh?

8      A.    Yes.

9      Q.    Anyone else at that meeting?

10     A.    No.?

11     Q.    Do you remember generally when that was?

12     A.    Probably the fall of 2010.

13     Q.    What was discussed at that meeting?

14     A.    The discussion was if PCLS would want to take those

15  confirmations, and Bill Hughes would, again, do the screening

16  and then sent the samples to PCLS for the confirmations, and

17  that Bill Hughes at Universal Oral Fluids would continue to bill

18  the screenings and PCLS would bill the confirmations,

19     Q.    Did PCLS and Universal ever end up entering into that

20  business arrangement?

21     A.    Yes.

22     Q.    When did that happen?

23     A.    That would have been probably October or November of

24  2010.

25     Q.    You mentioned that you were there at that initial

1 meeting.  Other than that, what else was your involvement in

2 that arrangement the between Universal and PCLS?

3          MR. VILLMER:  Objection to the form of the question?

4     A.    Can you say the question again?  I'm sorry.

5     Q.    Sure.  Other than that initial meeting that you just

6 mentioned, can you describe your involvement, if any, in the

7 business arrangement between PCLS and Universal?

8          MR. VILLMER:  Objection to the form of the question.

9     A.    Okay.  Yes.  On behalf of PCLS, I set up the -- any new

10 business or any new claims that Universal brought on board, I

11 would provide that information to PCLS so they in turn can set

12 up the account to receive the samples and again distribute the

13 lab results to those individual physicians.

14    Q.    So was it Universal that was finding all of the

15 doctors?

16    A.    Yes.

17    Q.    Was that -- can you just generally describe how was

18 that done?  Was there a form or separate forms for PCLS and

19 Universal?  Can you take me through the process of finding a

20 doctor?

21          MR. VILLMER:  Objection to the form.

22    A.    I received information either from Bill Hughes or

23 Amy Bogardus.  That would be information on the new accounts,

24 and that would include physician names, address, NPI number and

25 that type of information.  I would fill out the new account form

1  for PCLS and provide that to PCLS.

2     Q.    Did you make commission from PCLS on the Universal

3  confirmations?

4     A.    Yes, I did.

5     Q.    Was that the same 8 percent?

6     A.    Yes.

7     Q.    At the time was anyone at PCLS aware that Universal was

8  paying physicians?

9           MR. VILLMER:   Object to the form.

10     A.    PCLS was aware of the agreements that Universal was

11  using with these physicians.

12     Q.    And can you just describe generally what the terms of

13  those agreements between Universal and its physicians were?

14     A.    Yes.   The agreement -- let's start off that the

15  physicians would pay $100 per sample for the screening by

16  Universal Oral Fluids, and in turn any monies over and above

17  $100 would be sent back and return to or paid 1to those

18  individual physicians.

19     Q.    So to make sure that I understand, originally the

20  physicians paid $100?

21     A.    To clarify that, there was no money exchanged up front.

22  It was really based on accounting, and after one, two, three or

23  four months, as that accounting caught up, anything over and

24  above the $100 would be paid back to that physician.

25     Q.    All of these samples were samples that were either

1  billed out to insurance or Medicare or someone like that; right?

2         MR. VILLMER:  Objection to the form.

3     Q.   You can answer.

4     A.   That is correct.

5     Q.   I'm just trying to make sure that I understand what you

6  meant by no money was paid out but by accounting.  So the

7  physician never paid any money to Universal?

8     A.   That's correct.

9     Q.   Is it that when the sample was billed to the insurance

10 company or Medicare, they would receive anything above $100

11 paid?

12        MR. VILLMER:  Objection to the form.

13    A.   Yes.

14    Q.   What would happen if, for example, a sample was sent

15 out and the insurance company only paid $90 on it?

16    A.   Universal did not bill physicians for the difference.

17    Q.   Do you know why the $100 figure was used?

18    A.   That was a figure that Universal came up with and

19 Bill Hughes came up with.

20    Q.   The doctors never owed anything to Universal?

21    A.   That's correct.

22    Q.   But if the testing came back and it reimbursed over

23 $100, they would get whatever that extra was?

24    A.   Yes.

25    Q.   And that was the payment arrangement between the

1  physicians and Universal?

2      A.   Yes.

3      Q.   And you said that that was done in a written contract?

4      A.   Yes.  It was a license agreement.

5      Q.   Did anyone at PCLS have copies of those license

6  agreements?

7      A.   Yes.  Those were provided at PCLS.

8      Q.   Who at PCLS were they provided to?

9      A.   I believe that Phil McHugh received those from

10  Bill Hughes.

11      Q.   At the initial meeting between yourself and Mr. Hughes

12  and Mr. McHugh, was Universal's payment arrangement discussed?

13      A.   Yes.

14      Q.   Can you tell me a little bit about those discussions?

15      A.   Bill discussed the license agreement that he had based

16  on the screening and discussed really what the agreement was is

17  what we discussed.

18      Q.   When you were at PCLS, was there any discussion of the

19  possibility of doing something similar to what Universal was

20  doing?

21          MR. VILLMER:  Objection to the form.

22      A.   I know that they looked at the agreements, but I don't

23  know if there were discussions about implementing.

24      Q.   At the beginning of PCLS' and Universal's arrangement,

25  did Universal have a way to do confirmation testing at that

1 time?

2         MR. VILLMER: Objection to the form of the question.

3         MR. JOHNSON: What is your objection to that, Matt?

4         MR. VILLMER: At the beginning you said -- and I'm

5 trying to recall the exact language, but you said the

6 arrangement between PCLS and Universal Oral Labs or whatever it

7 was. I don't quite understand what the arrangement is, but that

8 is the basis for my objection.

9     Q. Mr. Thomas, we've been talking about a business

10 arrangement between PCLS and Universal; correct?

11     A. Yes.

12     Q. So when I say that, you understand what I'm referring

13 to?

14     A. Yes.

15     Q. So at the beginning of PCLS' and Universal's business

16 arrangement, did Universal have a way to do confirmation testing

17 at that time?

18     A. No.

19     Q. Did Universal ever begin working on a way to do their

20 own confirmation testing?

21     A. Yes.

22     Q. Did that cause friction with PCLS?

23     A. Yes.

24     Q. Can you describe that?

25     A. Once Universal Oral Fluids was able to do

1  confirmations, all of the samples that were being sent through

2  Universal back to PCLS they would stop, and Universal would be

3  doing their own confirmation testing.

4      Q.   Do you know generally what portion of PCLS' business

5  came from Universal?

6      A.   No.  It would think substantial, but no, I don't know a

7  percent.

8      Q.   Do you know generally how much per month PCLS was

9  making from the Universal business arrangement?

10      A.   I mean, just based on my commission checks, it was

11  probably in the millions.

12      Q.   Did the business arrangement between Universal and PCLS

13  end at some point?

14      A.   Yes, it did.

15      Q.   Can you talk about how that ended?

16      A.   With the inevitability of Universal being able to do

17  confirmation testing -- it would have been the October time

18  frame or November of 2011 into December -- there was a plan to

19  go after Universal's physicians and business, and there were

20  conversations regarding those conversations with the physicians

21  and with the offices.  PCLS' plan was that they were not going

22  to accept anymore confirmation tests from Universal, and if the

23  offices wanted to continue to send to PCLS, they could do that;

24  however, it would have to be a relationship directly with PCLS

25  and the practice or office.

1    Q.    Did PCLS make an effort to retain the business from
2 Universal?
3    A.    Yes.
4    Q.    Could you talk about what those efforts were?
5    A.    Again, there was a blitz -- I'll call it a blitz --
6 where sales representatives in the majority of where those
7 offices were to get face-to-face meetings and phone calls to
8 make the announcement and give the information that PCLS would
9 no longer accept any confirmation testing from Universal Oral
10 Fluids and those sales representatives were supposed to retain
11 that business.
12    Q.    Are you familiar with what a desktop analyzer is?
13    A.    Yes.
14    Q.    What is your understanding of what a desktop analyzer
15 is?
16    A.    Quite simply -- I'll keep it simple.  Essentially a
17 desktop analyzer takes the sample, you put it in the analyzer,
18 and the analyzer essentially calculates and spits out the
19 information or the results, if you will, from the sample.
20    Q.    Is that a type of machinery that a doctor could have at
21 their office?
22    A.    Yes.
23    Q.    Did you ever attend any meeting at PCLS that discussed
24 implementing a program where PCLS would help doctors obtain
25 desktop analyzers?

1      A.    Yes.

2      Q.    Can you talk about those meetings?

3      A.    I attended a meeting where we -- John Grove, Phil

4  McHugh and myself -- I don't recall who else was there -- went

5  to Carolina Liquid Systems and had a meeting with the owners

6  there regarding their equipment and their desktop analyzers and

7  what they could do and what the billing process would be with

8  regard to using those machines in physician's offices.

9      Q.    Is Carolina Liquid Systems in Greensboro?

10     A.    Yes, I believe so.

11     Q.    Other than the meeting at Carolina Liquid, any other

12  meeting to talk about a desktop analyzer program?

13     A.    Yes.  There was --

14           MR. VILLMER:  Object to the form.

15     Q.    You can continue your answer.

16     A.    There were meetings and conference calls regarding

17  implementation and use of a desktop analyzer to provide revenue

18  to individual physician offices and what that revenue stream

19  would look like.

20     Q.    Who was attending those meetings or on the phone calls?

21     A.    That would have been John Grove, Phil McHugh, I think

22  that Marcus was on those calls, but it was also the sales team

23  and sales representatives.

24     Q.    By Marcus, you mean Marcus Sowinski?

25     A.    Sowinski, right.  I believe that Manoj Kumar was a part

1  of those meetings too.

2      Q.   As part of those discussions, was there any discussions

3  of other labs setting up analyzers for doctors?

4      A.   Other laboratories?  No.  Other than PCLS, no.

5      Q.   Did you ever receive any emails regarding placing

6  analyzers in doctors' offices?

7      A.   Yes.

8      Q.   Can you talk a little bit about that?

9      A.   Yes.  We received emails with spreadsheets that showed

10 what the revenue would look like based on screening, based on

11 moderately complex testing and highly complex testing.

12     Q.   Was that revenue for the doctor?

13     A.   Yes.

14     Q.   Was there any discussion of revenue for PCLS?

15     A.   Other than confirmation testing that would follow up,

16 yes.

17     Q.   Did you understand the analyzer programs involve

18 getting confirmation testing at PCLS in exchange for setting up

19 the analyser?

20          MR. VILLMER:  Objection to form.

21     A.   I don't remember that.  I don't remember what any

22 reimbursements would be back to PCLS.  I'm not --

23     Q.   Do you know if Universal ever provided analyzers to

24 physicians?

25     A.   Universal did not provide analyzers to physicians.

1          MR. JOHNSON:  Let's take five.  I might be about done.

2          THE VIDEOGRAPHER:  Off the record at 10:20.

3          (Recess taken.)

4          THE VIDEOGRAPHER:  We are back on the record at 10:32.

5     BY MR. JOHNSON:

6     Q.    Mr. Thomas, earlier we were talking about the payment

7     arrangements that Universal had with physicians?

8     A.    Yes.

9     Q.    Did PCLS express concerns to you about the payment

10    arrangements that Universal had with physicians?

11    A.    No.

12    Q.    Did anyone at PCLS discuss concerns with you about

13    doing business with Universal for any reason?

14    A.    Can you ask the question one more time?

15    Q.    Sure.  Did anyone at PCLS ever express concerns to you

16    about doing business with Universal for any reason?

17    A.    Yes.

18    Q.    What were those reasons?

19    A.    Just if Universal was able to do their own confirmation

20    testing, that would be a loss of business because of it.  I

21    would say that Bill Hughes and Phil McHugh do not have a good

22    relationship.

23    Q.    Could you explain that a little bit more?

24    A.    Well, just the demands that Phil McHugh, Universal, had

25    with PCLS with regard to PCLS did provide the collection devices

1    Q.    Did PCLS make an effort to retain the business from

2 Universal?

3    A.    Yes.

4    Q.    Could you talk about what those efforts were?

5    A.    Again, there was a blitz -- I'll call it a blitz --

6 where sales representatives in the majority of where those

7 offices were to get face-to-face meetings and phone calls to

8 make the announcement and give the information that PCLS would

9 no longer accept any confirmation testing from Universal Oral

10 Fluids and those sales representatives were supposed to retain

11 that business.

12    Q.    Are you familiar with what a desktop analyzer is?

13    A.    Yes.

14    Q.    What is your understanding of what a desktop analyzer

15 is?

16    A.    Quite simply -- I'll keep it simple.  Essentially a

17 desktop analyzer takes the sample, you put it in the analyzer,

18 and the analyzer essentially calculates and spits out the

19 information or the results, if you will, from the sample.

20    Q.    Is that a type of machinery that a doctor could have at

21 their office?

22    A.    Yes.

23    Q.    Did you ever attend any meeting at PCLS that discussed

24 implementing a program where PCLS would help doctors obtain

25 desktop analyzers?

1 independent contractor to a W-2 employee?

2      A.   Yes.

3      Q.   And who did you talk to about that?

4      A.   Marcus Sowinski.

5      Q.   And tell me a little bit about the content of that

6 conversation.

7      A.   They just wanted me to become a full time employee, a

8 W-2 employee, as opposed to a 1099 employee.

9      Q.   Did you want to do that?

10     A.   No.

11     Q.   And was that conversation around November or December

12 of 2012 -- 2011 shortly before you left?

13     A.   Yes.

14     Q.   And why didn't you want to become a W-2 employee of

15 Physicians Choice?

16     A.   My income would have been cut.

17     Q.   So your commissions would have been cut as a result?

18     A.   Yes.

19     Q.   And considering Physicians Choice was halting its

20 relationship with Universal Oral Fluids, would that have also

21 resulted in the lowering of your commissions if you would have

22 remained employed by Physicians Choice?

23     A.   Yes.

24     Q.   So as a result of that, I guess you and Physicians

25 Choice parted ways.  Where did you go to work after you left

1  Physicians Choice in late November of 2011?

2      A.    I began working with Universal Oral Fluids back in

3  January of 2012.

4      Q.    What was your position with them?

5      A.    Chief operations officer.

6      Q.    And talk to me a little bit about why when you left

7  Physicians Choice you decided to go work for Bill Hughes and

8  Universal Oral Fluids?

9      A.    Sure.  In talking with Bill Hughes, and again the fact

10 that Universal was setting up a highly complex lab, he needed

11 somebody to oversee the operations.  It was a good fit for me,

12 and so I decided to go with Bill Hughes.

13     Q.    Why was it a good fit for you?

14     A.    To be able to do the operations side and oversee that

15 side of the business -- the laboratory side of the business.

16     Q.    Before that time, did you have any experience

17 overseeing the operations of a lab?

18     A.    No.

19     Q.    So talk to me a little bit about what Bill Hughes saw

20 in your qualifications that indicated that you would be the

21 right fit to operate a lab?

22     A.    Sure.  My organization skills were probably first and

23 foremost, the fact that over the course of the time in

24 discussing the fact that he was moderate complex and moving to

25 highly complex and doing research with regard to what that

1  entails and what that means and to help with what that

2  laboratory needed to get it from moderately to highly complex,

3  it was a good fit, and that was all based on discussions of what

4  he needed.

5  Q.   I think that you testified earlier, speaking of these

6  written agreements Universal Oral Fluids and various doctors

7  about how they would be paid, I think that you indicated that

8  PCLS had copies of these agreements; right?

9  A.   They had copies of -- not the individual agreements

10 between physicians and Universal but what that agreement looked

11 like; a blank agreement.

