IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL FILE NO. 3:17-CV-37
(CONSOLIDATED WITH CIVIL FILE NO. 3:17-CV-46)

_____
                                    )
UNITED STATE OF AMERICA ex rel.     )
TARYN HARTNETT, and DANA SHOCHED,   )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )   DEPOSITION OF MANOJ KUMAR
                                    )
PHYSICIANS CHOICE LABORATORY        )
SERVICES, DOUGLAS SMITH, PHILIP     )
MCHUGH AND MANOJ KUMAR,             )
                                    )
        Defendants.                 )
_____)

       On Friday, October 16, 2020, commencing at 8:42 a.m., the deposition of Manoj Kumar was taken on behalf of the Plaintiff at the US Attorney's Office, Carillon Building, 227 West Trade Street, Suite 1650, Charlotte, North Carolina, and was attended by Counsel as follows:

APPEARANCES:

       KATHERINE T. ARMSTRONG, ESQ.
       Assistant United States Attorney
       US Attorney's Office
       227 West Trade Street, Suite 1650
       Charlotte, North Carolina  28202
       on behalf of the Plaintiff

       BO CAUDILL, ESQ.
       MATTHEW M. VILLMER, ESQ.
       Weaver, Bennett & Bland, PA
       196 North Trade Street
       Matthews, North Carolina  28105
       on behalf of the Defendant Philip McHugh

(Appearances continue)

828-254-9230    ASHEVILLE REPORTING SERVICE    800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 131-2   Filed 12/22/20   Page 1 of 7

## Page 10

1. A   Yes, ma'am.
2. Q   What do you do?
3. A   A manage a group of clinics in Asheville.
4. Q   Asheville, North Carolina?
5. A   Yes, ma'am.
6. Q   What types of clinics do you manage?
7. A   They are pain clinics.
8. Q   When you say manage, just talk to us generally
9.     about your roles and responsibilities.
10. A  Administrative role.
11. Q  What does that mean?
12. A  Hiring people, making sure the clinics are
13.    running okay, all facilities are available for
14.    the clinicians. Typically that's the role.
15. Q  Do you have any other prior work experience
16.    managing medical practices?
17. A  Yes, ma'am.
18. Q  Tell me about that.
19. A  In Indiana it was called Pain Management
20.    Centers of Southern Indiana and then it was
21.    Texas Pain Institute in Dallas. In between
22.    that I've given guidance to a couple of
23.    physicians, not as a full-time employee but
24.    just as a consultant.
25. Q  Great. When were you working or providing

## Page 11

1.     services for the Pain Management Centers of
2.     Southern Indiana?
3. A   From 2005 to like 2009 -- 2010. Sorry, 2010.
4. Q   Sure, thank you. What type of practice was
5.     the Pain Management Centers of Southern
6.     Indiana?
7. A   It was a pain group, ma'am.
8. Q   Was that one office location or multiple?
9. A   It had multiple locations.
10. Q  Was there a physician who ran that practice?
11. A  The owner is the physician.
12. Q  Who was that?
13. A  His name was Dr. Kamal Tiwari.
14. Q  What was your title when you were working for
15.    Pain Management Centers of Southern Indiana?
16. A  It started as HR manager and then after it
17.    became manager in the last, I would say, one
18.    year.
19. Q  Were you a W2 employee for that practice?
20. A  Yes, ma'am.
21. Q  In your role as manager for Pain Management
22.    Centers of Southern Indiana, what types of
23.    duties did you perform?
24. A  All administrative duties.
25. Q  In the context of Pain Management Centers of

## Page 12

1.     Southern Indiana, give us some examples of
2.     administrative duties.
3. A   Oversee billing, talk to contractors, hiring
4.     people, making sure facilities are running,
5.     making schedules.
6. Q   Were you involved in any way, while you were a
7.     manager of Pain Management Centers of Indiana,
8.     in the laboratories referral of urine drug
9.     testing to outside labs?
10. A  No, ma'am.
11. Q  Why did you end up leaving the practice in
12.    2010?
13. A  It got closed down.
14. Q  Why did it get closed down?
15. A  Because the owner-physician was indicted for
16.    doing too many -- various reasons, one of
17.    which was doing too many procedures.
18. Q  Do you recall what happened in his criminal
19.    case?
20. A  He went to prison for a short period of time.
21.    I did not know how much.
22. Q  Did the practice cease operating at that point
23.    when Dr. Tiwari was indicted?
24. A  Yes, ma'am.
25. Q  When did you work for Texas Pain Institute in