12 Q.   They had a form agreement but not the individual

13 agreements with ever single doctor?

14 A.   Correct.

15 Q.   And PCLS as a whole I guess had a form agreement.  Were

16 you also aware of the content of the form agreement?

17 A.   Yes.

18 Q.   And you were aware of that while you were employed or

19 working as an independent contractor for Physicians

20 Choice; right?

21 A.   Yes.

22 Q.   When did you stop working for Bill Hughes and Universal

23 Oral Fluids?

24 A.   June or July of 2014.

25 Q.   And why did you stop working for Bill Hughes and

1  Universal Oral Fluids?

2      A.   The laboratory was shut down.

3      Q.   Why was the laboratory shut down?

4      A.   The laboratory was under investigation by the FBI.

5      Q.   And how did you learn for the first time that the

6  laboratory was under investigation by the FBI?

7      A.   When the FBI came to the laboratory and they also came

8  to my home.

9      Q.   So the FBI raided the laboratory?

10     A.   Yes.

11     Q.   And did the FBI kind of, I guess, raid your home as

12  well?

13     A.   Yes.  They did come to my home.

14          MS. ROBERTO:  I'm going object to the word "raid."  It

15  was an execution of a search warrant.

16          MR. VILLMER:  Understood.

17     Q.   Are you aware that earlier this year that Bill Hughes

18  pled guilty to frauding the government out of over 1.6 million

19  through cash payment kickback to doctors?

20     A.   Yes.

21     Q.   At any point in time did you own a 1999 Bentley Azure

22  car?

23     A.   Yes.

24     Q.   Was that a convertible or hard top?

25     A.   It's a convertible.

1       Q.    The form agreement between Universal and

2   physicians that you discussed with Mr. Villmer, who at

3   PCLS held that form agreement to your knowledge?

4           MR. VILLMER:   Objection to form.

5       A.    Which agreement are we talking about?   The

6   agreements between PCLS and Universal?

7       Q.    No.   Let me break it down for you.   That is a

8   fair clarification.

9           When you were talking with Mr. Villmer, you

10  were talking about how the agreement that Universal

11  had with physicians, PCLS had a form copy of that

12  agreement but not specific individual agreements with

13  the doctors?

14      A.    Yes.   That's correct.

15      Q.    That form agreement of the arrangement with

16  physicians between Universal and those physicians, who

17  at PCLS, to your knowledge, saw that agreement?

18      A.    It was Phil McHugh had a copy of it.

19      Q.    Anyone else that you know?

20      A.    No.

21      Q.    When is that last time that you spoke with

22  Phil McHugh?

23      A.    November of 2011.

24      Q.    So when you left PCLS?

25      A.    Yes.

```
 1   CERTIFICATE

 2   COMMONWEALTH OF PENNSYLVANIA, )
                                   )  SS:
 3   COUNTY OF ALLEGHENY.          )

 4        I, Jill A. Oliver, do hereby certify that before
     me, a Notary Public in and for the Commonwealth
 5   aforesaid, personally appeared JEFFREY ALAN THOMAS,
     who then was by me first duly cautioned and sworn to
 6   testify the truth, the whole truth, and nothing but
     the truth in the taking of his oral deposition in the
 7   cause aforesaid; that the testimony then given by him
     as above set forth was by me reduced to stenotype in
 8   the presence of said witness, and afterwards
     transcribed by means of computer-aided transcription.
 9
          I do further certify that this deposition was
10   taken at the time and place in the foregoing caption
     specified.
11
          I do further certify that I am not a relative,
12   counsel or attorney of either party, or otherwise
     interested in the event of this action.
13
          IN WITNESS WHEREOF, I have hereunto set my hand
14   and affixed my seal of office at Pittsburgh,
     Pennsylvania, on this _____ day of _____,
15   2020.

16

17        _____
          Jill A. Oliver, Notary Public
18        In and for the Commonwealth of Pennsylvania
          My comission expires: September 23, 2023
19

20                         - - -

21

22

23

24

25
```

**In The Matter Of:**

*United States of America v.*
*Physicians Choice Laboratory Services, LLC, et al.*

---

*Joseph Wiegel*
*September 24, 2020*

---

*Tri-State Reporting, Inc.*
*901 S. Kenmore Drive*
*Evansville, IN  47714*
*Phone:  (812) 477-7666 Fax:  (812) 477-8032*
*www.tsreporting.com*

Original File 0924wiegel.txt
Min-U-Script® with Word Index

United States of America v.
Physicians Choice Laboratory Services, LLC, et al.

Joseph Wiegel
September 24, 2020

Page 9

1   A  Well, I started out environmental. We were testing
2      water, soil, air for pollutants, mostly -- mostly
3      related to cleanup of contaminated sites. So I
4      worked ultimately for a company called Columbia
5      Analytical Services. We had seven labs across the
6      country. I was a regional manager.
7   Q  Okay.
8   A  I left that company and started a business called
9      Novidea. That was a sales business that sold
10     analytical equipment to laboratories doing analytical
11     chemistry. And I was -- I don't know. Somehow that
12     transitioned into working for a company called
13     Quantum Analytics. Quantum Analytics sold mass
14     spectrometers.
15          Phil -- or, rather, Physicians Choice
16     Laboratory Services reached out to me to buy their
17     first mass spectrometer, and that was in 2009-ish.
18     So from there Physicians Choice took off, until we
19     closed it in 2016, I think, and -- and that was the
20     end of my analytical chemistry, and I bought a
21     business here in -- it's located in Evansville and
22     Owensboro, managing clinical trial sites, clinical
23     trial sites for -- we work with most of the major
24     pharmaceutical companies across the country.
25   Q  Okay.

Page 10

1   A  So that brings us up to date.
2   Q  Yeah. And so when you first started out in the
3      laboratory setting, did you physically work inside of
4      the lab?
5   A  Uh-huh, yes.
6   Q  Okay. And what did you do when you worked inside the
7      lab?
8   A  Well, you know, it was a long career, so it started
9      off as just bucket chemistry, mixing and shaking and
10     extracting and preparing samples so they could be
11     analyzed by different types of analytical techniques.
12          We don't need to go into a lot of detail --
13   Q  Sure.
14   A  -- on those, I don't think. And then eventually I
15     moved into a management role and, you know, I had
16     less hands-on analytical chemistry and more
17     management of people, and that's just how things
18     progressed.
19   Q  And so by the -- is it fair to say by the time you
20     made your way to Physicians Choice you had experience
21     physically working in a lab; is that fair?
22   A  Yes.
23   Q  You had experience managing people that worked for a
24     lab?
25   A  Yes.

Page 11

1   Q  And you had experience with obtaining lab equipment?
2   A  Yes.
3   Q  Setting up a lab?
4   A  Yes.
5   Q  Okay.
6   A  Writing SOPs, sales.
7   Q  Okay.
8   A  Everything.
9   Q  Okay. Got you. All right. So let's just wrap back
10     around to where we were. How did you first come into
11     contact with anyone that worked at Physicians Choice?
12   A  Well, like I said, I was working for Quantum
13     Analytics. Our -- our business model was to -- we
14     were a distributor for a large company called Agilent
15     Technologies, a spinoff of HP. Agilent Technologies
16     was HP's analytical arm. So they made instruments
17     like gas chromatographs and liquid chromatographs and
18     mass spectrometers.
19          What Physicians Choice needed was a mass
20     spectrometer, and the reason that they were brought
21     to me through an Agilent Technologies salesperson was
22     that Quantum Analytics provides leasing in addition
23     to instrument sales.
24   Q  Okay.
25   A  So it was a startup company. It needed access to

Page 12

1      capital. Quantum Analytics would take the risk on a
2      startup because they could -- they knew they could
3      take that equipment back in and get rid of it on the
4      secondary market, so --
5   Q  Okay.
6   A  -- that's how I got involved with it.
7   Q  And who -- who was the person that approached you
8      first on behalf of Physicians Choice?
9   A  I believe it was Michael Cox of Agilent Technologies.
10   Q  And did he ultimately introduce you to some people
11     over at Physicians Choice?
12   A  Yes.
13   Q  Okay. And who were you introduced to at that time?
14     Who was --
15   A  Phil.
16   Q  Okay. Just Phil?
17   A  Phil was the first contact, yes.
18   Q  Okay. And talk to me about what happened from then.
19     What did you do as far as the mass --
20   A  Well, I sold them the equipment, and I realized
21     quickly that they didn't have the technical expertise
22     to set the equipment up. So I contracted -- they
23     contracted me to manage the process of setting up the
24     tests that they wanted to run.
25   Q  Okay. And talk to me about how that went from a

United States of America v.
Physicians Choice Laboratory Services, LLC, et al.

Joseph Wiegel
September 24, 2020

Page 13

1    30,000-foot view.  I don't need the nitty-gritty.
2  A  It went slower than they wanted, but, you know, from
3    the standpoint of what we did and accomplished, it
4    worked -- it went fine.  We had a very robust method
5    for analyzing opiates and other analgesics, and we
6    were using cutting edge technology to do it, and, you
7    know, modeling off of other companies that had done
8    it.  We weren't doing anything novel, but we were
9    doing things that were efficient.
10  Q  And you said that was around 2009 when you came
11    onboard as kind of a consultant for Physicians
12    Choice?
13  A  That's right.  So, yeah, just to finish that train of
14    thought --
15  Q  Yeah.
16  A  -- so I -- I was contracted in 2009.  By September of
17    2009, we pretty much were ready to go to market.  So
18    it took nine months.  And at that point somewhere in
19    that late 2009, early 2010, I realized that I wasn't
20    going to get my -- all of my bonus for the work that
21    they had contracted me to do, and we ended up talking
22    about me taking an investment position in the
23    company.
24    So I did.  I think it was four percent to
25    start with.  Eventually that climbed up to -- I don't

Page 14

1    know -- six or seven or ten percent, something like
2    that.  And that's how I got involved with all of the
3    people at Physicians Choice.
4  Q  Okay.  And so walk me through.  In 2009, you said
5    initially you were introduced to Phil McHugh.  Who
6    else was working for Physicians Choice at that time
7    during the startup phase, that nine months?
8  A  Physicians Choice was -- was the three owners, Phil,
9    Doug Smith, Marcus Sowinski, and one of Doug's
10    associates.  I can't remember his name, but that was
11    Physicians Choice.
12  Q  Okay.  And that's during the startup phase?
13  A  During that month -- that year of 2009, yeah.
14  Q  Okay.
15  A  And Phil hired people to work in the lab.  So, I
16    mean, Phil was the -- the driving force of Physicians
17    Choice during the early years.
18  Q  Okay.
19  A  He managed the people and, you know, I was more
20    hands-off at that time.  I was really just technical
21    consultant expert.
22  Q  Okay.  And at some point did your role change from
23    kind of advisor/technical expert to --
24  A  In 2011.
25  Q  Okay.

Page 15

1  A  In 2011 -- oh, I'm sorry --
2  Q  No, no --
3  A  -- I stepped on you.
4  Q  -- that's all right.  Go ahead.
5  A  In 2011, I want to say November of 2011, I quit my
6    day job and went to work for Physicians Choice full
7    time as an executive level position.
8  Q  Okay.
9  A  And I can't remember the exact title, but -- yeah.
10  Q  And why did you decide to do that?
11  A  Well, the company was doing well, for one thing.  For
12    another, the laboratory that I was working with at
13    the time -- I had gone back to a company called
14    Columbia Analytical Services to help with the --
15    manage the chemistry side of the Gulf Oil spill.
16    They sold that company, and I had to make a
17    choice whether to go with the new owner or go, you
18    know, do something else, and Physicians Choice was
19    doing very well in 2011, and it seemed like the right
20    move was to just walk away from Columbia Analytical
21    Services and go with, you know, put my effort into
22    helping to make Physicians Choice a better company.
23  Q  Got you.  And talk to me a little bit about the
24    executives that worked for Physicians Choice back in
25    2011 when you kind of joined on that executive team.

Page 16

1  A  So the key member of the management or the operations
2    team was Mark -- Mark.  I'm going to draw a blank --
3    Mark Roth.  Mark Roth was the key -- key member of
4    the operations team.  He kind of put all of the nuts
5    and bolts together, I guess.  So the first thing I
6    did was I worked with him to start to expand the
7    capabilities of the business --
8  Q  Okay.
9  A  -- the company.
10  Q  And what do you mean by that?
11  A  So, you know, with any startup you're kind of shoe-
12    stringing it for a while.  By 2011, we weren't
13    shoe-stringing it anymore, but there was no
14    management -- really, the management guidance was --
15    was -- needed to be beefed up, and that's the role I
16    played when I came in.
17    I took -- I took over basically all of
18    operations, and Mark ended up reporting to me
19    ultimately.  Phil took over sales, and Marcus
20    Sowinski was starting to take over the
21    regulatory/legal aspect of running a clinical
22    chemistry laboratory.
23  Q  Got you.  And you said that was --
24  A  In healthcare.
25  Q  Yeah.  That was around 2011 --

United States of America v.
Physicians Choice Laboratory Services, LLC, et al.

Joseph Wiegel
September 24, 2020

1   A   Yeah.

2   Q   -- when you --

3   A   Kind of late 2011 that all worked itself out.

4   Q   Okay.  And at one point in time did your role change

5       or title change to CEO of the company?

6   A   That was years later.  We were a three-headed

7       president.  Three-headed monster, I called it,

8       because we all had the president title, all three of

9       us, Phil, myself, and Marcus Sowinski, even though we

10      were doing those roles the way I explained it

11      earlier, but we were each titled president, and

12      eventually that shifted when -- really, when we

13      started to look for a buyer.

14          We were thinking, okay, we're going to make

15      some investments here to make us, you know, better, a

16      better target for maybe a LabCorp or somebody, you

17      know, or anybody -- we didn't care who we really

18      ended up selling to.  So that was probably 2014-ish,

19      maybe, '14, '15.  Yeah, probably '14.  Or maybe --

20      yeah, late '13 or '14, 2014, when we started to add

21      more structure.

22          And by that time we had Paul Schmitt working

23      full time.  He was our -- started as my financial --

24      you know, finance guy that I could bring in and help

25      with accounting and bookkeeping and all of this

1       stuff.  By that time we had brought him on full time.

2           Alan Campbell had come in.  He was working

3       full time as -- as our regulatory guy.  And so, yeah,

4       so then I got the CEO title.  And by that time Phil

5       and Marcus had kind of backed out of the company as

6       well.  They weren't really -- they weren't really

7       actively in management anymore.  Marcus first and

8       then eventually Phil.

9   Q   Got you.  Backing up to late 2011 just for a moment,

10      when you were head of operations talk to me about

11      some of the things that you did to better organize

12      the company so it could achieve its goals.

13  A   Well, there's really two fronts.  One was just on

14      the -- on the -- on the technology side.  I knew the

15      equipment.  I knew mass spectrometers from my

16      previous employment, and we hired a PhD chemist,

17      Brent Dixon, to kind of really take the testing to

18      the next level.

19          His background was mass spectrometry, and

20      very good at it, a very good method development

21      person, and he took the method that I ended up

22      ultimately created back in 2009 and took -- just took

23      it to the next level, and I kind of gave him, you

24      know, the over -- I was in the position of overseeing

25      all of that.  And then on the other side was Mark

1       Roth, who was running the operation.

2           So we had this division of here's all of the

3       technical stuff.  This is where the testing gets

4       done.  This is how we manage it.  This is how we

5       process the samples.  This is how we get reports back

6       to doctors.  This is -- so that's kind of the

7       structure that we had, and I was overseeing that.