## Page 13

1.     Dallas?
2. A   From 2015, March-April onwards, till 2018
3.     January, end.
4. Q   What type of services did you provide for that
5.     pain clinic?
6. A   Similar administrative services.
7. Q   What you've already described to us, billing,
8.     contractors, etcetera?
9. A   Yes, ma'am.
10. Q  Were you involved in any way with Texas Pain
11.    Institute's referral of urine drug testing to
12.    laboratories?
13. A  They had -- we had an internal lab. So there
14.    was nothing going out.
15. Q  But did Pain Management Centers of Southern
16.    Indiana have an in-house lab?
17. A  It did not have an in-house lab.
18. Q  Did Pain Management Centers of Southern
19.    Indiana send all of its patient samples out to
20.    other laboratories for urine drug testing?
21. A  Yes, ma'am.
22. Q  Do you recall what laboratories that Pain
23.    Management Centers of Southern Indiana
24.    physicians were referring to?
25. A  It was a laboratory based out of Indianapolis.

4 (Pages 10 to 13)

828-254-9230   ASHEVILLE REPORTING SERVICE   800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 131-2   Filed 12/22/20   Page 2 of 7

Page 26

1  A    Geographical area.
2  Q    What was your geographical area?
3  A    Indiana.  That's where I was at that time.
4  Q    Were you living in Indiana at that point?
5  A    Yes, ma'am.
6  Q    Did MK Land Holdings end up getting sales reps
7       working under it?
8  A    It did, one or two.  I do not recall how much
9       business they were able to drum up.
10 Q    Do you recall their names?
11 A    No, ma'am.
12 Q    Did you approach PCLS about working as a sales
13      representative or manager or did someone from
14      PCLS approach you?
15 A    I do not recall, ma'am.
16 Q    Who at PCLS was involved in negotiating this
17      independent contractor agreement with MK Land
18      Holdings?
19 A    I used to talk to only two people at PCLS and
20      I do not recall who talked about the contract
21      and how much, but the two people were Marcus
22      Sowinski and Phil McHugh.
23 Q    When did you first meet Marcus Sowinski?
24 A    In 2008 or 2009.  I'm not sure right now.
25 Q    Where did you meet him?

Page 27

1  A    Florida.
2  Q    What were those circumstances of that meeting?
3  A    While working for Pain Management Centers of
4       Southern Indiana, Marcus and Phil and the head
5       of the -- which I was given to understand at
6       that time a partner or doctor -- were setting
7       up a prescription dispensation in a
8       physician's office.  And I was invited out
9       there to see how it works and that's how --
10      that's the first time I met Marcus Sowinski.
11 Q    What do you mean by a prescription
12      dispensation system?
13 A    When you go to a doctor's office, they write a
14      prescription to you and then you go to a
15      pharmacy and get it filled.  So at that time
16      it was new that you have a pharmacy within the
17      clinic itself and you could dispense the
18      prescriptions right there and then.
19 Q    Who invited you to come see this prescription
20      dispensing system?
21 A    I'm hazy on how it happened and which one it
22      was, but I used to talk to only two people,
23      Marcus and Phil.
24 Q    So you don't recall who invited you to go see
25      the system?

Page 28

1  A    No, ma'am, it's very long back.
2  Q    Why did they invite you to come see this
3       system?
4  A    They were doing regular sales.  I guess that's
5       why they invited me, because they saw the -- I
6       presumed they realized that we had a large
7       practice and it can be successful.
8  Q    Did the Pain Managements Centers for Southern
9       Indiana ever end up doing a prescription
10      dispensing system in-house?
11 A    No, ma'am.
12 Q    Do you remember the name of the clinic where
13      you went to see the demonstration?
14 A    No, ma'am.
15 Q    When was the first time you spoke to Phil
16      McHugh?
17 A    I do not recall the date and -- maybe 2008 or
18      '09, somewhere around that time.  I don't
19      recall when.
20 Q    What were the circumstances of you meeting Mr.
21      McHugh?
22 A    I do not recall, ma'am.  The only thing I have
23      a hazy memory and what I can put together is
24      that at Pain Management Centers of Southern
25      Indiana at that time urine drug testing cups