8           As CEO, I also had Paul Schmitt working --

9       you know, he was all finance and sales.  By that time

10      we had kind of made a dumb decision -- you know, you

11      don't do everything right, right?  So it was kind of

12      a dumb decision, but we went and hired ninety

13      salespeople, with the idea that that would make us

14      more marketable.

15  Q   Uh-huh.

16  A   Because we make the investment in the sales force, we

17      train the sales force, and then we sell the company

18      and we've got that trained sales force.

19  Q   Sure.

20  A   So back to the structure, though, Paul was over that,

21      and then Alan was over all of the regulatory/

22      legal/compliance, all of the compliance stuff.  And

23      then we hired a junior lawyer, Meg Wood, who did

24      contracts, worked for Alan, and we hired another

25      lawyer that had -- I think he worked -- yeah, he

1       worked for LabCorp, so he had experience with buying

2       and selling companies and --

3   Q   Got you.

4   A   -- due diligence of companies.  So, anyway, your

5       question was what did I do.  That's what I did.  I

6       built that structure.

7   Q   Okay, great.  And let's just stick on the kind of

8       legal and compliance aspect --

9   A   Sure.

10  Q   -- for a moment.  So from when you arrived at the

11      company in 2009 through the date that it closed, did

12      Physicians Choice's legal and compliance needs, did

13      those kind of evolve and change over time?

14  A   Oh, yeah.  Yeah.  I mean --

15  Q   Talk to me a little bit about that.

16  A   -- it started from, like I said, a shoestring.  You

17      have one person doing everything.  You know, it was

18      -- it was hard enough just to try to get a COLA

19      license to just put up on the wall.  So obviously,

20      you know, when you start that's how things go.

21          By the time -- by the time 2015 rolled

22      around, which is when -- I think that's the first

23      time the government actually contacted us, we had a

24      robust compliance department.  Very robust.  In fact,

25      the sales team hated them.  I mean, literally hated

United States of America v.
Physicians Choice Laboratory Services, LLC, et al.

Joseph Wiegel
September 24, 2020

1  THE WITNESS: Hi.
2  MR. JOHNSON: My name is Seth Johnson, and
3  I'm the Assistant United States Attorney representing
4  the United States in this case. Do you understand
5  that?
6  THE WITNESS: Uh-huh, yes.
7  MR. JOHNSON: Thanks. And same rules apply
8  as to the depo.
9  CROSS-EXAMINATION,
10  QUESTIONS BY MR. JOHNSON:
11  Q  But, first, I want to -- is it fair to say you were
12  one of the operations guys?
13  A  Yes.
14  Q  And since I've got you here and you were one of the
15  operations guys, I want to talk a little bit about
16  just the operations of PCLS generally. It was
17  involved in the business of urine drug testing,
18  right?
19  A  Yes.
20  Q  Anything else?
21  A  Yes.
22  Q  What?
23  A  The genetic -- enzymatic genetic testing for
24  metabolic, you know, how you metabolize different
25  drugs. We had a blood division. We were doing blood

1  chemistries. We had a women's health division. We
2  did pap smears and things like that.
3  Q  So testing, generally?
4  A  Yes, clinical testing.
5  Q  Do you have an estimate of how much of PCLS's
6  business was from the urine drug testing versus the
7  other components you mentioned?
8  A  Well, at -- at one point genetic testing was about
9  ten percent of our -- of our income, which means
10  urine would have been ninety percent of our income.
11  Q  So fair to say primarily urine drug testing business?
12  A  Uh-huh.
13  Q  Is that a "yes"?
14  A  Yes.
15  Q  Thank you. What type of facility did PCLS have to
16  conduct that urine drug testing?
17  A  We had a laboratory.
18  Q  Could you describe the laboratory for me?
19  A  There was -- well, we had two laboratories. We had a
20  laboratory in Charlotte and then we moved to a bigger
21  laboratory in Rock Hill. So to describe it, it's --
22  Q  Well, I'm asking --
23  A  -- a very -- it's a lab. I mean, there's --
24  obviously there's offices for the people to work in
25  and then there's lab space, benchtop space for your

1  instruments and your prep devices and all of that
2  stuff that you need in order to process samples --
3  Q  Sure.
4  A  -- which were located --
5  Q  And I'm just trying to -- if I was a member of the
6  jury, I'm just trying to get a general sense of kind
7  of what that lab looked like, how big it was, what
8  types of machines they had. You know, not where
9  every wall socket is --
10  A  Right.
11  Q  -- but like let's take the Charlotte lab --
12  A  Okay.
13  Q  -- or the smaller lab in Charlotte first.
14  A  Okay.
15  Q  Like, you know, how many machines were there? How
16  big was it? That -- just give me an idea.
17  A  It was -- I think it was 11,000 square feet, but I'm
18  not positive. How many machines were there? We
19  probably had as many as six or eight, maybe ten. I
20  don't know. I don't remember. Somewhere in that
21  ballpark. Ten -- ten or so.
22  Q  And it's not a memory test. I'm just trying to
23  get --
24  A  Yeah.
25  Q  -- a general feel.

1  A  I know.
2  Q  What about the Rock Hill lab?
3  A  That was built -- that was 100,000 square feet. It
4  was built for -- I think I said four hundred people.
5  I think I told you that was four hundred people. So
6  it was -- obviously, it was much bigger. And we had
7  -- I think we had as many as fifty instruments at one
8  time, and then we had an entire -- that was half --
9  urine was half of the building.
10  The rest of the building was -- let me back
11  up. Urine was half of the lab space, the technical
12  lab space. The building was probably 50,000 square
13  feet of -- of lab space, 50,000 square feet of admin
14  and -- administrative and that type of stuff. Then
15  you take the lab space and divide it in half again.
16  Fifty percent of it was urine, fifty percent of it
17  was blood, genetics.
18  We had a -- kind of a division that just
19  basically would look out and say, okay, what
20  technologies do we want to invest in, let's make that
21  investment today. So like we bought the assets of
22  Predictive Biosciences, and we were trying to
23  re-commercialize a urine genetic test that would help
24  doctors understand what the recurrence rate of
25  bladder cancer is.

United States of America v.
Physicians Choice Laboratory Services, LLC, et al.

Joseph Wiegel
September 24, 2020

1    different techniques to get those drugs.
2        So some may go through the AU400 or some may
3    go through an ELISA test. Some -- I think at one
4    point we were using -- we were using electrophoresis
5    for isomer determination. There's a lot of -- you
6    get a lot of requests, and it's hard to do it all in
7    one -- one analysis.
8  Q  You mentioned an ELISA test, I believe?
9  A  Uh-huh.
10  Q  What is that?
11  A  It's a -- it is a -- pretty much you -- you react the
12    target compound with another chemical or could be an
13    antibody, but that -- if the drug is there it
14    triggers a light response. The light response is
15    measured, and then that's how you quantify the --
16    quantify the presence or absence of the drug.
17  Q  Are you familiar with the terms qualitative versus
18    quantitative testing?
19  A  Yes.
20  Q  So that would be like qualitative testing, right?
21  A  ELISA could be quantitative, but usually it's going
22    to be qualitative.
23  Q  What about the electrophoresis?
24  A  Again, it could be qualitative or quantitative.
25  Q  And what is that, just generally?

1  A  So you -- you have a bed of resin material or a
2    column of resin material. You put your drug on it or
3    you put your sample on it, and you apply a current,
4    and compounds are going to move through that resin at
5    different rates and separate, and then you can --
6    what we did was once we separated them on the
7    electrophoresis bed we funneled it into or channeled
8    it into a mass spectrometer to identify the compound
9    and quantify it. I don't know that we had to
10    quantify. We definitely identified the compound that
11    way.
12  Q  So that's a method that would be used kind of prior
13    to the mass spectrometer?
14  A  Uh-huh.
15  Q  For confirmation testing, did PCLS use the mass
16    spectrometers?
17  A  Uh-huh.
18  Q  Did PCLS --
19  A  Yes.
20  Q  Did PCLS use any other method for confirmation
21    testing?
22  A  I don't know. I'm not sure.
23  Q  To me, it wouldn't make sense if a doctor used a --
24    you know, a test cup in the -- in his lab for PCLS to
25    also use a dipstick test, correct?

1        MR. VILLMER: Objection to the --
2  A  Why would we do --
3        MR. VILLMER: -- objection to the form. Go
4    ahead.
5  A  Why would -- I don't understand why you think that.
6    You're -- you're -- I mean, I don't understand the
7    question, I guess.
8  Q  (MR. JOHNSON CONTINUING) Sure. So --
9  A  If you're --
10  Q  -- what would --
11  A  -- just replicating the test you're not doing
12    anything.
13  Q  That was the point I was driving at. So doctors do
14    point of care testing as well, right?
15  A  Uh-huh.
16  Q  And they can use methods like dipstick testing,
17    correct?
18  A  Uh-huh.
19  Q  And they can use desktop analyzers?
20  A  Yes.
21  Q  And so if a sample was sent to PCLS after it was
22    tested by some other method that a doctor could use
23    at the point of care, it wouldn't make sense for PCLS
24    to just test it the same way, right?
25  A  Right.

1        MR. VILLMER: Objection to the form.
2  Q  (MR. JOHNSON CONTINUING) And then so the testing
3    that PCLS would do on the confirmation samples would
4    be the mass spectrometer, correct?
5  A  Yes.
6  Q  Were you ever involved with providing any doctors
7    desktop analyzers?
8  A  No.
9  Q  Were you ever involved with making a down payment so
10    that any doctors could obtain a desktop analyzer?
11  A  No.
12  Q  Are you aware of PCLS or anyone at PCLS ever
13    providing doctors with desktop analyzers?
14  A  No.
15  Q  Did you -- were you ever involved with paying
16    expenses for a doctor's lab?
17  A  No.
18  Q  Are you aware of anyone at PCLS doing so?
19  A  No.
20  Q  You think it would be improper if they did so?
21  A  Yes.
22        MR. VILLMER: Objection.
23  Q  (MR. JOHNSON CONTINUING) If someone at PCLS made a
24    down payment on an analyzer for a doctor, do you
25    think that would be improper?

Case 3:17-cv-00037-KDB-DCK   Document 125-4   Filed 12/08/20   Page 260 of 283

United States of America v.
Physicians Choice Laboratory Services, LLC, et al.

Joseph Wiegel
September 24, 2020

Page 53

1    MR. VILLMER: Objection to the form.
2  A  Yes.
3  Q  (MR. JOHNSON CONTINUING)  If PCLS procured analyzers
4     for doctors, do you think that would be improper?
5    MR. VILLMER: Objection to form.
6  A  Yes.
7  Q  (MR. JOHNSON CONTINUING)  Are you familiar with a
8     Dr. John Johnson, who was a pain management doctor in
9     Pennsylvania?
10 A  I know the name, but I'm not familiar with him
11    personally.
12 Q  How do you know the name?
13 A  Just through business communications.
14 Q  And let me just back up more maybe globally.  What
15    was your, I guess, involvement at a general level
16    with any particular doctor or client?  Did you
17    have --
18 A  Almost -- almost --
19 Q  -- correspondence with them or were you mainly doing
20    operations?
21 A  No, almost no -- almost nothing.
22 Q  That's something that would have been done --
23 A  The name like --
24 Q  -- by the sales team?
25 A  -- Johnson's name or -- I mean, there are doctors

Page 54

1     that -- that we would talk about because, you know,
2     you have sales targets.  I mean, that's what you
3     have.  So those names would come up in meetings, but
4     I personally wasn't -- that wasn't part of my -- I
5     delegated that to Paul Schmitt and to Phil, when Phil
6     was still with the company, you know, working with
7     the company.
8        So, you know, we would discuss names, but me
9     personally, I didn't have interaction with any of
10    them except for when we fired -- fired one of our
11    customers, United Oral Fluid, which happened, I
12    think, probably real -- real close to when I came on
13    the company in February of 2011.  We felt that -- we
14    felt that Bill Hughes was a risk, that his business
15    model was not -- I should say his business model was
16    a risk for us to be involved in.
17        So we fired them, and we made an effort to
18    obtain business from the doctors that were sending
19    samples to Bill Hughes.  We had a call-in campaign to
20    try to get them to switch to PCLS, and in that case,
21    I did talk to a few doctors.  I was actually one of
22    the -- we divided the list up and, you know, we
23    had -- we had each of us calling maybe, I don't know,
24    a hundred doctors or twenty doctors -- or whatever it
25    was, we divided the list.  So I had a part of the

Page 55

1     list was part of my responsibility.
2  Q  Other than that --
3  A  That's it.
4  Q  -- interfacing with doctors wasn't part of your job
5     description?
6  A  No.
7  Q  Okay.  And I just -- I want to go back to --
8  A  And, again, I should caveat it again.  We fired
9     another customer out of Texas, Andrew Hillman's
10    group.  I can't remember the name of them.  And
11    similar situation with United Oral Fluids.  We
12    divided the list of doctor customers up, and we -- we
13    did go out with salespeople and make calls to
14    doctors' offices.  We -- when I say "we," I mean the
15    management team.
16 Q  So it sounds like at certain points, you know, if a
17    relationship with a client broke down, the management
18    team would try and, I guess, retain the business?
19 A  Yeah.
20 Q  And that was the extent -- and when that would
21    happen, that's kind of when you got involved --
22 A  Yes.
23 Q  -- with customers?  But other than that, wasn't part
24    of your job description?
25 A  That's true.

Page 56

1  Q  What about a Dr. John Nichols, who is a pain
2     management doctor in Ohio?
3  A  I know Dr. Nichols through the United Oral Fluid
4     campaign that I discussed earlier, and that's really
5     my only -- my only knowledge of -- and I think I
6     talked to him on the phone once.  Was he in Cleveland
7     or somewhere in Ohio?
8  Q  Cleveland, yep.
9  A  Yeah, I talked to him on the phone once.
10 Q  Did you have any involvement in paying expenses for
11    his lab?
12 A  No.
13 Q  And no knowledge that that was occurring, correct?
14    MR. VILLMER: Objection to the form.
15 A  I don't --
16 Q  (MR. JOHNSON CONTINUING)  If that was occurring, no
17    knowledge that it was?
18 A  You mean -- clarify your question for me.  You
19    mean --
20 Q  If --
21 A  -- were -- were payments being made?  Is that what
22    you're saying?
23 Q  If they were being paid --
24 A  I had no knowledge.
25 Q  -- you had no knowledge?

United States of America v.
Physicians Choice Laboratory Services, LLC, et al.

Joseph Wiegel
September 24, 2020

Page 61

1 give a report. I mean, my understanding is Phil
2 sought legal advice prior to doing the loan.
3 Q Have you ever seen anything in writing regarding
4 that?
5 A Like the loan itself, the loan documents, or writing
6 that Phil received legal advice?
7 Q The latter.
8 A No.
9 Q What about a Dr. Jay Achandran? Are you familiar
10 with him?
11 A Only by name. Was there a loan done to him, too?
12 Q There was.
13 A Okay. His name came up in the debrief of the Florete
14 loan. So that's one -- I don't know when the -- when
15 the management team, when other members of the
16 management team found out about that loan, but that's
17 when I found out about that loan.
18 Q So same questions. You weren't involved with the
19 loan when it was made?
20 A No.
21 Q Okay. Didn't know about it when it was made?
22 A No.
23 Q If there was legal advice sought, you weren't
24 involved in doing that?
25 A No.