Page 29

1       were being utilized as a source for immediate
2       qualitative results and that is something --
3       those cups were something Phil was selling.  I
4       do not know how we got -- how he came to know
5       about me or who introduced us.  So that is the
6       first time I met him and he assisted us in
7       procuring the cups for our clinic and doing --
8       guided the staff.  He came and visited once to
9       guide us in how it should be done.
10 Q    Just to confirm, when you say we, you're
11      talking about the Pain Management Centers ---
12 A    Yes, ma'am.
13 Q    Thank you, of Southern Indiana?
14 A    Yes, ma'am.
15 Q    Do you remember the year when Mr. McHugh came
16      and, as you described, showed your staff how
17      to use the cups at Pain Management Center?
18 A    No, ma'am.
19 Q    Do you know if Mr. McHugh was an owner of PCLS
20      at the time he came to the clinic with the
21      cups?
22 A    From what I know, PCLS did not exist at that
23      time.
24 Q    What's your understanding of when PCLS came
25      into existence?

8 (Pages 26 to 29)

828-254-9230    ASHEVILLE REPORTING SERVICE    800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 131-2   Filed 12/22/20   Page 3 of 7

## Page 34

1  A  Like I said, there were only two people I
2     talked to and I can not say who exactly it
3     was, but it was just the two of them I talked
4     to.
5  Q  If you will, turn to the second page of the
6     email. I'm looking at Paragraph -- Point 2,
7     Sales. The first sentence indicates that you
8     are not seeking new physicians and there are
9     those that you have already signed on. What
10    do you mean by that?
11 A  I do not recall what I meant at that time, but
12    after reading it, it appears that I had
13    already signed on one or two clients. Who
14    they were, I do not know. I don't remember.
15 Q  Who were you referring to when you state,
16    "Those that I personally know and could
17    possibly influence in some way"?
18 A  Possibly the doctors who called me to ask me
19    things and these I've elaborated later. For
20    example, the family practices in Arkansas who
21    is communicating with me on EMIRS. I think
22    that should be EMRs. There was another doctor
23    who had split from Pain Management Centers and
24    had started his practice in Columbus, Indiana.
25    He was talking to me. So there were a couple

## Page 35

1     of them who used to talk to me, but --
2     possibly that was what I meant. I do not
3     recall what I -- what was in my mind at that
4     time ten years back, ma'am.
5  Q  What did you mean by "could possibly influence
6     in some way"?
7  A  I think that's more of a sales talk because --
8     how you present and how well you present is --
9     you -- as a sales person, you portray the best
10    side about whatever you are trying to sell.
11    So that's just a figure of speech, ma'am.
12 Q  Possibly influenced to do what?
13 A  I can not say what I meant that time, ma'am.
14    I really can not.
15 Q  Were you referring to your role as a sales
16    representative in selling doctors on PCLS'
17    urine drug testing?
18 BY MR. CAUDILL:
19    Objection. He says he doesn't remember.
20 DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
21 Q  You can answer.
22 A  I really do not know what I meant at that
23    time, ma'am, because the decisions of are the
24    physician himself.
25 Q  What did you mean when you said, "Shah, who

## Page 36

1     will go the way I advise"?
2  A  I can't really say what I meant that time,
3     ma'am, because I was consulting with him. So
4     I was telling him pros and cons about
5     different things and -- but the decision is of
6     the physician. So I think it was just a
7     figure of speech.
8  Q  Were you advising Dr. Shah on urine drug
9     testing laboratories?
10 A  Not advising, presenting them to him because
11    he was aware of the others as well. He was
12    aware of (inaudible) and comprehensive pain
13    consultants we were sending. He had other
14    laboratories coming to talk to him about it
15    and I also presented it to him.
16 Q  What other laboratories did he have coming to
17    talk to him about urine drug testing?
18 A  Definitely the ones that was giving --
19    providing services in comprehensive -- not --
20    Pain Management Centers of Southern Indiana.
21    I'm not recalling the name of the Indiana,
22    Indianapolis-based -- the lab. Then
23    Millennium was there everywhere and is
24    everywhere, Quest. There are a bunch -- AGES
25    -- there are a bunch of labs. I mean, these