Page 62

1 MR. VILLMER: Objection to the form.
2 Q (MR. JOHNSON CONTINUING) So just to kind of close
3 the loop on this, any knowledge you have about the
4 Jay Achandran or Florete loans is all after the fact
5 when it came to light at PCLS, correct?
6 MR. VILLMER: Objection to the form.
7 A Correct.
8 Q (MR. JOHNSON CONTINUING) You mentioned that you
9 thought Jane Pine Wood recommended a repayment to the
10 government, correct?
11 A Yes.
12 Q Were you involved in any repayment to the government?
13 A No.
14 Q Do you know who would have been?
15 A Paul Schmitt and Alan Campbell.
16 Q If any such repayment was made, do you know where it
17 would have come from, like such as what bank account?
18 A No.
19 Q Do you have any knowledge about the amount of any
20 such purported repayment?
21 A No.
22 Q Do you know when any such repayment would have been
23 made?
24 A Not off the top of my head.
25 Q Have you ever seen any type of written confirmation

Page 63

1 regarding any repayment related to the Florete or Jay
2 Achandran loans?
3 A No.
4 Q I want to go back to Bill Hughes' company. You also
5 mentioned that they were a high risk to be involved
6 with?
7 A In my opinion.
8 Q Yeah. What's the basis for your opinion that Bill
9 Hughes' company was a high risk for PCLS to be
10 involved in?
11 A Well, I don't know exactly what Bill Hughes'
12 company's business model was. I'm sure I did know at
13 some point, I did have insight into that, but I can't
14 pull it out right now, but it seemed like a risky
15 model for two reasons. One, he was generating a lot
16 of samples, and, you know, just that worries me when
17 I see one -- one source generating tons of samples.
18 The other thing is I saw no protection that
19 we could maintain our technical approach to testing
20 Oral Fluid samples in the long run. We knew that one
21 of our salespeople had already left and gone to work
22 for Bill Hughes. It seemed like a short step to
23 where he would just cut us off, cut us out, you know,
24 not use us anymore and develop his own test
25 procedures.

Page 64

1 So that seemed like a business risk. So
2 when you put the compliance risk together and the
3 business -- business risk together, I just -- I just,
4 you know, thought the right thing to do was to fire
5 the customer.
6 Q Who was that salesperson that left?
7 A I don't -- Andrew somebody. I don't remember.
8 Q You mentioned earlier that there was conflict between
9 compliance and sales; is that fair?
10 A Uh-huh.
11 Q Could you expound on that a little bit for me?
12 A Sales wanted free rein to do whatever they needed to
13 do to make a sale, and compliance wanted to vet it
14 against what was allowable in healthcare. So sales
15 would get upset when that process took longer than a
16 day or two days. That's a hy- -- that's hyperbole,
17 but that's where the conflict arose, is that
18 compliance needed more time to vet than what sales
19 wanted to give.
20 Q I believe you testified, too, that, you know, kind of
21 the robustness of the compliance department grew over
22 time --
23 A Uh-huh.
24 Q -- as PCLS went on, right?
25 A Yes.

United States of America v.
Physicians Choice Laboratory Services, LLC, et al.

Joseph Wiegel
September 24, 2020

Page 65

1  Q  Do you have a recollection of about when that
2     friction between sales and compliance started?
3  A  Well, by the time we had moved into Rock Hill, which
4     I think was 2013, I think it was -- I can't remember
5     if it's early or mid 2013, but, anyway, by the time
6     we made that move our compliance department was
7     starting to get pretty beefy, like they didn't have
8     enough space in Charlotte.
9          So, I mean, it's just, you know, bad memory,
10    but -- or inconsistent memory, maybe, but it seems
11    like around 2013 things would -- and maybe we were
12    hiring more salespeople then, too, so the sales
13    department was getting bigger, the compliance
14    department was getting bigger.  Compliance was
15    sticking their fingers in deeper into -- into the
16    operation.  So, yeah, probably 2013-ish.
17 Q  You mentioned that yourself, Doug Smith, Sowinski,
18    and McHugh all had ownership interest in PCLS?
19 A  Yes.
20 Q  Did anyone else have an ownership interest --
21 A  No.
22 Q  -- in the company?  Do you know what the percentage
23    apportionment of those ownership interests were?
24 A  Ballpark.
25 Q  Yeah.  Just rough ballpark.

Page 66

1  A  Smith was 47-ish, McHugh was 24, maybe, Sowinski was
2     17, I was nine -- eventually nine.  Started at four.
3     If you add all of that up and come up with somewhere
4     plus or minus five percentage points -- I don't know.
5  Q  I'm a lawyer, so --
6  A  I don't know.  You can add it up in your head and see
7     where that brings you, but something like that.
8  Q  I doubt it would be accurate if I did, but just
9     generally, Phil McHugh had the second largest --
10 A  Yes.
11 Q  -- ownership percentage?
12 A  Yes.
13 Q  And that remained constant throughout PCLS's life?
14 A  Doug's -- Doug's share changed and my share changed
15    as we made a -- towards the end we were trying to
16    hang on to bring you guys to a settlement, actually,
17    is why we were trying to hang on, but -- so I put a
18    bunch of money back into the business, and Doug gave
19    up some shares because he didn't put anything in.
20 Q  When you went from four percent to nine percent or
21    so --
22 A  Uh-huh.
23 Q  -- whose, I guess, share did that come from?
24 A  There was a set aside of five percent.  When they set
25    up the -- when those three set up the structure, they

Page 67

1     had a set aside of five percent.  So it didn't come
2     out of anybody in particular.  I guess it came out of
3     everybody equally is what it boils down to.
4  Q  So the set aside?
5  A  Yeah.
6  Q  You mentioned you attended quarterly board meetings.
7     Did PCLS keep board minutes?
8  A  Uh-huh, yes.
9  Q  Are you familiar with Manoj Kumar?
10 A  Yes.
11 Q  Are you familiar with the circumstances of how he
12    left PCLS?
13        MR. VILLMER: Objection to the form.
14 A  Yes.
15 Q  (MR. JOHNSON CONTINUING)  Could you tell me about
16    those?
17 A  Manoj had a lot of different businesses going on.  We
18    made him an employee probably in 2012-ish.  Yeah,
19    probably in 2012 he became an employee of PCLS, but
20    he also had other businesses that he was working on,
21    and I'd say that Manoj was a -- you know, he decided
22    to leave the company mostly out of frustration.
23        You know, our organization structure
24    changed.  Phil had backed out, wasn't -- and Phil and
25    Manoj were very close.  Phil had backed out.  Paul

Page 68

1     Schmitt had taken over the salespeople.  Manoj was
2     working with the sales team.  So it just got dicey, I
3     guess, and he decided to back out.  There was a
4     separation agreement.  I can't remember what it was,
5     but I know there was a separation agreement.
6          He might have had a phantom -- there were --
7     there were a couple of shares of phantom -- phantom
8     stock that if we had ever made a sale that, you know,
9     some key players would have gotten a small piece of
10    the action there.  So, you know, I don't know the
11    details, but that's essentially the nuts and bolts.
12 Q  When he separated from PCLS, did PCLS purchase one of
13    his companies?
14 A  I don't recall that.
15 Q  A company called CSS; do you remember that?
16 A  I remember CSS, but I don't remember purchasing it.
17 Q  Do you remember having any discussions about whether
18    to purchase it?
19 A  No.
20 Q  Do you know whether Mr. Kumar continued to manage
21    physicians' practices while he was employed at PCLS?
22        MR. VILLMER: Objection to form.
23 A  No.
24 Q  (MR. JOHNSON CONTINUING)  If he did, do you think
25    that would be improper?

Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 263 of 283

United States of America v.
Physicians Choice Laboratory Services, LLC, et al.

Joseph Wiegel
September 24, 2020

Page 85

1    would like to. Would you like to read and sign or
2    would you like to waive?
3         **THE WITNESS:** I guess I should read and
4    sign.
5         **MR. CAUDILL:** Okay.
6
7    AND FURTHER DEPONENT SAITH NOT.
8
9    THIS DEPOSITION TO BE READ AND SIGNED BY JOSEPH WIEGEL.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 86

1                    DEPONENT'S CERTIFICATION
2
3
4              I, JOSEPH WIEGEL, DEPONENT HEREIN, DO HEREBY
5    CERTIFY THAT THE ABOVE AND FOREGOING TRANSCRIPT IS A FULL,
6    TRUE AND COMPLETE COPY OF PROCEEDINGS WHICH TOOK PLACE ON
7    THE 24TH DAY OF SEPTEMBER, 2020, AT THE LAW OFFICES OF WOODS
8    & WOODS, 208 N.W. FOURTH STREET, EVANSVILLE, VANDERBURGH
9    COUNTY, INDIANA. I FURTHER CERTIFY THAT ANY CHANGES AND/OR
10   CORRECTIONS, IF ANY, HAVE BEEN NOTED ON THE FORM ATTACHED AS
11   THE LAST PAGE OF THE TRANSCRIPT.
12              IN VERIFICATION AND CERTIFICATION THEREOF, I
13   HAVE HEREUNTO PLACED MY SIGNATURE ON THIS THE         DAY OF
14        , 2020.
15
16
17                              JOSEPH WIEGEL
18            SUBSCRIBED AND SWORN TO BEFORE ME, A NOTARY
     PUBLIC, ON THIS         DAY OF             , 2020.
19
20                              NOTARY PUBLIC
21
22   MY COMMISSION EXPIRES:
     COUNTY OF:
23
24
25

Page 87

1    STATE OF INDIANA      )
2    COUNTY OF VANDERBURGH )  SS:
3         I, AMY L. HOOTEN, CSR, RMR, A NOTARY PUBLIC AT LARGE
4    IN AND FOR THE STATE OF INDIANA, DO HEREBY CERTIFY:
5         THAT THE WITNESS HEREIN, JOSEPH WIEGEL, WAS FIRST
6    DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH AND NOTHING
7    BUT THE TRUTH IN THE FOREGOING DEPOSITION;
8         THAT I THEN STENOGRAPHICALLY AND ELECTRONICALLY
9    RECORDED THE TESTIMONY OF THIS WITNESS AND THAT THE
10   TYPEWRITTEN TRANSCRIPT ABOVE IS A TRUE RECORD OF THE
11   TESTIMONY GIVEN; THAT SAID DEPONENT SUBSCRIBED HIS SIGNATURE
12   TO HIS DEPOSITION AFTER THE SAME HAD BEEN CAREFULLY READ
13   OVER BY HIM;
14        THAT I ALSO RECORDED AND TRANSCRIBED ANY AND ALL
15   OBJECTIONS MADE BY COUNSEL AND THE REASONS THEREFOR; AND
16        THAT I AM NOT A RELATIVE OR EMPLOYEE OR ATTORNEY OR
17   COUNSEL OF ANY OF THE PARTIES, NOR A RELATIVE OR EMPLOYEE OF
18   SUCH ATTORNEY OR COUNSEL, NOR AM I FINANCIALLY INTERESTED IN
19   THIS ACTION.
20        IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND
21   AFFIXED MY NOTARIAL SEAL ON THIS        DAY OF        2020.
22
23                    AMY L. HOOTEN, CSR, RMR, NOTARY PUBLIC
     MY COMMISSION EXPIRES:
24   JUNE 24, 2023
25

Errata Sheet

1                    ERRATA SHEET
               WITNESS: JOSEPH WIEGEL
2
3    After having read my deposition, I wish to make the
     following changes:
     Page ___ Line ___
4    Change_____
5    To_____
     Reason for Change_____
6    Page ___ Line ___
7    Change_____
     To_____
8    Reason for Change_____
9    Page ___ Line ___
10   Change_____
     To_____
     Reason for Change_____
11   Page ___ Line ___
12   Change_____
13   To_____
     Reason for Change_____
14   Page ___ Line ___
     Change_____
15   To_____
     Reason for Change_____
16   Page ___ Line ___
17   Change_____
     To_____
18   Reason for Change_____
19   Page ___ Line ___
     Change_____
20   To_____
     Reason for Change_____
21
22   I am, therefore, signing my deposition conditioned on the
23   fact that the above noted shall be entered upon the
     deposition by the notary public _____
24                              (Signature of Deponent)
25                              Date: _____

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL FILE NO. 3:17-CV-37
(CONSOLIDATED WITH CIVIL FILE NO. 3:17-CV-46)

---

UNITED STATE OF AMERICA ex rel.            )
TARYN HARTNETT, and DANA SHOCHED,          )
                                           )
            Plaintiff,                     )
                                           )
        v.                                 )    DEPOSITION OF ANNA WINGER
                                           )
PHYSICIANS CHOICE LABORATORY               )
SERVICES, DOUGLAS SMITH, PHILIP            )
MCHUGH AND MANOJ KUMAR,                    )
                                           )
            Defendants.                    )

---

On Thursday, October 29, 2020, commencing at 1:43 p.m., the deposition of Anna Winger was taken via Zoom on behalf of the Plaintiffs and was attended by Counsel as follows:

APPEARANCES:

            SETH JOHNSON, ESQ. (by videoconference)
            Assistant United States Attorney
            US Attorney's Office
            227 West Trade Street, Suite 1650
            Charlotte, North Carolina  28202
            on behalf of the Plaintiff

            BO CAUDILL, ESQ. (by videoconference)
            MATTHEW M. VILLMER, ESQ. (by videoconference)
            Weaver, Bennett & Bland, PA
            196 North Trade Street
            Matthews, North Carolina  28105
            on behalf of the Defendant Philip McHugh

            KAREN H. CHAPMAN, ESQ. (by videoconference)
            Poyner Spruill, LLP
            301 South College Street, Suite 2900
            Charlotte, North Carolina  28202
            on behalf of the Deponent Anna Winger

REPORTED BY:  Dee Anna Michaels, CVR-M, CCR
              ASHEVILLE REPORTING SERVICE

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
                    ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 265 of 283

1  from a normal conversation. The court reporter
2  has to transcribe what we're saying. So I will
3  do my best to try and let you fully answer, if
4  you'll do your best to kind of let me fully get
5  my questions out, and that way we have a clean
6  record. You know, in normal conversation, a
7  lot of times you anticipate what the person is
8  going to say and there's a tendency to speak
9  over each other, and we're all bad for that.
10 The court reporter, I'm sure, will remind us,
11 if we start doing a poor job. Fair enough?
12 A  Yes.
13 Q  At various intervals, either Bo or Ms. Chapman,
14 your lawyer, may object to the questions I've
15 asked. Same rules kind of apply. If I ask a
16 question and they object, you know, let's just
17 let everyone talk. Unless you are instructed
18 not to answer by your counsel, you can go ahead
19 and answer, after the objection.
20 A  Okay.
21 Q  If you don't understand a question I ask, feel
22 free to ask me to clarify, and I'll try and do
23 my best. Okay?
24 A  Okay.
25 Q  If you don't ask me to clarify a question, I'm

1  going to assume that you understand it. Fair
2  enough?
3  A  Yes.
4  Q  And my name is Seth Johnson. I'm an Assistant
5  United States Attorney. I represent the United
6  States in a False Claims Act lawsuit against
7  defendants Physicians Choice Laboratory
8  Services, Douglas Smith, Philip McHugh and
9  Manoj Kumar. Do you understand that?
10 A  Yes.
11 Q  And Physicians Choice Laboratory Services is
12 often referred to as PCLS for short. If I do
13 that, do you understand what I mean?
14    Yes.
15 Q  Can you take me through 30,000-foot overview of
16 your career history as a lawyer?
17 A  I attended Vermont Law School. I graduated in
18 2005. I practiced initially in Montana. I
19 relocated to North Carolina in 2011, sat for
20 the North Carolina Bar exam and set up shop in
21 Hickory, North Carolina. My focus has been
22 primarily estate planning, with some other
23 areas of the law that overlap; some real
24 estate, some business and miscellaneous
25 matters. But I currently -- well, I have had

1  numerous changes in my firm. I had a partner
2  initially, Nancy Huegerich. I was solo for
3  several years, and approximately three years
4  ago I merged with Jessie Bone, and I have three
5  partners now in the firm and six support staff.
6  But we focus on estate planning and elder law,
7  primarily.
8  Q  What's the name of your current firm?
9  A  Bone, Winger & Simmons, PLLC.
10 Q  And backing up from that, what firm were you at
11 before this firm?
12 A  I began as Huegerich & Winger and later was
13 Winger Law when I was solo; and now Bone,
14 Winger & Simmons.
15 Q  How long were you at Huegerich & Winger?
16 A  I would need to look back. I want to say it
17 was a couple of years.
18 Q  What time period? From what year to what year?
19 A  Roughly, 2012 to '14.
20 Q  And then from '14 on to when were you at Winger
21 Law?
22 A  Until 2017, but I'm speaking generally. I do
23 not have the time line.
24 Q  Fair enough. I'm just looking for rough
25 approximations here. You mentioned you focused

1  in estate planning and some of the ancillary
2  areas to that; fair?
3  A  Yes.
4  Q  Do you have any other areas of expertise in the
5  law?
6  A  As a solo practitioner, you know, you develop
7  areas of focus. I would need to know more
8  specifically what you're interested in.
9  Q  Sure. Do you know what the False Claims Act
10 is?
11 A  I know what it is, but that is not an area of
12 focus for me.
13 Q  Have you ever done any legal work, with regard
14 to the False Claims Act?
15 A  I have -- to the extent, you know, that --
16 well, you're aware of -- you have seen my
17 understanding, which was, you know, I
18 recognized the issue and contacted a healthcare
19 lawyer. So (pause) ---
20 Q  So fair to say that you, yourself, don't have
21 any expertise in the healthcare field?
22 A  Generally, that's correct, yes. I have no
23 special experience in that area.
24 Q  Same thing with the False Claims Act?
25 A  Correct.