## Page 37

1     labs keep going to -- their reps whose job is
2     to go to doctors' offices and plan
3     (inaudible).
4  Q  What is MD Logic?
5  A  I think that is an EMR, but I'm not sure.
6  Q  When you were presenting urine drug testing
7     options to Dr. Shah, were you also at that
8     time working as a sales representative for
9     PCLS?
10 A  Possibly, yes. I'm not sure on the time when
11    I started providing services to Dr. Shah.
12 Q  Did you ever tell Dr. Shah that your company
13    MK Land Holdings had entered into an
14    independent contractor agreement with PCLS?
15 A  I do not recall distinctly whether it was, but
16    I've always been open about wherever I work to
17    let them know that I am working with somebody
18    else as well. So I must have -- must have
19    informed them that I'm working with PCLS also.
20 Q  I know you said you must have, but sitting
21    here today you don't recall?
22 A  I do not, ma'am.
23 BY MR. CAUDILL:
24    Objection to the form. You can answer.
25 BY THE DEPONENT:

10 (Pages 34 to 37)

828-254-9230    ASHEVILLE REPORTING SERVICE    800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 131-2   Filed 12/22/20   Page 4 of 7

## Page 66

1  Dr. Shah.
2  Q  So when you stated earlier that the reason Dr.
3     Shah and Avicenna were not listed on Schedule
4     C could be that the practice had stopped
5     operating, that was speculation, correct?
6  A  Yes, ma'am, I said it could be.
7  Q  Going back to Page 2 of the employment
8     agreement which is Exhibit 4, there's a
9     Subparagraph C -- little C. Just take a
10    moment and read that for me to yourself. I
11    didn't mean for you to read it out loud. I'm
12    going to ask you some questions about it.
13 BY MS. OWEN:
14    Which exhibit?
15 BY MS. ARMSTRONG:
16    Four.
17 DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
18 Q  Are you through?
19 A  Yes, ma'am.
20 Q  So Subparagraph C states, "For the period of
21    March 1, 2013, through May 31, 2013, it is
22    expected that Employee bring to a conclusion
23    any and all activities with such clients while
24    working in the capacity as owner of MHS," and
25    it's referring to the clients on Schedule C.

## Page 67

1     By May 31, 2013, did MHS stop working with Dr.
2     Masimore's practice?
3  A  Once I moved to Charlotte, the only work I was
4     effectively doing for them was payroll.
5  Q  I appreciate that. I'm not talking about your
6     work for Dr. Masimore. But Schedules C lists,
7     it appears, several accounts of MHS and this
8     contract states that by May 31st of 2013 MHS
9     cease its activities related to Dr. Masimore's
10    practice, correct?
11 A  Yes, ma'am.
12 Q  Did that happen?
13 A  No, ma'am.
14 Q  Why not?
15 A  It was my understanding that these -- these
16    clients will continue with MHS. That's why
17    PCLS continued paying for them all the while.
18 Q  Did anyone at PCLS discuss this paragraph with
19    you?
20 A  No, ma'am.
21 Q  Did you read it prior to signing the
22    employment agreement?
23 A  No, ma'am.
24 Q  Did you read through the agreement generally
25    before signing it?

## Page 68

1  A  No, ma'am.
2  Q  Why not?
3  A  I did not go word-by-word.
4  Q  Do you know who drafted this agreement?
5  A  I do not know who at PCLS drafted it.
6  Q  If you flip to Page 10, who signed this
7     employment agreement on behalf of PCLS?
8  A  Phil McHugh.
9  Q  Keep flipping forward to -- it is Page 1 of
10    Schedule E kind of near the back.
11 A  Yes, ma'am.
12 Q  I'm paraphrasing here, but there's a paragraph
13    that indicates PCLS has adopted written
14    policies -- certain compliance policies for
15    its personnel. Were you ever provided with
16    any copies of written policies from PCLS?
17 A  I don't recall.
18 Q  There's also a sales and marketing standard of
19    conduct referenced in Schedule E. Can you
20    tell us what that is?
21 A  It is part of the code of ethics, Schedule E.
22 Q  Do you recall PCLS' sales and marketing
23    standard of conduct?
24 A  Yes, ma'am.
25 Q  Was a copy of the sales and marketing standard

## Page 69

1     of conduct ever provided to you?
2  BY MR. CAUDILL:
3     Objection to the form.
4  BY THE DEPONENT:
5     I do not recall, ma'am.
6  DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
7  Q  Did you read through this Schedule E before
8     you signed the contract?
9  A  I don't think so, ma'am.
10 Q  Again, why did you not read through Schedule
11    E?
12 BY MR. CAUDILL:
13    Objection to the form. You can answer.
14 BY THE DEPONENT:
15    I have no answer to that, ma'am.
16 DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
17 Q  It does look like on the last page, Page 5,
18    that your signature appears here, is that
19    correct?
20 A  Yes, ma'am.
21 Q  Did your employment with PCLS ever come to an
22    end?
23 A  In 2015.
24 Q  Do you recall the date and the month in 2015?
25 A  No, ma'am.