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 266 of 283

1 Q   Same thing with the Anti-Kickback Statute?
2 A   Correct.
3 Q   Have you read the United States Complaint and
4     Intervention in this case?
5 A   I have not read it in its entirety.
6 Q   Have you read some of it?
7 A   I may have scanned it, but I have -- would not
8     say that I've read it.
9 Q   And it's your understanding that Phil McHugh
10    has waived his attorney-client privilege with
11    regards to matters in the United States
12    Complaint and Intervention; correct?
13 BY MS. CHAPMAN:
14        Objection.
15 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
16 Q   You can answer.
17 A   It's my understanding.
18 Q   That is your understanding?  Is that a "yes,"
19    Ms. Winger?
20 A   This is -- the reason is that I have an
21    attorney is because I'm not a litigator.  And
22    so, honestly, I do not know that I understand
23    your question, but I think I understand the
24    question.
25 Q   Okay.  Sure.  And I'll ask it again.  You

1     understand that I'm going to be asking you
2     questions today about your attorney-client
3     relationship with Phil McHugh; correct?
4 A   Yes.
5 Q   And, you know, generally, there is a privilege
6     that attaches with that; correct?
7 A   Yes.
8 Q   And you understand, to a certain degree, that
9     privilege has been waived by Mr. McHugh who
10    holds the privilege?
11 A   Correct.
12 Q   And that degree is the matters listed in United
13    States Complaint and Intervention in this case;
14    right?
15 BY MS. CHAPMAN:
16        Objection.  I just want to note for the record
17    we sent the letter noting our objection and our
18    understanding of the extent to which Mr. McHugh
19    has waived his attorney-client privilege in our
20    letter dated October 16th that I sent to
21    Katherine Armstrong.
22 BY MR. JOHNSON:
23        Sure.  And that's concurrent with what's pled
24    in our Complaint; right?
25 BY MS. CHAPMAN:

1     Well, that's not for us to make the decision.
2     She just said that she hasn't read the
3     Complaint, so I don't know that she can make
4     that call.
5 BY MR. CAUDILL:
6        Seth, I would just say that, with respect to
7     the specific areas of liability alleged as
8     against Phil McHugh; that might narrow this
9     issue a little bit and help move things
10    forward.  Broadly speaking, the Complaint makes
11    allegations about Phil's relationship with
12    Physicians Choice and some things that
13    Physicians Choice did.  And so, maybe if we
14    talk about the specific allegations in the
15    Complaint, as they relate to Phil, we might be
16    able to avoid anymore confusion about that.
17 BY MR. JOHNSON:
18        Sure.  And, I mean, I would assume Ms. Winger
19    wouldn't have any relationship to, you know,
20    Doug Smith or anyone else in the Complaint.
21    Fair enough.  You know, if something specific
22    comes up, we can address it then.
23 BY MS. CHAPMAN:
24        And I'm not trying to, Seth, obstruct your
25    process here.  I just want to make sure because

1     we only -- we've only been told they consent to
2     or waive the privilege as to those things
3     outlined.  So -- and, again, the privilege
4     belongs to Mr. McHugh, so that's Bo's call.
5 BY MR. JOHNSON:
6        Right.  My read of your letter is that's kind
7     of synonymous with our theories about ---
8 BY MR. CAUDILL:
9        I think we're all saying the same thing in a
10    different -- in a different way.
11 BY MR. JOHNSON:
12        Fair enough.  Attorney depo's are a little
13    different than the normal ones, so before we
14    got started, I just wanted to make sure we're
15    all on the same page here.
16 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
17 Q   Ms. Winger, do you know who Dr. John Johnson
18    is?
19 A   No.
20 Q   Never heard the name before?
21 A   Repeat the name.
22 Q   Dr. John Johnson?  He was a pain management
23    doctor in Western Pennsylvania at Lighthouse
24    Medical.
25 A   No.

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 267 of 283

1     easier to -- for me to address.
2 Q   Fair enough. Did you ever perform any legal
3     work or give any legal advice to Phil McHugh
4     related to Manoj Kumar's employment
5     relationship with PCLS?
6 A   No.
7 Q   Nothing related to whether any type of
8     employment relationship with Manoj Kumar would
9     violate the AKS?
10 A   No.
11 Q   Do you know who Dr. Yunus Shah is?
12 A   No.
13 Q   He was with Avicenna Pain Relief in Kentucky.
14     Doesn't ring a bell?
15 A   No.
16 Q   Fair to say you never performed any legal work
17     or gave legal advice to Phil McHugh related to
18     Manoj Kumar's management of Dr. Shah's practice
19     while employed at PCLS?
20 A   No.
21 Q   Do you know who Dr. Gregory Masimore is?
22 A   No.
23 Q   He was with Pain Management Solutions in
24     Indiana. That doesn't ring a bell?
25 A   No.

1 Q   Fair to say you didn't perform any legal work
2     or give any legal advice to Phil McHugh related
3     to Manoj Kumar's management of Dr. Masimore's
4     practice, while employed at PCLS?
5 A   No.
6 Q   Do you know who Sanker Jayachandran is?
7 A   I do not, no.
8 Q   He's a doctor with Confidential Care in
9     Indiana. That doesn't ring a bell?
10 A   No.
11 Q   Fair to say you didn't perform any legal work
12     or give any legal advice to Phil McHugh related
13     to a loan made to Dr. Jayachandran?
14 A   No.
15 Q   Do you know who Dr. Orlando Florete is?
16 A   Yes.
17 Q   And you did perform some legal work and give
18     Phil McHugh legal advice related to a loan made
19     to Dr. Florete; right?
20 A   Yes.
21 Q   Just in general terms, can you tell me what
22     that legal work was regarding that loan?
23 A   Regarding that loan, initially, it -- it came
24     to me as a loan. It came from Dr. Orlando
25     Florete's attorney, Randy Briley. He sent

1     closing documents to me to review. And so, my
2     role was to review and to advocate on Phil's
3     behalf, as we negotiated the terms of that
4     loan.
5 Q   And that was in September to October of 2013;
6     correct?
7 A   That is -- that sounds correct. I believe
8     that's in one of your exhibits. I could look
9     at the actual ---
10 Q   Sure. Let's do that. Let's take a look at
11     Exhibit 1, which is the original loan document.
12 A   Okay.
13   (PLAINTIFF'S EXHIBIT NO. 1 INTRODUCED)
14 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
15 Q   If you'll turn to four pages in, you'll see the
16     Florete guaranty is dated October 18th, 2013?
17 A   (Upon review) Uh-huh.
18 Q   And after that, on what's Bates-labeled PM Page
19     9, you'll see the Mortgage and Security
20     Agreement is dated October 18th, 2013?
21 A   Uh-huh.
22 Q   You were representing Mr. McHugh in his
23     personal capacity regarding this loan; correct?
24 A   Yes. But I believe that Silent Storm was the
25     lender.

1 Q   Is Silent Storm one of Phil McHugh's companies?
2 A   Yes.
3 Q   Prior to the loan being made in October 2013,
4     did you talk to anyone at PCLS, other than
5     McHugh?
6 A   No.
7 Q   What's your understanding of the terms of the
8     October 2013 loan, just generally?
9 A   Silent Storm agreed to lend, I believe it was,
10     $1.7 million dollars to Aries Medical
11     Corporation, I believe IPM may also be a
12     borrower, in exchange for a mortgage on some
13     real estate owned by those companies, with
14     payment terms as laid out in the -- the
15     documents.
16 Q   The documents in Exhibit 1 are the documents
17     related to the October 2013 loan; correct?
18 A   It appears, yes.
19 Q   There's a guaranty from Orlando Florete; right?
20 A   A personal guaranty, yes.
21 Q   Personal guaranty. There's a Mortgage and
22     Security Agreement?
23 A   Yes.
24 Q   There's a No Lien and Possession Affidavit?
25     That's all on Bates-labeled 24 of the exhibit.

1  A  Yes.
2  Q  There's a promissory note on Bates Label 26?
3     Is that a "yes"?
4  A  Yes.
5  Q  And then there's a Security Agreement on Page
6     30?
7  A  Yes.
8  Q  Any other agreements or documents related to
9     the October 2013 loan to Florete that aren't
10    included in Exhibit 1, that you know of?
11 A  The only other agreement, I believe there's a
12    cost agreement that's in one of your exhibits.
13    But that was simply an agreement about who was
14    going to pay certain costs of preparing the
15    closing documents.
16 Q  And we'll get to that. But outside of those,
17    you know, that's kind of the universe of the
18    loan documents for the October 2013 loan;
19    correct?
20 A  There is also a UCC filing statement and, you
21    know, some of the more -- the maybe ancillary
22    kind of loan documents, in the normal course of
23    business. So I may be missing something, but
24    the main documents are, yes, in your exhibit.
25 Q  Let's skip around, actually, because you

1     mentioned the cost agreement. Can you pull up
2     Exhibit 4?
3  A  Sure.
4  (PLAINTIFF'S EXHIBIT NO. 4 INTRODUCED)
   DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
6  Q  Is this the cost agreement you were
7     referencing?
8  A  Yes.
9  Q  Can you tell me what the -- what was agreed to
10    in this cost agreement?
11 A  I believe that Dr. Florete agreed to pay the
12    lender's side of the closing costs. Give me
13    just a minute to read.
14 Q  Sure.
15 A  (Review of document) Yes. I believe it's --
16    the intent of the agreement was for Dr. Florete
17    to cover some of the closing costs.
18 Q  That would have included your attorney's fees;
19    correct?
20 A  Yes.
21 Q  And would you turn to Exhibit 5?
22 (PLAINTIFF'S EXHIBIT NO. 5 INTRODUCED)
23 DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
24 Q  Do you have that in front of you, Ms. Winger?
25 A  I do.

1  Q  And Exhibit 5 starts with an email from
2     yourself to Travis Guthrie, cc'ing Phil McHugh,
3     on October 31st, 2013; right?
4  A  Yes.
5  Q  And you attach an invoice for your services
6     rendered on the loan.
7  A  It appears so, yes.
8  Q  And the second page of Exhibit 5 is your bill;
9     right?
10 A  Uh-huh.
11 Q  Is this all the work you did in October 2013 --
12    or September to October 2013 on the loan?
13 A  Can you restate your question?
14 Q  Sure. You sent Travis Guthrie a bill for your
15    work on the Florete loan; correct? And in the
16    bill there are billing entries for various
17    dates; right?
18 A  Correct.
19 Q  The first starts on September 6, 2013?
20 A  Uh-huh.
21 Q  And it ends on the loan date of October 18,
22    2013?
23 A  Yes.
24 Q  The billing entries contained in this invoice,
25    do those accurately reflect your work done

1     during that time period on this loan?
2  A  Yes.
3  Q  So there wasn't work you were doing that's not
4     included in this invoice; correct?
5  A  Do you mean work on other matters or other work
6     on this particular ---
7  Q  No, ma'am. Yes, other work on this particular
8     loan.
9  A  Typically, when I'm billing, this is -- you
10    know, I send a bill with the entries that
11    reflect the work that I've done. I mean, to
12    the extent that something (pause) ---
13 Q  It's not a trick question. I just want to
14    confirm that the bill you sent to Mr. Guthrie
15    contains, you know, an accurate, to the best of
16    your knowledge, recitation of the work that you
17    did on the loan during this time period?
18 A  Okay. Yes. And, I'm sorry, I'm smiling
19    because I often -- I do a lot of things that,
20    you know -- you know, that I'm studying that
21    don't make it onto my time sheet, from time to
22    time. But, yes, this is the reflection of my
23    -- the work that I've done and the time spent
24    on it.
25 Q  I spent a couple of stints in big law. I