18 (Pages 66 to 69)

828-254-9230    ASHEVILLE REPORTING SERVICE    800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 131-2   Filed 12/22/20   Page 5 of 7

## Page 102

1 Dr. Johnson's meeting in Pennsylvania?
2 A Dr. Johnson wanted to know about how to set up
3 a laboratory in his office to do presumptive
4 testing. And since I had knowledge about
5 that, I was asked to go and advise him.
6 Q What is presumptive testing?
7 A Analyzer. Presumptive testing could be a
8 urine cup or an analyzer, ma'am.
9 Q Just to simplify it even more, what is
10 presumptive testing? What are you testing
11 when you refer to presumptive testing?
12 A Presumptive testing for urine toxicology.
13 Q Is presumptive testing qualitative or
14 quantitative?
15 A Qualitative.
16 Q Qualitative testing means you're looking for
17 what?
18 A Positives and negatives.
19 Q The presence of a substance?
20 A Or an absence of a substance.
21 Q Did ---
22 A Sorry. The qualification there is that it has
23 a lot of false-positives and false-negatives.
24 Q Presumptive testing does?
25 A Yes, ma'am, and it does not talk about

## Page 103

1 metabolites.
2 Q Dr. Johnson was interested in learning more
3 about a lab to do presumptive testing. Did he
4 reach out to the company, to PCLS, about this?
5 A I was not working with PCLS that time. The --
6 the rep for Dr. Johnson was Elan Colen from
7 Florida and the lead came through him and
8 that's how I got roped in to talk to his
9 client about an analyzer.
10 Q When you say you weren't working at PCLS, you
11 mean you weren't working as a W2 employee at
12 that time?
13 A Yes, ma'am.
14 Q But you were working as a channel partner?
15 A I'm not certain about the time, but it appears
16 so.
17 Q Do you recall anything specific about what Mr.
18 Colen told you about Dr. Johnson's needs?
19 A No, I do not recall specifically what he told
20 me.
21 Q You mentioned analyzers. Tell us more about
22 analyzers. What is an analyzer?
23 A An analyzer is a lab equipment to do amino
24 acid testing.
25 Q Is it something that a doctor could set up and

## Page 104

1 use in his or her practice?
2 A That is something a doctor could set up to use
3 in a -- in his or her practice to reduce the
4 cost or to reduce the number of confirmations
5 that they have to send for.
6 Q What do you mean by confirmations?
7 A Quantitative testing as you had specified.
8 Q What is involved in setting up an analyzer lab
9 in a physician's clinic?
10 A Three aspects are required. The first is a
11 license, the second is a director, and the
12 third is an analyzer.
13 Q Prior to meeting with Dr. Johnson, have you
14 had experience setting up analyzer labs in
15 physician practices?
16 A Yes, ma'am.
17 Q Tell me about that.
18 A For six months I was working with a company
19 called Clinical Lab Services whose job was to
20 set up laboratories in doctors offices -- set
21 up laboratories. They may or may not be in
22 doctors' offices.
23 Q Other than a doctor's office, where would you
24 find an analyzer lab?
25 A In the regular lab also there will be

## Page 105

1 analyzers.
2 Q When were you working for Clinical Lab
3 Solutions -- Solutions did you say?
4 A Clinical Lab -- I do not remember the exact
5 name of the company. It was based out of
6 California. This was four or five months in
7 2010 August to 2011, beginning, something like
8 that, ma'am.
9 Q Did you have any ownership interest in that
10 company?
11 A No, ma'am.
12 Q What specifically was your role with Clinical
13 Laboratory Services?
14 A To coordinate the setting up of a laboratory.
15 Q Prior to joining that company, Clinical Lab
16 Services, did you have any experience in
17 setting up analyzer labs?
18 A No, ma'am.
19 Q How did you get trained to do that?
20 A On-job training.
21 Q During your time with Clinical Laboratory
22 Services, about how many analyzer labs did you
23 work on setting up? Not to completion, just
24 how many analyzer lab projects were you
25 working on?