7 (Pages 22 to 25)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
                        ars@ashevillereporting.com
           Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 269 of 283

```
 1    understand the headache of billing.
 2  A  Right.
 3  Q  But, you know, the major kind of tasks, you
 4     know, outside of thinking about it in the
 5     shower or, you know ---
 6  A  Okay.  Thank you.  That's exactly what I was
 7     thinking.  And, I mean, it's possible that I
 8     thought about it and didn't bill him for it.
 9     Okay.
10  Q  You'd agree with that; correct?
11  A  Yes.  Yes.  I'm with you.  Yes.
12  Q  I don't see any billing entry related to the
13     Anti-Kickback Statute; is that fair?
14  A  Yes.
15  Q  In September to October of 2013, you didn't
16     provide Phil McHugh any advice regarding
17     whether the loan to Dr. Florete complied with
18     the Anti-Kickback Statute; correct?
19  A  Correct.
20  Q  You didn't procure that advice for Phil McHugh
21     from any other lawyer during that time period;
22     correct?
23  A  To my knowledge, no.
24  Q  Did Mr. McHugh ever discuss with you during
25     that time period of September to October 2013
```

```
 1     any advice he had received regarding the Anti-
 2     Kickback Statute and the Florete loan?
 3  A  No.
 4  Q  If you could turn to Exhibit 3?
 5  (PLAINTIFF'S EXHIBIT NO. 3 INTRODUCED)
 6  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
 7  Q  Exhibit 3 is an email between yourself and
 8     Jessica Trammel at Wells Fargo, copying Phil
 9     McHugh and another individual, regarding wiring
10     instructions for the loan; is that right?
11  A  Yes.  But I'm -- I'm sorry.  I'm reviewing the
12     email.  Yes, I presume this is the Florete
13     loan, yes.
14  Q  Take your time, Ms. Winger.  And this wire
15     transfer was completed; correct?
16  A  Correct.  I don't see the receipt, but I
17     presume it was, yes.
18  Q  And Mr. Trammel writes, "The wire's been sent"?
19  A  Uh-huh.
20  Q  And it's your understanding that on October 18,
21     2013, Mr. Florete, through his companies, was
22     paid $1.7 million?
23  A  Yes.
24  Q  Will you turn to Exhibit 6?
25  (PLAINTIFF'S EXHIBIT NO. 6 INTRODUCED)
```

```
 1  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
 2  Q  Exhibit 6 is email correspondence between
 3     yourself and Gregory Herman-Giddens; is that
 4     correct?
 5  A  Yes.
 6  Q  What was Gregory Herman-Giddens' relationship
 7     to this transaction?
 8  A  Greg Herman-Giddens is a tax lawyer that is a
 9     colleague of mine that I work with when I have
10     issues that may be under Florida law, and I'm
11     not licensed in Florida.  So, you know, whether
12     I'm doing estate planning or business law or,
13     you know, whatever it is, I'm going to reach
14     out and run it by a colleague who's licensed in
15     the proper state.  So, he was essentially, you
16     know, kind enough on a -- you know, to take a
17     look and discuss it with me briefly.
18  Q  Was his involvement in the Florete loan just
19     how it implicated Florida law?
20  A  I'm sorry.  I didn't hear the last part.
21  Q  Sure.  Was his involvement in doing legal work
22     on the, you know, October 2013 Florete loan
23     just to the extent the loan might implicate
24     Florida law?
25  A  Yes.
```

```
 1  Q  No involvement regarding the False Claims Act
 2     or Anti-Kickback Statute?
 3  A  No, sir.
 4  Q  And no other lawyer involved in that
 5     transaction that gave legal advice on the Anti-
 6     Kickback Statute or False Claims Act back in
 7     October of 2013?
 8  A  Not that I know of, no.
 9  Q  In the second email down in the chain, Mr.
10     Herman-Giddens writes, "Why is he making this
11     loan anyway?  Seems like 3.5 percent is not
12     enough to justify the risk.  What about a
13     personal guaranty from Florete?"  Did I read
14     that correctly?
15  A  Uh-huh.
16  Q  And you respond with, "I agree about the rate.
17     It's my understanding that Phil is trying to
18     get Dr. Florete to come up and work for PCLS.
19     Apparently, Dr. Florete made some business deal
20     with another guy that isn't working out, so
21     Phil is trying to free Dr. Florete from that
22     situation."  Did I read that correctly?
23  A  Yes.
24  Q  Does that email reflect your understanding of
25     why Mr. McHugh was making the loan to Dr.
```

8 (Pages 26 to 29)

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
                       ars@ashevillereporting.com
               Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 270 of 283

1  them separate.  See above for alternate email.
2  Thank you, Gabi."  Do you know why Gabi was
3  asking you to not use Phil's PCLS email
4  address?
5  A  Speaking generally, it's probably similar to me
6  not wanting my personal emails to come to my
7  firm email, as far as keeping things -- keeping
8  things separate.  I think that, you know, both
9  Phil and probably Gabi had different, you know,
10  things going on and they're -- you know,
11  organizationally keeping the emails in the
12  right bucket would be my -- just my thought on
13  it.
14  BY MR. CAUDILL:
15  I'm going to object to that, just put an
16  objection on the record to that question, as it
17  calls for speculation.
18  BY THE DEPONENT:
19  Okay.  And I'm sorry.  I speculated.
20  Absolutely.
21  BY MR. CAUDILL:
22  If you know.  If you don't know ---
23  BY THE DEPONENT:
24  Sorry.  I'm getting tired.
25  BY MR. JOHNSON:

1  Do you need a break, Ms. Winger?
2
3  BY THE DEPONENT:
4  No.  Let me have a sip of water and take a
5  pause.  I'm fine.  We can proceed.  All right.
6  BY MR. JOHNSON:
7  Are you ready?
8  BY THE DEPONENT:
9  I'm ready.
10  (PLAINTIFF'S EXHIBIT NO. 7 INTRODUCED)
11  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
12  Q  Would you take a look at what should be Exhibit
13  7, which is an email chain between yourself and
14  Matt Hodges?  Do you see that?
15  A  I do.
16  Q  If you look at the second page of the email
17  chain, you email Mr. Hodges in March of 2014,
18  stating, "Matt, please take a look at the
19  attached docs.  Phil is loaning Orlando
20  additional 300K and modifying term and rate."
21  Do you see that?
22  A  Uh-huh.
23  Q  Was there a loan modification in March of 2014?
24  A  Yes.  If you -- I'm assuming those documents
25  are in another exhibit, but that sounds like

1  the correct date, yes.
2  Q  They are.  If you could take a look at Exhibit
3  8.
4  A  Okay.
5  (PLAINTIFF'S EXHIBIT NO. 8 INTRODUCED)
6  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
7  Q  Are those the March 2014 loan modification
8  documents that you were referencing?
9  A  Yes.
10  Q  There's a Promissory Note Modification
11  Agreement?
12  A  Uh-huh.
13  Q  And a loan agreement?
14  A  Yes.
15  Q  And a cost agreement, again; is that correct?
16  A  Yes.  Uh-huh.
17  Q  Any other remaining documents, other than those
18  three, in March of 2014?
19  A  To my knowledge, no, unless there was another
20  kind of loan closing agreement, a settlement
21  statement or something.  But I -- I've sent you
22  all that I have, so I believe this is complete,
23  yes.
24  Q  And was an additional $300,000 loaned to Dr.
25  Florete in March of 2014?

1  A  To my knowledge, yes.
2  Q  Do you know why an additional $300,000 was
3  loaned to Dr. Florete, in March of 2014?
4  A  It was my understanding that it was a general
5  capital need for operational expenses, but I am
6  not certain.
7  Q  As before, you submitted your invoice to Dr.
8  Florete for your legal services on this loan;
9  correct?
10  A  I presume, yes.  Is there ---
11  Q  There is.  Yeah.
12  A  Okay.
13  Q  That was the same cost agreement as the October
14  2013 loan; right?
15  A  Right.
16  (PLAINTIFF'S EXHIBIT NO. 9 INTRODUCED)
17  DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
18  Q  And if you'll look at Exhibit 9, that's an
19  email from yourself to Travis Guthrie,
20  attaching your invoice for the work in March of
21  2014; correct?
22  A  Correct.
23  Q  Is that a "yes," Ms. Winger?
24  A  Yes.
25  Q  If you will turn to the invoice that's dated

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 271 of 283

```
1    April 1st, 2014, and has three dates worth of
2    billing entries; do you see that?
3    A    1173?
4    Q    Yes, ma'am.
5    A    Yes.  I am looking at it, yes.
6    Q    Does this invoice accurately reflect your work
7         on the loan modification, in March of 2014?
8    A    Yes.
9    Q    No other major substantive legal work that you
10        performed that's not on this invoice?
11   BY MR. CAUDILL:
12        Object to form.
13   DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
14   Q    You can answer, Ms. Winger.
15   BY MR. CAUDILL:
16        You can answer.
17   BY THE DEPONENT:
18        Sorry.  I'm not that kind of lawyer, so I'm
19        looking for someone to guide me.
20   DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
21   Q    I'll back it up.
22   A    Okay.
23   Q    Before we had talked about, you know, you had
24        kind of a worry that maybe you were thinking
25        about it in the shower ---
```

```
1    A    Right.
2    Q    So same question here.  Legal work that you did
3         on the loan, kind of outside of something like
4         that, would be reflected here in this invoice;
5         correct?
6    A    Correct.
7    Q    I don't see anything regarding either the AKS
8         or False Claims Act on this invoice; is that
9         fair?
10   A    Yes.
11   Q    And is it fair to say that you did not give Mr.
12        McHugh any legal advice regarding the AKS or
13        False Claims Act in March of 2014?
14   A    Yes.  That's fair to say.  I did not advise him
15        in that way.
16   Q    You also didn't procure any advice related to
17        the AKS or FCA for Mr. McHugh, related to the
18        March 2014 loan modification, at that time;
19        correct?
20   A    Correct.  And I'm pausing because, you know, we
21        did speak with Trish Markus, and I just wanted
22        to -- I don't believe that was prior to this
23        April of 2014 invoice.
24        Maybe this will make it simple.  You reached
25        out to Patricia Markus at Smith Moore once;
```

```
1         right?
2    A    I reached out to her in -- later in 2014.  But
3         do you mean (pause) ---
4    Q    Right.  We can get to these emails but, you
5         know, there's emails where you reached out to
6         Ms. Markus in October of 2014.  That is after,
7         you know, March of 2014; right?
8    A    Correct.
9    Q    And I'm just trying to make sure that, you
10        know, there wasn't another time that you
11        reached out to either Ms. Markus or anyone
12        else, you know, back in the March 2014 time
13        period, regarding AKS advice?
14   A    No, I did not.
15   Q    Just to close the loop on this, in March of
16        2014, you did not give Mr. McHugh any legal
17        advice related to the AKS; right?
18   A    Correct.
19   Q    And you didn't go out and procure any legal
20        advice for Mr. McHugh regarding the AKS, in the
21        March 2014 loan modification at that time;
22        right?
23   A    Right.
24   Q    There's no AKS legal advice that was given in
25        March 2014, related to the Florete loan
```

```
1         modification, that you're aware of; right?
2    A    Not that I'm aware of, no.
3    Q    At one point, though, you did reach out to
4         Patricia Markus; right?
5    A    Yes.
6    (PLAINTIFF'S EXHIBIT NO. 10 INTRODUCED)
7    DIRECT EXAMINATION RESUMED BY MR. JOHNSON:
8    Q    If you'll look at Exhibit 10, that is a chain
9         of emails between yourself and Ms. Markus;
10        correct?
11   A    Correct.
12   Q    The first one is dated October 7, 2014, from
13        yourself to Ms. Markus, and you note at the
14        beginning that "We spoke on 09-18 about my
15        client Philip McHugh and a loan made by his
16        entity Silent Storm Holdings, LLC, to the
17        Institute of Pain Management in Jacksonville,
18        Florida; right?
19   A    Correct.
20   Q    Was that Line 18 phone conversation the first
21        time you spoke with Ms. Markus regarding this
22        matter?
23   A    I do not recall.
24   Q    Do you recall any conversations, emails or
25        other correspondence with Ms. Markus, outside
```

828-254-9230        ASHEVILLE REPORTING SERVICE        800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 272 of 283

1    A    Yes.

2    Q    Did you ever provide Ms. Markus with any other

3         facts that aren't contained in this email

4         correspondence for her to rely on in forming

5         her AKS opinion?

6    A    To my knowledge, no.

7    Q    And Ms. Markus ultimately did provide you with

8         an opinion on both the Stark Law and the Anti-

9         Kickback Statute, as it relates to her

10        understanding of the facts regarding the

11        Florete loan; correct?

12    A    Yes.

13    Q    And that opinion is contained in the October

14        9th, 2014, email that's on the second page of

15        Exhibit 10?

16    A    Yes.

17    Q    Did she provide any other opinions, other than

18        what is contained in this email?

19    A    To my knowledge, no. I mean, it would have

20        been produced with the other documents, but I

21        believe this is the only one.

22    Q    To be clear, no prior opinions before this

23        October 9th, 2014, email; correct?

24    A    Correct.

25    (PLAINTIFF'S EXHIBIT NO. 11 INTRODUCED)

---

1    DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

2    Q    If you could take a look at Exhibit 11, and

3         this is Smith Moore's invoice on the matter.

4         Do you see that?

5    A    Uh-huh.

6    Q    Page 1 is dated in November of 2014; correct?

7    A    Yes.

8    Q    And it's for the services rendered from 09-18-

9         2014 to 10-09-2014; right?

10    A    Right.

11    Q    That's for $2,685; right?

12    A    Yes.

13    Q    And then, if you will turn to the very last

14        page of the exhibit, there's a December invoice

15        for a telephone conference on November 7th,

16        2014; do you see that?

17    A    (Upon review) Yes.

18        Is there any work that Patricia Markus or

19        anyone at Smith Moore Leatherwood performed

20        regarding this matter that's not reflected in

21        these invoices?

22    BY MR. CAUDILL:

23        I'm going to object. I don't know how she

24        would know the answer to that.

25    DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

---

1    Q    I'll rephrase it. Were you ever billed for any

2         work, outside of these invoices?

3    A    Was I billed?

4    Q    Sure. So looking at the first page of Exhibit

5         11, it's an invoice from Smith Moore

6         Leatherwood to yourself; correct?

7    A    Correct.

8    Q    For work performed for Phil McHugh and Silent

9         Storm Holdings; right?

10    A    Right.

11    Q    And the invoices we've looked at span the time

12        period of 09-18-2014 until November 7th, 2014;

13        right?

14    A    Right.

15    Q    Did you ever receive any other invoices from

16        Smith Moore Leatherwood, related to Anti-

17        Kickback Statute advice for Phil McHugh?

18    A    No.

19    Q    So the work they performed on this matter is

20        reflected in the invoices in Exhibit 11;

21        correct?

22    A    To my knowledge, yes.

23    Q    Did you ever reach out to anyone else, other

24        than Patricia Markus, for legal advice

25        regarding the Anti-Kickback Statute and the

---

1        Florete loan?

2    A    I did not.

3    Q    Did you ever reach out to anyone else, other

4         than Patricia Markus, regarding any activity

5         that Phil McHugh did while at PCLS and

6         compliance with the Anti-Kickback Statute?

7    A    No.

8    Q    So it's fair to say the sum total of the Anti-

9         Kickback Statute advice that you received was

10        from Patricia Markus in the September to

11        October, November time frame in 2014; right?

12    A    Correct.

13    Q    Have you ever performed any legal work or given

14        any legal advice to anyone at PCLS, other than

15        Phil McHugh?

16    A    I have not. Frankly, PLS (sic) had -- there

17        have been many lawyers involved that this fell

18        into their area of expertise.

19    BY MR. JOHNSON:

20        Let's take five. I might be about done.

21    (OFF THE RECORD)

22    DIRECT EXAMINATION RESUMED BY MR. JOHNSON:

23    Q    Ms. Winger, just a couple of quick questions,

24        and then I will pass you off to Bo. Going back

25        to the original October 2013 loan to Dr.

---

14 (Pages 50 to 53)

828-254-9230       ASHEVILLE REPORTING SERVICE       800-357-5007
ars@asheville reporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 273 of 283

CERTIFICATE

I, Dee Anna Michaels, CVR-M, CCR, Court
Reporter and Notary Public, do hereby certify that
the foregoing 85 pages are an accurate transcript of
the deposition of Anna Winger, taken by me and
transcribed under my supervision.

I further certify that I am not financially
interested in the outcome of this action, a
relative, employee, attorney or counsel of any of
the parties, nor am I a relative or employee of such
attorney or counsel.

This is the 15th day of November 2020.


_____
DEE ANNA MICHAELS, CVR-M, CCR

Notary Public No.: 19953300157

(The foregoing certification of this transcript does
not apply to any reproduction of the same by any
means, unless under the direct control and/or
supervision of the certifying reporter.)