27 (Pages 102 to 105)

828-254-9230    ASHEVILLE REPORTING SERVICE    800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK   Document 131-2   Filed 12/22/20   Page 6 of 7

## Page 122

1 Services to set up the lab for him. He wanted
2 to buy the -- they would provide the director.
3 They would set up the lab, that is policies
4 and procedures, it was certification.
5 Q What do you recall your involvement being with
6 Dr. Johnson after he signed up with CLC?
7 A After he signed up with CLC?
8 Q I think you just said he would sign up with
9 CLC or the vendor.
10 A At that stage, I did not know what -- what
11 involvement will I have. So my only intention
12 was to go and meet with him and explain to him
13 all that was required and present him these
14 contracts from other companies.
15 Q Were you providing him with options from
16 various companies or just CLC?
17 A I knew of only CLC that time.
18 Q At this time you were not longer working for
19 CLC?
20 A I was not working for CLC that time.
21 Q Why did Mr. McHugh come to this meeting with
22 you?
23 BY MR. CAUDILL:
24 Objection to form. You can answer.
25 BY THE DEPONENT:

## Page 123

1 I do not know why he came. Possibly because
2 the rep who had referred this account was a
3 part of the channel partners and Phil at that
4 time was in charge of marketing or everything.
5 I do not now. And maybe that is how they had
6 come to him and that's why he wanted to
7 participate in that meeting.
8 DIRECT EXAMINATION RESUMED BY MS. ARMSTRONG:
9 Q Again, that was all just conjecture, is that
10 correct?
11 A Yes, absolutely.
12 Q Did you invite Mr. McHugh to this meeting with
13 Dr. Johnson?
14 A I think it possibly is the other way around.
15 I do not know Dr. Johnson. Dr. Johnson has
16 been sent to me from PCLS.
17 Q Did you and Mr. McHugh have any conversations
18 about Dr. Johnson before you met with him in
19 2012?
20 A I don't remember, ma'am.
21 Q Does the name Steve Glenn sound familiar to
22 you?
23 A Say it again, ma'am.
24 Q Steve Glenn, is that familiar?
25 A I've forgotten the name.

## Page 124

1 Q Is it possible that he is one of Dr. Johnson's
2 administrative employees or staff?
3 A Could be.
4 Q Do you recall if you ever met or communicated
5 with Mr. Glenn about the analyzer?
6 A I communicated a couple of times because he
7 was the one who was responsible to get the
8 paperwork and money, etcetera, everything. So
9 he was my main person to contact.
10 Q When you met with Dr. Johnson, what was his
11 response to the information you provided about
12 setting up an in-house analyzer lab?
13 A He was very interested in setting it up.
14 Q Did he have questions about it?
15 A I don't recall, but he must have had questions
16 at that time, ma'am.
17 Q What happened after your initial meeting with
18 Dr. Johnson in terms of the analyzer lab set-
19 up?
20 A I don't distinctly recall, but I do know that
21 he signed up with the lab setting up company
22 who started his paperwork for the licensure.
23 He set up an agreement with me to pay me over
24 four installments for -- three or four
25 installments and I was supposed to get paid

## Page 125

1 three or four thousand dollars to help him get
2 this all together. We signed an agreement and
3 he -- I think he sent a first payment. After
4 that his payment did not come. So it's --
5 well, it was put in a stall.
6 Q During your first meeting with Dr. Johnson,
7 was there any discussion about him sending
8 samples to PCLS for confirmatory testing?
9 A No, ma'am.
10 Q That didn't come up at all during your initial
11 conversation?
12 A No, ma'am.
13 Q At the time you met with Dr. Johnson, was he a
14 customer of PCLS?
15 A I do not know, ma'am.
16 Q Was Elan Colen a sales rep for any other urine
17 diagnostic testing laboratories that you're
18 aware of?
19 A Please say it again.
20 Q Yes, I want to make sure I understand the
21 players. Elan Colen was a rep for PCLS, is
22 that correct?
23 A He was the rep of another channel partner.
24 Q Was he also a sales rep for any other urine
25 drug testing labs?

32 (Pages 122 to 125)

828-254-9230  ASHEVILLE REPORTING SERVICE  800-357-5007
ars@ashevillereporting.com
Case 3:17-cv-00037-KDB-DCK  Document 131-2  Filed 12/22/20  Page 7 of 7