Asheville Reporting Service
111 McDowell Street, Asheville, NC 28801
828-254-9230

828-254-9230          ASHEVILLE REPORTING SERVICE          800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 274 of 283

Joseph Strickland

UNITED STATES OF AMERICA, et al., ex rel. HARTNETT and SCHOCHED v. PHYSICIANS CHOICE LABORATORY SERVICES, LLC, et al.
3:17-cv-37-KDB-DCK

November 6, 2020



P.O. Box 33364
Charlotte, NC 28233
(704) 300-9770

office@queencitycourtreporting.com
www.queencitycourtreporting.com

**Page 1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:17-cv-37-KDB-DCK

UNITED STATES OF AMERICA, et al., )
ex rel. TARYN HARTNETT and DANA )
SCHOCHED, )
　　　　　　　　　　　　　　　　　 )
　　　　　Plaintiffs, )
　　　　　　　　　　　　　　　　　 )
　　　vs. )
　　　　　　　　　　　　　　　　　 )
PHYSICIANS CHOICE LABORATORY )
SERVICES, LLC, DOUGLAS SMITH, )
PHILIP MCHUGH, and MANOJ KUMAR, )
　　　　　　　　　　　　　　　　　 )
　　　Defendants. )

12:58 p.m.
November 6, 2020
Charlotte, North Carolina

30(b)(6) DEPOSITION

OF

DEPARTMENT OF HUMAN AND HEALTH SERVICES

BY AND THROUGH ITS AGENT
JOSEPH ALLEN STRICKLAND

**Page 2**

APPEARANCES:

For Plaintiffs:　MR. J. SETH JOHNSON, ESQ.
　　　　　　　　MS. KATHERINE T. ARMSTRONG, ESQ.
　　　　　　　　ASSISTANT UNITED STATES ATTORNEY
　　　　　　　　U.S. ATTORNEY'S OFFICE
　　　　　　　　Carillon Tower
　　　　　　　　227 W Trade Street, Suite 1650
　　　　　　　　Charlotte, North Carolina 28202
　　　　　　　　704-344-6222
　　　　　　　　katherine.armstrong@usdoj.gov
　　　　　　　　seth.johnson@usdoj.gov

For the　　　　MR. BO CAUDILL, ESQ.
Defendants:　　MR. MATTHEW M. VILLMER, ESQ.
　　　　　　　　WEAVER, BENNETT & BLAND, P.A.
　　　　　　　　196 N. Trade St.
　　　　　　　　Matthews, North Carolina 28105
　　　　　　　　704-844-1400
　　　　　　　　bcaudill@wbbatty.com
　　　　　　　　mvillmer@wbbatty.com

For Defendant　MR. KENDALL R. WALKER, ESQ.
Palmetto GBA, LLC:　ASSOCIATE GENERAL COUNSEL, LAW DEPT.
　　　　　　　　BLUE CROSS BLUE SHIELD OF SOUTH CAROLINA
　　　　　　　　I-20 @ Alpine Road, AA 270
　　　　　　　　Columbia, South Carolina 29219
　　　　　　　　803-264-6632
　　　　　　　　kendall.walker@bcbssc.com

Also Present:　Cathleen Hollowell, Investigator
　　　　　　　　Jill Wright, OCC
　　　　　　　　* * * * * * * *

**Page 3**

I N D E X

30(b)(6) EXAMINATION OF　　　　　　　　　PAGE

JOSEPH ALLEN STRICKLAND
　By Mr. Caudill　　　　　　　　　　　　4

　　　　　　　* * * * *

EXHIBITS

DEFENDANT'S　　　　　　　　　　　　　　PAGE
NUMBER　　　　　　　　　　　　　　　　MARKED

Exhibit 1　Reopening Simple Claim Correction　15
Exhibit 2　Physicians Choice Check 12676 and　19
　　　　　Supporting Documentation
Exhibit 3　Notice of 30(b)(6) Deposition　　20

　　　　　* * * * * * * * *

12　　This is the 30(b)(6) deposition of DEPARTMENT OF HUMAN AND

13　HEALTH SERVICES, by and through its agent, JOSEPH ALLEN

14　STRICKLAND, taken pursuant to Notice of the parties and in

15　accordance with the Federal Rules of Civil Procedure before

16　Shannon J. Colangelo, Notary Public, located in the offices of

17　U.S. Attorney's Office, Carillon Tower, 227 West Trade Street,

18　Suite 1650, Charlotte, North Carolina, on November 6, 2020,

19　beginning at 12:58 p.m.

20　　IT IS STIPULATED AND AGREED by and between counsel for the

21　parties that all objections except as to form shall be reserved

22　until which time they can be heard by the Court.

23　　IT IS STIPULATED AND AGREED by and between counsel for the

24　parties that the reading and signing of this transcript by the

25　witness is reserved.

**Page 4**

1　　　JOSEPH ALLEN STRICKLAND, called as a witness, having

2　been duly sworn, was examined and testified as follows:

3　E X A M I N A T I O N (By Mr. Caudill):

4　Q.　Can you please tell us your name for the record?

5　A.　Joseph Strickland.

6　Q.　Mr. Strickland, we met off the record, but my name is

7　　　Bo Caudill.  I represent the defendant, Philip McHugh

8　　　in the case of United States versus Physicians Choice

9　　　Laboratory Services, LLC, and others.  That is case

10　　number 3:17-cv-37 in the Western District of North

11　　Carlina; have you heard of that case before?

12　A.　Yes.

13　Q.　Mr. Strickland, you are here today pursuant to a --

14　　　you've been designated by the Department of Health

15　　　and Human Services to answer questions within certain

16　　　categories of inquiry at this deposition; is that

17　　　your understanding?

18　A.　Yes.

19　Q.　Before I get into some of the ground rules of the

20　　　deposition, can you tell me your current job title

21　　　and give me just sort of a 30,000-foot view of your

22　　　day-to-day job functions?

23　A.　I am an accounting director at Palmetto GBA, the

24　　　Medicare administrative contractor for CMS.  I

25　　　oversee overpayment and debt collection activities

5

1　　　　for Medicare providers.

2　　　　　　　MR. JOHNSON:  And, Bo, just so the

3　　　　　　　record is clear, we designated him for

4　　　　　　　1F and 1G of your notice.

5　　　　　　　MR. CAUDILL:  Great.  Thank you, Seth.

6　Q.　So what Mr. Johnson just indicated is that the

7　　　　Department of Health and Human Services has

8　　　　designated you to answer my questions within two

9　　　　categories of inquiry.  The first one is whether

10　　　Physicians Choice ever repaid or attempted to repay

11　　　any amounts received from Medicare as payment or

12　　　reimbursement for the testing samples referred from

13　　　the Institute of Pain Management; is that right,

14　　　you're here to answer questions about that today?

15　A.　Yes, those two questions.

16　Q.　And there's one other question and that is whether

17　　　Physicians Choice repaid or attempted to repay any

18　　　amounts received from Medicare as payment for a

19　　　different referring physician, Sanker Jayachandran;

20　　　is that right?

21　A.　Yes.

22　Q.　Is that your understanding?

23　A.　That is my understanding.

24　Q.　Have you ever been deposed before?

25　A.　I have not.

6

1　Q.　Okay.  So I'm going to go over some ground rules of

2　　　deposition with you.  First, I want to talk

3　　　specifically about this kind of deposition.  So,

4　　　today, as we mentioned earlier, you're here to

5　　　testify on behalf of the Department of Health and

6　　　Human Services; is that your understanding?

7　A.　Yes.

8　Q.　And so throughout today's deposition, I may say you,

9　　　I may use that pronoun, but in all such instances, I

10　　　am referring to the department; does that make sense

11　　　to you?

12　A.　Uh-huh.

13　Q.　I'm sorry.  I'm going to tell you this later on, but

14　　　it's important that you to give a verbal response; is

15　　　that a yes?

16　A.　That is a yes.

17　Q.　Thank you.  Now, let's go over some more general

18　　　deposition rules?

19　A.　Okay.

20　Q.　So the first one is you're testifying here today

21　　　under oath; do you understand that?

22　A.　Yes.

23　Q.　It's the same oath that you would take if you were

24　　　testifying in court; does that make sense?

25　A.　Yes.

7

1　Q.　And so the obligation is to tell the truth, the whole

2　　　truth and nothing but the truth, right?

3　A.　Yes.

4　Q.　Any reason why you would be unable to do that today?

5　A.　No.

6　Q.　Because your testimony is being recorded in the form

7　　　of a written transcript, it's also important that you

8　　　provide verbal responses to my questions.  So if I

9　　　ask you a yes or no question, for example, uh-huh or

10　　　uh-uh is difficult to translate on a transcript.

11　　　Also head nods and head shakes don't translate to the

12　　　transcript; does that make sense?

13　A.　Yes.

14　Q.　So I may interrupt you or ask you to say yes or no,

15　　　I'm not trying to be rude, I'm just trying to

16　　　sure the record is clear.  Okay?

17　A.　I understand.

18　Q.　The other sort of non-intuitive thing is while we're

19　　　talking and the court reporter is taking down our

20　　　testimony, it's very helpful to the court reporter

21　　　that we not speak over each other.  So I will do my

22　　　best today not to speak over you and I will ask that

23　　　you do the same for me.  Okay?

24　A.　I understand.

25　Q.　If I ever ask you a question that you don't

8

1　　　understand or that's unclear to you, please ask me to

2　　　clarify the question.  Okay?

3　A.　I will.

4　Q.　If you begin answering my question without asking to

5　　　clarify, I will assume that you understood it; does

6　　　that make sense?

7　A.　Yes, it does.

8　Q.　Then last, but not least, I anticipate this will be a

9　　　very short deposition.  In the event, however, that

10　　　you need to take a break for any reason, stretch your

11　　　legs, walk around, get something to drink, please

12　　　feel free to ask me to take a break.  Okay?

13　A.　I understand.

14　Q.　The only thing that I will ask is that before we take

15　　　any break, if there's a pending question, that we

16　　　finish answering that question.  Okay?

17　A.　Yes.

18　Q.　Great.  All right.  So referring back then to the two

19　　　categories of inquiry, we're going to take them one

20　　　at a time.  Just so the record is clear, I'm going to

21　　　read the categories to you.  I know that's a little

22　　　dry.  Bear with me.  Okay?

23　A.　(The witness gave a nonverbal answer.)

24　Q.　The first category of inquiry was whether Physicians

25　　　Choice ever repaid or attempted to repay any amounts

1  received from Medicare as payment or reimbursement
2  for the testing of samples referred from the
3  Institute of Pain Management. What did you do to
4  prepare to answer questions about that today? Please
5  don't tell me anything that you discussed with your
6  attorneys.
7  A.  We researched the cash receipts and overpayments
8  associated with the company, Pain Management, and
9  identified the universe of that activity. And that's
10  what we used to review the request, the question.
11  Q.  Okay. And, I'm sorry, I'm probably going to ask you
12  some questions today that we may have to go back and
13  forth a little bit to make sure we understand. When
14  you say that you reviewed the cash receipts, in this
15  context, what is a cash receipt?
16  A.  A cash receipt would be a check that was remitted by
17  the provider to Medicare.
18  Q.  And that would come through a company called Palmetto
19  GBA; is that right?
20  A.  It would be remitted to Palmetto GBA by the provider,
21  yes.
22  Q.  Okay. So just to understand sort of how we would try
23  to trace those payments, we would look at the records
24  of Palmetto GBA to see if they received a check from
25  Physicians Choice; that's one way to do it?

1  A.  Yes.
2  Q.  And you did that?
3  A.  Yes.
4  Q.  And then I think you said you looked at another data
5  set; what was that?
6  A.  The other data set was any overpayments that had been
7  established, an overpayment being an adjustment to a
8  previously paid claim that resulted in money due back
9  to Medicare.
10  Q.  And so I think you explained that pretty well. In
11  this context, an overpayment refers to a
12  determination on the part of Medicare that it had
13  issued reimbursement above the appropriate
14  reimbursement rate?
15  A.  Could you ask the question again please?
16  Q.  Absolutely. So overpayment, in this context, refers
17  to a situation where Medicare has paid a claim above
18  what it determined to be the proper reimbursement
19  rate?
20  A.  Well, if I could clarify that?
21  Q.  Yes, please do. Yes.
22  A.  The overpayment would be where Medicare has adjusted
23  the previously paid amount to an amount that is now
24  lower and determined an amount is due back to
25  Medicare.

1  Q.  All right. And so when you -- that information about
2  overpayment is maintained separately from the cash
3  receipts that you were talking about before, sort of
4  in a separate data set?
5  A.  Yes.
6  Q.  Okay. So there are a number of instances, I suppose,
7  where a company like Physicians Choice -- and just so
8  the record is clear, you understand that to be a
9  diagnostic laboratory?
10  A.  That is my understanding.
11  Q.  All right. Yeah. Where a diagnostic lab like
12  Physicians Choice might repay money to Medicare
13  through Palmetto GBA. One of those circumstances is
14  when an adjustment has been made and there's an
15  overpayment; is that right?
16  A.  Could you ask the question again please?
17  Q.  All right. And, I'm sorry, it's going to be a lot
18  like this for most of the deposition.
19  A.  That's okay.
20  Q.  Okay. So under what circumstances, sort of normal
21  circumstances, would a company like Physicians Choice
22  write a check to Palmetto GBA?
23      MR. JOHNSON:  Object to the extent he
24      can't testify what's in Physician
25      Choice's head when they're doing any

1      particular thing, but, I mean, you can
2      testify from Palmetto's perspective.
3      MR. CAUDILL:  Right.
4  A.  So, generally speaking, a provider would identify an
5  error in billing or something that they submitted
6  incorrectly and is now disclosing that and would
7  submit a request to adjust the claim.
8  Q.  Okay. Would there be any preliminary -- would it be
9  normal -- well, I'm trying to think if there's a
10  better way for me to ask this question. In addition
11  to cash receipts and overpayment records, would it be
12  typical for a company like Physicians Choice to
13  communicate with Palmetto GBA in advance of making a
14  repayment?
15      MR. WALKER:  Object to the form.
16  A.  Yeah. Could you repeat the question again please?
17  Q.  Yeah. Let me try it this way. I'm going to give you
18  sort of -- I'm going to try to do this by way of a
19  hypothetical so you can understand what I'm trying to
20  get. So imagine Physicians Choice decides that it
21  has received money from Medicare that it should not
22  have received. It's made that decision independently
23  of Medicare or Palmetto GBA; it's reached that
24  decision on its own. Would they then just cut a
25  check to Palmetto GBA or would there need to be some

```
1       kind of communication between those two companies so
2       that Palmetto GBA knew what that payment related to?
3               MR. JOHNSON:  Objection; calls for
4               speculation.  You can answer if you
5               understand.
6               THE WITNESS:  I do understand the
7               question, thank you.
8    A.  Yeah.  So typically a provider would not just send in
9        a check with no documentation.
10   Q.  All right.  So that would be pretty unusual?
11   A.  Uh-huh.
12   Q.  That's what I was trying to make sure I understood.
13       So in addition to looking through cash receipts and
14       overpayment records, did you check any other records
15       of Palmetto GBA?
16   A.  No.
17   Q.  So you did not, for example, look for communications
18       between representatives of Physicians Choice or
19       Palmetto GBA related to the possibility of an
20       overpayment?
21   A.  No, we did not.
22   Q.  Okay.  After you checked check receipts -- or, excuse
23       me, cash receipts and overpayment records, what did
24       you locate?
25   A.  And this is still related to the first question?
```

```
1        Correct.
2    Q.  Yes.  This is related to the Institute of Pain
3        Management and the doctors associated with that
4        practice.
5    A.  Okay.  We did not locate any receipts or collections
6        associated with any funds remitted back to Medicare
7        for Physicians Choice.
8    Q.  All right.  Let's move to the second question, which
9        relates -- the same exact question except a different
10       referring provider, Sanker Jayachandran.  What did
11       you do -- did you do anything differently to prepare
12       to respond to that question than you did with respect
13       to the one we've already discussed?
14   A.  No, it was the same process to review and research.
15   Q.  All right.  And after you did that, what did you
16       locate?
17   A.  We identified two claims that had been submitted by
18       the provider, by Physicians Choice, that resulted in
19       overpayments.  The two claims totalled $732.02, I
20       believe, and it was -- the reopening requested -- the
21       request to adjust the claim was submitted by the
22       provider January 20, 2015.  The overpayment was
23       demanded as a result of the request.  The overpayment
24       was demanded by Medicare on February 20, 2015, and it
25       was -- the overpayment amounts were collected through
```

```
1        recoupment through the provider's Medicare
2        reimbursement on April 6, 2015.
3    Q.  Okay.  And I've been handed a document that I'm
4        going to -- feel free to sort of be cautious about
5        touching it -- but, I think you've seen it before,
6        that I'm going to mark as Defendant's 1 for the
7        purpose of this deposition.
8               MR. CAUDILL:  Can I borrow a pen?
9               MR. VILLMER:  Now you're going to touch
10              it.
11              (WHEREUPON, Exhibit 1 was marked for
12              identification.)
13   Q.  If you could just take a look at that document and
14       let me know if you've seen it before?
15   A.  Yes, I have.
16   Q.  Okay.  Can you tell me what this document is?
17   A.  This is a simple claim correction reopening form that
18       this provider submitted to adjust these two claims.
19   Q.  Okay.  And do you know whether this payment was made
20       by -- this repayment was made by Physicians Choice
21       following adjustment?
22   A.  Could you -- I guess -- so a check was not submitted
23       by Physicians Choice for these adjustments.
24   Q.  All right.  So, just to make sure I understand how
25       this process would go and what this reflects, okay,
```

```
1        so I think you testified the provider requested that
2        this claim be reviewed; is that what -- did I
3        understand that correctly?
4    A.  No, the provider submitted the request to have this
5        -- have these claims adjusted.
6    Q.  Okay.  And so in this context, what does that -- what
7        does a request to have a claim adjusted, what does
8        that refer to?
9    A.  It refers to a request from a provider that would be
10       submitted with their request for the adjustment that
11       they want to disclose and Palmetto GBA would make the
12       adjustment as the provider requests.
13   Q.  Okay.  And so -- and I understand this is a very sort
14       of dumb-down question, but for the benefit of the
15       folks who don't work in this field, in this context,
16       what is an adjustment; what does that mean?
17   A.  An adjustment would be a correction to a previously
18       paid claim.
19   Q.  All right.  So I think then, if I'm understanding
20       correctly, the provider asked Palmetto to adjust a
21       previously submitted -- a claim that had been
22       previously paid?
23   A.  That is correct.
24   Q.  All right.  And then that happened and Palmetto
25       issued this simple claim correction indicating an
```

1      amount billed in error of $732.02?

2   A.   That is correct.

3   Q.   So that amount would be an overpayment?

4   A.   That's right.

5   Q.   And it would then be Physicians Choice's

6      responsibility to pay that money back to Palmetto?

7   A.   That is correct.

8   Q.   And there's no check showing that that happened?

9   A.   That is correct.

10   Q.   Other than that document, were there any documents

11      that you saw in your review that indicated that

12      Palmetto GBA received payment from Physicians Choice

13      related to Sanker Jayachandran?

14   A.   We did not locate -- there were no other documents.

15   Q.   Again, just to make sure that I'm clear, your

16      investigation into that involved checking the cash

17      receipts and overpayment data?

18   A.   That is correct.

19   Q.   And you would have found this -- this would be a form

20      that you would have found in the overpayment data?

21   A.   That is correct.

22   Q.   Similarly to your testimony with respect to the

23      Institute of Pain Management, you didn't look for or

24      locate any e-mails concerning the possibility of a

25      repayment?

1   A.   No.

2   Q.   All right. Or any discussion between Palmetto GBA's

3      representatives and Physicians Choice's

4      representatives about Physicians Choice's desire to

5      make a repayment?

6   A.   No, we did not locate anything, anything that would

7      constitute what you just described.

8   Q.   All right. I'm going to ask kind of a difficult

9      question here and I'll be happy to try to tailor it

10      as much as I can. Is there any reason that you're

11      aware of that Physicians Choice would send money to

12      Palmetto GBA, other than as a repayment for an

13      overpayment or -- well, really, I guess that's it.

14      So is there any reason, other than that, that

15      Physicians Choice would send money to Palmetto GBA?

16          MR. JOHNSON: Objection; calls for

17          speculation. You can answer.

18          THE WITNESS: I can answer.

19   A.   To my knowledge, there would be no other reason than

20      to repay an overpayment.

21   Q.   Is the -- are repayments for claims processed and

22      paid through Tricare sort of segregated from

23      repayments for claims processed and paid by Medicare

24      Part B?

25   A.   Tricare is a different payer all together and would

1      be outside of what Palmetto GBA administers.

2   Q.   Okay.

3          MR. CAUDILL: If we could just take five

4          minutes? I do have a few more for you,

5          but I've got some logical things I've

6          got to figure out. If we could go off

7          the record?

8          (WHEREUPON, a recess was taken from 1:19

9          to 1:44 p.m.)

10 BY MR. CAUDILL:

11   Q.   Mr. Strickland -- it is Strickland, right?

12   A.   Yes.

13   Q.   Okay. I'm sorry. I'm having trouble this morning

14      keeping up with everybody's names. We just got back

15      from a break. I have a few more questions for you.

16      The first thing I'm going to do, I'm actually

17      going to mark a document that the government's

18      counsel just handed to me, which I understand to be

19      part of the subpoena production that Palmetto GBA has

20      served on us in this case and we've just had some

21      issues getting it open. This is going to be

22      Defendant's 2.

23          (WHEREUPON, Exhibit 2 was marked for

24          identification.)

25          MR. CAUDILL: I'm also going to mark the

1      notice as Defendant's 3.

2          MR. JOHNSON: That's fine.

3          (WHEREUPON, Exhibit 3 was marked for

4          identification.)

5   Q.   All right. So, Mr. Strickland, if you could take a

6      look at what I marked as Defendant's 3 and, once

7      you've had the opportunity to look at it, could you

8      tell me have you seen it before?

9   A.   Three or two?

10   Q.   Two, Defendant's 2.

11   A.   I have seen it before.

12   Q.   What is that document, sir?

13   A.   This is a check received from Physicians Choice to

14      Palmetto GBA for repayment of an overpayment demand.

15   Q.   All right. And do you -- there's a -- on the first

16      page, underneath our voucher number, there's a -- the

17      words multi and then the abbreviation ACCT. Does

18      that stand for multiple accounts?

19   A.   So I didn't complete this. I believe this was

20      submitted by the provider.

21   Q.   I see. So this is a Physicians Choice document?

22   A.   Yes, it is.

23   Q.   This page one. So then, as we flip through this

24      document, these overpayments, what I'm trying -- I

25      guess what I'm trying to get to is do you know what

1          referring doctor any of those overpayments would be

2          related to?

3     A.   I don't know, based on the review here.  But, we have

4          a record of the referring doctors for each of those

5          overpayments.

6     Q.   If I were to hand you this document outside of the

7          context of this deposition and ask you to go

8          determine who -- what doctors referred to Physicians

9          Choice for the services related to these

10         overpayments, how would you go about doing that?

11    A.   We would have to query the claim in the claim system

12         and the claim itself would store the referring

13         doctor's information.

14    Q.   All right.  If I were just -- if all I had to

15         reference was the claims data for each of those claim

16         numbers that are listed in this document, would the

17         claim data tell me who the referring doctor was?

18    A.   Yes, it would.

19    Q.   All right.  You testified earlier how you went about

20         trying to determine if a repayment was received.

21         What date range were you using in terms of trying to

22         locate repayment?

23    A.   The date range that we were asked to research was

24         January 1, 2013, through December 31, 2016.

25    Q.   All right.  So any time from January 1, 2013 to the

1          Choice decided it should not have received from CMS?

2          Is that possible?

3                    MR. JOHNSON:  Objection; calls for

4                    speculation.  If you know, you can

5                    answer.

6     A.   We have had cases where a provider has gone to CMS to

7          discuss overpayments, but it always comes back to the

8          MAC to administer the financial transaction.

9     Q.   So in that distance, in the instance you just

10         described, it would be typical for CMS to say send

11         your payment through Palmetto GBA?

12                   MR. JOHNSON:  Objection; calls for

13                   speculation.  But, you can answer.

14    A.   In the experience that we've had, yes.

15    Q.   Yeah.  And that's all that I'm asking.  Did you

16         review any record, other than the records of Palmetto

17         GBA, in attempting to determine whether any repayment

18         to CMS was made?

19    A.   No.

20    Q.   All right.  I'm -- again, I'm going to ask you some

21         questions that really are -- they may strike you as

22         silly.  I'm sorry.  I certainly don't want to waste

23         your time, I just want to make sure I understand how

24         the system works.  Is it possible that if Physicians

25         Choice wanted to repay amounts to Palmetto GBA, that

1          end of 2016?

2     A.   (The witness gave a nonverbal answer.)

3     Q.   And you were asked -- so, again, sort of in the

4          course of your investigation, what you looked for

5          were cash receipts and overpayment records.  And that

6          would include what is here in Exhibit 2, right;

7          that's an overpayment record?

8     A.   That -- well, this is a cash receipt record.

9     Q.   Okay.

10    A.   This is the cash receipt copy that was received with

11         the physical check.

12    Q.   This first page of Exhibit 2?

13    A.   And the succeeding pages are what was included by the

14         provider in repaying -- in submitting the check to

15         Medicare.

16    Q.   I see.  And that would be sort of ordinarily how it

17         would go.  If there's an overpayment, you would get a

18         check, the check would reference the overpayment

19         notice?

20                   MR. WALKER:  Object to form.

21    A.   That is correct.

22    Q.   All right.  Are you aware of any instance in

23         which -- well, strike that.  Let me ask it this way.

24         Could Physicians Choice bypass Palmetto GBA to make a

25         repayment directly to CMS for amounts that Physicians

1          one way Palmetto GBA would accept repayment would be

2          in the form of credits against future payments?

3     A.   Can you describe credits against future payments?

4     Q.   Let's use -- let's try the phrase withholding of

5          future payments.  For example, if Palmetto GBA

6          determined that CMS -- or if CMS determined CMS

7          owed money by Physicians Choice and then Physicians

8          Choice made additional claims, could CMS withhold

9          payment to reimburse itself for the overpayment?

10    A.   Yes.  When an overpayment is established, if a

11         provider chooses not to remit a check for the

12         overpayment, administratively, a Medicare contractor

13         is authorized to offset and withhold from that

14         provider's Medicare reimbursement.

15    Q.   How would one go about determining whether that sort

16         of withholding occurred?

17    A.   We would review the overpayment activity as well as

18         the payment activity for a provider and those

19         offsets, those withholding amounts, would be

20         reflected in those financial transactions.

21    Q.   Again, I'm sorry, I'm going to sort of ask a strange

22         question.  In the event of a voluntary repayment,

23         there would not necessarily be -- you tell me if I'm

24         wrong, but there would not necessarily be an

25         overpayment record showing that that amount was

**25**

1    demanded by CMS or accepted by CMS as repayment on
2    the account; is that true?
3  A.   So if a provider voluntarily repays, they disclose
4    and remit payment for an overpayment that they are
5    disclosing up front, the -- in our financial system,
6    we would record a voluntary overpayment.  So there
7    would be a financial record of receiving a check and
8    a voluntarily disclosed overpayment, and the claims
9    system would also be updated to reflect that the
10   provider has voluntarily disclosed and repaid a claim
11   adjustment associated with the overpayment.
12 Q.   All right.  And so when you're looking through
13   overpayment records, would that kind of record show
14   up as part of that search?
15 A.   Yes, it would.
16 Q.   All right.  At this point, having looked at the cash
17   receipts and the overpayment records, is there
18   anything else that in your mind it would be a good
19   idea to review to determine whether a repayment was
20   made during the time period you referenced?
21 A.   Could you rephrase the question please?
22 Q.   Yeah.  The -- I guess what I'm driving at is sort of
23   the confidence level of the belief that no repayment
24   was made based on your investigation.  I'm not asking
25   you to be 100 percent certain, right; nobody is

**26**

1    100 percent certain of anything.  But, I am trying to
2    sort of gauge is there anything else out there that
3    maybe it would be a good idea to look into before we
4    said no payment was made during this time period; is
5    there anything like that?
6         MR. WALKER:  Object to the form.
7  A.   There would be nothing else that would provide any
8    kind of indication of any repayment.  We've
9    researched everything that would provide us with any
10   indication of repayment.
11 Q.   Okay.  So that -- and that's cash receipts and
12   overpayment records?
13 A.   Yes.
14 Q.   All right.  Okay, Mr. Strickland, I really appreciate
15   you taking the time to speak with me today.  I don't
16   have any further questions for you at this time?
17        MR. JOHNSON:  Nothing from me.
18        COURT REPORTER:  Read and sign or waive?
19        THE WITNESS:  Read.
20        (WHEREUPON the deposition was concluded
21         at 2:01 p.m.)
22
23
24
25

**27**

1  STATE OF NORTH CAROLINA   )
                             )    C E R T I F I C A T E
2  COUNTY OF CABARRUS        )
3
4         I, Shannon J. Colangelo, Notary Public, do hereby
5  certify that JOSEPH ALLEN STRICKLAND was duly sworn by me prior
6  to the taking of his deposition; that said deposition was taken
7  and transcribed by me; and that the foregoing pages are a true
8  and accurate transcript of the testimony of said witness.  I
9  further certify that the persons were present as stated.
10        I further certify I am not of counsel for or in the
11 employment of any of the parties to this action, nor am I
12 interested in the result of said action.
13        IN WITNESS WHEREOF, I have hereunto subscribed my name,
14 this 19th day of November, 2020.
15
16
17
18
19
20
21
22
23        SHANNON J. COLANGELO
          Notary #201735200055
24        My Commission Expires:  12/10/22
25

**28**

1                  VERIFICATION OF DEPONENT
2
3
4         I, JOSEPH ALLEN STRICKLAND, have read the foregoing
5  testimony, which was reported by Shannon J. Colangelo, Notary
6  Public in and for the State of North Carolina, on November 6,
7  2020.
8         I find the transcript of my testimony to be true and
9  accurate according to my testimony on that date, with the
10 exception of _____ corrections as listed on the attached
11 errata page, which was completed by me.
12
13
14        _____
15             JOSEPH ALLEN STRICKLAND
16
17
18 Sworn to and Subscribed before me
19 this _____ day of _____, 2020.
20
21
22 _____
         Notary Public
23
24 My Commission Expires _____
25

Case 3:17-cv-00037-KDB-DCK   Document 129-4   Filed 12/08/20   Page 282 of 283

1     E R R A T A   S H E E T

2  Page #  Line #  Change/Correction (& Explanation)

3  _____  _____ _____

4  _____  _____ _____

5  _____  _____ _____

6  _____  _____ _____

7  _____  _____ _____

8  _____  _____ _____

9  _____  _____ _____

10  _____  _____ _____

11  _____  _____ _____

12  _____  _____ _____

13  _____  _____ _____

14  _____  _____ _____

15  _____  _____ _____

16  _____  _____ _____

17  _____  _____ _____

18  _____  _____ _____

19  _____  _____ _____

20  _____  _____ _____

21

    The above changes were noted by me on this errata page

22 before signing the attached verification of deponent.  I have

  retained a copy of this errata page for my records, and the

23 court reporter is to attach this page and my verification to

  the original transcript.

24

  Dated: _____  _____

25         JOSEPH ALLEN STRICKLAND